AO 106 (Rev. 01/09) Application for a Search Warrant

**E-FILED**
Monday, 11 April, 2011 01:15:15 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

FILED

AUG 16 2010

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| 1042 US Highway 67, Roseville, Illinois, and all appurtenances thereto and improvements thereon | ) ) ) |

Case No. 10-mc-4032

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____Central_____ District of _____Illinois_____ *(identify the person or describe property to be searched and give its location):* at 1042 US Highway 67, Roseville, Illinois, and all appurtenances thereto and improvements thereon, more particularly described in Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):* See attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ___18___ U.S.C. § _2252 & 2252A_ , and the application is based on these facts: See attached Affidavit

- ☐ Continued on the attached sheet.
- ☑ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Dwayne E. Haferkamp, Special Agent, ICE
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___08/16/2010___

_____
*Judge's signature*

City and state: Rock Island, Illinois

Thomas J. Shields, Chief U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Dwayne E. Haferkamp, being duly sworn, depose and state:

I am a Special Agent (SA) with the U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE), assigned to the Resident Agent in Charge in Springfield, Illinois. I have been employed as a Special Agent since August of 2009. As part of my duties as an ICE agent, I investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2252(a) and 2252A. I have received training in the area of child pornography and child exploitation at the Federal Law Enforcement Training Center in Glynco, Georgia and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256)[1] in various forms of media including that of computer media.

2. This Affidavit is made in support of an application for a warrant to search the premises located at 1042 US Highway 67, Roseville, Illinois 61473 (hereinafter known as the "SUBJECT PREMISES") described below in this affidavit and in Attachment A. The SUBJECT PREMISES to be searched is more particularly described as: a two story farm house with light green siding and brown shingles on the roof. The residence has a natural-wood colored split-rail fence located on the West side of the house partially

---

1 "Child Pornography means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where – (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; . . . [or] (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct." For conduct occurring after April 30, 2003, the definition also includes "(B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from that of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8).

covering the patio area. There are also two concrete porches with coverings, one located to the South and the other to the East of the house. The house number, "1042," is displayed in yellow on the mailbox that is located across 105 Avenue to the South of the house. Immediately adjacent to the house are two structures. The first is more particularly described as a shed like structure located to the North West of the house. The shed has yellow colored siding and a light in color metallic roof. The second structure is a large modern barn with all white siding. The large barn has two entry/exit points; a two car garage sized door on the West side, and a larger entry/exit point to the North side of the structure. These two out buildings are close enough in proximity to the house that if wired to as such may be used to store a computer that is either directly or indirectly connected to the Internet Service Provider (ISP) located at the premises.

3. The purpose of this application is to seize evidence, as specified in Attachment B of this affidavit, of violations of 18 U.S.C. Section 2252A(a)(2), Receipt or Distribution of Child Pornography, and 18 U.S.C. Section 2252A(a)(5)(B), Possession of Child Pornography.

4. The facts set forth in this affidavit are based upon my personal observations and training, and where noted, information related to me by other law enforcement officials and witnesses. Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of 18 U.S.C. §§ 2252 and 2252A are located at the SUBJECT PREMISES within a computer, related peripherals and computer media found at the SUBJECT PREMISES. Where statements

2

of others are set forth in this Affidavit, they are set forth in substance and in part.

5. As a result of the instant investigation described more fully below, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of federal law, including 18 U.S.C. §§ 2252 and 2252A, are present at the SUBJECT PREMISES.

### Brief Summary

6. As set forth in greater detail below, this investigation was initiated by ICE after an individual utilizing the screen name/user name "DAVID SMITH" on facebook.com sent a link via fecebook.com to the stepmother of a thirteen year old female that contained pornographic images of the 13 year old female.

7. As set forth below, the screen name/user name "DAVID SMITH" was used to access facebook.com. "DAVID SMITH" sent a link to the 13 year old female's stepmother. The link was to pornographic images located on yfrog.com (aka Imageshack) of her thirteen year old stepdaughter. The images located at yfrog.com were verified by the London Police Service in Ontario, Canada, to be the images of the thirteen year old victim. The images were subsequently removed from viewing on the site. The images of child pornography were uploaded to yfrog.com on 01/08/2010 at 02:22:18 GMT from IP address 74.36.163.43, subsequently identified to be assigned to **RON SEIVER** at the SUBJECT PREMISES. On 01/08/2010 someone at the SUBJECT PREMISES possessed images of child pornography on a computer that is located at the SUBJECT PREMISES and posted those images of child pornography to yfrog.com through the internet. I believe someone living at the SUBJECT PREMISES used at least one computer

3

(hereinafter described as the "SUSPECT COMPUTER") from the SUBJECT PREMISES
(the location where the IP address resolves back to) to post child pornography on the
yfrog.com website over the internet.

### Terminology and Definitions

8. In this affidavit, "child pornography," "visual depiction," "minor," and
"sexually explicit conduct" are defined as set forth in Title 18, United States Code,
Section 2256.

A. *Computers and Child Pornography* - Based on my knowledge, training
and experience, and the experience and training of other law enforcement officers
with whom I have had discussions, I know computers and computer technology
have revolutionized the way in which individuals interested in child pornography
interact with each other. Child pornography formerly was produced using cameras
and film (either still photography or movies). The photographs required darkroom
facilities and a significant amount of skill in order to develop and reproduce the
images. There were definable costs involved with the production of pornographic
images. To distribute these images on any scale required significant resources.
The photographs themselves were somewhat bulky and required secure storage to
prevent their exposure to the public. The distribution of these wares was
accomplished through a combination of personal contacts, mailings, and
telephone calls.

B. The development of computers has changed this; computers serve four
basic functions in connection with child pornography: production,
communication, distribution, and storage.

4

C. Child pornographers can now transfer photographs from a camera onto a computer readable format with a device known as a scanner. With the advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

D. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store hundreds of thousands of images at very high resolution.

E. *Internet* - The Internet is a collection of computers and computer networks which are connected to one another via high-speed data links and telephone lines for the purpose of communicating and sharing data and information. Connections between Internet computers exist across state and international borders; therefore, information sent between two computers connected to the Internet frequently crosses state and international borders even when the two computers are located in the same state.

F. *Internet Service Providers* - Any individuals and businesses obtain access to the Internet through businesses known as Internet Service Providers ("ISPs"). ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving

5

electronic messages through the ISPs' servers; remotely store electronic files on their customers' behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them. Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

G. *IP Addresses* - An Internet Protocol address ("IP address") is a unique numeric address used by each computer on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be properly directed from its source to its destination. Most ISPs control a range of IP addresses.

H. When a customer logs into the Internet using the service of an ISP, the computer used by the customer is assigned an IP address by the ISP. The customer's computer retains that IP address for the duration of that session (i.e., until the user disconnects), and the IP address cannot be assigned to another user during that period.

I. The term "Online Chat Room" is defined as the real time visual interface which displays messages and responses of participants who are using online chat. Chat rooms are usually devoted to specific topics such as US politics; however, there are a number of general chat rooms which are devoted to

6

any issue the participants wish to bring up.  Participants usually communicate by typing their contributions into a simple text box line by line.  The primary use of a chat room is to share information via text with a group of other users.  New technology has enabled the use of file sharing and webcams to be included in some programs and almost all Internet chat rooms or messaging services allow users to display and/or send pictures.

J. The term "Open Source" is defined as software that includes a free license; in other words, it is freely available to everyone using the Internet.

K. The term "Web site" consists of textual pages of information and associated graphic images.  The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from the web servers to various web clients via Hyper-Text Transport Protocol.

L. The term "Computer system and related peripherals, and computer media" as used in this affidavit refers to tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drives and other computer-related operation equipment, digital cameras, scanners, in addition to computer photographs, Graphic Interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats, including, but not limited to, JPG, GIF, TIF, AVI, and MPEG.

7

**Probable Cause**

9. On January 7, 2010 at 9:30 P.M. a subject utilizing facebook.com screen name/user name "DAVID SMITH" sent a message to D.W.. The message contained a link to a yfrog.com page that contained child pornography. The link was accompanied with the following message: "is J.H. ur daughter? U need 2 tell dat slut 2 stop getting naked on cam on blogtv n on msn 4 ppl. she also say she had sex over 100 times since she was 9 yrs old." D.W. replied 50 minutes later stating "I don't know what you are talking about... but I'm going to report you & block!!!!!!!"

10. The incident referenced in paragraph 9 above was reported to the London Police Services (LPS) on January 8, 2010 at 1440 hours by M.H. (DOB 12/16/1959). M.H. is the father of J.H. (DOB 08/14/1996), who is the thirteen year old girl pictured in the yfrog.com link. J.H. resides in London, Ontario, Canada, with her father, M.H., and her step-mother, D.W.. Police Constable (PC) Jennifer Smith was assigned to conduct interviews related to this incident. During her interview of D.W., D.W. told PC Smith that she had received a message from a "DAVID SMITH" on facebook with a link to pictures of her step daughter J.H.. D.W. stated that there were "about 20 or so pictures" of J.H. posing in different positions. "Some with her top down, some with no pants on, leaning back in the chair, leaning forward where it's close up. It's J.H.'s face, I'm not sure about her body parts, and I'm not sure where it's taken." D.W. then gave her facebook.com and yahoo.com account information to PC Smith, and provided PC Smith with permission to access the accounts.

11. PC Smith next interviewed J.H.. J.H. was asked if she knew where the pictures on yfrog.com had come from and she stated "No, I'm confused about that." J.H.

stated that she saw the pictures PC Smith was relating to and confirmed that the face in the pictures was hers, but then stated that she had not looked at the body of the person in the photographs. J.H. then denied having a blogtv account. When PC Smith informed J.H. that she knew J.H. had a blogtv account because she had already seen it, J.H. recanted and stated that she used to have an account: "Iloveyoubaby1996." J.H. stated that she was last on her blogtv account about a week and a half prior to the interview. J.H. was asked to give her account information to PC Smith, but J.H. told PC Smith that she did not remember the password to the account. J.H. also stated that she did not know a "DAVID SMITH." J.H. then stated that she had taken photos of herself on a webcam before but not naked photographs. J.H. was not aware of how these pictures may have gotten on the internet. J.H. stated that she has never used her webcam to take private pictures of herself for anyone else's benefit. J.H. then went on to give PC Smith her facebook name and password, as well as her e-mail address. PC Smith then advised J.H. that the cyber crimes unit would use this and other information to find out where the pictures had originated and how they got there. In response, J.H. stated "The only time I have ever taken one was the first time I went on blogtv and it was just my boobs because I didn't know that people were watching. There aren't any other pictures. I never did that again." J.H. told PC Smith that she did not know who she was talking to when she took this picture on blogtv.

12. Shortly after the interview with J.H. was conducted, PC Smith viewed the pictures at the yfrog link with D.W.. PC Smith and D.W. confirmed that the pictures were of J.H. in a pink spaghetti strap top, or less, showing her breasts and genital areas. PC Smith observed that one picture showed J.H. fondling her vagina.

13. Detective Constable (DC) Jeremy Dann, a member of the cyber crimes unit for the London Police service, accessed the yfrog.com website that contained the photographs of J.H. and noted that the photographs appeared to be stills from an avi file that was 10 minutes and 13 seconds in duration. The avi file had been named "cassyslut.avi." DC Dann conducted a query of the yfrog account and found it to be a sub site of Imageshack, a popular internet site that provides file and image sharing services. DC Dann stated that he had activated a blogtv account in order to access J.H.'s "Iloveyoubaby1996" account. Despite J.H.'s earlier statement to PC Smith that she no longer had the password to her blogtv account, DC Dann was able to determine that the account had last been accessed on 01/09/2010. DC Dann noted that J.H. has a youtube channel titled "TheSexybabe96." DC Dann stated that the youtube profile has J.H.'s correct name, age, and address. The youtube videos show J.H. in the same distinct green chair as she had been sitting in when the nude photographs located on the yfrog.com website were made. DC Dann believes that J.H. willingly uploaded a short avi to blogtv or some other file sharing service, and that someone posted photographs made from this avi file to the yfrog.com website.

14. D.W. was notified of DC Dann's findings. D.W. told investigators that she was aware of the youtube account and admitted that J.H. had unsupervised access to the internet on a laptop in J.H.'s room. D.W. advised that she would be removing J.H.'s unsupervised access to the internet.

15. DC Dann sent an email to Imageshack support in an attempt to obtain the IP address of the party that uploaded the photographs to yfrog and with a request that the images be removed from viewing on yfrog. On 01/11/2010, Imageshack support replied

10

with the IP address, 74.36.163.43, as well as provided the date and time the upload took

place, 01/08/2010 at 02:22:18 GMT.  Imageshack also informed DC Dann that they had

removed the yfrog.com photographs from view.  DC Dann conducted a "WHOIS" search

of IP address 74.36.163.43 using domain tools and found that this IP address was owned

by the ISP Frontier Communications located at 180 South Clinton Avenue, Rochester,

NY 14646.  DC Dann reviewed the photos made from the avi file and concluded that

J.H. exposed her breasts, as well as removed her underwear and possibly masturbated

directly in front of the camera.  DC Dann forwarded this information on to the Rochester

Police Department in New York.

16. On 01/13/2010, DC Dann contacted D.W. with the updates on the case.  D.W.

advised that J.H. admitted her entire involvement with the blogtv blogcast and believes

that J.H. will be cooperative with upcoming interviews.

17. On 01/22/2010, DC Alanna Hollywood interviewed J.H.. During the interview

J.H. admitted that a few days before police involvement in this case, she had gone on her

webcam while on MSN Messenger, an instant messenger device, and had displayed her

breasts and vagina.  J.H. stated that this was the first time she had exposed herself on

webcam, and the video probably lasted approximately a half hour.

18. Following this investigation, the London Police Services advised the Royal

Canadian Mounted Police (RCMP) National Child Exploitation Coordination Centre

(NCECC) that images of a 13 year old female resident of London, Ontario, Canada, had

been uploaded onto the yfrog.com website via an internet service provider located in

Rochester, New York.  The RCMP provided the ICE Attache in Ottawa, Canada, with an

investigative referral. In turn, the matter was referred to the ICE SAC in Buffalo, New York.

19. The ICE SAC in Buffalo, New York, subpoenaed Frontier Communications and was subsequently advised that the IP address used to upload the subject photographs was in service at the SUBJECT PREMISES.

20. The Attaché Ottawa sent a collateral to the RAC Springfield office and the case subsequently was assigned to SA Haferkamp. SA Haferkamp subpoenaed Frontier Communications requesting production of the name of the subscriber at IP address 74.36.163.43. On 4/28/2010 information was received from Frontier Communications revealing that, at the time the images were uploaded to yfrog.com from the SUBJECT PREMISES, the IP address was assigned to RON SEIVER.

A. Detailed below are the images of child pornography posted on yfrog.com by someone at the SUBJECT PREMISES, utilizing the SUSPECT COMPUTER / TARGET IP ADDRESS on 01/08/2010 at 02:22:18 (GMT), all of which I have reviewed:

i. Image one is taken from an avi file at the 36th second and is described as follows: J.H. is sitting in a green striped chair leaning forward facing the camera. J.H. is wearing a pink spaghetti strap top with a low v neck.

ii. Image two is taken from an avi file at the 72nd second and is described as follows: J.H. is again sitting in a green striped chair leaning forward facing the camera. J.H. is wearing a pink spaghetti strap top with a low v neck.

iii. Image three is taken from an avi file at the 108th second and is described as follows: J.H. is again sitting in a green striped chair leaning back in the chair facing the camera with her hands up near her breast pulling her shirt down with her bra on. J.H. appears to be wearing low cut pants or none at all.

iv. Image four is taken from an avi file at the 144th second and is described as follows: J.H. is again facing the camera wearing the same pink shirt, however, this time the shirt is pulled down exposing her stomach and her bra. The image shows the lewd display of the breasts involving a child less than 18 years of age.

v. Image five is taken from an avi file at the 180th second and is described as follows: J.H. is sitting in a green striped chair facing the camera. J.H. has the pink spaghetti strap shirt pulled down with bra pulled up exposing her breast. The image shows the lewd display of the breasts involving a child less than 18 years of age.

vi. Image six is taken from an avi file at the 206th second and is described as follows: J.H. is sitting in a green striped chair with her head turned to the left with her hair covering her face. J.H. is wearing a pink spaghetti strap shirt and blue jean type bottoms, and is leaning to the right of the chair.

vii. Image seven is taken from an avi file at the 252nd second and is described as follows: J.H. is again sitting in a green striped chair leaning

forward facing the camera. J.H. is wearing a pink spaghetti strap top with a low v neck.

      viii. Image eight is taken from an avi file at the 288th second and is described as follows: J.H. is standing in front of the green striped chair. J.H. is wearing the pink spaghetti strap shirt and is beginning to disrobe her blue jean bottoms partially exposing her vaginal area. The image shows the lewd display of the genital area of a child less than 18 years of age.

      ix. Image nine is taken from an avi file at the 324th second and is described as follows: J.H. is standing in front of the green striped chair leaning forward with her face directly in front of the camera. J.H.'s legs are exposed, and she appears to be shirtless with just her bra on.

      x. Image ten is taken from an avi file at the 360th second and is described as follows: J.H. is standing in front of the green striped chair leaning forward with her left hand resting on her chin looking to the left side of the camera. It appears that J.H. is not wearing a shirt.

      xi. Image eleven is taken from an avi file at the 396th second and is described as follows: J.H. is standing in front of the green striped chair leaning forward with her left hand resting on her chin looking straight into the camera. It appears that J.H. is not wearing a shirt or pants.

      xii. Image twelve is taken from an avi file at the 432nd second and is described as follows: J.H. is sitting in the green striped chair leaning back with her bottoms pulled off. J.H. has her legs open with her right

14

hand placed over her vaginal area with her fingers touching her vagina. The image shows the lewd display of the breasts and genital area of a child less than 18 years of age.

xiii. Image thirteen is taken from an avi file at the 468th second and is described as follows: J.H. is again sitting in the striped green chair wearing a pink spaghetti strap shirt. J.H. is not wearing any bottoms and is leaning forward as if she is using a computer mouse to control the computer.

xiv. Image fourteen is taken from an avi file at the 505th second and is described as follows: J.H. is sitting in the green striped chair leaning back with a pink spaghetti strap shirt on with her bottoms pulled off. J.H. has her legs open with her right hand placed over her vaginal area with her fingers touching or near her vagina. J.H.'s left hand is touching her chin and mouth. The image shows the lewd display of the genital area of a child less than 18 years of age.

xv. Image fifteen is taken from an avi file at the 541st second and is described as follows: J.H. is again sitting in a green striped chair leaning forward facing the camera. J.H. is wearing a pink spaghetti strap top with a low v neck.

xvi. Image sixteen is taken from an avi file at the 577th second and is described as follows: J.H. is again sitting in a green striped chair leaning forward facing the camera. J.H. is wearing a pink spaghetti strap top with a low v neck.

*Identification of the Subject Premises*

21. On or about 04/28/2010, in response to a subpoena issued by SA Haferkamp, Frontier Communications provided the subscriber information for IP Address 74.36.163.43 (the TARGET IP ADDRESS). Frontier Communications reported that the TARGET IP ADDRESS was registered to RON SEIVER, and that the service of this IP Address was physically being provided to 1042 US HWY 67, Roseville, Illinois 61473 (the SUBJECT PREMISES) at the times the same IP Address was used to make the posts set forth in paragraph 20A above.

22. On 04/28/2010 SA Haferkamp conducted a check in CLEAR for the SUBJECT PREMISES. CLEAR consolidates public records including addresses, driver's licenses, property deed transfers and corporate information. According to the CLEAR check, associated with the address are RON SEIVER, Brian Addis, and April Addis. In a query through a postal inspector it was also found that two other individuals may be residing at the SUBJECT PREMISES. The individuals are Jeanne G. Alexander and Douglas E. Alexander. Douglas E. Alexander is also named by Frontier communications as a subscriber at the SUBJECT PREMISES.

23. On 04/30/2010, ICE SA Haferkamp observed a vehicle with Illinois license plate 735 1738 in the parking area to the west side of the SUBJECT PREMISES. According to DMV records, the car is registered to the SUBJECT PREMISES by Jeanne G. Alexander and Douglas E. Alexander.

24. On 07/13/2010 SA Haferkamp made contact with Postal Inspector Larry Maxwell. Maxwell provided information confirming that RON SEIVER, April Addis, Brian Addis, Douglas Alexander, and Jeanne Alexander all are receiving mail delivered

at the SUBJECT PREMISES. Brian Addis is forwarding his mail to a PO Box from the SUBJECT PREMISES. Inspector Maxwell also indicated that the SUBJECT PREMISES is a single dwelling two story farm house.

25. On 07/14/2010 criminal history checks were run on all individuals mentioned in paragraph 22 above, with negative results.

26. On 07/16/2010 a subpoena was sent to Imageshack requesting information on who posted the images to yfrog for further verification. On 07/27/2010 Imageshack returned information regarding the upload of images to their yfrog site. Imageshack stated that the IP address 74.36.163.43 uploaded the images anonymously, meaning that the person who uploaded the file did not register prior to the upload. It is clear, however, that the images, though uploaded anonymously, were uploaded by someone at the SUBJECT PREMISES.

27. Based upon my own knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

A. Child pornography collectors may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

B. Collectors of child pornography may collect sexually explicit or suggestive materials, in a variety of media, including electronic media,

17

photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Child pornography collectors oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

C. Collectors of child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Child pornography collectors typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

D. Likewise, collectors of child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly.

E. Child pornography collectors also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names,

addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

F. Collectors of child pornography prefer to have continuous access to their collection of child pornography.

### Computer Data

28. Based on my own experience and consultation with other agents who have been involved in the search of computers and retrieval of data from computer systems and related peripherals, and computer media, there are several reasons why a complete search and seizure of information from computers often requires seizure of all electronic storage devices, as well as all related peripherals, to permit a thorough search later by qualified computer experts in a laboratory or other controlled environment:

A. Computer storage devices, such as hard disks, diskettes, tapes, laser disks, and Bernoulli drives, can store the equivalent of hundreds of thousands of pages of information. Additionally, when an individual seeks to conceal information that may constitute criminal evidence, that individual may store the information in random order with deceptive file names. As a result, it may be necessary for law enforcement authorities performing a search to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This review and sorting process can take weeks or months, depending on the volume of data stored, and would be impossible to attempt during a search on site; and

B. Searching computer systems for criminal evidence is a highly technical process, requiring expert skill and a properly controlled environment. The vast

array of computer hardware and software available requires even those who are computer experts to specialize in some systems and applications. It is difficult to know before a search what type of hardware and software are present and therefore which experts will be required to analyze the subject system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis.

29. Based on my own experience and my consultation with other agents who have been involved in computer searches, searching computerized information for evidence or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

A. The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve

the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

B. In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). In cases like the instant one where the evidence consists partly of image files, the monitor and printer are also essential to show the nature and quality of the graphic images which the system could produce. Further, the analyst again needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

C. I am familiar with and understand the implications of the Privacy Protection Act ("PPA"), 42 U.S.C. § 2000aa, and the role of this statute in protecting First Amendment activities. I am not aware that any of the materials to be searched and seized from the SUBJECT PREMISES are protected materials pursuant to the PPA. If any such protected materials are inadvertently seized, all efforts will be made to return these materials to their authors as quickly as possible.

### Conclusion

30. Based on the above information, there is probable cause to believe that 18 U.S.C. §§ 2252 and 2252A, which, among other things, make it a federal crime for any

person to knowingly possess and/or receive child pornography, has been violated, and

that the property, evidence, fruits and instrumentalities of these offenses, more fully

described in Attachment B of this Affidavit, are located at the SUBJECT PREMISES. I

request the authority to seize such material. It is my assertion, based on previous

investigative experience, that evidence of the receipt and possession of child pornography

will be located on a computer or computers located at the SUBJECT PREMISES and that

this evidence can be forensically recovered from any computers used to commit the

offenses that are at the location to be searched. I am aware that evidence located on hard

drives is often recoverable months, and even years, after it has been placed on the hard

drive through the use of data recovery software utilized by computer forensic examiners.

31. Based on the foregoing, I respectfully submit that there is probable cause to seize evidence of violations of 18 U.S.C. Section 2252A(a)(2), Receipt or Distribution of Child Pornography, and 18 U.S.C. Section 2252A(a)(5)(B), Possession of Child Pornography, found at the SUBJECT PREMISES. I respectfully request that this Court issue a search warrant for the SUBJECT PREMISES, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B.

FURTHER AFFIANT SAYETH NOT.

Dwayne E. Haferkamp
Special Agent,
Department of Homeland Security
U.S. Immigration and Customs Enforcement
Office of Investigations

Subscribed and sworn
before me this ___16___ day of ___August,___ 2010

HONORABLE THOMAS J. SHIELDS
UNITED STATES MAGISTRATE JUDGE

23

## ATTACHMENT A

*DESCRIPTION OF LOCATION TO BE SEARCHED:*

The SUBJECT PREMISES (pictured below) to be searched is more particularly described as: a two story farm house with light green siding and brown shingles on the roof. The residence has a natural-wood colored split-rail fence located on the West side of the house partially covering the patio area. There are also two concrete porches with coverings, one located to the South and the other to the East of the house. The house number, "1042" is displayed in yellow on the mailbox that is located across 105 Avenue to the South of the house. Immediately adjacent to the house are two structures. The first is more particularly described as a shed like structure located to the North West of the house. The shed has yellow colored siding and a light in color metallic roof. The second structure is a large modern barn with all white siding. The large barn has two entry/exit points; a two car garage sized door on the West side, and a larger entry/exit point to the North side of the structure. These two out buildings are close enough in proximity to the house that if wired to as such may be used to store a computer that is either directly or indirectly connected to the Internet Service Provider (ISP) located at the premises.



25

## ATTACHMENT B

***ITEMS TO BE SEIZED:***

The following items to be seized constitute evidence of violations of Title 18, United States Code, Sections 2252A(a)(2) and 2252A(a)(5)(B), which may be found at the SUBJECT PREMISES:

a.    Materials depicting or containing child pornography, as defined in Title 18, United States Code, Section 2256.

b.    Any record or document pertaining to the possession, receipt, distribution and/or reproduction of child pornography, as defined in Title 18, United States Code, Section 2256.

c.    Any record or document identifying persons transmitting, through interstate commerce, including by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

d.    Any record or document bearing on the production, receipt, shipment, orders, requests, trades, purchases or transactions of any kind involving the transmission through interstate commerce, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

e.    Any record or document pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce of any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

26

f.      Any record or document which lists names and addresses of any minor visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

g.      Any record or document which shows the offer to transmit through interstate commerce any depictions of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

h.      Any items displayed in the child pornographic images posted by the suspect to the Internet chat room described within the Affidavit herein.

i.      Any and all materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings. "Child erotica" may also include, in this context, sex aids and/or toys.

j.      Electronically stored communications or messages reflecting computer on-line chat sessions or e-mail messages with a minor that are sexually explicit in nature, as defined in Title 18, United States Code, Section 2256.

k.      Any documents, records, programs, or applications that identify the residents of the SUBJECT PREMISES.

l.      Any documents, records, programs or applications that identify the Internet service provided to the SUBJECT PREMISES.

27

m.  Any documents, records, programs, or applications tending to demonstrate the actual user(s) of computers found at the SUBJECT PREMISES.

n.  As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form.

o.  In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

i.  Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices (collectively the "computer devices") to determine whether the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the computer devices.

ii.  If the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, they will be searched on-site, and a computer device will be seized only if the search reveals it to contain any data that falls within the list of items to be seized set forth herein.

iii.  If the computer devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the computer devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer devices will be reviewed by appropriately trained

personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

        iv.     In searching the computer devices, the computer personnel may examine all of the data contained in the computer devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

        v.     If the computer personnel seize the computer devices pursuant to subparagraph iii above, the computer personnel will search the computer devices or data images within a reasonable amount of time not to exceed 60 days from the date of execution of the warrant. If, after conducting such a search, the case agents determine that a computer device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the computer device; otherwise, the government will return the computer device. If the government needs additional time to determine whether the data on the computer devices falls within any of the items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original sixty day period from the date of execution of the warrant.

        p.     In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above: