1              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF ILLINOIS
2

3

4    UNITED STATES OF AMERICA,      )
                                    )
5              Plaintiff,           )
                                    )  Criminal No. 4:10-40091
6         vs.                       )  Peoria, Illinois
                                    )
7    RONALD ALAN SEIVER,            )
                                    )
8              Defendant.           )

9
                    RECORD OF PROCEEDINGS
10           HEARING ON MOTION TO SUPPRESS
                    APRIL 12, 2011
11
                        BEFORE:
12           THE HONORABLE JAMES E. SHADID,
                United States District Judge
13

14   APPEARANCES:

15   For the Government:       MICHAEL McCOY, ESQUIRE
                               Asst. United States Attorney
16                             1830 Second Avenue
                               Rock Island, Illinois 61201-8003
17                             (309) 793-5884

18

19   For the Defendant:        GEORGE F. TASEFF, ESQUIRE
                               Federal Public Defender
20                             401 Main Street, Suite 1500
                               Peoria, Illinois 61602
21                             (309) 671-7891

22

23           Jennifer E. Johnson, CSR, RMR, CRR
               U.S. District Court Reporter
24             Central District of Illinois

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer

2

1                              INDEX

                                                PAGE
2
WITNESSES FOR THE GOVERNMENT:
3
   DWAYNE HAFERKAMP
4
       Direct Examination                    6
5       Cross-Examination                    68
       Redirect Examination                110
6       Recross-Examination                 114
7   MICHAEL MITCHELL

8       Direct Examination                  118
       Cross-Examination                   144
9
   THOMAS BEROLA
10
       Direct Examination                  153
11       Cross-Examination                   169
12 WITNESSES FOR THE DEFENSE:

13   RONALD A. SEIVER

14       Direct Examination                  191
       Cross-Examination                   206
15       Redirect Examination                224
16

17

18

19

20

21

22

23

24

25

1      (Proceedings held in open court)

2      THE COURT:  On the record.  This is United

3  States of America vs. Ronald --

4      Is it pronounced Seiver?

5      THE DEFENDANT:  Seiver.

6      THE COURT:  -- Seiver.  Okay.  10-CR-40091.

7  Rock Island case, right?  Mr. Seiver is present

8  with his attorney, Mr. Taseff.  Mr. McCoy present

9  for the government.

10     This matter's set today for a hearing on a

11  motion to suppress evidence.  The government has

12  filed a response.  Is that what is to be addressed

13  today?

14     MR. McCOY:  That's correct, Your Honor.

15     THE COURT:  Mr. Taseff?

16     MR. TASEFF:  Yes.

17     THE COURT:  Okay.  Mr. McCoy?

18     MR. McCOY:  Joining me as well, Your Honor, is

19  Miss Glenda Verbeke, and she's going to be

20  assisting with the audio/video portion of the

21  presentation.

22     THE COURT:  Okay.  Thank you.  Ms. Verbeke.

23     All right then.  The motion addresses two

24  issues.  Is that right?

25     MR. TASEFF:  Correct.

1        THE COURT:  The parties ready to proceed?

2        MR. McCOY:  We are, Your Honor.

3        THE COURT:  And one addresses a statement, and

4    the other addresses timeliness.

5        MR. TASEFF:  Yes, probable cause for the

6    warrant.

7        THE COURT:  Right.  So, who wants to proceed?

8        MR. TASEFF:  Well, the warrant challenge is a

9    facial challenge, whether the --

10       THE COURT:  Please be seated.

11       MR. TASEFF:  -- information contained in the

12   four corners establishes probable cause.  I can

13   argue that point at this time.

14       THE COURT:  Okay.

15       MR. TASEFF:  However, we have three police

16   officers, as I understand it -- the government's

17   testimony.  We have questions concerning assertions

18   made to Mr. Seiver at the outset of the interview,

19   whether he was in custody and subject to being

20   arrested.  There's one officer who was the first to

21   enter Mr. Seiver's room at the time of the

22   execution of the warrant and then two officers who

23   sat in during a roughly one-hour interview in the

24   kitchen of the home.

25       THE COURT:  And I have read the transcripts.

1      MR. TASEFF:  And during that interview, of
2 course, the mother undergoes a seizure, and EMT
3 people are there.  So depending on how the Court
4 wishes to handle this -- candidly, I appeared this
5 morning believing that the government would play
6 substantial portions of the interview and that we'd
7 have the three officers testify first on the
8 question of voluntariness of the statements --
9      THE COURT:  Mr. McCoy?
10      MR. TASEFF:  -- and reserve legal argument as
11 to the search warrant until the Court has heard the
12 entirety of the evidence and the Court has heard
13 both issues in argument.
14      THE COURT:  Do you want to proceed that way?
15      MR. McCOY:  That's fine, yes.
16      THE COURT:  Let's do that.
17      MR. McCOY:  Your Honor, the government would
18 call Special Agent Dwayne Haferkamp.
19      THE COURT:  Okay.  Do you want to come
20 forward, please, raise your right hand to be sworn?
21      **(Witness sworn by the clerk.)**
22      THE COURT:  Have a seat right here.
23                 **DWAYNE E. HAFERKAMP,**
24 **called as a witness, was examined and testified**
25 **upon his oath as follows:**

1          **DIRECT EXAMINATION**

2   BY MR. McCOY:

3   Q.   Could you please state your full name and

4   spell your last name for the court reporter?

5   A.   Dwayne E. Haferkamp.

6   Q.   How do you spell your last name?

7   A.   H-a-f-e-r-k-a-m-p.

8   Q.   And where are you currently assigned?

9   A.   Springfield, Illinois, with Immigration and

10  Customs Enforcement.

11  Q.   And how long have you been with the

12  Immigration and Customs Enforcement?

13  A.   Since August of 2009.

14  Q.   Now, with Immigration and Customs Enforcement

15  -- is that also known by the acronym ICE, I-C-E?

16  A.   Yes.

17  Q.   What is your current -- you said you're a

18  special agent with I.C.E.?

19  A.   Yes, I am.

20  Q.   What are your responsibilities as a special

21  agent with I.C.E.?

22  A.   To conduct various cases that we -- of laws

23  that we enforce.

24  Q.   Now, prior to joining I.C.E., what were you

25  doing?

1  A.   I had worked approximately six years for a
2  government contract security company.  And then
3  prior to that, I enforced security forces for about
4  the same time frame.
5  Q.   Security forces with whom?
6  A.   Air Force.
7  Q.   Air Force?  In total, how many years of law
8  enforcement experience do you have?
9  A.   Approximately 13 to 14.
10 Q.   In your capacity as a special agent with
11 I.C.E., have you had the opportunity to work on
12 cases involving child pornography or child
13 exploitation matters?
14 A.   Yes, I have.
15 Q.   And how many such cases have you worked on?
16 A.   Including this particular one today as well as
17 search warrants conducted, approximately -- well,
18 in the last year, many more.  But prior to this
19 case, probably approximately six.
20 Q.   Okay.  And since this case, how many have you
21 worked on, approximately?
22 A.   With search warrants?  I couldn't tell you
23 exact number.  Several more.
24 Q.   As part of your training as a special agent
25 for I.C.E., did you receive any specialized

1  training regarding child pornography or child
2  exploitation investigations?
3  A.   Yes.
4  Q.   And where did you receive that training?
5  A.   Federal Law Enforcement Training Center.
6  Q.   And as part of that training, did you have the
7  opportunity to observe various examples of child
8  pornography?
9  A.   During -- partially during that training but
10  also due to on-the-job training at -- well, since
11  I've been in Springfield.
12  Q.   With the six cases that preceded this?
13  A.   Yes.  Yes.
14  Q.   As part of your official training or your
15  on-the-job training as well, did you receive any
16  guidance or instruction on what qualifies as child
17  pornography?
18  A.   Yes.
19  Q.   And what is your understanding of what
20  qualifies as child pornography?
21  A.   Lewd display of the genitalia,
22  sexually-explicit activity.
23  Q.   With who?
24  A.   With minors.  Sorry.
25  Q.   And what's your understanding of what

1  qualifies as a minor?

2  A.   Anyone under the age of 18.

3  Q.   Are you the case agent in this current matter?

4  A.   Yes.  Yes, I am.

5  Q.   And can you explain to the Court briefly how

6  this investigation was initiated?

7  A.   Sure.  In the very beginning of the case,

8  there -- it started in Canada, particularly.

9  There's -- the London Police Services had received

10  a notification from a parent that some activity had

11  occurred on the Internet.  There was a Facebook

12  contact with the stepmother of a 13-year-old child,

13  and she had received a link to a yfrog account that

14  had had -- well, 20 -- I'm sorry -- 16 images that

15  were linked to that website of her stepdaughter, a

16  13-year-old.

17  Q.   And what were the images depicting?

18  A.   Child pornography.

19  Q.   All 16 of them?

20  A.   Negative.  Approximately, I think -- I believe

21  it was two, two to four.  Two to three.

22  Q.   Was this link that was sent to the stepmother

23  via Facebook, was it accompanied with any sort of

24  message or description of what the link pertained

25  to?

1  A.   Yes.  I'm not sure exactly what it said
2  particularly.  I've read it several times.  I
3  couldn't verbatim tell you exactly what it says,
4  but basically, Your -- Your daughter needs to stay
5  off blogTV.  She's showing herself to people.
6       Basically that.
7  Q.   All right.  And was this incident subsequently
8  reported to law enforcement up in Canada?
9  A.   Yes, it was.
10  Q.   Did they start an investigation?
11  A.   Yes.  They went to interview the stepmother
12  and the, the 13-year-old victim as well.
13  Q.   All right.  Now, where -- this link that was
14  sent to the stepmother, who was it -- was there a
15  "From" name listed in the link so she knew who it
16  was coming from?
17  A.   Yes, there was a name written at the -- next
18  to -- well, in the page itself of David Smith.
19  Q.   Had she known anybody by the name of David
20  Smith?
21  A.   No.
22  Q.   Were law enforcement officials up in Canada
23  able to make any determinations regarding these
24  images and where they had come from?
25  A.   Yes.  After the investigation had gone on and

1  part of the interviews had been conducted, I

2  believe it was D.C. Dann, who was a forensics

3  expert in Canada, who had found out where the --

4  had contacted ImageShack, which is a subsidiary or

5  a linked ownership to yfrog.  From there, he was

6  able to find out the I.P. address that had uploaded

7  those images to yfrog.

8  Q.  And where was that I.P. address linked to?

9  A.  It was linked to or the ownership of the --

10  the Internet service provider was Frontier

11  Communications in, in New York.

12  Q.  Okay.  Was a lead sent down then to New York?

13  A.  Yes, it was, to SAC Buffalo.

14  Q.  And what, if anything, was the -- the SAC in

15  Buffalo, which agency was that?

16  A.  That's I.C.E. as well.  That's special agent

17  in charge area.

18  Q.  And was the I.C.E. office in Buffalo able to

19  make any conclusions on who had uploaded this link

20  onto yfrog?

21  A.  Yes.  They had subpoenaed the information, and

22  it came back to an address at 1042 U.S. Highway 67

23  in Roseville.

24  Q.  These images, you said -- were they still

25  images or --

A.   They were still, still images of an AVI file,

an audio/video interlude file of -- I think -- I

believe it was 10 minutes and 13 seconds long,

approximately.  And 16 still images were taken from

that, you know, loaded to yfrog.

Q.   Once the I.P. address was linked back here to

Roseville, Illinois, the address you just gave, did

you get involved in the case at that point?

A.   Yes, I did.

Q.   All right.  And what investigative steps did

you take after you got involved with this case?

A.   After I had received the case, we had

subpoenaed Frontier as well to attempt to get a

name that was linked to the I.P. address as well.

And at the -- at the top of that information was

Mr. Seiver's information.

Q.   Still linked to the same address?

A.   Yes.  1042, yeah.

Q.   Were you able to review these 16 images as

well?

A.   Yes, I was.

Q.   And did you reach any conclusions regarding

these 16 images as far as their nature and what

they qualified as?

A.   Qualified as -- two of them anyway

1  particularly, I believe, I described as child

2  pornography.

3  Q.   Did you describe them in your affidavit for

4  search warrant?

5  A.   Yes, I did.

6  Q.   What about these images -- these two images in

7  particular made you conclude that they were, in

8  fact, or could be classified as child pornography?

9  A.   The, the individual was very obviously under

10  the age of 18; anyone would be able to conclude

11  that.  There was also lewd display of the genitalia

12  in the video -- or, rather, in the images, the

13  still images from the video file.

14  Q.   Where was the -- in the images, where was the

15  girl's hand placed?

16  A.   Over, touching and/or in the general area of

17  her vagina.

18  Q.   All right.  What happened next in your

19  investigation once you -- after you reviewed these

20  images and confirmed the address the I.P. address

21  was linked to, what steps did you take at that

22  point in your investigation?

23  A.   Shortly after that, we had also -- later on we

24  had subpoenaed ImageShack as well to try to

25  reiterate that information as well.  They, they

1  sent us the same information, basically that the

2  I.P. address during this time frame had uploaded

3  the yfrog images, to confirm that -- to confirm

4  that information.  I'd have to go to my notes and

5  -- if you -- to tell you particular dates and times

6  and things.

7  Q.  Were you able to confirm who was living at

8  that house at 1042 --

9  A.  Yes, that's correct.

10  Q.  And who was that?

11  A.  There were five adults that appeared to be

12  living at that location at the time.  Through a

13  check, it's called a -- Clear is the name of the

14  open source that we were able to use to determine

15  from that address, if at all, how many and whose

16  names would be possibly staying at that address.

17  Q.  Okay.  And whose names were listed on that

18  address?

19  A.  Mr. Alexander, Mrs. Alexander, Mr. Addis,

20  Mrs. Addis and Ronald Seiver.

21  Q.  So, five total.  Did you perform a criminal

22  history check on all these individuals?

23  A.  Yes, I did.

24  Q.  Did the defendant have any criminal history?

25  A.  No, he did not.

1  Q.  Did you perform a weapons check on this
2  address?
3  A.  Yes.  We sent the information to Illinois
4  State Police, and they were able to come back with
5  information showing that there was, I believe, four
6  previous FOID cards for Mr. Alexander and three for
7  Mr. Addis and a proof of one purchase -- at least
8  one purchase from Gander Mountain for a weapon
9  there.
10  Q.  At some point did you apply for a search
11  warrant --
12  A.  Yes, I did.
13  Q.  -- at 1042 U.S. 67?
14  A.  Yes, I did.
15  Q.  And when was that?
16  A.  I believe that was on August 16th, 2010.
17  Q.  Okay.  Prior to applying for the search
18  warrant, did you consult with the U.S. Attorney's
19  Office?
20  A.  Yes, I did.
21  Q.  In support of this application for a search
22  warrant for 1042 U.S. Highway 67 in Roseville, did
23  you present an affidavit to Magistrate Judge Thomas
24  J. Shields?
25  A.  Yes.  Yes, I did.

1   Q.   And were you the affiant?

2   A.   Yes, I was.

3   Q.   Did anyone review your affidavit prior to you

4   presenting it to the judge?

5   A.   Yes.

6   Q.   Who was that?

7   A.   My supervisor as well as yourself.

8   Q.   Okay.

9       MR. McCOY:  May I approach, Your Honor?

10      THE COURT:  You may.

11  BY MR. McCOY:

12  Q.   I'm showing you what's been marked as

13  Government Exhibit 1.  Do you recognize that?

14  A.   I do.

15  Q.   And what is that?

16  A.   It is an application for search warrant.

17  Q.   All right.  Is that your signature on the

18  bottom of page one?

19  A.   It is.

20  Q.   And you can turn to page 23.  Let me have you

21  turn to page two actually first.

22  A.   Two?

23  Q.   What is -- what begins on page two of this

24  packet?

25  A.   The affidavit or -- I'm sorry.

1  Q.  Is this the affidavit that you prepared in

2  this case?

3  A.  Yes, it is.

4  Q.  And if I have you turn to page 23, is that

5  your signature under the Affiant block?

6  A.  It is.

7  Q.  Okay.

8      MR. McCOY:  Your Honor, the government would

9  move to admit Government Exhibit 1.

10      THE COURT:  Mr. Taseff?

11      MR. TASEFF:  No objection.

12      THE COURT:  It's admitted.

13  BY MR. McCOY:

14  Q.  Now, you previously testified that you

15  submitted this to -- the search warrant application

16  to Judge Shields -- Magistrate Judge Shields on

17  August 16th, is that correct, 2010?

18  A.  That's correct.

19  Q.  And Magistrate Judge Shields then issued a

20  search warrant for 1042 U.S. Highway 67?

21  A.  That's correct.

22  Q.  On that same date; is that correct?

23  A.  Yes.  Uh-huh.

24      MR. McCOY:  May I approach, Your Honor?

25  BY MR. McCOY:

1   Q.   Handing you what's been marked as Government's

2   Exhibit 1A, do you recognize that?

3   A.   Yes, I do.

4   Q.   And what is that?

5   A.   It is a search and seizure warrant.

6   Q.   Is that the warrant that was issued on

7   August 16th, 2010?

8   A.   Yes.

9   Q.   If you could turn to page two of that warrant?

10  A.   Uh-huh.

11  Q.   What is that?  What's located on page two of

12  that warrant?

13  A.   These are the items that were seized from

14  1042.

15  Q.   Are those your handwritten notes?

16  A.   Yes, they are.

17  Q.   And when did you complete page two?

18  A.   It would have probably been the same day or

19  just prior to this, the 8/27/2010.

20  Q.   This would have happened after the execution

21  of the search warrant?

22  A.   That's correct.

23       MR. McCOY:  Your Honor, the government moves

24  to admit Government Exhibit 1A as well.

25       MR. TASEFF:  No objection.

1      THE COURT:  Admitted.

2   BY MR. McCOY:

3   Q.  All right.  At the time that you applied for

4   the search warrant, did you also apply for an

5   arrest warrant for Mr. Seiver or for anybody in the

6   house?

7   A.  No, I didn't.

8   Q.  When was the search conducted?

9   A.  On August 24th, 2010.

10  Q.  And what were your duties in connection with

11  the execution of the search warrant?

12  A.  I'm the case agent as well as if you --

13  anything -- the person who would generally be in

14  charge of the search itself.

15  Q.  Approximately what time of day did the

16  execution of this warrant begin?

17  A.  Approximately 9:30 would have been about the

18  time that we arrived at the residence.

19  Q.  Okay.  Do you recall how many agents assisted

20  you in the execution of the search warrant?

21  A.  Yes.  There was either nine or ten.

22  Q.  Including yourself?

23  A.  Including myself.

24  Q.  How were they all dressed -- or how were they

25  generally dressed?

1  A.  Everyone had a bulletproof vest on for safety

2  purposes, obviously.  Everyone was armed.  I

3  believe I was in 511 jeans and a, a -- probably an

4  I.C.E. T-shirt of some kind.  Most everybody was

5  either wearing jeans or 511s and our bulletproof

6  vests.

7  Q.  Were you wearing masks?

8  A.  No.

9  Q.  Did you have any protective head gear on?

10  A.  No.

11  Q.  Kevlar or -- you said everyone was armed?

12  A.  Yes.

13  Q.  What type of firearm were you carrying?

14  A.  I was carrying a SIG P229.

15  Q.  Were there any long guns there, any rifles?

16  A.  That I have -- I don't recall particularly.  I

17  would have to check with the weapons agent.

18      MR. McCOY:  Your Honor, is it okay to continue

19  to --

20      THE COURT:  Just -- yes.

21  BY MR. McCOY:

22  Q.  Showing you what's been marked as Government

23  Exhibit 2A, do you recognize that?

24  A.  Yes, I do.

25  Q.  And what is that?

1  A.   This is 1042 U.S. Highway 67.

2  Q.   Is it a picture of that location?

3  A.   A picture of the house at that location, yes.

4  Q.   Who took that picture?

5  A.   I did.

6  Q.   And when was that picture taken?

7  A.   I believe it was April 30th, 2010.

8       MR. McCOY:  Your Honor, the government has

9  several photographs, both of the exterior and the

10  interior of the house.  I don't believe that the

11  defense has any objection to just doing a universal

12  admittance of all these.

13       MR. TASEFF:  Admit them all; that's fine.

14       MR. McCOY:  This is Government's Exhibits 2A

15  through 2U, I believe.  Let me confirm.  Yes, 2U.

16       THE COURT:  Okay.  They'll all be admitted.

17       MR. McCOY:  May I publish this, Your Honor?

18       THE COURT:  You may.

19       MR. McCOY:  Is it on the videos?

20       THE CLERK:  Yes.

21       THE COURT:  It's not on this one.  It's not on

22  the --

23       MR. McCOY:  It's on the ELMO.

24       THE COURT:  There we go.

25       THE WITNESS:  There it is.

1          MR. McCOY:  Excuse me.

2          THE COURT:  Now, in the interest of time, do

3    you want to just show them all from the screen and

4    he can identify them that way?

5          MR. McCOY:  Sure.  Yes, Your Honor.  Thank

6    you.

7          MR. TASEFF:  Does Your Honor have a monitor as

8    well?

9          MR. McCOY:  Yes.

10         THE COURT:  I do.  Do you?

11         MR. TASEFF:  Yes.  We've used this huge screen

12   in the past which is affected by the light in the

13   room so --

14         MR. McCOY:  Yes, I think it may be back.

15         MR. TASEFF:  You're on the same page with the

16   monitors?

17         MR. McCOY:  You can see it?

18         MR. TASEFF:  Yes.

19   BY MR. McCOY:

20   Q.   I'm sorry.  I believe you already stated this,

21   but let me ask this again:  When were these

22   pictures taken?

23   A.   August 30th, I believe.

24   Q.   Pardon me?

25   A.   August 30th.

1    Q.   Of the outside --

2    A.   I'm sorry, April 30th.

3    Q.   So prior to the execution of the search

4    warrant?

5    A.   Yes, that's correct.

6    Q.   Okay.  Now, if you can, walk the Court through

7    exactly how you executed the warrant, what you did

8    and how you approached the house and what you did

9    prior to coming to the house, et cetera.

10   A.   Okay.  Prior to, we briefed for safety

11   purposes at the sheriff's office in Monmouth.  From

12   there we traveled to the location.  I led.  There

13   was a patrol vehicle also in front of me by the

14   time we got there to this location.

15        We came off of U.S. Highway 67, onto the road

16   that is adjacent to this, this subject premises.

17   Drove around the house to make sure that there was

18   enough room for the tailing individuals, the other

19   officers and agents that were with me in their

20   vehicles to be able to get onto the road.

21        At that time, which I said before was

22   approximately 9:30, we got out of our vehicles.  I

23   believe --

24   Q.   Can I stop you for just one moment?

25   A.   Absolutely.

1   Q.   Let me show you -- this is Government

2   Exhibit 2P.   Now, when was that picture taken?

3   A.   That would have been the same day as the

4   search warrant.

5   Q.   All right.   And there -- as you can see, there

6   are a series of cars parked in the background.

7   Whose vehicles are those?

8   A.   The very first one that you can see there,

9   which is, I believe -- the picture's not -- yeah,

10  it's the very first one there would have been my --

11  the Charger that I drove.   And then several other

12  vehicles of our agents that were there that day.

13  Q.   So these were all the agents who were

14  executing the search warrant?

15  A.   Yes.

16  Q.   This is where they parked?

17  A.   Uh-huh.

18  Q.   Anyone in a marked car?

19  A.   Yes.

20  Q.   Who was in a marked car?

21  A.   That would have been a sheriff -- one of the

22  sheriffs.

23  Q.   Where did he park?

24  A.   In the front of the -- in front of the

25  building, which would have been on the south side.

1   Q.  Was he the first to arrive on the scene -- at

2   the scene?

3   A.  Himself, he pulled into the yard as well as, I

4   believe, Agent Deeter.  And they both had their,

5   their lights on.

6   Q.  Okay.  And Agent Deeter was in a marked car or

7   an unmarked car?

8   A.  He was in an unmarked.

9   Q.  Now, you said that you first -- you met at the

10  sheriff's substation at the department?

11  A.  Yes.

12  Q.  How long before you arrived at the scene of

13  the house did you meet there?

14  A.  Probably somewhere around 8:30.  Anywhere from

15  8:30 to 9, when everyone started showing up to be

16  there for the briefing.

17  Q.  And what was the purpose?

18     It was a briefing.  What was the purpose of

19  the briefing itself?

20  A.  It's a safety briefing to make everyone aware

21  of the -- you know, what the house looks like, the

22  location, assignments of what the individual agents

23  are going to be doing while they're there.  Some,

24  you know, things like that.

25  Q.  Was there an operation plan developed --

1  specifically developed for the execution of this

2  warrant?

3  A.   Yes, there was.

4  Q.   And was each of the agents given a -- assigned

5  a particular task in that operation plan?

6  A.   Most everyone was assigned at least like an

7  entry or security or evidence or, you know, things

8  such as that.

9  Q.   Was anybody assigned the task of being an

10  arresting official?

11  A.   No.

12  Q.   Were there any plans at that point to conduct

13  any on-site arrests?

14  A.   No.

15  Q.   Was that briefed at all?

16  A.   No.

17  Q.   At the -- okay.

18      So you parked there along -- as indicated in

19  the picture along the side there.  What happened

20  after you got out of your vehicles?

21  A.   Okay.  Initially the stepfather,

22  Mr. Alexander, I believe he had come out to the

23  front yard or he was already in the front yard when

24  we approached.  That's when Agent Deeter pulled

25  into the -- to the yard.  I'm not sure exactly

1   which vehicle he was in the stack, but -- and

2   approached Mr. Alexander.  And from there,

3   everybody got out of their vehicles.  We got into

4   what's basically called a formation, and we began

5   to enter the house.

6   Q.   Was Mr. Alexander handcuffed when he was

7   approached?

8   A.   I believe he was.

9   Q.   Do you know why he was handcuffed?

10  A.   I believe for officer safety, from what I was

11  told.

12  Q.   How did you enter the house?

13  A.   How or where?

14  Q.   Well, how first?  I mean, did you have to

15  break the door down?

16  A.   No, we did not.

17  Q.   Did you just open the door?

18  A.   Just opened the door.

19  Q.   And what type of door was it?

20  A.   It was a screen -- a screen type door at the

21  front of the house.  I recall seeing Miss Alexander

22  in the -- through the doorway there.

23  Q.   Put 2A back on the screen.

24  A.   Yes, this --

25  Q.   That bottom picture, can you --

1  A.   This screen door here to the bottom picture,

2  the left portion of the house, it shows the porch

3  and --

4  Q.   I believe if you touch the screen, there will

5  be an arrow that shows up.

6  A.   Okay.  Yes, that screen door right there with

7  the white.

8  Q.   Who was the first to enter the house?

9  A.   I do not recall that.

10  Q.   Were you one of the first into the house?

11  A.   I was one of the first.

12  Q.   At the time that you and the other agents made

13  entry into the house, were your firearms displayed?

14  Were they out?

15  A.   Yes, they were.

16  Q.   Out of their holsters?

17  A.   Yes.

18  Q.   And how were they being carried at that point?

19  A.   Out of the holster, in either a -- depending

20  on the time frame, I mean, and the scenario that

21  you're in, you're either going to point your weapon

22  in a safe direction or continue on through the

23  house to clear the house.

24  Q.   But they were unholstered?

25  A.   Unholstered, yes.

1   Q.   And why was it -- why were the weapons

2   unholstered?   Why did the officers have them in

3   their hands?

4   A.   Officer safety.   That's what we do every time

5   we enter a house for a search warrant.

6   Q.   What was the tone of your voice and those of

7   the other agents as you entered the house --

8   approached and entered the house?

9   A.   Well, we state, "Police.   Search warrant," and

10  you -- most of the time everyone sounds off and

11  repeats that, make sure that everyone -- you know,

12  that it's known.   And then we enter the house.

13      Agents -- we usually -- what we're trained is

14  one left, one right, and then we fill and, you

15  know, continue through the house.   And depending on

16  what number you are into the house, you may go

17  right or left; it just depends.

18  Q.   And what's your primary goal then upon first

19  making entry into a house like this?

20  A.   Securing the house.

21  Q.   What does that mean?

22  A.   Clearing each room, making sure there's no

23  threats.

24  Q.   Did the -- did the fact that you had

25  previously confirmed that there was at least one

1   weapon associated or assigned -- connected to this
2   house --
3   A.   Correct.
4   Q.   -- did that affect in any way how the house
5   was secured during this execution?
6   A.   It, it makes a heightened awareness of the
7   fact that there is most likely weapons in the
8   house.
9   Q.   Were there any weapons actually found in the
10  house?
11  A.   Yes, I believe there was.
12  Q.   Okay.  And do you know what type of weapon
13  that was?
14  A.   I believe it was a revolver.  I'd have to
15  consult.
16  Q.   So, the defendant's father -- Mr. Alexander --
17  was located as you previously testified --
18  A.   Yes.
19  Q.   -- on the outside of the house as you
20  approached?
21  A.   Yes.
22  Q.   How about the other occupants of the house?
23  Where were they located?
24  A.   I believe Miss Alexander and Miss Addis were
25  both on the first floor.

1  Q.   Miss Addis is who?

2  A.   April Addis, the sister.

3  Q.   The sister of who?

4  A.   Sister of Ron Seiver.

5  Q.   Okay.  They were located on the first floor?

6  A.   Yes.

7  Q.   And were they secured as well?

8  A.   Yes.  They were -- they were taken out to the

9  patio side of the house which would have been -- if

10 you can see here, the top picture here, there's a

11 wooden area around the patio.  They would have been

12 escorted out.

13      I don't know if you're saying -- by "secured,"

14 do you mean handcuffed?  No, I believe they were

15 not handcuffed.

16 Q.   To your knowledge, they were not handcuffed?

17 A.   That's correct.

18 Q.   What happened to, to Miss Alexander and

19 Mr. Alexander and April Addis, the sister?

20 A.   I believe they were taken over here to this

21 area that I just pointed out.

22 Q.   That you pointed to.  Sorry.

23      Was the defendant located inside the house?

24 A.   Yes, on the second floor.

25 Q.   And where on the second floor was he located?

1  A.   In his room.

2  Q.   Were you one of the agents who went up and

3  actually found the defendant?

4  A.   I was not.

5  Q.   Who was that?

6  A.   I believe Agent Mitchell, Waite and Bowers.

7       MR. McCOY:  Your Honor, just for the Court's

8  information, I will be calling Special Agent Mike

9  Mitchell to testify about, among other things, the

10 entry into the defendant's bedroom.

11      THE COURT:  Fine.

12 BY MR. McCOY:

13 Q.   To your knowledge, what happened to the

14 defendant after he was handcuffed in the upstairs

15 bedroom?

16 A.   Whenever -- I know that whenever he was

17 first --

18 Q.   I'm sorry, contacted or --

19 A.   Contacted?

20 Q.   Yes, in the upstairs bedroom.

21 A.   From what I was told, he was seen at his -- at

22 his bed and doing something with the computer.  At

23 that point, he was not compliant, from what I was

24 told, and passed off to, I believe, Agent Waite and

25 then handcuffed and taken outside.

1  Q.   Okay.  And why was he handcuffed?

2  A.   For one, for officer safety.  And, two,

3  because he had been -- it appeared that he had been

4  messing with the computer.  And he was also not

5  compliant initially.

6  Q.   All right.  Do you have any knowledge of how

7  long the defendant was handcuffed after he was

8  removed from the room?

9  A.   From what I was told, five to ten minutes.

10  Q.   Were you made aware of any computer media

11  devices or items that had been located in the

12  defendant's bedroom?

13  A.   His laptop.  That was next to the foot of his

14  bed.

15  Q.   At some point did you go up to the bedroom and

16  conduct your own search of the room?

17  A.   Yes.  After the -- after the initial sweep of

18  the house to secure, and then we always do a

19  secondary sweep.  After that then the search begins

20  for evidence.  And so after that, yes, I had gone

21  up to the room.

22  Q.   And what, if anything, did you find when you

23  were doing your cursory -- or your search of the

24  room at that point?

25  A.   A 16-gigabyte thumb drive.

1   Q.   Where was that thumb drive located?

2   A.   Under the mattress at the foot of Mr. Seiver's

3   bed.

4   Q.   Showing you Government Exhibit 2Q.  What is

5   that a picture of?

6   A.   It's an SD thumb drive.

7   Q.   Okay.  And is that the thumb drive you found

8   under the mattress?

9   A.   Yes, it is.

10  Q.   Now, that sort of wooden board below it, was

11  that where the mattress was sitting?

12  A.   Yeah, uh-huh.  That's the bottom of the bed.

13  No box spring, I guess you would say.

14  Q.   What other computer media devices were found,

15  if any, in the bedroom?

16  A.   In this bedroom, I believe that was -- I

17  believe that was it.

18  Q.   Just the thumb drive and the laptop computer?

19  A.   Yes.

20  Q.   What happened to the thumb drive and laptop

21  computer after they were located?

22  A.   There may have been CDs -- I -- possibly that

23  were found in that room particularly, but the ones

24  that I know for sure that were found in that room

25  were the thumb drive and the laptop.

1  Q.  Okay.  And what happened to those items after
2  they were located in the room?
3  A.  The laptop was found first, and it was taken
4  downstairs.  And then the search had continued of
5  the house.  I came up, as I said, and began
6  assisting with the search of the room and located
7  the thumb drive under his bed.
8  Q.  And after you located it and, obviously, the
9  photograph was taken of it, what happened to it?
10  A.  It was taken downstairs to Ellen Price, who is
11  a task force officer who conducts on-site
12  forensics.
13  Q.  Of computer items?
14  A.  Of computer items and things, yeah.
15  Q.  Was the -- were photographs taken of the
16  interior of the home in addition to the photographs
17  we've already seen?
18  A.  Yes.
19  Q.  Who took those photographs?
20  A.  That would have been Agent Westover.
21  Q.  How long did it take to secure the house once
22  you gained entry into the home?
23  A.  Secure as in conducting our initial and our
24  secondary sweeps of the house, probably would have
25  been five minutes.  Five to ten minutes.

1  Q.   And then once -- after that initial securing

2  of the residence is complete, what happens next?

3  What's the next step in the search?

4  A.   After that's completed, that's when everybody

5  kind of starts doing their own assignments as in

6  taking photos of the rest of the premises.   That's

7  when Forensics is brought in to begin their checks.

8  That's when evidence is begun to be secured and

9  found and, you know, things like that.

10  Q.   At some point -- well, let me step back and

11  ask, you do the initial securing and the sweep.

12  And then I'm assuming you said that people start

13  their roles of either searching, photographing --

14  A.   Correct.

15  Q.   -- whatever it might be.

16      How long did that take?  How long in this --

17  yes, in this particular instance, how long did it

18  take to do the searching as well as the

19  photographing of the home?

20  A.   The photographing, I'm not sure exactly how

21  long that, that takes.  I mean, it -- you get your

22  initial photos, and then throughout the search you

23  continue to take photos of things as they're found.

24  Q.   Do you know how long it took in this case?  It

25  was ongoing?

1  A.   We were searching, yeah, even after the --
2  even after the interviews began.
3  Q.   At some point that morning, then, was a
4  decision made to approach the defendant for an
5  interview?
6  A.   Yes, there was.
7  Q.   And who was tasked with conducting this
8  interview?
9  A.   Myself as secondary and Investigator Berola as
10  primary.
11  Q.   And was that part of the original operation
12  plan?  Were you given that assignment before you --
13  A.   Yes.
14  Q.   -- gained entry into the house?
15       You said interviews, plural.  Was -- who other
16  than the defendant was interviewed that morning?
17  A.   No one.
18  Q.   No one else was interviewed?
19  A.   Well, there -- throughout the day, April Addis
20  was interviewed on a separate subject.
21  Q.   Okay.  Did you conduct that interview of April
22  Addis?
23  A.   No, I did not.
24  Q.   Who conducted that interview?
25  A.   That would have been Agent Waite and Agent

1  Deeter.

2  Q.  How long after the start of the search -- and

3  remind me again, when did the search begin

4  approximately?

5  A.  Approximately 9:30.

6  Q.  How long after 9:30 did you -- was the

7  defendant approached for an interview?

8  A.  I believe that was also around 10:30 or 10:40.

9  Q.  And who approached him?

10  A.  Myself?  And --

11  Q.  Yes.  Who, who --

12  A.  And who interviewed, who conducted --

13  Q.  Who approached him initially for the

14  interview?

15  A.  I --

16  Q.  Not who interviewed him but who approached

17  him?

18  A.  I did.  I guess you could say I brought him

19  into the house.

20  Q.  Okay.  In this hour between when the search

21  began and when you approached the defendant, where

22  was the defendant located during this period of

23  time?

24  A.  Out on the south side of the house.

25  Q.  And where -- what, was he sitting down; was he

1  standing up?

2  A.   Sitting down.

3  Q.   What was he sitting down on?

4  A.   The grass.

5  Q.   Was he handcuffed at the time?

6  A.   No, he was not.

7       MR. TASEFF:   Objection.   At what time?   On the

8  grass or in the house?

9  BY MR. McCOY:

10 Q.   Was he handcuffed when he was -- when you

11 approached him an hour later for the interview --

12 A.   No, he was not.

13 Q.   -- sitting on the grass?

14 A.   No.

15 Q.   And you previously testified, correct, that he

16 was handcuffed for how long after he was first

17 secured in the residence?

18 A.   Five to ten minutes, as I had been told by, by

19 another agent.

20 Q.   Now, what did you say to the defendant when

21 you approached him on the -- sitting there on the

22 grass?

23 A.   I, I didn't speak to him much.   I just asked

24 him if he'd come in for, for an interview.

25 Q.   And where did he come into for the interview?

1  A.   Into -- in through the front door, around

2  through -- into the kitchen and over to a small

3  table there in the kitchen.  It's like an eat-in

4  kitchen area, I guess you could call it.

5  Q.   I'm sorry, it's what?

6  A.   Like an eat-in kitchen area.

7  Q.   Show you two exhibits.  First one is 2M.  What

8  is that a depiction of?

9  A.   That is the kitchen from the dining room side

10  of the house.

11  Q.   And 2N, what's that a picture of?

12  A.   That's also the kitchen, but it's -- if the,

13  the dining -- the eat-in dining table area where

14  the interview was conducted would be to your --

15  behind you in this picture.  That's the kitchen

16  area, and then the back would be the -- I think

17  it's a laundry area.

18  Q.   And this is Government Exhibit 2K.  Is that

19  another photograph of the kitchen?

20  A.   Of the kitchen, yes.

21  Q.   Where was that taken from?

22  A.   That would have been from near where the

23  stairwell is that leads to the second floor.

24  Q.   What were the -- we have the pictures here,

25  but if you can, for the record, do you have any

1   idea what the dimensions of this room were -- was,
2   this kitchen?
3   A.   Just by a guess, I'd say it was probably about
4   15 -- 14 to 15 feet from one side to the other and
5   then approximately 18 to 20 feet from the south
6   side to the north side.
7   Q.   So, 14 to 15 feet wide and then what -- and
8   then the length was what?
9   A.   18 to 20.
10  Q.   18 to 20.
11       During -- to your knowledge, during the hour
12  between when the defendant was first discovered
13  inside the house until when you approached him for
14  the interview, had he been told he was under
15  arrest --
16  A.   No.
17  Q.   -- by you or anybody else?
18  A.   No, he had not.
19  Q.   Had there been any discussion or plan
20  established prior to executing the search warrant
21  regarding arresting the defendant?
22  A.   No, there was not.
23  Q.   Now, I believe you previously testified that
24  the laptop and the thumb drive were brought down to
25  TFO Price, Task Force Officer Ellen Price?

1  A.   That's correct.

2  Q.   And what was her role again?

3  A.   She's the forensics officer who works with us.

4  She conducts on-site previews and -- as well as

5  conducts the entire forensic viewing after the

6  fact.

7  Q.   And when you're talking about a forensic

8  preview, what does that mean?  What is she doing?

9  A.   She, she would be looking through the

10  computer, trying to find any evidence of child

11  pornography.

12  Q.   Where was she conducting this forensic

13  preview?

14  A.   That would be the dining area.

15  Q.   Showing you Government Exhibit 2L, what is

16  that?

17  A.   That is the dining area, dining table.

18  Q.   And there's a fair number of pieces of

19  equipment on that table.

20  A.   That's correct.

21  Q.   Whose equipment was that?

22  A.   That's Miss -- well, sorry -- TFO Price's

23  equipment.

24  Q.   Okay.  That's what she was using to conduct

25  the forensic preview with?

1   A.   Yes.

2   Q.   Okay.   Now, prior to beginning your interview

3   with the defendant, were either you or Investigator

4   Berola advised of any findings that Task Force

5   Officer Price had found at that point either on the

6   laptop or on the thumb drive?

7   A.   I had not seen any child pornography pictures

8   at the time.

9   Q.   And to your knowledge, did -- had Investigator

10  Berola seen any?

11  A.   I'm not sure of that.

12  Q.   You said you brought the defendant into the

13  kitchen.   Where specifically did you bring him into

14  the kitchen?

15  A.   To the -- there's a small table there in the

16  eat-in kitchen area.   There's three seats at it.

17  Q.   Put 2M back on here.

18  A.   That's it.

19  Q.   Are those the three seats that you're talking

20  about?

21  A.   That's correct.

22  Q.   And where were you seated?

23  A.   I was seated -- which would be the furthest

24  chair away.

25  Q.   Okay.   From where this photograph's being

1   taken?

2   A.   Right there (indicating).

3   Q.   Can you point to that?   Yes.

4        Where was the defendant located?

5   A.   In this -- this seat right here, if I can get

6   it to work.   There we go (indicating).

7   Q.   In the one closest to the wall; is that

8   correct?

9   A.   There's -- yes, closest to the camera.

10  Q.   Okay.   And where was Investigator Berola

11  seated?

12  A.   Seated here (indicating), in the seat to the

13  left.

14  Q.   What time, approximately, did the interview

15  begin?

16  A.   I believe it was 10:40 as I -- I think that's

17  what was stated on the beginning of the interview.

18  Q.   Prior to questioning the defendant, was he

19  advised of his Miranda rights?

20  A.   Yes, he was.

21  Q.   And why?   Why was he advised of his Miranda

22  rights?

23  A.   As a precautionary measure.

24  Q.   And how was he advised of his Miranda rights?

25  A.   Verbally and in writing.

1  Q.   I'm showing you what's been marked as

2  Government Exhibit 3.  Do you recognize that?

3  A.   Yes, I do.

4  Q.   And what is that?

5  A.   It is the Miranda Rights Waiver Form.

6  Q.   Is that your signature at the bottom of the

7  form?

8  A.   Yes, it is.

9  Q.   And whose signature's above yours?

10  A.   Tom Berola's.

11  Q.   And is that the form that was used to advise

12  the defendant of his rights?

13  A.   It was.

14       MR. McCOY:  Your Honor, I'd like to admit

15  Government Exhibit 3.

16       MR. TASEFF:  No objection.

17       THE COURT:  Admitted.

18  BY MR. McCOY:

19  Q.   Was the interview audio-recorded?

20  A.   It was.

21  Q.   And how was that recorded?

22  A.   On a digital recorder.

23  Q.   I'm showing you a CD.  Do you recognize that

24  CD?

25  A.   I do.

1  Q.   What is that?

2  A.   It is a CD of three audio tracks of the

3  interview.

4  Q.   Okay.  And prior to appearing here today, did

5  you have the opportunity to listen to that -- those

6  audio tracks?

7  A.   I did, yes.

8  Q.   And are they -- are they the audio recording

9  that was taken during the course of this interview?

10  A.   Yes.

11      MR. McCOY:  Your Honor, we'd move to admit

12  Government Exhibit 4 as well.

13      MR. TASEFF:  No objection.

14      THE COURT:  Be admitted.

15  BY MR. McCOY:

16  Q.   Now, did you assist in the preparation of a

17  transcript in this case -- a transcript of the

18  audio recording?

19  A.   Yes.

20  Q.   And have you had a chance to review that

21  transcript?

22  A.   In the last few days, no, I have not.

23  Q.   Have you reviewed it before?

24  A.   Yes.

25  Q.   And is the transcript a fair and accurate --

1   A.   Yes, it is.

2   Q.   -- representation of that?

3   A.   Yes.

4   Q.   This is Government Exhibit 5.  Is that the

5   transcript you've previously reviewed?

6   A.   Yes, as well as the one that I -- I thought

7   you were also alluding to the one that I had,

8   had --

9   Q.   So you assisted with the preparation of the

10  transcripts?

11  A.   Yes.   That's correct.

12  Q.   Okay.

13       MR. McCOY:  Your Honor, we move to admit

14  Government Exhibit 5 as well, which is the

15  transcript of the audio recording.

16       THE COURT:  Any objection?

17       MR. TASEFF:  No objection.

18       THE COURT:  It will be admitted.

19       MR. McCOY:  Your Honor, at this point we have

20  certain clips, portions of this interview --

21  BY MR. McCOY:

22  Q.   Let me ask, first of all, Agent Haferkamp, how

23  long did this initial portion of the interview

24  last?

25  A.   I believe it was just over an hour.

1      MR. McCOY:  We have particular clips, Your

2   Honor, of segments of this hour-long interview that

3   we'd like to play for the Court if that's all

4   right.

5      THE COURT:  That's fine.  Mr. Taseff,

6   anything?

7      MR. TASEFF:  That's fine.  I assume on cross I

8   can revisit or go to others?

9      MR. McCOY:  Sure.

10      THE COURT:  I would assume.  Okay.

11      MR. McCOY:  If you could play clip one,

12   please?

13      (Audio commenced and paused.)

14   BY MR. McCOY:

15   Q.  Whose voice is heard advising the defendant of

16   his rights?

17   A.  Agent -- or Investigator Berola.

18   Q.  Now, other than what was obviously just played

19   for the Court here, I want to ask you some

20   additional questions that may not be obvious from

21   just listening to the audio recording --

22   A.  Sure.

23   Q.  -- about the mood and demeanor of the

24   defendant.

25      Did the defendant, when he was being advised

1  of his rights, did he have a confused look on his

2  face or appear puzzled at all by what he was being

3  told?

4  A.   Not at all.

5  Q.   Is it fair to say that in your experience --

6  your law enforcement experience and the Air Force

7  and special agent with I.C.E., et cetera, that

8  you've dealt with some people who have been under

9  the influence of either alcohol or drugs?

10 A.   Yes.

11 Q.   Do you feel fairly confident in being able to

12 identify someone who's intoxicated or under the

13 influence of some substance?

14 A.   I do.  I do.

15 Q.   Did the defendant appear to be intoxicated or

16 under the influence?

17 A.   He did not.

18 Q.   Prior to the audio recording starting,

19 Investigator Berola said that he had previously

20 told him that he was going to be recording the

21 interview.  How much conversation occurred prior to

22 the audio actually starting at 10:40?

23 A.   Hardly any at all.  I would say just in the --

24 long enough for him to say this interview is

25 actually going to be recorded and then --

1  Q.   What had you said to him from the time that

2  you met him on the lawn in front of the house to

3  when he came into the kitchen?

4  A.   Not much of anything at all.

5  Q.   Do you remember specifically anything that you

6  said?

7  A.   No, I do not.

8  Q.   Did either you or Investigator Berola, to your

9  knowledge, promise the defendant anything in return

10 for making a statement?

11 A.   No, we did not.

12 Q.   Were there any threats made to the defendant?

13 A.   No, there was not.

14 Q.   Where was your firearm at this point?

15 A.   In the holster.

16 Q.   How about Investigator Berola's firearm?

17 A.   Same thing.

18 Q.   And you still had the -- well, let me give you

19 Government Exhibit 4 again -- Government Exhibit 3,

20 rather.   Under the Waiver section --

21 A.   Uh-huh.

22 Q.   Put the ELMO back.

23      Under the Waiver section, whose signature is

24 located there?

25 A.   Ron Seiver.

1  Q.   And in the audio recording that we just heard,

2  did he sign it there at the end of the recording --

3  A.   Yes.

4  Q.   -- to your knowledge?

5       Now, while you were interviewing the

6  defendant, was Task Force Officer Price continuing

7  her forensic preview of the -- of the computer

8  media items that had been found in the defendant's

9  bedroom?

10 A.   Yes.

11 Q.   Were you and Investigator Berola provided with

12 updates on some of the findings that she was --

13 A.   Yes, that's correct.

14 Q.   All right.  And how were you being notified of

15 these findings?

16 A.   Either verbally, off to the side or -- I, I

17 don't know for sure if there may have been a note

18 passed or something.  I'm not sure, but --

19 Q.   And who was coming in to either provide the

20 note or verbally advise you of some of the

21 findings?

22 A.   RAC -- my boss, Mitchell.  RAC Mike Mitchell

23 as well as Ellen Price.  There were other times

24 where I had temporarily stepped up to -- somebody

25 may have been telling me something about another

1  finding in the -- throughout the search as well.

2  Q.  And did you check in on the -- at those times,

3  did you check in on the preview yourself?

4  A.  I had at least once stepped into the area

5  where the preview was going on.

6  Q.  And what area was that?  Which room?

7  A.  The, the dining room area.

8  Q.  Okay.  At some point during the interview did

9  either you or Investigator Berola receive an update

10  regarding the potential of a local victim?

11  A.  Yes.

12  Q.  And what do you mean by a local victim?

13  A.  A local victim would be someone -- in this

14  particular case, it would be someone who has had

15  contact with the suspect as well as in the general

16  area of our AOR or the local area in general.

17  Q.  Okay.  And by contact with the defendant, what

18  do you mean?  Casual contact or what?

19  A.  Would be sexual contact, or if there's any

20  possible molestation or any pictures that would be

21  involved or anything like that.

22  Q.  How long into the interview -- do you remember

23  approximately -- was it before you received this

24  information regarding a potential local victim?

25  A.  I know that at about 15 minutes in, there was

1   notification of -- that's when Tom began speaking

2   about Brittany Miller.

3   Q.   All right.  And was Brittany Miller, that was

4   the local victim -- alleged local victim?

5   A.   That's correct.

6   Q.   And what, if anything, were you or

7   Investigator Berola told about Brittany Miller at

8   that point?

9   A.   I myself had not been told much of anything

10  that I recall.

11  Q.   And did you or Investigator Berola question

12  the defendant about Brittany Miller?

13  A.   Yes.

14  Q.   And what, what did he tell you about Brittany

15  Miller?

16  A.   What did the defendant?

17  Q.   Did the defendant tell you -- sorry -- about

18  Brittany Miller?  Yes.

19  A.   At the time of their interaction, she was 16,

20  I believe.  That he had traveled to meet with her

21  for sex on two occasions and -- yeah.  I believe

22  that's accurate.

23  Q.   Was TFO Price able to somehow confirm during

24  her preview what the real age of this victim was --

25  of Brittany Miller?

1  A.  I believe so.  At some point there was an I.D.
2  found that -- there was a picture of an I.D. taken.
3  And I believe that had her -- or her age on it.
4  Q.  Through the investigation, were you eventually
5  able to conclude what Brittany Miller's actual age
6  was at the time the contact occurred?
7  A.  Yes.  Yes.  I believe she was 15, if that's
8  your question.
9       MR. McCOY:  If we could play clip two, please?
10      MR. TASEFF:  Mike, can you advise where we're
11 starting at?
12      MR. McCOY:  Yes, I'm sorry.  Clip two starts
13 at minute 13 and 54 seconds.  We're looking at
14 13:54 and goes through minute 16 and 30 seconds.
15      MR. TASEFF:  Thank you.
16      MR. McCOY:  The transcript, Your Honor, that
17 was -- I'm sorry, Your Honor.  The transcript that
18 was provided to the Court includes time stamps on
19 the left-hand margin.
20      THE COURT:  Okay.
21      MR. McCOY:  Go ahead.  Thanks.
22      (Audio commenced and paused.)
23 BY MR. McCOY:
24 Q.  Okay.  At the time that this line of
25 questioning was occurring, did either you or

1  Investigator Berola know the nature of this

2  relationship that the defendant had had with

3  Brittany Miller?

4  A.   I personally did not, no.

5  Q.   To your knowledge, did Investigator Berola

6  know?

7  A.   No.

8  Q.   At some point after this, did the defendant go

9  into detail regarding his relationship with her?

10 A.   Yes.

11 Q.   And I know you previously touched on this just

12 a moment ago, but if you could, what were some of

13 the specific details he provided regarding that

14 relationship?

15 A.   That, that they had -- that he had met her on

16 several occasions in, I believe, Rantoul to have

17 sexual relations with her.  That it was -- I

18 believe he said that it was her idea for them to

19 travel -- for him to travel to her.  That he met

20 her mother.

21 Q.   Did he say anything about the photographs that

22 tipped off --

23 A.   Yes.

24 Q.   -- TFO Price and others regarding Brittany

25 Miller?

1    A.   That it was both their ideas to take pictures

2    and/or video of the sexual interaction.

3    Q.   And so these pictures and/or video were of his

4    encounters with her?

5    A.   Yes.

6    Q.   While this line of questioning we just heard

7    was going on, had you seen any of these pictures or

8    the video?

9    A.   I had not.

10   Q.   Now, while you were interviewing the

11   defendant, where were the other adult occupants

12   that had been found at the house?

13   A.   During the beginning of the interview, the

14   three other adults that were at the residence were

15   out on the patio that I pointed out to you

16   initially.

17   Q.   And were they sitting down, standing up or --

18   A.   I believe they were sitting in chairs that

19   were on the patio.

20   Q.   At some point during the interview, did the

21   defendant's mother suffer a medical condition?

22   A.   Yes.

23   Q.   And what happened?

24   A.   I believe she was complaining of chest pains,

25   if that's correct.  I know that after we had talked

1  through the interview that she had -- that

2  Mr. Seiver had mentioned it may have been a stroke

3  or fibromyalgia.  But at the time I didn't know

4  exactly what her condition was.

5  Q.   Okay.  And when she started complaining of

6  chest pains, obviously you -- I'm assuming you were

7  not with her?

8  A.   I was not.

9  Q.   Because you were conducting the interview at

10  the time?

11  A.   That's correct.

12  Q.   At the time she started complaining of this

13  problem, what steps did the other agents take?

14  A.   The, the sheriff had actually called for

15  paramedics and the -- from what was told to me,

16  Mr. Alexander had asked if she could go to sit on

17  the couch in the living room area.  And, of course,

18  she was accommodated.

19  Q.   She was brought in to the couch?

20  A.   Yes.

21  Q.   How close was the living room, where the

22  mother was brought, to the kitchen where you were

23  located?

24  A.   It's diagonally on the opposite side of the

25  first floor.

1  Q.   Do you know approximately how many feet away

2  it would be -- would have been?

3  A.   30 feet.

4  Q.   And were there walls separating where you were

5  in the kitchen from the living room?

6  A.   Yes.   There's also kind of open-door areas as

7  well.

8  Q.   When the -- when the defendant's mother was

9  brought in to rest on the couch from the patio, how

10  was she brought in from the patio to, to the living

11  room?  Did she have to walk through the kitchen?

12  A.   Yes.  Temporarily.  There's a staircase that

13  comes -- a short staircase that comes up into the

14  kitchen area and then make an immediate right, goes

15  into the couch area, the dining -- or living room.

16  Q.   What, if anything, did the defendant say --

17  well, let me step back and ask, Did the defendant

18  -- was he aware that his mother was having this

19  condition?

20  A.   I could clearly hear that, that she was

21  walking up the stairs and making a moaning sound,

22  so I would -- I would have to say he would be

23  aware.  He would have heard the same thing that I

24  did, so --

25  Q.   And could you see her from your position at

1  the table?

2  A.  I could.  I could.

3  Q.  What, if anything, did the defendant say about

4  his mother's condition?

5  A.  After Agent Berola asked her (sic) if she's

6  all right, if she -- what condition she had, he

7  stated that she had had a stroke in the past and

8  that she has fibromyalgia.

9  Q.  At any point during this time or any point

10  after this, did the defendant ask to see his

11  mother?

12  A.  No, he did not.

13  Q.  What reaction, if any, did he have to her

14  condition?  I mean, did his -- well, let me ask it

15  this way:  Did his demeanor change noticeably at

16  all?

17  A.  No, it did not.

18  Q.  If the defendant had asked you or Investigator

19  Berola to stop the questioning so he could go and

20  see his mother, what would you have done?

21  A.  We would have stopped and allowed him to check

22  on her or talk to her, whatever he wanted to do.

23  Q.  Had you previously -- you or Investigator

24  Berola previously explained to him that he could

25  stop the questioning at any time?

1  A.  We had.

2      MR. McCOY:  If you could play clip three which

3  starts at minute 18 and goes to minute 19:21.

4      (Audio commenced and paused.)

5  BY MR. McCOY:

6  Q.  How long after that, if you remember,

7  approximately did paramedics arrive?

8  A.  I'd have to review the tape again myself, but

9  I believe it was approximately 15 -- 10 to 15

10 minutes.

11 Q.  And was the defendant's mother in the living

12 room that entire time --

13 A.  Yes.

14 Q.  -- between what we just heard and when the

15 paramedics arrived?  Was she in the living room the

16 entire time?

17 A.  I believe she was, yes.

18 Q.  Was she visible while she was in the living

19 room?

20 A.  No.

21 Q.  From your location in the kitchen, I should

22 say.

23 A.  No.

24 Q.  How long did this interview last, this first

25 portion of the interview?

1  A.   First portion?  Just a little over an hour.

2  Q.   And during the interview, did the defendant

3  ask to speak to an attorney at any point?

4  A.   No, he did not.

5  Q.   Did he ever ask for the questioning to stop?

6  A.   No.

7  Q.   What was his demeanor like during the

8  interview?

9  A.   Stayed pretty much the same the whole time.

10  Calm.

11       MR. McCOY:  If you can play clip four, please,

12  which starts at minute 19:22 and goes to -- oh, I'm

13  sorry.  Yes, if you can play clip four, please?

14       (Audio commenced and paused.)

15  BY MR. McCOY:

16  Q.   So this interview ended at what time,

17  approximately, or how long after it started?

18  A.   Just shortly over an hour.  So, if it was

19  10:40, then it would have been 11:40-something.

20  Q.   Did you or any other agents, did you approach

21  the defendant again after this initial portion of

22  the interview?

23  A.   Yes.

24  Q.   And who did?

25  A.   Agent Mike Mitchell and Investigator Berola.

1   Q.   And yourself?

2   A.   Yes, on the third track.   Yep.

3   Q.   Okay.   And when, when did you re-approach?

4   When did these agents re-approach the defendant?

5   A.   Approximately how long?

6   Q.   How long after the end of the first part of

7   the interview?

8   A.   If I recall correctly, I believe it was 45

9   minutes to an hour.   I'm not sure.

10   Q.   Okay.   And why -- do you know why the

11   defendant was re-approached again?

12   A.   The second portion of the interview, I believe

13   he was asked about his accounts.

14   Q.   Which accounts?

15   A.   BlogTV or any other Internet accounts that he

16   may have had.

17   Q.   Okay.   And why was he being asked about those

18   accounts?

19   A.   I'd have to listen to the audio again to --

20   Q.   What was the purpose of asking about these

21   accounts?

22   A.   Oh, to -- I know on the third -- the third

23   section of the interview, which I was also involved

24   in on the third part, to obtain consent to view

25   those accounts.

1   Q.   And where was the defendant at this time?

2   A.   In the -- yes, still in the kitchen area.

3   Q.   Had he been in the kitchen the time between

4   the end of the first part of the interview and when

5   the second part started?

6   A.   I believe so.  I believe he was there most of

7   the time.  There had been a portion of the time

8   where I had gone back upstairs and/or around the

9   rest of the premises.  And so he -- technically, I

10  guess, during that time he could have stepped away

11  from the table.  But as far as I know, he was in

12  the kitchen area.

13  Q.   You stated that he was re-approached to ask

14  about the -- asked for consent to search these

15  accounts; is that correct?

16  A.   Yes.

17  Q.   And what did he say when he was asked to

18  consent to the search of these accounts?

19  A.   That we could look at them; but to fully give

20  up the accounts, he was not willing to do that

21  except for the blogTV account.

22  Q.   All right.  I'm showing you Government

23  Exhibit 6.  Do you recognize that?

24  A.   I do.

25  Q.   What is that?

1  A.   It is a I.C.E. form for consent to gain access

2  to accounts, user accounts.

3  Q.   Okay.  Is this the form that you presented to

4  the defendant?

5  A.   Yes.

6  Q.   And is that your signature at the bottom of

7  the form?

8  A.   It is.

9  Q.   Whose signature is above yours?

10  A.   Tom Berola.

11  Q.   Okay.

12       MR. McCOY:  Your Honor, the government would

13  like to admit this as Government Exhibit 6.

14       MR. TASEFF:  No objection.

15       MR. McCOY:  Objection?

16       MR. TASEFF:  No objection.

17       THE COURT:  It will be admitted.

18  BY MR. McCOY:

19  Q.   Now, listed at the top of the form, what are

20  those?

21  A.   The top of the form, from -- see, it's

22  Facebook, refused.  It says Yahoo, refused.  MSN,

23  refused.  World of Warcraft, refused.  And then

24  blogTV, which in the interview you can hear him

25  saying that he agrees to give us access to that

1   account, and the user account and the password next
2   to it.
3   Q.   Okay.  So all these accounts here -- one, two,
4   three, four, five of them --
5   A.   Yes.
6   Q.   -- these were the accounts that you were
7   seeking consent to search?
8   A.   Yes.
9   Q.   And so then by -- he's refusing all of them
10  except this last one, blogTV; is that correct?
11  A.   That's correct.
12  Q.   Who wrote this information in here; was that
13  you or --
14  A.   That would have been, I believe, Tom Berola.
15  And part of -- I think the "flag" and "ban" and "i
16  love April" may have been written by Mr. Seiver
17  because at the end -- during the interview Tom
18  asked him to write that down, and he did.
19  Q.   How long did this portion of the interview
20  last when you're asking for consent?
21  A.   I think it was somewhere around nine to ten
22  minutes.
23  Q.   During this portion of the interview, did the
24  defendant ask to speak to an attorney or ask
25  questions -- well, let me stop.

1    Did he ask to speak to an attorney?

2    A.   No, he did not.

3    Q.   Did he ask for the questioning to stop at all?

4    A.   No.

5    Q.   Did he seem to understand what he was being

6    told?

7    A.   Yes.

8    Q.   What happened next?  After this form was

9    completed, what happened next?

10   A.   The interview was terminated, I believe,

11   shortly thereafter and a continuation of the search

12   and so on.

13   Q.   At some point did you or one of the other

14   agents attempt to make contact with the U.S.

15   Attorney's Office?

16   A.   Yes.  Mike Mitchell, my supervisor.

17   Q.   And at that point was a decision made on

18   arrest?

19   A.   Could you repeat the question?

20   Q.   At that point, after the consultation with the

21   U.S. Attorney's Office, to your knowledge was a

22   decision made on arrest?

23   A.   I believe so, yes.

24   Q.   And what was that decision?

25   A.   To arrest.

1  Q.   Okay.  And on what grounds; do you know?

2  A.   Production, possession and due to the fact

3  that there was a local victim.

4  Q.   Now, you had stated earlier -- testified

5  earlier that there were no plans to arrest the

6  defendant prior to executing the search warrant.

7  Why did those plans change?  Why did you then

8  decide to conduct an on-site arrest of the

9  defendant at that time?

10  A.   After -- like I -- like we just said, after

11  consultation with AUSA's Office, arrest was

12  decided, and primarily due to the production.

13  Q.   After Task Force Officer Price conducted her

14  initial forensic preview of the laptop and thumb

15  drive in this case, was a more thorough or in-depth

16  analysis conducted?

17  A.   Yes.

18  Q.   And where was that conducted?

19  A.   She has an office at the AUSA's office in

20  Springfield, Illinois, where she conducts her

21  forensic analysis.

22  Q.   And who conducted that analysis, that more

23  thorough analysis?

24  A.   Ellen Price.

25  Q.   And what were the findings of that analysis;

1    do you know?

2    A.   In terms of videos and pictures?

3    Q.   That's correct.

4    A.   If I recall exact numbers, it would be 119 for

5    child pornography images and 31 videos.

6    Q.   Videos of what?

7    A.   Child pornography.

8        MR. McCOY:   Thank you, Your Honor.  That's all

9    the questions I have for direct examination.

10       MR. TASEFF:   Judge, could I just have two

11   minutes to use the rest room?

12       THE COURT:   Yes.  Why don't we take five

13   minutes here?  Take a short break.

14       (Recess at 10:56 to 11:04 a.m.)

15       THE COURT:   Okay.  Mr. Taseff, ready?

16       MR. TASEFF:   Thank you.

17                    **CROSS-EXAMINATION**

18   BY MR. TASEFF:

19   Q.   Sir, how tall are you?

20   A.   Approximately 6 foot tall, I'd say.

21   Q.   How much do you weigh?

22   A.   Currently?

23   Q.   Yes.

24   A.   Approximately 280 pounds, '85 maybe.

25   Q.   And back in August of last year, pretty much

1  the same height and weight?

2  A.   No, I was probably 40 to 50 pounds lighter

3  then, I'd say.  Same height, of course.

4  Q.   Agent Berola, he's a pretty big guy, too,

5  isn't he?

6  A.   He's a tall gentleman, yes.

7  Q.   About 6'6" or so?

8  A.   I think so.

9  Q.   About 230?

10  A.   Somewhere around there.  I think he's gained a

11  few pounds since then, but --

12  Q.   And on the morning of August 24th when the

13  search warrant was executed, both of you, as well

14  as your fellow officers, were wearing a book or

15  vests?

16  A.   That's right.

17  Q.   Armed with firearms?

18  A.   That's correct.

19  Q.   Handguns?

20  A.   Yes.

21  Q.   AR15 type assault rifles?

22  A.   That I, I -- honestly, at this point I don't

23  want to say that there were for sure that day.  I'd

24  have to -- I'd have to talk to the -- another agent

25  that would know for sure on that.

1  Q.   Well, were you and other officers wearing
2  anything on your heads?
3  A.   That's not --
4  Q.   Any kind of device --
5  A.   No.
6  Q.   -- or stocking cap or anything to cover the
7  hair, the neck, the face?
8  A.   No.
9  Q.   But everyone's armed?
10  A.   Yes.
11  Q.   Nine to ten?
12  A.   Nine to ten, yes.
13  Q.   Now, back in January of 2010 -- Mr. McCoy had
14  you recite some of the background investigation in
15  this case.  And just to summarize, back in January
16  -- January 7th, 2010, a woman in Canada --
17  A.   That's correct.
18  Q.   A woman receives a Facebook message, correct?
19  A.   That's correct.
20  Q.   On her Facebook account?
21  A.   Yes.
22  Q.   And the message that she received was from a
23  David Smith?
24  A.   Yes, that was the --
25  Q.   Correct?

1  A.  -- account user name or whatever you want to

2  call it.

3  Q.  And it's this David Smith e-mail to Mom's

4  Facebook account in Canada that started this whole

5  thing rolling, correct?

6  A.  That is correct.  That is correct.

7  Q.  And subsequent investigation by Canadian

8  authorities, I.C.E. authorities in New York, your

9  office, subsequent investigation concluded that the

10  I.P. address of the computer that sent that

11  Facebook message to Mom in Canada with the link to

12  yfrog, that I.P. address was registered to Ronald

13  Seiver, correct?

14  A.  The I.P. address -- to be more specific, the

15  I.P. address that was assigned to Mr. Seiver was

16  the one that uploaded the images to yfrog.

17  Q.  Correct.

18  A.  Yes.

19  Q.  Now, this link to the Facebook account of Mom

20  would have allowed Mom then to double-click on the

21  link, correct?

22  A.  That's correct.

23  Q.  And upon double-clicking on the link, up comes

24  16 images --

25  A.  That's correct.

1  Q.  -- of her stepdaughter?

2  A.  Yes.

3  Q.  Whom she, obviously, recognized?

4  A.  Yes.

5  Q.  In various states of undress or dress,

6  correct?

7  A.  That's correct.

8  Q.  Now, of the 16 images -- which you've seen,

9  correct?

10  A.  That's correct.

11  Q.  And you enumerate those images in your search

12  warrant affidavit?

13  A.  That's correct.

14  Q.  Two of the 16 would constitute child

15  pornography, in your opinion?

16  A.  That's correct.

17  Q.  Obviously, Mom or Stepmom was very alarmed,

18  correct?

19  A.  That's correct.

20  Q.  She notifies Canadian law enforcement,

21  correct?

22  A.  Yes.

23  Q.  Who interviewed her stepdaughter?

24  A.  Yes.

25  Q.  And after several sessions -- as you recount

1  in your affidavit, after several sessions of

2  interviewing the girl -- the minor -- the

3  authorities concluded that the minor had posted

4  video file of herself engaged in sexually-explicit

5  conduct, correct?

6  A.   On blogTV, yes.

7  Q.   On blogTV?

8  A.   Yes.

9  Q.   BlogTV is a site that anyone in the world on

10 the worldwide net could access, correct?

11 A.   That's correct.

12 Q.   And that this minor living in Canada,

13 unbeknownst to her parents, had posted this AVI

14 file, correct?

15 A.   That's correct.

16 Q.   Which is computer tech words for a video file,

17 correct?

18 A.   Yes.  Uh-huh.

19 Q.   And the video file was some ten minutes long?

20 A.   Uh-huh.

21 Q.   And it engaged her touching herself in various

22 ways?

23 A.   That's correct.

24 Q.   Lewd and lascivious ways, correct?

25 A.   That's correct.

1   Q.   Which would constitute child pornography?

2   A.   Yes.

3   Q.   And that she posted -- she admitted this to

4   the Canadian authorities ultimately, after several

5   denials, didn't she?

6        Ultimately, in January of 2010, the minor

7   admitted to the authorities that she posted that

8   ten-minute AVI file under her account,

9   cassyslut.avi, correct?

10  A.   That is the name that it was given by whomever

11  posted it to yfrog.

12  Q.   Whoever posted it to yfrog?

13  A.   That's correct, from that --

14  Q.   Presumably the girl?

15  A.   From the I.P. address.

16  Q.   Presumably the girl?

17  A.   Not the -- not the way that I -- that I --

18  that it's, it's --

19  Q.   Or was that "Iloveyoubaby1996"?  Was that --

20  A.   That would have been her account, her blogTV

21  account.

22  Q.   Now, Mom's e-mail then in January of 2010

23  contains this link to yfrog, correct?

24  A.   That's correct.

25  Q.   Which is a subset of ImageShack, correct?

A.   That's correct.

Q.   Which is one of these social media places where people can exchange video images, correct?

A.   Yeah.  You can post videos and things, yeah.

Q.   Did you or any other agent ever determine or ascertain how it was David Smith learned of Mom's Facebook account to post that message and link?

A.   We did not.  Not from my office, no, we did not.

Q.   Isn't it true the girl's account with her lewd and lascivious video, didn't it have information linked to Mom and the location?

A.   I'm sorry.  Could you ask that --

Q.   Didn't the girl's -- the minor's account have information that would link to Mom's identity and Facebook?

A.   I'm not sure of that.  I mean, I didn't -- we didn't look into that portion.  My office did not.

Q.   So what this -- this Facebook e-mail then with the 16 image files, that e-mail then is -- according to Dan, the minor willingly uploaded a short AVI to blogTV or some other file-sharing service, and that someone posted photographs made from this AVI file to the yfrog.com website, correct?

1   A.   Correct.

2   Q.   And that's the premise upon which you were

3   acting?

4   A.   The AVI file had -- if you -- the yfrog

5   account or, rather, the yfrog postings were of the

6   16 images.  Those were taken from an AVI file --

7   Q.   Under the girl's account?

8   A.   -- that she had posted --

9   Q.   Correct.

10  A.   -- or that she had.  But the images were

11  posted to yfrog from someone who had access to

12  those files, who posted them to yfrog.

13  Q.   And made stills?

14       And basically by, by utilizing a mouse, you

15  can create still photographs off an image --

16  A.   From the video file.

17  Q.   -- and then upload those to the e-mail?

18  A.   Upload those to the e-mail or yfrog, yes.

19  Q.   Yfrog.

20       Now, the particular content of that message is

21  enumerated; it's set forth in your affidavit, isn't

22  it?

23  A.   Yes.

24  Q.   The verbatim text of that e-mail.  And I'm

25  going to quote it to you, and I want you to tell me

1  if this is your recollection of what the e-mail

2  from David Smith stated.

3      Quote, Is J.H. your daughter, question mark.

4  You need tell -- You need to tell that slut to stop

5  getting naked on cam on blogTV on MSN for people.

6  She also say she had sex over 100 times since she

7  was 9 years old, unquote.

8      Correct?

9  A.   That's correct.

10 Q.   So presumably David Smith is notifying the

11 mother of this minor that the minor is posting

12 child pornography on the Internet, correct?

13 A.   Correct.

14 Q.   And this is what started your investigation

15 that culminated with the execution of a search

16 warrant some eight and a half months later,

17 correct?

18 A.   That's correct.

19 Q.   Now, your investigation also allows you in

20 some cases -- you investigate persons who are doing

21 peer-to-peer file sharing, correct?

22 A.   That's correct.

23 Q.   Where traffickers or distributors of child

24 pornography have certain programs, such as LimeWire

25 or Kazaa or other yfrog type situations, where they

1  can basically trade and distribute image files

2  amongst each other on the worldwide web, correct?

3  A.   That's correct.

4  Q.   The course of your investigation over that

5  eight-month period revealed no evidence at all that

6  the I.P. address assigned to Ronald Seiver was

7  involved in peer-to-peer file sharing of child

8  pornography, correct?

9  A.   I believe that's correct, other than the

10  posting to yfrog.

11  Q.   That one time in January of 2010?

12  A.   Correct.

13  Q.   So, a subpoena's then issued to Frontier

14  Communications in New York?

15  A.   That's correct.

16  Q.   Which is the Internet service provider that

17  Mr. Seiver was registered to, correct?

18  A.   That's correct.

19  Q.   And subpoenas revealed -- were complied with

20  and revealed to you on April 28th, some four months

21  later --

22  A.   That's correct.

23  Q.   -- confirming the I.P address, correct?

24  A.   Yes.  It had been confirmed prior to that as

25  well, but I personally --

1  Q.  And, indeed, a day or so later, after subpoena

2  compliance narrowing the I.P. address to

3  Mr. Seiver, on or about April 30th you went out to

4  the Seiver residence, didn't you?

5  A.  That's correct.

6  Q.  And you photographed it, didn't you?

7  A.  Yes, I did.

8  Q.  And you ran certain information with respect

9  to vehicle -- a vehicle or vehicles located there,

10  correct?

11  A.  That is correct.

12  Q.  So, the information that started in January

13  narrowed to one Ronald Seiver with I.P. addresses,

14  residences and everything as of April 28th,

15  correct?

16  A.  Approximately.

17  Q.  Or April 30th?

18      And then sometime in July you did a criminal

19  records check for the people that the post office

20  folks said might be living there, correct?

21  A.  That's correct.

22  Q.  And it came back totally negative as to all

23  five of the individuals?

24  A.  That's positive.

25  Q.  So, as of the month of May and June and July

1   and most of August, there really wasn't anything

2   going on in this investigation, was there?

3   A.   There was an ROI that was posted during that

4   time frame.

5   Q.   What is an ROI?

6   A.   Report of investigation.

7   Q.   But no subsequent activity of any substance,

8   correct?

9   A.   That's correct.

10  Q.   So it takes --

11  A.   Up until --

12  Q.   So it takes three and a half months --

13  A.   -- June or July.

14  Q.   -- three and a half months to prepare a search

15  warrant affidavit?

16  A.   No, it does not.

17  Q.   Indeed, this was the first search warrant

18  affidavit you ever prepared as an I.C.E. agent,

19  isn't it?

20  A.   That's correct.  Yes, it is.

21  Q.   Did someone give you a form to use to

22  structure the affidavit?

23  A.   There's general go-bys; that is correct.

24  However --

25  Q.   That include the same boilerplate allegations

1  about collectors of child pornography?

2       Did you get that off a form in I.C.E. records

3  depository for search warrant affidavits?

4  A.   There's general go-bys that are used and/or

5  passed on to agents that -- you know, to go by.

6  Q.   When we look at those allegations in your

7  search warrant affidavit about the habits and

8  patterns of collectors of child pornography --

9  A.   Yes.

10  Q.   -- did you get that out of a book?

11  A.   No.

12  Q.   Was that your own research?

13  A.   No.

14  Q.   Was it case-specific to this particular case,

15  or did you get it off of a form from I.C.E. for

16  search warrant affidavits?

17  A.   It would be something that we would utilize as

18  a go-by, as I said.

19  Q.   Now, the search warrant was presented to

20  Magistrate Judge Shields on or about August 16th?

21  A.   That's correct.

22  Q.   You presented the search warrant affidavit to

23  Judge Shields?

24  A.   I did.

25  Q.   Were you alone?

1   A.   No, I was not.

2   Q.   Were other agents present?

3   A.   At the presentation to the --

4   Q.   To the judge.

5   A.   -- to the judge?  AUSA McCoy was with me.

6   Q.   The two of you.  Did you swear --

7   A.   I did.

8   Q.   -- in the judge's presence to the information

9   in your complaint and affidavit?

10  A.   I did.

11  Q.   And that, of course, was the sole information

12  provided to the judge?

13  A.   Yes.

14  Q.   Was there a court reporter present?

15  A.   Court reporter present?

16  Q.   Present during the presentation of --

17  A.   No.

18  Q.   Did the judge ask you any questions?

19  A.   That I can recall -- I'm sure that he did, but

20  I couldn't tell you exactly what questions he

21  asked.

22  Q.   So, once the warrant was issued by the judge

23  on August 16th, it took some eight days of

24  preparation to execute the warrant at the residence

25  you had visited back in April, correct?

1  A.   That entails several things.  I mean, in order

2  to be able to get the nine to ten agents there and

3  to schedule to make sure we have enough officers to

4  attend the search warrant, it can take a few days

5  in itself.  However, we have to make sure that

6  those agents are available on that -- on a specific

7  date, depending on their schedules and things.

8  Q.   So, you got the group together for

9  August 24th?

10  A.   That's correct.

11  Q.   And the eight or nine of you then arrive, as

12  you've described today, to execute the warrant?

13  A.   That's right.

14  Q.   You saw the elder Mr. Alexander in his front

15  yard upon your arrival?

16  A.   I initially did not.  I pulled into the yard;

17  and then after I got out of the vehicle, that's

18  when I saw, saw him there.

19  Q.   He obviously was not armed, was he?

20  A.   No, he was not from what I --

21  Q.   He did not attempt to flee or resist, did he?

22  A.   Not that I know of.  I didn't go hands-on.  I

23  didn't approach him myself.

24  Q.   As case agent, you know that he was accosted

25  at gunpoint and handcuffed in his own front yard,

1  correct?

2  A.  He was not.  By your definition of accost I

3  don't know, but --

4  Q.  He was encountered in the front yard?

5  A.  Encountered.  I heard you say accost.

6  Q.  They encountered him, and they handcuffed him,

7  correct?

8  A.  Yes.

9  Q.  And then Mrs. Alexander, the wife, is at the

10  front door?

11  A.  Yes.

12  Q.  It's a hot morning, August morning so the

13  door's open, correct?

14  A.  Sure.

15  Q.  And then the agents made -- you and your

16  agents made entry into the front door, correct?

17  A.  Yes, that's correct.

18  Q.  And a search of the premises then occurs to

19  contact any other occupant, correct?

20  A.  That's correct.

21  Q.  Now I'm going to show you what we'll mark as

22  Defense Exhibit 1.  I'll use the ELMO to publish.

23  We've had a lot of questions concerning photographs

24  and that.

25      This diagram purports to show a front entrance

1  to the residence at the bottom or southern portion

2  of the residence, correct?

3  A.   Correct.

4  Q.   And is this diagram square with the

5  configuration of the first floor as you recall it?

6  A.   It's very similar, I'd say.

7  Q.   So, upon entry to the front entrance, one

8  would be in the dining room, correct?

9  A.   That is correct.

10  Q.   Where there is a table and chairs?

11  A.   Correct.

12  Q.   And from the dining room there would be access

13  to the kitchen --

14  A.   Uh-huh.

15  Q.   -- where you and Berola met with Mr. Seiver

16  one hour or so after the entry to the house,

17  correct?

18  A.   That's correct.

19  Q.   And then across from the kitchen diagonally,

20  one would go to the living room area, correct?

21  A.   That is correct.

22  Q.   Where ultimately Mrs. Alexander was placed on

23  a sofa awaiting the arrival of the EMT people,

24  correct?

25  A.   She was placed on the sofa in the living room

1    area.  The exact configuration of whether that was

2    exactly what it looks like, I'd have to consult the

3    pictures, the photos.

4    Q.  Well, the living room area would be in the

5    lower left-hand portion of the diagram, correct?

6    A.  Yes, that's correct.

7    Q.  And clearly from the audiotape we can hear the

8    sounds of Mrs. Alexander in the living room as you

9    were recording that interview in the kitchen,

10   correct?

11   A.  That is correct.

12   Q.  And, indeed, if one were to turn one's

13   position in the chair in the kitchen or get up to

14   look towards the living room area, one could

15   actually see Mrs. Alexander as she lay in distress

16   on that couch, correct?

17   A.  Depends on what angle you're at in the

18   kitchen.

19   Q.  So she's within eyesight and ear sight (sic),

20   correct?

21   A.  Earshot, yes.

22   Q.  Now, as I understand your testimony, Agent

23   Mitchell and other officers ascend the steps to the

24   bedroom, correct?

25   A.  That's correct.

1   Q.   And as they ascend the steps, they're

2   shouting, aren't they, "Police.  Search warrant,"

3   aren't they?

4   A.   Yes, that's a standard procedure.

5   Q.   Very loud shouts, correct?

6   A.   That's to make sure that everyone knows that

7   we're in the house.

8   Q.   I mean, that's your intent; to put everybody

9   on notice to freeze?

10  A.   To let everyone know that we're coming into

11  the house; that is correct.

12  Q.   Now, as case agent, Mitchell then, who's at

13  the front or the lead, the point of this search

14  group going upstairs, he ultimately reported back

15  to you what had transpired upstairs in that

16  bedroom?

17  A.   Later on that, that day, yes.

18  Q.   Well, Mitchell told you that morning that when

19  he entered Seiver's bedroom, Seiver was in the bed,

20  correct?

21  A.   That's correct.

22  Q.   Indeed, sitting up in the bed, correct?

23  A.   That's correct.

24  Q.   Suggesting to any casual observer that Seiver

25  was aware of your officers' entry.  Fair statement?

1   A.   I, I don't know what Mr. Seiver was thinking

2   at the time so I could not state what --

3   Q.   Well, I believe I heard you testify that

4   Mitchell told you that Seiver was doing something

5   with the laptop?

6   A.   That's correct.

7   Q.   Correct?

8   A.   That is correct.

9   Q.   The laptop that was within arm's reach of his

10   bed?

11   A.   That's correct.

12   Q.   And Mitchell was so concerned about what he

13   observed Seiver doing that he grabbed the laptop

14   and pulled the battery out, didn't he?

15   A.   That's correct.

16   Q.   To deactivate the computer, to prevent any

17   attempt to destroy files on that laptop?

18   A.   That's correct.  That's what I was told after

19   the fact.

20   Q.   Now, you've been a federal officer long enough

21   to know what obstruction of justice is, don't you?

22   A.   Yes.

23   Q.   And attempts to commit that crime, correct?

24   A.   Correct.

25   Q.   And attempts to destroy computer files that

1  are suspected of child pornography might be an

2  attempted obstruction of justice committed in the

3  officer's presence, correct?

4  A.   Might be if they were, in fact, on the

5  computer, but at the time he -- there was no way

6  for Agent Mitchell to know for a fact that, that

7  that's exactly what was happening.  He was just

8  trying to prevent any, any further damage if there

9  was.

10 Q.   So in an abundance of caution, the officer

11 seizes that laptop, pulls out the battery and puts

12 a gun in Mr. Seiver's face and orders him to his

13 knees, correct?

14 A.   I am not aware of that.

15 Q.   And handcuffs him, correct?

16 A.   He was put into handcuffs.  I know that he was

17 passed off to Agent Waite and handcuffed from

18 there.

19 Q.   And before having him handcuffed at gunpoint,

20 Mitchell claims that he saw Seiver slip that thumb

21 drive underneath the mattress of the bed that

22 Seiver was sitting or laying in, correct?

23 A.   I, I don't know that he knows that he slipped

24 a thumb drive under there.  I know that he gestured

25 to put his hand in that general area.

1  Q.   Suggesting to a casual observer that there was
2  an attempt to secrete an item of relevant evidence.
3  Wouldn't you agree?
4  A.   Possibly.
5  Q.   Now, once the laptop and the thumb drive were
6  seized from the bedroom, Seiver is taken outside to
7  the front yard where he sits in the grass for an
8  hour, correct?
9  A.   Approximately, yeah.
10 Q.   Now, Seiver at that point is not in custody,
11 is he?
12 A.   That's correct.
13 Q.   And he's not under arrest, is he?
14 A.   That's correct.  That's correct.
15 Q.   And while Seiver is outside in the front yard
16 sitting in the grass, are there any agents
17 attending to him?  Is he left alone in the grass?
18 A.   To all personnel in the house, there was at
19 least one person in the general area of all adults
20 in the --
21 Q.   So Seiver is under the watchful eye of an
22 armed federal officer in the front yard, correct?
23 A.   Or, or a sheriff.  That's correct.
24 Q.   Meanwhile, the laptop and the thumb drive are
25 being tested by Special Federal Officer Price?

1    A.    That's correct.

2    Q.    Tested in a makeshift computer lab that the

3    agents assembled in the dining room of the

4    premises, correct?

5    A.    That's correct.

6    Q.    And that's where we see all the fancy laptops

7    and computers that the agents brought with them

8    that day to execute the warrant?

9    A.    That's correct.

10   Q.    And they commence their preview of the thumb

11   drive and the laptop at least 45 minutes before the

12   interview of Mr. Seiver ever begins?

13   A.    I know that the laptop was initially taken,

14   and then I couldn't tell you exactly how long into

15   the search the thumb drive was found, but

16   subsequently afterwards the thumb drive was brought

17   down and then viewed but after --

18   Q.    It was previewed as well?

19   A.    That's right.

20   Q.    The thumb drive was previewed before the

21   interview commenced?

22   A.    I can't state that directly myself because --

23   Q.    You can't?  Haven't you already under oath?

24   A.    I, I could say that I know that the laptop and

25   the thumb drive were being -- were being viewed.

1  What was found, I cannot say.

2  Q.  Did you affix your signature under oath to a

3  criminal complaint that was filed in this case on

4  August 25th, 2010?

5  A.  Could you state the date again?

6  Q.  August 25th, 2010.

7  A.  Yes.

8  Q.  By my calculations, that's the day after

9  Mr. Seiver's arrest, isn't it?

10  A.  Yes.  Uh-huh.

11  Q.  Did you present a sworn complaint --

12  A.  Yes.

13  Q.  -- for the arrest of Ronald Seiver --

14  A.  Yes, I did.

15  Q.  -- to U.S. Magistrate Judge Thomas Shields?

16  A.  I believe so.

17      MR. TASEFF:  May I approach, Judge?

18      THE COURT:  You may.

19  BY MR. TASEFF:

20  Q.  Showing you what we have identified and marked

21  as Defense Exhibit 2.  Could you examine that?

22  A.  Yes, this is the criminal complaint.

23  Q.  That you prepared within 24 hours of

24  Mr. Seiver's arrest?

25  A.  Yes.

1  Q.   And presented under oath to a federal agent?

2  A.   Yes.

3  Q.   Let's go to paragraph 11, page four of your

4  sworn affidavit.

5  A.   Sure.

6  Q.   Have you found that portion?

7  A.   Not yet.

8  Q.   Paragraph 11.

9  A.   Uh-huh.  Yes.  That was -- this -- the known

10 number of images were --

11 Q.   Okay.  Well, I want you --

12 A.   -- given to me after the fact.

13 Q.   If you could, sir -- excuse me.

14 A.   Sure.

15 Q.   I would like you to read -- I would like you

16 to read paragraph 11 as I have it here before ELMO.

17 Let's read paragraph 11.

18 A.   Okay.  On August 24th, 2010, a search warrant

19 was conducted at 10 -- or 1042 U.S. Highway 67,

20 Roseville, Illinois.  Zip code.  Seiver was located

21 inside the residence in a second floor bedroom.  In

22 that same bedroom agents located an Acer Aspire,

23 Model 5720 laptop and Sandisk 16 gigabyte thumb

24 drive which was found under the mattress of the

25 bed.  After seizing both the items -- both of these

1  items, agents conducted a preview search of a -- of

2  files on the laptop computer and on the thumb

3  drive.   Through the preview search, agents

4  identified 24 images depicting child pornography on

5  the thumb drive.  For example, the following

6  images.

7  Q.   Of child pornography?

8  A.   Of child pornography were among the 24 found

9  on the Sandisk 16 gigabyte thumb drive.

10 Q.   You went further then to identify those three

11 specific images that you chose, you highlighted for

12 the magistrate judge's consideration of probable

13 cause to arrest.  You highlight that for him in

14 subparagraph 11(a), 11(b) and 11(c), correct?

15 A.   That's correct.

16 Q.   Let's go to the next page, page five,

17 paragraph 12.

18 A.   Page five, 12, yep.

19 Q.   And it says -- read, please.

20 A.   On August 24, 2010, Seiver consented to an

21 interview with federal agents after being advised

22 of the Miranda Rights and Waiver Form.  During the

23 interview, Seiver admitted that he had a sexual

24 relationship with a 16-year-old minor female from

25 Rantoul.  Seiver told agents that he had

1  encountered the girl online and had subsequently

2  met with her twice in person during the fall of

3  2008 to have sex.

4  Q.  And stopping there then, isn't it true that

5  the rest of that paragraph and the enumerated image

6  files that were described deal with the contact

7  related to Brittany Miller, correct?

8  A.  Yes.

9  Q.  So, wouldn't you agree that one's reading of

10  your criminal complaint could be interpreted that

11  some 24 image files of child pornography were

12  detected on the laptop and the thumb drive before

13  the interview even commenced?

14  A.  No, that is not correct.

15  Q.  Well, you don't think -- excuse me.  You're

16  saying that one could not read that paragraph --

17  paragraphs 11 and 12 and draw a conclusion that the

18  preview, by its very nature, preceded the

19  interview?

20  A.  I could definitely tell you that that was not

21  my intent, if that's the case, but anyone's

22  interpretation's going to be the next person's

23  interpretation (sic).

24  Q.  Well, here's what we're driving at.  When the

25  interview started and you and Agent Berola go on

1  tape with Mr. Seiver, you knew at the time that
2  interview commenced that Price had found child porn
3  on the computer, didn't you?
4  A.   I don't -- I don't believe I recall that she
5  had actually found -- prior to the interview --
6  Q.   Prior to the commencement of the interview,
7  when Berola and you activate that recorder in the
8  kitchen, you and Berola were aware of Agent Price's
9  discovery?
10 A.   I knew that she had been going through the
11 thumb drive.  I can attest to that, yes.
12 Q.   You were aware that she had discovered child
13 pornography on those items found in Seiver's
14 bedroom before you and Berola began your formal
15 interview?
16 A.   I do not recall that.
17 Q.   You don't recall that.
18      Do you have a copy of the transcript of the
19 interview before you?
20 A.   I do not.
21      MR. TASEFF:  May I approach, Judge?  I believe
22 this is Government 2.
23      THE COURT:  You may.
24      MR. McCOY:  Transcript is Government 5.
25 BY MR. TASEFF:

1  Q.   Government 5.  I'll show you a copy of

2  Government 5, sir.  And my references will be to

3  the time stamp on the left-hand margin.

4       You're present during the interview, correct?

5  A.   That's correct.

6  Q.   You're taking notes?

7  A.   That's correct.

8  Q.   Berola is the lead questioner?

9  A.   That's correct.

10 Q.   In fact, he performs basically 98 percent of

11 the questions?

12 A.   Correct.

13 Q.   Berola starts out by getting confirmation that

14 the matter is being tape-recorded?

15 A.   That's correct.

16 Q.   And then at time stamp 53 seconds where it

17 says, TB:  Okay.  You've seen on TV, uhm, I'm sure

18 you've seen police shows, and you've seen them

19 where they read people their rights.

20      RS at 1:01, Yeah.

21      At 1:02, Berola:  You're not under arrest,

22 okay, but in order to ensure that you understand

23 your rights, uhm, I'm gonna, uhm, go ahead and read

24 you, uhm, your Miranda rights.

25      And at 1:13, RS, Mr. Seiver replies:  All

1  right.

2      1:13, Berola:  I don't plan to arrest you.

3      RS at 1:14:  Okay.

4      1:15, Berola:  But this is a formality.

5      I understand these are Berola's words and not

6  yours?

7  A.   Correct.

8  Q.   But you're sitting there, and you heard him

9  say, We have to do as part of our job and to make

10 you understand your rights.  Do you understand

11 that?

12     Seiver:  Yes.

13     So, the two of them then recite the verbiage

14 off of the form, do they not?

15 A.   That's correct.

16 Q.   And proceeding then to 2:28, a page or two

17 later, 2:28, Berola:  Okay.  Uh, you're not in

18 custody.

19 A.   That's correct.

20 Q.   So I'm gonna line through that, and he's

21 referring to the form where he lined through the

22 custody provision of the Miranda waiver form?

23 A.   That's correct.

24 Q.   We can actually see where he did that on the

25 copy we have?

1  A.   Correct.  Uh-huh.

2  Q.   I'm gonna line through that, uhm, where it

3  says 'I was taken into custody,' okay?

4       2:35, Berola:  I'm gonna -- I'm gonna line

5  through that because you're not in custody.  I'm

6  just gonna line through that whole thing.

7       Seiver:  So if I sign this, I'm still waiving

8  my rights, though, right?

9       Berola at 2:45:  You're just saying, uhm, yes,

10 you're waiving your rights, saying that you

11 understand your rights and that you still agree to

12 speak to us.  Okay?  You -- you're not admitting

13 any guilt if that's what --

14      Seiver:  No, I'm just want to know what I'm

15 signing.

16      And it goes on to 3:10, Seiver says:  All

17 right.

18      Berola:  Okay.

19      I don't like the idea of that, Seiver says.

20      This idea about waiving his rights, you heard

21 Seiver say he didn't like the idea of that, right?

22 A.   Correct.  Yeah.

23 Q.   Berola at 3:14, says:  Well, you can still --

24 you can exercise your rights at any time.

25      Seiver:  All right.

1     Berola, 3:18:  It's not like you're throwing
2  them out the window.
3     Seiver:  Okay.
4     Berola:  And you can't go back to them.
5     Seiver:  Okay.  Just making sure.
6     3:22, Seiver:  I don't have anything to hide.
7     Berola:  Yeah, no, this just says you
8  understand them, and you're gonna -- you're gonna
9  talk to us because it doesn't mean you, you --
10  you've given them up for all time.
11     Shriver:  Okay.
12     3:29, Berola:  Okay.  You can always go back
13  to anything on here.  You can go back to it.
14     Seiver:  Okay.
15     And then Berola, 3:33:  So we -- you're not in
16  custody, and it says you've signed this document.
17     By my count, there are as many as five
18  references that Berola says in this two-minute
19  snippet, You're not in custody.  You're not under
20  arrest.  We don't plan to arrest you.
21  A.  That's correct.
22  Q.  Correct?
23  A.  That's correct.
24  Q.  Mr. McCoy asked you a hypothetical, Well, what
25  would you have done if Seiver had piped in and

1  said, "Gee, can I tend to my mom?"

2      And you opined at that time you would have

3  stopped, correct?

4  A.  Of course.

5  Q.  Let me pose to you a hypothetical or two.

6  Let's assume that Mr. Seiver at that juncture said,

7  "Wait a minute.  Did you guys seize my passport

8  from my bedroom upstairs?"

9      You did, did you not?

10  A.  I don't know that we had seized it.  I, I

11  believe it was --

12  Q.  You found it.  You found a passport issued to

13  Ronald Seiver, correct?

14  A.  Yes.

15  Q.  What if Seiver had said at that juncture, "I

16  want to go to the Quad City airport using my

17  father's car, and I want my passport that you found

18  in my bedroom so I can get onboard the nearest

19  plane and leave the United States of America for as

20  long as I want"?

21      Now, is it your testimony here today that you

22  would have let Ronald Seiver get up from that

23  kitchen table and drive away from his parents' home

24  and go to an airport and leave the United States of

25  America under these circumstances?

1  A.   Well, that's a hypothetical situation, and I
2  don't --
3  Q.   Well --
4  A.   I don't --
5  Q.   You answered other hypotheticals, and you are
6  saying again and again, You're not in custody?
7  A.   Correct.  He was not in custody.
8  Q.   You're not under arrest.
9       So, would you have let him leave the premises
10 and go to the airport some 40 miles away?
11 A.   If he would have requested it.  He was not in
12 custody, so I'd have to say yes.
13 Q.   You would have let him go, correct?
14 A.   At that point.
15 Q.   Is that what you're saying?
16      Did you ever tell him that he was free to
17 leave?
18 A.   In the Miranda rights, it tells them exactly
19 what he can and what his options are.
20 Q.   No.  Do the Miranda rights tell him he's free
21 to leave?
22 A.   The Miranda rights say that he's free to stop
23 the questioning at any time and --
24 Q.   Well, did you ever tell him or Berola ever
25 tell him that, "You're not under arrest"?  We know

1  Berola said that?

2  A.   Right.

3  Q.   "We don't plan to arrest you.  You're free to

4  leave."  Did he ever say he's free to leave?

5  A.   I don't -- I don't believe he did, no.

6  Q.   Mr. McCoy has played various snippets of this

7  interview wherein we hear -- we hear Mrs. Alexander

8  in distress, correct?

9  A.   That's correct.

10 Q.   And it's obvious to anybody who listens to

11 that that this woman is in great pain, correct?

12 A.   You can hear the moans in the background, yes.

13 Q.   And so much pain that one or more of your

14 agents summoned EMT officials from the Warren

15 County Sheriff's Department, correct?

16 A.   That's correct.

17 Q.   They summoned an ambulance, didn't they?

18 A.   That would be common procedure if anyone was

19 in distress of any form.  We're not paramedics

20 ourselves so we can't assume what is wrong with

21 her.

22 Q.   And this conversation that you're having with

23 Mr. Seiver at the kitchen table, are you all

24 sitting there that morning having a leisurely cup

25 of coffee, enjoying each other's company?

1  A.   No, we were not having coffee.

2  Q.   I mean, it's a little more formal than that,

3  isn't it?

4  A.   It's an interview, if you want to call that

5  formal.

6  Q.   And the two of you then are seated around the

7  table -- it's a small kitchen table, isn't it?

8  A.   Yes.

9  Q.   And both of you are sitting across from him.

10  In fact, you're sitting directly across from

11  Mr. Seiver, and Agent Berola is sitting to Seiver's

12  left at this small kitchen table?

13  A.   That's correct.

14  Q.   Let's go to 10:24 -- 10:17, that is.  Now

15  Berola's talking about something here that I don't

16  -- I'm not sure if you understood or were unaware

17  of.  10:17.  Do you see that exchange?

18      TB:   The -- we saw upstairs -- we saw upstairs

19  that you apparently were on the Internet, and then

20  it looked like your sister -- now, that would

21  suggest Berola was aware of Seiver's activity in

22  the room at the time that Mitchell entered,

23  correct?

24  A.   Like we said, there's an hour between the

25  interview and the beginning of the search so their

1  conversations that they may have had I would not be
2  privy to.
3  Q.  So, we'll ask Berola that.
4       We saw upstairs that you apparently were on
5  the Internet, and then it looked like your
6  sister --
7       Seiver:  I woke up.  I was sleeping.  I woke
8  up, and I heard a bunch of stuff outside.  I sat up
9  and looked at my computer, and it was doing
10 something.  I don't know.  And you guys came in and
11 scared the shit out of me, is what Seiver tells
12 you, correct?
13 A.  That's what he told us in the interview, yes.
14 Q.  And I don't detect from listening to that that
15 he's laughing when he says that.  Did you?
16 A.  Correct.
17 Q.  Berola:  Uhm.
18      Seiver:  I was half asleep.
19      And then Berola says, 10:35:  You didn't
20 activate a program?
21      Seiver:  No, I didn't do anything.  Sometimes
22 it scans on its own.  I just woke up.
23      And Berola queries further about what program
24 was running.  You heard that, didn't you?
25 A.  That's correct, yeah.

1  Q.   Let's go to 11:43.  Roughly 12 minutes into

2  the interview, Berola poses this question, 11:43:

3  Okay.  Obviously, you know, we wouldn't go to all

4  this trouble if -- unless we suspected something

5  significant going on here.  I mean, is that fair to

6  say?

7       Seiver:  Yeah.

8       11:57, Berola:  So why do you think we're

9  here?

10      Seiver:  I have no idea.

11      12:00:  You don't have any idea whatsoever?

12      Seiver:  No, I don't 'cause I was half asleep

13  when I heard you guys, and I didn't even know what

14  was going on until they opened the door and I had

15  the gun pointed at me, so --

16      And then Berola states at 12:11:  Yeah, yeah,

17  well --

18      Seiver:  I understand that's your job, but

19  it's still --

20      Berola:  It's --

21      THE COURT:  Mr. Taseff, are these going to be

22  questions that -- because I can read this.

23      MR. TASEFF:  Here's the question, Your Honor.

24      THE COURT:  Okay.

25  BY MR. TASEFF:

1  Q.   12:16, Berola:  It's kind of a rude awakening.

2  I understand.  I mean, that's the true definition

3  of rude awakening.

4       Seiver:  Yeah.

5       In Berola's own words, this was a rude

6  awakening of Ronald Seiver in his bedroom that

7  morning, correct?

8  A.   Correct.

9  Q.   So after sitting an hour on the lawn outside

10  the house, he's seated in the kitchen, being

11  questioned by you and Berola, correct --

12  A.   That's correct.

13  Q.   -- when his mother experiences a seizure that

14  prompts your agents to call emergency medical

15  officials, correct?

16  A.   I cannot say correct to the seizure because I

17  am not aware of that.

18  Q.   Going further in the interview --

19       THE COURT:  As opposed to asking this officer

20  what he thinks Berola understood, shouldn't these

21  questions be better directed at Berola?

22       MR. TASEFF:  They will, but I'd like to ask

23  this series of questions about the conversation

24  that this witness heard between Berola and Seiver

25  starting at 18:17.

1        THE COURT:  Okay.

2   BY MR. TASEFF:

3   Q.  Are you at 18:17, Agent?

4   A.  Almost.  Almost, sir.  18:17.  Yes.

5   Q.  And that's where the previous -- at 18:04,

6   there's background noise, correct?

7   A.  Uh-huh.

8   Q.  And roughly 15 to 18 minutes into the

9   interview, we hear Mrs. Alexander groaning in pain,

10  correct?

11  A.  That's correct.

12  Q.  And this is when Berola says, What's the

13  matter?

14      And Ronald says, Uh, she had a stroke.

15      How long?

16      Last year.

17      Berola:  Is she all right?

18      Seiver:  And she -- sometimes she's not -- she

19  has fibromyalgia.

20      Berola:  Oh.

21      Seiver:  It's pretty bad.

22      Berola:  That hurts.

23      Yeah.

24      Now, Mr. McCoy asked did Ronald at any time

25  say, "I want to quit"?

A.   Correct.

Q.   Correct?  Did you or Berola ever tell Ronald, "Look, do you want to take break?"

A.   We did not pause at that point.

Q.   Did you at any time, while the mother is groaning in pain, ask if he wanted to attend to her?

A.   We did not.

Q.   Why not?

A.   At the time when it all was happening, there was not much, any change in demeanor in the -- in Mr. Seiver which didn't indicate that he had any want to (sic).  And that would just -- continual -- progression of the interview just continued on from there.

Q.   Well, certainly Berola was interested enough to ask him, What's the matter with her?

A.   That's correct.

Q.   Correct?

A.   Uh-huh.

Q.   And Berola goes on at 19:03 saying, I've got to ask questions.  19:06:  I need all the details.

      And he basically proceeds then from that point inquiring about Brittany Miller and other matters while Mom is groaning in pain in the adjacent room,

1  correct?

2  A.  That's correct.

3  Q.  And nobody from your law enforcement team ever

4  said, "Are you okay?  Do you want to take a break?"

5  to Ronald Seiver, correct?

6  A.  That's correct.

7  MR. TASEFF:  Judge, I think it's fair to say

8  that the bulk of my questions would be those

9  directed toward Agent Berola's handling of this, so

10  I have no further questions.

11  THE COURT:  Mr. McCoy, anything?

12  MR. McCOY:  Just briefly, Your Honor.

13  **REDIRECT EXAMINATION**

14  BY MR. McCOY:

15  Q.  Agent Haferkamp, I want to just go over a few

16  points that the -- Mr. Taseff raised on his

17  cross-examination, just points of clarification

18  actually.

19  A.  Sure.

20  Q.  There was some discussion with Mr. Taseff

21  about the I.P. address and what was being uploaded

22  and from where.  Just to be clear, the person who

23  sent the images to the stepmother of the

24  13-year-old in Canada in January 2010, they

25  identified themselves as David Smith; is that

1  correct?

2  A.   That's correct.

3  Q.   Is this necessarily the same person who

4  uploaded the images onto yfrog itself?

5  A.   No, not necessarily.

6  Q.   And do you have any way of determining if it

7  is the same person at this point?

8  A.   Through my investigation, I did not.

9  Q.   The I.P. address that was assigned -- or

10  address that was associated with this upload to the

11  yfrog site, who was that assigned to?

12  A.   That, that came back subsequently to Ron

13  Seiver.

14  Q.   Okay.  At the address in Roseville?

15  A.   Yes, that's correct.

16  Q.   Mr. Taseff also asked you about the delay

17  between when you got the case in April and when you

18  prepared the search warrant -- began to prepare the

19  search warrant in June or July.  Are those dates

20  accurate, approximately?

21  A.   Yes.

22  Q.   You got the case in April?

23  A.   Yes, I did.  Middle April sometime.

24  Q.   What was the reason for that delay?

25  A.   The delay --

1   Q.   In your handling of the case?

2   A.   From after April?  Is that what you're --

3   Q.   That's correct.  Yes.

4   A.   At the beginning of May, I was assigned for a

5   temporary duty -- TDY -- to Kansas City for

6   approximately a month there, you know, 30 days

7   approximately, including travel days, a couple

8   days.  And then after that, I had returned home for

9   FMLA purpose, and I was out for another week or

10  two.

11  Q.   What's FMLA?

12  A.   Family Medical Leave Act.

13  Q.   Now, Mr. Taseff also showed you the complaint,

14  particularly paragraph 11 of the complaint that was

15  prepared in this case on August 25th, 2010.  And

16  you reference in that paragraph the 24 images of

17  child pornography that were found during the

18  forensic exam, the preview of the laptop and/or the

19  computer.  Is that correct?

20  A.   Yeah, that's correct.

21  Q.   Would those items necessarily have been found

22  prior to you beginning your interview with the

23  defendant?

24  A.   No.

25  Q.   Do you know when those items were found or

1  what stage during the search?

2  A.   I do not, especially the number that were

3  found.   I mean, I couldn't answer that question for

4  you, quite honestly.

5  Q.   Were you advised prior to the start of the

6  interview that images of child pornography had been

7  found either on the laptop or on the thumb drive?

8  A.   I don't recall that.

9  Q.   If you had been told that there were images of

10  CP -- sorry, of child pornography found on either

11  device, would that necessarily have changed your

12  opinion on conducting an on-site arrest?

13  A.   No, not for -- not for general possession of

14  child pornography.

15  Q.   The defendant's mother, an ambulance was

16  called, correct?

17  A.   Yes.

18  Q.   And what happened after the paramedics

19  arrived?

20  A.   I believe they attended to her; I'm not sure

21  exactly on-site how long.   Then she was taken to

22  the hospital, I believe, shortly thereafter.

23  Q.   Did anyone accompany her from the family to

24  the hospital?

25  A.   I don't recall for sure, but I believe the

1    stepfather was, was going to.  He may have driven

2    there afterwards.

3    Q.   And had you or Investigator Berola told the

4    defendant at any time prior to this -- the mother's

5    condition arising that he could stop questioning at

6    any time?

7    A.   Yes.

8    Q.   And when did you advise him of that?

9    A.   That was -- that was during the advisement of

10   his rights.

11        MR. McCOY:   Those are all my questions, Your

12   Honor.

13        THE COURT:   Anything based on that?

14                   **RECROSS-EXAMINATION**

15   BY MR. TASEFF:

16   Q.   Mom was taken out on a stretcher, correct?

17   A.   I believe so.  I, I didn't see that directly

18   myself.  It was on the other side of the wall, but

19   I was sitting in the living room or in the kitchen.

20        MR. TASEFF:   Nothing further.

21        THE COURT:   All right.  You may step down.

22   Thank you.

23        All right.  How many more witnesses left for

24   the government?

25        MR. McCOY:   Your Honor, we have two more

1  witnesses.  The next one is Special Agent Mike

2  Mitchell, and I don't anticipate that going more

3  than about 30 minutes, maybe 45.

4      Investigator Berola would come after that, and

5  he will take probably some, some time more than

6  that.

7      THE COURT:  Any reason we can't break for

8  lunch?  They're available all afternoon?

9      MR. McCOY:  They are, Your Honor.

10     THE COURT:  Let's take our lunch break then.

11  Let's resume at 1:15.  How's that?

12     MR. McCOY:  Thank you.

13     THE COURT:  Thank you.

14     THE CLERK:  Court is in recess.

15     (Recess at 11:55 a.m. to 1:12 p.m.)

16     THE COURT:  Back on the record in the matter

17  of the United States vs. Mr. Seiver.  Mr. Seiver

18  present with Mr. Taseff.  Government present by

19  Mr. McCoy and Ms. Verbeke.

20     Parties ready to proceed to the afternoon?

21     MR. McCOY:  We are, Your Honor.

22     MR. TASEFF:  Yes, Judge.

23     THE COURT:  Let's have some clarification.

24  Have a seat, okay?

25     At issue, I gather by the line of questioning,

1  there's going to be a couple issues.  One, whether

2  you believe the defendant was in custody, right?

3       MR. TASEFF:  Yes.

4       THE COURT:  Two, then, whether his waiver was

5  voluntarily made?

6       MR. TASEFF:  Right.

7       THE COURT:  Okay.  And the third, you're going

8  to argue as to the warrant, something to do with

9  staleness?

10      MR. TASEFF:  Yes, lacks probable cause based

11 upon stale information.

12      THE COURT:  Okay.  Are those the three issues

13 the government sees?

14      MR. McCOY:  Yes, Your Honor.

15      THE COURT:  What I'm going to ask this

16 afternoon during the questioning if you focus on a

17 couple things because I think this is an issue.  Is

18 the fact that the defendant -- what if the

19 defendant were even found to be in custody, does

20 that affect then subsequent Miranda warnings and

21 waiver if I were to find those were properly given?

22 And I guess, then -- so I think there's an

23 overlapping issue here, based on what I've heard so

24 far.

25      MR. TASEFF:  Miranda, custody and

1  interrogation.  But the Fifth Amendment

2  voluntariness test under the totality of

3  circumstances, we are alleging in part that it was

4  a coerced confession --

5      THE COURT:  Right.  I understand.

6      MR. TASEFF:  -- because of his mother's

7  condition and other factors outlined in the motion.

8      THE COURT:  Right.  I understand.  So I see a

9  couple of issues, and one of them -- and separately

10  is, even if I find that he was in custody -- and

11  I'm just doing a hypothetical.  Since you guys got

12  one, I get one.  All right?

13      Even if I find he was in custody, that doesn't

14  necessarily mean that the statement gets tossed, so

15  I want you to be clear when you're identifying

16  those as -- separately.

17      MR. TASEFF:  And just so I am accurately

18  portraying the issue before the Court, what impact,

19  if any, are these multiple assertions of, "You're

20  not in custody.  You're not under arrest.  We don't

21  intend," how does that ultimately bear on his

22  decision to speak and what ramifications?

23      THE COURT:  Well, I think that's part of you

24  connecting dots.

25      MR. TASEFF:  And whether there is deceit or

1   misrepresentation with respect to his situation so
2   that his decision is voluntary under the totality
3   of the circumstances.
4        THE COURT:  I understand.  I just want to make
5   sure, with the two of you, that I'm on the same
6   page as to what the issues are.
7        Okay.  So, do you want to call your next
8   witness?
9        MR. McCOY:  Yes, Your Honor.
10       THE COURT:  I also think that should help
11   narrow down questions as well.
12       MR. McCOY:  Yes, Your Honor.
13       THE COURT:  Okay.
14       MR. McCOY:  Your Honor, the government would
15   call Special Agent Mike Mitchell.
16       THE COURT:  Sir, do you want to come forward,
17   please, raise your right hand before the clerk?
18       THE WITNESS:  Yes, Your Honor.
19       **(Witness sworn by the clerk.)**
20                    **MICHAEL MITCHELL,**
21   **called as a witness, was examined and testified**
22   **upon his oath as follows:**
23                    **DIRECT EXAMINATION**
24   BY MR. McCOY:
25   Q.  Would you please state your full name and

1  spell your last name for the court reporter?

2  A.   Michael Fabian Mitchell, M-i-t-c-h-e-l-l.

3  Q.   And where are you currently assigned?

4  A.   I'm assigned to the Springfield RAC office in

5  -- with Immigration and Customs Enforcement.

6  Q.   And that's also known as I.C.E.?

7  A.   Yes.

8  Q.   What's your position there at the Springfield

9  office?

10  A.   I'm the resident agent in charge.

11  Q.   And how long have you held that position?

12  A.   Since July of '09.

13  Q.   And what are some of your responsibilities as

14  being the resident agent in charge?

15  A.   I supervise the, the agents that are

16  underneath me.

17  Q.   Prior to becoming the resident agent in

18  charge, were you a special agent with I.C.E.?

19  A.   I was.

20  Q.   For how many years?

21  A.   Since its inception in March of 2003.  And

22  prior to that I was an agent with U.S. Customs.

23  Q.   In total, how much law enforcement experience

24  do you have?

25  A.   I started as an agent -- I was hired as an

1  agent in '94, so from '94 to present.

2  Q.   Approximately 17 years or so?

3  A.   Yeah.

4  Q.   In your work with I.C.E. over the last at

5  least eight years, have you had the opportunity to

6  work on cases involving child pornography and/or

7  child exploitation?

8  A.   Yes.  I've been doing computer forensics since

9  1996 and have worked various investigations to

10  include child pornography.

11  Q.   And approximately -- if you can tell us,

12  approximately how many of those types of cases have

13  you worked on?

14  A.   There would be several hundred.  I -- in my

15  last few years, I was probably clearing 20 to

16  30 cases a year.

17  Q.   Since -- I'm going to pick a date here --

18  January 2009, which would have been, I guess, six

19  or seven months before you became the RAC, but you

20  were in Springfield -- the Springfield I.C.E.

21  office at that point, correct, in January of '09?

22  A.   Correct.  Yeah.

23  Q.   Since January 2009, how many federal search

24  warrants related to child pornography or child

25  exploitation has that office handled?

A.    42.

Q.    Okay.  And what role did you play in the
execution of these search warrants?

A.    At that point, in January, prior to my being
promoted in July -- so from January to July -- I
was probably affiant on one or two of those,
supervised, and then I also did computer forensics.

Q.    If you could, please, explain to the Court
what your standard practice is -- I.C.E.'s standard
practice when executing a search warrant in a child
pornography or child exploitation case.  Take us
through from the beginning to the end how you
execute those warrants and what's done.

A.    We, we either develop information or receive a
collateral request and then develop information
related to the case.  That information will be
developed into an affidavit.  Once the affidavit is
signed, an ops plan is prepared.  The ops plan is
then reviewed by the supervisor and -- the first
line, second line supervisor; they're signed off.
We pick a date for the execution of the warrant.
We execute the warrant.

      Prior to the execution, we have a briefing,
usually in the general area of where it's going to
be executed.  The roles and responsibilities of the

1   individuals involved will, you know, be explained.

2   The case summary will be explained because not

3   everybody that's present is familiar with the case

4   at the time that it's being executed.  We'll go

5   over responsibilities.

6        We'll then proceed to the location and execute

7   the warrant.

8   Q.   Okay.  And once you execute the warrant, what

9   happens from that point forward?

10  A.   When we execute the warrant, we'll secure the

11  residence in that we make sure that we have control

12  over the residence so we can execute the search.

13  We identify the individuals that are in the house.

14  Once everybody's been identified, we make sure that

15  there's nobody else hiding in the house.  Then

16  we'll explain to the individuals of the house what

17  we're there for and why we're there.

18       Obviously, we've already announced when we're

19  making entry that we're there with a warrant.  If

20  they answer the door, it's a soft entry.  If they

21  don't answer the door, it's a hard entry where

22  we'll actually physically open the door and then

23  secure the location.

24  Q.   Does securing a location ever involve

25  handcuffing any of the occupants that you find

1  inside of it?

2  A.   It does sometimes, yes.

3  Q.   And why would you do that?

4  A.   If the individual is either non-compliant or

5  poses some type of threat.

6  Q.   Now in a child pornography or child

7  exploitation case, do you conduct any on-the-scene

8  forensic analysis of the items that you find there,

9  particularly computer items?

10  A.   Yeah, there will be what we call a forensic

11  preview, and we do the preview to assist the

12  investigator or the individuals that are doing the

13  interviews, to be able to feed them with

14  information related to what we find on the

15  computer.

16       If the person or subject that's being

17  interviewed is denying or -- you know, denying the

18  facts of what we find on the computer, we're able

19  to provide them information that will assist in the

20  interview.

21  Q.   Of the -- if you can recall -- 42 search

22  warrants that you referenced since January 2009

23  that your office has handled, how many of those

24  have been accompanied by a corresponding arrest

25  warrant that was --

1        MR. TASEFF:  I object to that on relevancy

2    grounds and how that would bear on this case.  We

3    don't know what those 42 cases involved, Judge, nor

4    do we know the facts of those individuals, what

5    probable cause they had with respect to homes,

6    computers or individuals to be searched or

7    suspected.  So, of what value is that witness's

8    testimony in the probable cause or the focus and

9    custody status of this particular defendant on

10   these facts presented before the Court today?

11        MR. McCOY:  Your Honor, the issue here the

12   government believes the defense is raising is

13   whether or not even though the agents told him he

14   wasn't in custody, if, in fact, he was in custody.

15        And what I'm trying to elicit from this

16   witness, who has particular knowledge of being the

17   RAC for that office, is that just because they have

18   a search warrant doesn't mean they necessarily have

19   a target or that they're intending to arrest or, in

20   fact, show up with an arrest warrant, prepared to

21   arrest somebody in that particular situation.

22        THE COURT:  Well, just ask him that then.

23        MR. McCOY:  All right.

24   BY MR. McCOY:

25   Q.  Well, let me ask you the question directly.

1  Of the 42 search warrants that were -- that you

2  participated in since January '09, how many have

3  resulted in on-site arrests?

4       MR. TASEFF:  Objection.  Same objection.

5       THE COURT:  I think you can ask the question

6  but not that way.  So, the objection is sustained.

7  But I do think it's fair to ask Agent Mitchell if

8  -- just what you explained to me.

9       MR. McCOY:  Okay.

10      THE COURT:  If the fact that he obtains a

11  warrant automatically means he's going to have an

12  arrest.

13      MR. McCOY:  All right.

14  BY MR. McCOY:

15  Q.  Does the fact that --

16      MR. McCOY:  Thank you, Your Honor.

17  BY MR. McCOY:

18  Q.  Does the fact that you have a search warrant

19  to look for child pornography automatically mean

20  that you're going to be conducting an arrest, or do

21  you expect necessarily to conduct an arrest --

22  A.  No.

23  Q.  -- in those situations?

24      Now, what if after -- in your experience, if

25  after executing a search warrant and this forensic

1   preview that you just mentioned images of CP -- of
2   child pornography, rather, are located in the house
3   or they're found on a computer device, does that
4   necessarily change plans regarding arrest?
5   A.   No.
6   Q.   Why not?
7   A.   Just possession -- because it's just
8   possession.  The only time we'll change it to an
9   arrest is if we have a local victim, if the
10  person's a hands-on offender or there's some type
11  of danger for the -- somebody else within the
12  vicinity.
13  Q.   And what do you mean by a "hands-on offender"?
14  A.   Somebody that's actually had contact with a
15  minor.
16  Q.   Okay.  If you receive information during the
17  course of a search that the person's a hands-on
18  offender or there's a local victim, what process do
19  you go through then to effect an arrest if you are
20  going to conduct one?
21  A.   Well, if the individual that is being
22  interviewed is a hands-on offender, we want to
23  determine where is the victim, and is there
24  potential that there are going to be other victims
25  in the house, other children in the house that are

1  potential victims, how far or how easy is it for

2  the suspect to get back to the victim that he -- we

3  may have found pictures on.

4      So, it's -- it varies from situation to

5  situation.

6  Q.  Are you familiar with the defendant in this

7  case, Mr. Seiver?

8  A.  Yes.

9  Q.  And what role did you play in the

10  investigation of the defendant?

11  A.  Well, I was the team leader.  I reviewed the

12  ops plan that was signed off on as the first-line

13  supervisor.  I was the supervisor on scene.  I

14  assisted TFO Price with the forensics that were

15  being conducted, the on-site preview.  I also

16  assisted in searching the location.  And at a

17  certain point I actually conducted some of the

18  interview with the suspect.

19  Q.  Now, prior to -- you talked about the ops

20  plan.  In your process of preparing the ops plan,

21  were you able to determine or at least make a

22  reasonable finding on how many occupants were in

23  that house?

24  A.  We believed there were five occupants in the

25  house -- the suspect, his mother, stepfather,

1  sister and then the sister's husband.

2  Q.  Is it standard practice to also try to figure

3  out if there are any weapons in the house prior to

4  executing the warrant?

5  A.  Yes.

6  Q.  And did you do that in this case?

7  A.  I didn't myself, but Agent Haferkamp had

8  checked with the state police to see if there had

9  been any FOID cards issued to any of the residents.

10  Q.  What was the result?

11  A.  Two of the residents -- both the male

12  occupants -- had had FOID cards issued to them in

13  the past.  And one of them -- I don't remember if

14  it was the brother -- the brother -- his

15  brother-in-law or if it was his dad, but one of

16  them had actually had a confirmed purchase of a

17  weapon.

18  Q.  When was the search warrant executed?

19  A.  August 24th, 2010.

20  Q.  And what were your duties in connection with

21  the execution of that warrant?

22  A.  Again, I was the supervisor on-scene.  I was

23  part of the entry team.  Did the preview --

24  assisted TFO Price with the preview and some of the

25  search and the interview.

1  Q.   How many agents -- do you remember

2  approximately -- were involved in the execution of

3  the warrant?

4  A.   I believe there was either nine or ten.

5  Q.   Including yourself?

6  A.   That's correct.

7  Q.   How were you all dressed?

8  A.   Typically we'll either have on 511s, which are

9  khakis or jeans.  I was wearing jeans that day.

10  Our bulletproof vests.  We're issued shirts that

11  say I.C.E. on them -- Police, I.C.E. so we're

12  either wearing shortsleeved or longsleeved shirts

13  that are matching.

14  Q.   Any helmets or --

15  A.   No.

16  Q.   -- Kevlar?

17  A.   No.

18  Q.   Was everyone armed with a firearm?

19  A.   Yes.

20  Q.   And why was that?

21  A.   It's routine.  We're armed 24/7.

22  Q.   Were those firearms displayed when the search

23  team made entry to the home?

24  A.   Yes.  My, my firearm was out of its holster,

25  yes.

1   Q.   And why was that?

2   A.   It's officer safety.  If we encounter somebody

3   in the residence -- we knew that there was firearms

4   in the residence.  It was an officer safety issue.

5   Q.   Now, once you made entry into the house --

6   were you the first person to gain entry into the

7   house?

8   A.   I don't believe I was the very first person,

9   but I was probably the first two or three.

10  Q.   And what happened after you entered the home?

11  A.   Well, when we approached the residence, the

12  stepfather was outside; and he was first

13  encountered, and I believe that was by Agent

14  Deeter.  And I believe Agent Deeter had handcuffed

15  him.  He was given commands, and I don't think that

16  he was responding to come forward.  And I think

17  that Agent Deeter may have handcuffed him because

18  he was then going to stay with him, and then the

19  rest of us were going to enter the house.

20       We encountered the -- his mother right inside

21  the doorway.  The door was open, and the storm was

22  closed.  We had asked her to come out.  And then we

23  also encountered the daughter on the first floor.

24       We cleared the first floor.  I proceeded up

25  the stairs with Agent Waite and Agent Bowers.  At

1  the top of the stairs to the right, we encountered

2  a closed bedroom door which turned out to be the

3  parents'.  We cleared that.

4      We came to a second door on the right off the

5  stairs.  And when we went in, the defendant was

6  sitting on the bed, and it appeared that he had

7  done some keystrokes on his laptop computer.  And

8  as he was sitting up, his right hand went towards

9  the side of his mattress.  Looked like he was

10  stuffing something in there or reaching for

11  something, at which point I grabbed him and pulled

12  him up out of the bed, because I wasn't sure if he

13  was reaching for a weapon, and proceeded to push

14  him towards the other agents -- Agent Waite and

15  Agent Bowers -- who brought him out in the hallway.

16  And he was handcuffed at that point.

17  Q.  Were your firearms -- was your firearm

18  displayed when you made entry into his bedroom?

19  A.  Yes, it was.

20  Q.  And what did you do after -- in the process of

21  securing the defendant, where was your firearm at

22  that point?  Did you reholster it, or what did you

23  do with it?

24  A.  After I passed him forward -- I had my, my

25  weapon out.  As I encountered him, I was giving him

1    commands to, Get up.  Get up.  He wasn't

2    responding.  Then I grabbed him, pulled him towards

3    me and passed him past me to Agent Bowers and Agent

4    Waite.

5    Q.  You said the defendant was handcuffed.  Were

6    there any other types of restraints placed on him

7    at that point that you saw?

8    A.  No, not that I'm aware of.

9    Q.  What happened after the defendant was removed

10   from the room?

11   A.  It's my understanding he was taken outside by

12   Agent Waite to the front lawn area.

13   Q.  Did the defendant say anything to you when you

14   first made entry into the home -- or into his

15   bedroom, rather?

16   A.  I don't remember any specific words.  I mean,

17   I was giving him commands, Police with a search

18   warrant, told him to move away from the computer.

19   But I don't recall him stating anything

20   specifically to me.

21   Q.  After this, what did you do next?

22   A.  Once Agent Waite had taken the defendant

23   handcuffed downstairs, Agent Bowers and I finished

24   clearing the second floor.

25   Q.  And then what happened?

1  A.   And then at that point we secured the -- we
2  had the residence secured because the other agents
3  had secured the first and the basement.  We then
4  met in a -- went downstairs and met in the living
5  room area.
6       At that point, the defendant was out on the
7  front lawn, and the mother, stepfather and sister,
8  I believe, were out on the side porch which I think
9  is the west side of the house.  There was like a
10 concrete porch area.  And I think the sheriff was
11 at that time talking with them, just watching over
12 them until we got the house secured.
13 Q.   Did you return back to the defendant's bedroom
14 to conduct a search?
15 A.   Yes.  Well, once everything was secured, Agent
16 Westover was taking photos of the residence, and I
17 had him come to the second floor to start the
18 photos in the defendant's room, at which point a
19 picture of where the laptop was sitting and how,
20 how it was adjacent to the bed and then his room
21 itself was taken so that we could move the laptop
22 to begin the preview.
23 Q.   All right.  I'm going to show you a series of
24 pictures on the -- on your screen right there to
25 your right.

1    Do you recognize these pictures?

2    A.   Yes.

3    Q.   And what are they photographs of?

4    A.   They're the defendant's bedroom.

5    Q.   And that first picture, the one up here on the

6    upper -- I guess it would be your upper right, is

7    that the door frame leading into the defendant's

8    bedroom?

9    A.   That's correct.  To the right here of the door

10   there's a closet.  His computer is sitting right

11   here -- oops.

12   Q.   That's good.  That's fine.  If you want to

13   press the screen, it will actually leave an arrow.

14   A.   How do you clear that?

15        MR. McCOY:  Do you know how to clear it?

16        THE CLERK:  Do you want me to clear it?

17   A.   There it goes.

18        Right there is the computer (indicating).

19   Q.   And how many beds are in the bedroom?

20   A.   There's two.  It's my understanding that the

21   defendant's got a sister who lives in Galesburg who

22   has some children, and when they're over, they use

23   that bed.

24   Q.   All right.  That's Government Exhibit 2D --

25   I'm sorry, 2B.  2B.

1        Show you Government Exhibit 2C.  Is that
2   another view of the bedroom?
3   A.   Yes.
4   Q.   And what does that depict?
5   A.   The same.  As you're coming in the room, the
6   laptop computer is sitting right here on the bed.
7   The thumb drive was actually underneath where his
8   pillow is on the wood portion.  It's, it's almost
9   like a waterbed mattress but with a regular
10  mattress in the box.
11  Q.   And where was the defendant?  You said the
12  defendant was sitting when you made entry into the
13  room; is that correct?
14  A.   Yeah.
15  Q.   Where was he sitting?
16  A.   His head was on the -- towards the pillow, and
17  as I -- we came in the room he was sitting more or
18  less where the controller is right here.  His butt
19  would have been -- oops -- would have been about
20  right here (indicating).
21  Q.   All right.  Now, obviously, you pointed out
22  the laptop, and you mentioned the thumb drive.
23  What happened -- after the house was secured and
24  these photographs were taken, what happened to
25  those items?

1    A.   The, the laptop was brought downstairs to TFO

2    Price who was setting up her equipment to do the

3    preview.  She fills out a sheet on the -- what

4    she's working on, and then we'll pull the hard

5    drive out of it in order to do her analysis.

6    Q.   Okay.  Were you present with Task Force

7    Officer Price when she started her forensic

8    analysis preview?

9    A.   I don't remember if I was there when she like

10   first started it, but I was there once it was -- it

11   had begun.

12   Q.   Okay.  Can you -- approximately how long after

13   the start of the search, the initial entry into the

14   house, how many minutes passed before TFO Price

15   began her preview, if you can give an estimate?

16   A.   I would estimate 15 to 30 minutes from the

17   time that we, we made entry to when she got set up.

18   Once -- we had to get the residence secured from

19   the entry point, which was probably around --

20   somewhere around 9:30 because we briefed at 9.  I

21   would say she probably started her exam somewhere

22   between 10 and 10:10, 10:15, somewhere around

23   there.

24   Q.   Do you know which device she started with; was

25   it the laptop or the thumb drive?

A.    She started with the laptop because that was
the first thing that was given to her.   And then
the thumb drive was brought down to her later.

Q.    To your knowledge, did TFO Price at that time
find any images of or videos of child pornography
on the laptop?

A.    The initial preview that she did, she did not
find in allocated areas.   I think she later found
some in thumbs.db files.

Q.    And how long did this initial preview of the
laptop computer, how long did that take
approximately, if you know?

A.    I don't remember the size of it.   I would
guess that it was probably 20 to 30 minutes.

Q.    And what are you making that guess on?   Just
on your experience?

A.    Just on my experience of, you know, getting
the software started.   You start your laptop.   You
have to enter -- create directories on the forensic
laptop that you're using.   You have to create at
least four folders for evidence, case file, media
and export.   Then at that point you've got to type
in the information that you have from the suspect's
machine.   Then you have to identify it, attach it,
and then it has to actually read the drive through

1  a write block device which, at minimum, is going to

2  take 15 minutes just to get all that done.

3      And at that point you're going to end up

4  starting a preview and look through the images and

5  the movies.

6  Q.  Now, prior -- who was assigned to conduct

7  interviews on the ops order; do you remember?

8  A.  Yes.  It was TFO Berola and the case agent who

9  was Dwayne Haferkamp.

10 Q.  And prior to Investigator Berola and Special

11 Agent Haferkamp beginning their interview of the

12 defendant, were one or either of them made aware of

13 any findings that TFO Price had made during her

14 initial forensic preview of either the laptop or

15 the thumb drive?

16 A.  Yeah.  I had indicated to TFO Berola that, as

17 he was walking in, that we had located some --

18 Q.  Walking in to conduct the interview?

19 A.  He had gone outside to get his -- he's got a

20 -- like a knapsack, and he keeps in it his audio

21 recorder and his notepad and stuff like that.

22     So after we had secured the location, he had

23 gone back to his vehicle, which was parked on the

24 rock lane up to the house, to retrieve his stuff

25 for the interview.  And as he was walking back in,

1    coming in the front door through the dining room to

2    the kitchen -- we were located in the dining room

3    -- I had indicated to him that we had found some

4    child porn on the computer, but we had also found

5    some images of what appeared to be Mr. Seiver and a

6    female of age unknown -- I would guess she was

7    probably 15 to 18, but it was hard to tell.  She

8    had a cleft lip.  But she was -- you know, she had

9    breast development.  So the age -- aging her wasn't

10   like identifiable to a, you know -- it's not like a

11   minor who has no breast development.

12   Q.   At that time, were you aware of what the age

13   of this photograph was or these photographs were?

14   A.   We only knew that the file -- the files

15   themselves had been created February 2010 on the

16   piece of media that we had looked at, found them on

17   which was the thumb drive.

18   Q.   Now, how did the information -- you said you

19   found images of child pornography as well as these

20   images of -- these unknown images (sic) of this

21   girl.  How did that impact the original plan to

22   conduct an on-site arrest or not conduct an on-site

23   arrest is a better way of putting it?

24   A.   At that point it hadn't changed anything

25   because we still didn't know, Were those pictures

1  of him when he was in high school?  We didn't know,

2  Was it a local victim?  We didn't know anything.

3  Q.  At some point did you or TFO Price get more

4  information as far as who this girl was or perhaps

5  how old she was?

6  A.  Yeah.  About 15 minutes or so into their

7  interview, I was called downstairs.  And I was

8  looking at the computer with TFO Price, and on

9  there was -- she had located a Rantoul High School

10  I.D. card with the name Brenda (sic) Miller.  And

11  the face matched that of the girl that was in the

12  photos.

13  Q.  What did you do with this information once you

14  got it?

15  A.  I then walked into the kitchen and indicated

16  -- whispered to TFO Berola that -- to ask who

17  Brenda Miller was, and that was the name on the

18  I.D.

19  Q.  And this was approximately how long after the

20  interview started?

21  A.  I believe it was like 15 to 20 minutes.

22  Q.  Did you -- other than telling him to ask about

23  Brittany Miller, did you explain to Investigator

24  Berola any -- provide him, rather, with any

25  additional details about how old you thought she

1  was or anything along those lines?

2  A.   No, not at that point.

3  Q.   So, all you did was tell him in his ear to ask

4  about Brittany Miller; is that correct?

5  A.   Correct.

6  Q.   Did you continue to provide updates to

7  Investigator Berola or Special Agent Haferkamp

8  during the course of their interview of the

9  defendant?

10  A.   Yeah, there were a couple of times where we

11  had provided information, including some money

12  order slips from the -- that had gone between -- I

13  believe it was the defendant and the, the victim's

14  mother.

15  Q.   And where was this -- where were you acquiring

16  this information from?  Is it --

17  A.   Inside the residence.  The -- I want to say

18  the money orders were either found in his bedroom

19  or his sister's bedroom.  I'd have to go back and

20  look at that.

21  Q.   Was TFO Price, was she continuing her --

22  A.   Exam, yes.

23  Q.   -- exam of the thumb drive?

24  A.   Yes.

25  Q.   Throughout the interview or --

1  A.   As far as I know, yes.  I wasn't there the

2  whole time because I was trying to move around and

3  make sure that everything was being taken care of.

4  Q.   Now, at some point did the defendant's mother

5  suffer a medical condition?

6  A.   Yes.  I was made aware of the fact that she

7  was having some type of medical problem.  They were

8  outside.  It was my understanding that the father

9  asked if she could be brought inside to sit on the

10  couch, to be more comfortable, which was

11  accommodated.  And then the sheriff, I believe,

12  called the local services to have an ambulance show

13  up.  The ambulance did arrive.  I don't remember

14  exactly how much time passed because I was moving

15  throughout the house.

16      I know that TFO Price was in the dining room,

17  and when the -- when the ambulance showed up, the

18  father had asked if he should stay or go with the

19  wife.  And I think that TFO Price had relayed to

20  the stepfather that he should go with his wife; and

21  if he needed anything -- or if we needed to get

22  ahold of him, excuse me, we would.

23  Q.   At some point in time that morning, I guess

24  into the afternoon, was the United States

25  Attorney's Office contacted regarding the findings

1  on the thumb drive and the interview of the

2  defendant?

3  A.   Yeah.   After the interview was completed and

4  -- well, there was actually three segments of

5  interview.   After the first interview was

6  completed, I had attempted to actually contact you

7  and was unable to do that.   I then reached out for

8  Ellie Pierson, who was the PSC coordinator.

9  Q.   She was an AUSA, assistant U.S. attorney?

10  A.   Correct.   For the Central District.   And PSC

11  is Project Safe Child attorney.   So, I ran the

12  facts past her regarding the suspect, the

13  statements that were made and what we had found on

14  the computer to determine if she felt, as I did,

15  there was enough at that point to make an arrest.

16       And she had concurred, and she had asked --

17  actually asked me to interview the suspect to find

18  out about some Yahoo! accounts that I had located

19  and some chat.

20       She also asked us to try to get consent, which

21  was part of the third interview that was done.

22  Q.   But this telephone conversation occurred after

23  the first portion of the interview was complete?

24  A.   That's correct.

25  Q.   And how long did that first portion of the

1  interview last, to your knowledge, if you know?

2  A.  I want to say it was over an hour.

3      MR. McCOY:  Those are all the questions I

4  have, Your Honor.

5      THE COURT:  Thank you, Mr. McCoy.

6      Mr. Taseff?

7                    **CROSS-EXAMINATION**

8  BY MR. TASEFF:

9  Q.  Upon making entry into that residence, you

10  proceeded through the downstairs portion and then

11  up the stairs, correct?

12  A.  That's correct.

13  Q.  You entered one bedroom and found no one

14  present?

15  A.  That's correct.

16  Q.  You entered a second bedroom, and you saw

17  Mr. Seiver, I believe in your words, sitting up in

18  bed?

19  A.  Correct.

20  Q.  And based upon what you could see at that

21  time, I believe you said you observed him making

22  some kind of keystrokes on the computer?

23  A.  Correct.

24  Q.  That was on a stand next to his bed?

25  A.  Correct.

1    Q.   And you inferred from that conduct that he was
2    making some kind of command or executing some kind
3    of program on the computer, correct?
4    A.   That's correct.
5    Q.   And you were concerned enough about what you
6    had observed that you stepped forward and
7    physically removed him from proximity to the
8    computer, correct?
9    A.   Between that and his not responding to the
10   commands.  When I was giving him commands to get
11   out of bed, he then continued on the keyboard.  At
12   that point, yes, I did reach forward and grabbed
13   him to pull him out of the room.
14   Q.   I believe you also said you saw Mr. Seiver
15   engage in an act that you interpreted as his
16   attempt to stuff something under the mattress,
17   correct?
18   A.   Correct.  His, his right hand went -- instead
19   of going on the top of the bed to get up, his right
20   hand went into the mattress.
21   Q.   So that drew your suspicion further, did it
22   not?
23   A.   Yes.  Officer safety, yes.
24   Q.   And then once you passed him -- physically
25   passed him along to the second agent who was

1  standing beside you, you secured the laptop, didn't

2  you?

3  A.   I pulled the battery on the laptop to -- if he

4  had engaged some type of deletion program that -- I

5  pulled the battery to make sure it would stop

6  whatever it was doing.

7  Q.   Indeed, as Mr. McCoy noted, on page six of the

8  government's response to the motion to suppress,

9  and I quote, As S.A. Mitchell approached the

10  defendant, he also noticed that there was some type

11  of program running on the laptop.  Concerned the

12  defendant may have been trying to delete files,

13  S.A. Mitchell immediately pulled the battery out of

14  the laptop to shut the program down, unquote.

15      Does that accurately state what you

16  suspected --

17  A.   Yes.

18  Q.   -- of what you observed Mr. Seiver engaged in?

19  A.   Yes.

20  Q.   As I read that, would you agree that that was

21  interpreted by you as an attempt by him to destroy

22  evidence possibly?

23  A.   It's possible.

24  Q.   Attempted obstruction of justice maybe?

25  A.   Yes.

1  Q.   Based upon what you knew the search warrant
2  commanded you to do and to search for and to seize?
3  A.   Yes.
4  Q.   So upon your securing that computer and
5  removing the battery, you disabled it further,
6  correct?
7  A.   That's correct.
8  Q.   So that it would not perform whatever function
9  you were suspecting it as being commanded to,
10 right?
11 A.   Correct.
12 Q.   You later then went to search underneath the
13 bed in furtherance of what you observed his hand
14 motion to be?
15 A.   No.
16 Q.   Later you -- did you find that thumb drive
17 later?
18 A.   No, I believe that was found by another agent.
19 Q.   Okay.  And, of course, when you found that --
20 when that was found by the other agent, you
21 suspected that further as being a device where
22 there may be child pornography as well?
23 A.   Any other media in his room would have been
24 suspected of having child porn, correct.
25 Q.   Now, I take it you've been trained and you

1  have utilized these forensic tools in other cases,
2  correct?
3  A.   Yes.  I've been identified as an expert in
4  federal and state court.
5  Q.   Okay.  As has Agent Price?
6  A.   I'm not sure if she had at this point.
7  Q.   We have photographs of various computers set
8  up on the dining room table.  Is that where her
9  workstation was assembled?
10  A.   Yeah.  There was a laptop that was on the, the
11  dining room table that was hers.
12  Q.   And she then commences this preview of both
13  the laptop and the thumb drive?
14  A.   That's correct.
15  Q.   She's utilizing her computer, I take it?
16  A.   That's correct.
17  Q.   She's using a program called EnCase?
18  A.   That's correct.
19  Q.   And your EnCase is a diagnostic tool to
20  identify what files are on that particular storage
21  media, correct?
22  A.   It's a forensic tool.  It's not a diagnosis.
23  It doesn't diagnose the computer.  It allows you to
24  do computer forensics.
25  Q.   It allows you to preview files and to see what

1   is there, correct?

2   A.   Correct.   Yes.

3   Q.   And also to identify dates of creation,

4   correct?

5   A.   Correct.

6   Q.   Dates of deletion?

7   A.   Yes.

8   Q.   And other relevant information about

9   particular image files, correct?

10  A.   Correct.

11  Q.   And that's particularly noteworthy in a case

12  such as this because creation dates and deletion

13  dates would tend to indicate existent knowledge of

14  the presence of that image file on the computer

15  itself, correct?

16  A.   Correct.

17  Q.   And that's the kind of thing that you're

18  looking for?

19  A.   Well, yes and no.   We're looking for

20  information to be able to feed to the investigator

21  to help assist in the interview.

22  Q.   So once this preview station, the workstation

23  is assembled, your role then, I take it, is that

24  you're feeding your work.   You feed information to

25  the questioner, correct, so he can confront the

1  suspect with information from the preview?

2  A.   If, if the defendant were to say that he had

3  child pornography on his computer, there would be

4  no reason to do a preview.  But if he denied the

5  fact that there was child porn on there, we could

6  confirm whether, in fact, there was child

7  pornography on his media and be able to feed that

8  to the investigator.

9  Q.   That's essentially what happened in this case,

10 correct?

11 A.   Correct.

12 Q.   The preview was done, and you and others were

13 feeding Berola with information?

14 A.   I believe it was just myself and TFO Price.

15 Q.   Now, as I understand your testimony, you

16 encountered Berola as he was returning to the

17 premises with his knapsack, his tools, correct?

18 A.   Correct.

19 Q.   And that's when you advised him that you had

20 located child pornography on the laptop computer,

21 correct?

22 A.   Not that I located, but there was child

23 pornography located by TFO Price.

24 Q.   Price had located child pornography on the

25 very laptop --

1   A.   Not the laptop.  The thumb drive.

2   Q.   The thumb drive that you suspected Mr. Seiver

3   was trying to secrete under his bed, correct?

4   A.   I didn't suspect him to secrete that.  I saw

5   his hand going underneath there.  I didn't know

6   what he had in his hand at the time.

7   Q.   Okay.  And you know that the thumb drive was

8   found under the mattress?

9   A.   Later.  Yes, I do know that later.

10  Q.   Now, did you -- did you witness TFO Price

11  showing Berola various images of suspected child

12  pornography that she had already found on the thumb

13  drive as well as pictures of the defendant engaged

14  in a sexual encounter with a younger-looking

15  female?  Did you observe Price showing Berola such

16  images?

17  A.   That didn't occur.

18  Q.   That did not occur?

19  A.   No.  I had -- I had -- I had told TFO Berola

20  that child pornography images had been located on

21  the thumb drive.  At that point on the screen were

22  the images of Mr. Seiver and the minor from

23  Rantoul.  TFO Berola had seen the pictures of the

24  -- Mr. Seiver and the female, at which point we

25  didn't know she was a minor, on the screen.

Q.   But your testimony today is that TFO Price did
not show Investigator Berola various images of
suspected child pornography that she -- Price --
had already found on the thumb drive.  That did not
happen is what you told us, correct?
A.   Not, not on the way in, no.
Q.   At any time before the interview?
A.   Not prior to the interview, no.
Q.   You're confident of that; it did not happen?
A.   As far as I know, yes.
      MR. TASEFF:  Those are my questions.  Thank
you.
      THE COURT:  Mr. McCoy?
      MR. McCOY:  Nothing further, Your Honor, from
the government.
      THE COURT:  You may step down, sir.
      THE WITNESS:  Thank you, Your Honor.
      THE COURT:  Next witness?
      MR. McCOY:  Your Honor, the government's going
to call at this time Investigator Tom Berola.
      THE COURT:  Okay.
      **(Witness sworn by the clerk.)**
                       **THOMAS BEROLA,**
**called as a witness, was examined and testified**
**upon his oath as follows:**

1                      **DIRECT EXAMINATION**

2   BY MR. McCOY:

3   Q.   Would you please state your full name and

4   spell your last name for the court reporter?

5   A.   Yes.  My, my full name is Thomas M. Berola,

6   B-e-r-o-l-a.

7   Q.   And where are you currently assigned?

8   A.   I'm an investigator with the Illinois Attorney

9   General's Office.

10  Q.   And back in August of 2010, this past August,

11  what was your assignment then?

12  A.   I was acting in the capacity -- I was a task

13  force officer with, with Immigration and Customs

14  Enforcement.

15  Q.   And how long were you a task force officer

16  with I.C.E.?

17  A.   I believe I was -- I worked as a task force

18  officer with them approximately three to four

19  years.

20  Q.   And in total, how much law enforcement

21  experience do you have?

22  A.   I've been a police officer for a little over

23  19 years now.

24  Q.   And has that entire time been with the

25  attorney general's office?

1  A.   No.   The past almost 12 years with the
2  attorney general's office.
3  Q.   And prior to that, where were you working
4  then?
5  A.   I was a sergeant with the Auburn Police
6  Department.
7  Q.   As a law enforcement officer, have you had the
8  opportunity over those many years to work on cases
9  involving child porn or child exploitation?
10  A.   Yes.
11  Q.   And how many cases would you estimate you've
12  worked on?
13  A.   I would have to say approximately 50 to
14  100 cases.
15  Q.   Have you received training in the area of
16  child pornography and child exploitation?
17  A.   Yes.
18  Q.   And as part of that training, have you been --
19  and also your experience on the job -- have you had
20  the opportunity to observe examples of child
21  pornography?
22  A.   Yes.
23  Q.   And what is your understanding of what
24  qualifies as child pornography?
25  A.   It would be any child under the age of 18

1  years old depicted in a lewd manner, unclothed or

2  involved in a sexual situation with an adult.

3  Q.  Are you familiar with the defendant in this

4  case, Ronald Seiver?

5  A.  Yes.

6  Q.  And how do you know him?

7  A.  I was involved in a search warrant at his

8  residence back in August of 2010.

9  Q.  What role did you play in the execution of

10  that warrant -- that search warrant back in August

11  of 2010?

12  A.  On the -- on the entry, I was on the outside

13  of the house as perimeter security.  And then later

14  I conducted the interview with Mr. Seiver.

15  Q.  And were you given these assignments prior to

16  the agents executing the warrant?

17  A.  Yes.

18  Q.  And what specifically were your assignments?

19  A.  Well, at briefing I was listed to be on the

20  entry team, and then I was listed as -- to be one

21  of the interviewers and then listed as the primary

22  for interviewing.

23  Q.  Was it your understanding that the only person

24  that you would be interviewing that day would be

25  the defendant, or how was it classified in the ops

1  plan?

2  A.   No, the way it was classified in the ops plan

3  is that whoever the forensic team determined that

4  they felt was the person that had been transmitting

5  or receiving the child pornography, that was going

6  to be the person that I would interview.

7  Q.   And were there -- were there multiple people

8  that were listed as potential suspects?

9  A.   Yes.

10 Q.   Approximately what time of the day did the

11 execution of the search warrant begin?

12 A.   It was approximately 9:30 in the morning.

13 Q.   And do you recall how many agents were with

14 you for the execution?

15 A.   Yeah, there were approximately ten.

16 Q.   Including yourself?

17 A.   Yes.

18 Q.   And how were you all dressed?

19 A.   Some of us were wearing like 511 pants, some

20 of us were wearing blue jeans, and then wearing

21 our, our bulletproof vests.

22 Q.   Did you have your -- did the agents have their

23 weapons displayed when they made entry into the

24 house?

25 A.   Yes.

1   Q.   You said that you were responsible for doing

2   perimeter security around the house?

3   A.   Yes.

4   Q.   So were you outside while the agents were

5   gaining entry into the home?

6   A.   Yes.

7   Q.   And how long did you remain outside for?

8   A.   Until they advised that the house was secure,

9   and then I believe I made entry into the house.

10  Q.   Approximately how long was that after the

11  search began or the execution began?

12  A.   I would say approximately ten minutes.

13  Q.   Were you made -- once you came back into the

14  house or at some point afterwards were you made

15  aware of any computer media that had been

16  discovered in the defendant's bedroom?

17  A.   Yes.

18  Q.   And what was that?

19  A.   Investigator Price, who was conducting the

20  forensics, was -- she had been given a laptop

21  computer.  And then I believe later she was brought

22  down a thumb drive or USB drive to do forensics on.

23  Q.   All right.  How long after the start of the

24  search did you approach the defendant for -- to

25  conduct an interview?

1   A.   It would have been approximately an hour after
2   the actual search began.
3   Q.   And where did this interview take place?
4   A.   In the kitchen of the residence.
5   Q.   Do you know where the defendant was when he
6   was approached for the interview initially?
7   A.   No.  I believe he was outside and --
8   Q.   When you entered the house, where was the
9   defendant located?
10  A.   He was already in the kitchen with Agent
11  Haferkamp.
12  Q.   During your ops briefing prior to executing
13  the search warrant, had there been any discussion
14  on conducting any on-site arrests?
15  A.   No.
16  Q.   Was there any plan to conduct an on-site
17  arrest?
18  A.   No.
19  Q.   Now, prior to beginning your interview with
20  the defendant, were you updated on any of the
21  findings that TFO Price had made during her
22  forensic preview of either the laptop or the thumb
23  drive?
24  A.   Yes.  Just before I walked in to sit down to
25  conduct the interview, either TFO Price or RAC

1    Mitchell advised me that they had discovered some

2    child porn images.  And then I also saw agent -- or

3    Investigator Price had up on the screen some images

4    of Mr. Seiver and an unknown female.

5    Q.   What were you able to gather from those images

6    of Mr. Seiver and the unknown female?

7    A.   It appeared that they had some sort of

8    relationship, but I wasn't able to determine how

9    old Mr. Seiver was or how old the female was.  It

10   was just pictures of him -- the two of them.  And I

11   believe some of them may have been involved in some

12   sort of like sexual content, too.

13   Q.   Did you know at the time the age of the

14   photographs?  Did TFO Price relay that information

15   to you?

16   A.   I -- they pointed on the screen that they

17   believed that the images were either created or, or

18   transferred to that location in February of 2010

19   was the only date that I was given.

20   Q.   The information that you received then, these

21   images -- that there was images of CP and that you

22   saw these images of the defendant with this girl or

23   woman or whatever her status was, how did that

24   impact your plan on arrest or the general plan on

25   arresting the defendant?

1    A.   It didn't have any impact on, on -- it, it
2    didn't have any impact on it.  It just gave me some
3    information that I would be able to use while
4    conducting the interview.
5    Q.   And why didn't it impact the plan on
6    conducting an on-site arrest?
7    A.   Because typically when we had done these cases
8    in the past, we didn't make arrests for just
9    possession of child pornography.
10   Q.   The defendant was located in the kitchen,
11   correct?
12   A.   Yes.
13   Q.   Where was the -- where in the kitchen was the
14   interview -- did the interview take place?
15   A.   At the kitchen table.
16   Q.   Do you remember approximately when the
17   interview began?
18   A.   Approximately 10:40 in the morning.
19   Q.   Did you -- prior to questioning the defendant,
20   did you advise him of his Miranda rights?
21   A.   Yes.
22   Q.   And why did you do that?
23   A.   I, I wanted to make sure that he understood
24   his rights before, before we began the interview.
25   Q.   To your knowledge, had he been arrested prior

1  to the interview?

2  A.   No.

3  Q.   Had anybody explained to him that he was in

4  custody at that point?

5  A.   We had advised him that he was not in custody

6  at that point.

7  Q.   I want to show you what's been marked as

8  Government Exhibit 3 -- or what is Government

9  Exhibit 3.

10  A.   That would be the, the statement of Miranda

11  rights that, that we read to Mr. Seiver.

12  Q.   All right.  Whose signature is right here?

13  A.   That would be my signature.

14  Q.   Okay.  And how did you advise the defendant of

15  his rights?

16  A.   We -- I read through them verbally, each one,

17  one at a time, and then asked him if he understood

18  them.  And then I asked Mr. Seiver to read the last

19  warning on the -- on the page there.

20  Q.   And was -- is that Mr. Seiver's signature

21  underneath the Waiver section of that form?

22  A.   Yes.

23  Q.   Did he sign it contemporaneously with when you

24  were advising him of his rights, at the same time?

25  A.   Yes.  Once we completed, yes, he signed them.

1  Q.  Was the interview audio-recorded?

2  A.  Yes, it was.

3  Q.  And how was it recorded?

4  A.  With a -- with a hand-held digital audio

5  recorder.

6  Q.  When you advised the defendant of his rights,

7  at any point did he seem confused by what you were

8  saying?

9  A.  Yes.  He, he -- at one point he made a

10  statement that he, he said that he didn't like the

11  idea of, of that.  And so then I stopped and asked

12  him -- I said, you know, What don't you like the

13  idea about?  And -- because I wanted to make sure

14  that he understood his rights before he waived

15  them.

16  Q.  All right.  And do you remember what you

17  explained to the defendant?

18  A.  Yes.  He, he -- I think he was under the

19  impression that he was waiving his rights for all

20  time, and I explained to him that just because he

21  waived his rights and agreed to speak with us

22  didn't mean that he had completely given up his

23  rights and that at any time he could go back to his

24  rights.  I believe I used -- I believe I said that,

25  that, Just because you waive them now doesn't mean

 1    you've thrown them out the window, that you can go

 2    back to them at any time you want.

 3    Q.    Did the defendant appear to be intoxicated to

 4    you or under the influence of any narcotic?

 5    A.    No.

 6    Q.    Prior to the audio recording starting which

 7    the Court heard previously, did you make any

 8    promises to him --

 9    A.    No.

10    Q.    -- in exchange for his cooperation?

11    A.    No, I did not.

12    Q.    Did you make any threats to him?

13    A.    No.

14    Q.    Were your firearms displayed at this time?

15    A.    No.

16    Q.    Now, to your knowledge while you were

17    conducting this interview of the defendant, was TFO

18    Price, was she continuing her forensic exam of the

19    -- of the laptop and the thumb drive?

20    A.    Yes.

21    Q.    And were you provided with updates on the

22    findings of that exam throughout the interview?

23    A.    Yes.

24    Q.    And how were you provided with these updates?

25    A.    Periodically either she or RAC Mitchell would

1  either step in the room and whisper to me or would

2  hand me a note.

3  Q.  At some point during the interview, did you

4  receive an update regarding the potential of a

5  local victim?

6  A.  Yes.

7  Q.  And when was that?

8  A.  It was approximately -- I'd say approximately

9  20 minutes into the interview, Mitchell stepped in

10  and just whispered in my ear and told me to ask

11  about Brittany Miller.

12  Q.  Okay.  And was that all the information he

13  provided you?

14  A.  Yes.

15  Q.  What did you do once you received that

16  information?

17  A.  I, I, I got back on track, finished the

18  thought that I was going with, and then I asked

19  Mr. Seiver to tell me about Brittany Miller.

20  Q.  At the time that you asked him to tell you

21  about Brittany Miller, did you have any idea what

22  her age was or what the circumstances -- well, let

23  me ask you this:  Did you have any idea what her

24  age was?

25  A.  No.

1  Q.  And did you have any idea what the

2  circumstances of their relationship was at that

3  time?

4  A.  No.

5  Q.  How -- did you subsequently learn her age and

6  the nature of their relationship?

7  A.  Yes.

8  Q.  And who told you about that?

9  A.  Mr. Seiver did.

10  Q.  And what did he tell you?

11  A.  I, I asked how old she was currently.  He said

12  that he believed she was 17 years old currently.

13  And then I asked him, How old was she when you

14  first met her?  And he told me that she was 16

15  years old.

16  Q.  And what type of -- did he tell you about the

17  relationship he had with her or the nature of it?

18  A.  Yes.  He advised that he had traveled to, I

19  believe, Rantoul, Illinois, where he met with her,

20  and they had a sexual relationship.

21  Q.  How many -- on how many occasions?

22  A.  I believe he told me on, on two occasions.

23  Q.  Now, while you were interviewing the

24  defendant, did the defendant's mother suffer a

25  medical condition?

1   A.   Yes.

2   Q.   And were you aware of what was happening, or

3   what was your knowledge of the situation at that

4   time?

5   A.   I was -- it was taking place in the next room,

6   and I was aware that the agents in that room had,

7   had contacted for EMS personnel to respond.

8   Q.   Did, did you inquire with the defendant about

9   the status of his mom?

10  A.   Yes.

11  Q.   And what did he tell you?

12  A.   He told me that she had had a stroke in the

13  past and that, that she was currently suffering

14  from fibromyalgia.  And then I asked if, if she was

15  going to be all right, and I believe he said he

16  didn't know.

17  Q.   Okay.  Did -- at any point did he ask to see

18  his mother?

19  A.   No.

20  Q.   If he had asked to see his mother, would you

21  have stopped the questioning and allowed him to?

22  A.   Yes, we would have.

23  Q.   Did his demeanor or his manner of answering

24  your questions change after his mother suffered the

25  medical condition?

1  A.  No.  He, he kept the same demeanor throughout
2  the interview.
3  Q.  Had you advised the defendant previously that
4  he could stop questioning?
5  A.  Yes, when we -- yes, when we advised him of
6  his rights.
7  Q.  How long did this first part of the interview
8  last?
9  A.  The, the first complete interview?
10 Q.  Yes.  Yes.
11 A.  I believe it was approximately an hour.
12 Q.  Did you re-approach the defendant after that
13 -- at some point after that to seek his consent for
14 his computer accounts?
15 A.  Yes.
16 Q.  And what resulted with that?  Did he provide
17 consent for his accounts?
18 A.  We inquired about several accounts, and he
19 refused to provide consent for, I believe, all but
20 one account.
21 Q.  Did you present him with -- or how did you
22 advise him of his rights in regards to -- or how
23 did you advise him of his right to refuse consent?
24 A.  We -- I -- there's a form that we ask -- that
25 we read to them and ask them for consent to

1  basically take over the accounts that we're

2  interested in.  So, I read him that form and then

3  asked for his consent on it.

4  Q.  I'm showing you Government Exhibit 6.  Is this

5  the form that you presented to him?

6  A.  Yes.

7  Q.  And what did you advise him about what you

8  were looking for or what you were trying to do

9  here?

10  A.  Well, I advised him that once we took over

11  these accounts that, that, that we would -- we

12  would change the passwords, and he would no longer

13  have access to those accounts anymore.

14  Q.  What was his response to that?

15  A.  He didn't -- he didn't want to give up those

16  for all time.  He, he told us during the interview

17  that he didn't have a problem with us looking at

18  them, but he didn't -- he didn't want to give up

19  ownership to those accounts for all time.

20  Q.  Do you remember how long, approximately, this

21  second part of the interview lasted?

22  A.  It was approximately 10 to 15 minutes.

23      MR. McCOY:  Those are all the questions I have

24  for this witness at the time, Your Honor.

25      THE COURT:  Thank you, Mr. McCoy.

1      Mr. Taseff?

2                    **CROSS-EXAMINATION**

3  BY MR. TASEFF:

4  Q.   Sir, how tall are you?

5  A.   I'm 6'6".

6  Q.   How much do you weigh?

7  A.   250 pounds.

8  Q.   Were you approximately the same height and

9  weight back in August of last year when you and

10  Agent Haferkamp interviewed Mr. Seiver at the

11  kitchen table in Seiver's home?

12  A.   In August, unfortunately -- I was 6'6", but I

13  was only about 220 pounds then.  I was -- I gained

14  a little weight over the winter.

15  Q.   In spring training then, right?

16  A.   Something like that.

17  Q.   So, you would agree if Ronald were to stand

18  right now --

19      MR. TASEFF:  Stand up.

20  BY MR. TASEFF:

21  Q.   You're considerably taller and bigger than

22  Mr. Seiver, aren't you?

23  A.   Yes.

24  Q.   As is Agent Haferkamp?

25  A.   I don't think Agent Haferkamp is taller, but

1  he's heavier.

2  Q.  And both of you were dressed out in your

3  official garb that day with the bulletproof vest

4  with the I.C.E., with the various law enforcement

5  logos and firearms?

6  A.  Yes.

7  Q.  Now, upon the entry and the securing of the

8  residence, we have heard testimony that various

9  devices -- namely, a laptop and a thumb drive --

10  were removed from the bedroom upstairs and were

11  given to TFO Price for a preview, correct?

12  A.  Yes, sir.

13  Q.  TFO Price does the preview in the dining room

14  area adjacent to the kitchen, correct?

15  A.  Yes.

16  Q.  Within an hour or so of the securing of the

17  residence and the securing of these devices, an

18  interview commences in the kitchen.  Is that true?

19  A.  Yes.

20  Q.  By that time, you had a chance to talk to

21  Agent Mitchell, correct?

22  A.  Yes.

23  Q.  And he explained to you, at least in part, his

24  experience with Mr. Seiver in the bedroom when the

25  initial entry to the bedroom had been made,

1  correct?

2  A.   Yes.

3  Q.   You knew that there was some suspicious

4  activity that Mitchell believed Seiver engaged in

5  with respect to the laptop and some other item that

6  may have been tried to have been secreted

7  underneath the mattress, correct?

8  A.   Yes.

9  Q.   So, you had that information available to you

10 at the time that you commenced your interview of

11 Mr. Seiver?

12 A.   Yes.

13 Q.   You also had that information from the search

14 warrant affidavit itself -- Agent Haferkamp's --

15 correct?

16 A.   Which information?

17 Q.   Well, the affidavit that the agent prepared --

18 your fellow agent and submitted to a federal judge

19 on August 16th for the issuance of the search

20 warrant.  You had read that affidavit, didn't you?

21 A.   No, I did not.

22 Q.   You knew generally what Haferkamp's

23 investigation involved, didn't you?

24 A.   I had a thumbnail sketch of what, what the

25 case involved.

1    Q.   And an I.P. address registered to Mr. Seiver

2    at that address was linked to one or more images of

3    child pornography that had been uploaded onto a

4    Facebook account e-mail in early January of 2010,

5    correct?

6    A.   Yes.

7    Q.   You knew generally what that case was about?

8        So, before commencing your interview, you had

9    occasion to talk with Officer Price, correct?

10   A.   Yes.

11   Q.   You wanted to talk to her to find out what

12   information she had with respect to what was found

13   on the laptop and the thumb drive, correct?

14   A.   I had a brief -- I was -- I briefly spoke with

15   Investigator Price as I passed through the dining

16   room to go into the kitchen to begin the interview.

17   Q.   Did you talk to Mr. McCoy in preparation for

18   testifying today?

19   A.   Yes.

20   Q.   Did you have conferences with him to discuss

21   your testimony?

22   A.   Yes.

23   Q.   Did you relate to him those sequence of events

24   that you have told us today in court?

25   A.   Yes.

1  Q.   Would it surprise you, sir, if on page seven
2  of the government's response --
3      MR. McCOY:  Objection, Your Honor.  My
4  response is not evidence so I'm not sure where
5  Defense Counsel's going here, but this is -- I
6  didn't share this response with the agents so I'm
7  not exactly sure what he's --
8      THE COURT:  Mr. Taseff?
9      MR. TASEFF:  The government's response
10 includes a narrative of events, a statement of
11 facts that is markedly different from what two
12 witnesses have said.  And this witness now admits
13 that he conferred with the government prosecutor
14 before testifying to relate those sequence of
15 events that he's testified to.
16     THE COURT:  I understand, and your line of
17 questioning will be allowed to the extent that
18 you're going to ask any investigator what he knew,
19 but I don't think you need to ask him if he's
20 surprised to find certain things within Mr. McCoy's
21 response.
22     MR. TASEFF:  I'll rephrase.
23     THE COURT:  Okay.
24 BY MR. TASEFF:
25 Q.   Did TFO Price show you various images of

1  suspected child pornography that she had already
2  found on the thumb drive as well as pictures of
3  Mr. Seiver engaged in a sexual encounter with a
4  younger-looking female?
5  A.  I saw the pictures on the screen of Mr. Seiver
6  with a younger-looking female.  I didn't -- I, I
7  don't recall the child porn images, although I
8  believe I was advised of those before I walked in
9  to conduct the interview.
10  Q.  Who advised you of them?
11  A.  Either Investigator Price or RAC Mitchell, one
12  of -- they were both standing there.  I don't
13  remember exactly which one told me that they had
14  found child porn.
15  Q.  So, armed with information that there was
16  child pornography found on the thumb drive, you
17  commenced your interview?
18  A.  Yes.
19  Q.  Correct me if I'm wrong:  Did I hear you say
20  in response to Mr. McCoy's question that, Typically
21  we don't arrest persons for possession and receipt
22  of child pornography?
23  A.  When all we have is simple possession, no,
24  typically we have not made arrests in those cases.
25  Q.  You did make an arrest of Michael Slaight,

1  though, didn't you, in the case that we argued

2  before Judge Mihm two years ago?

3  A.   Yes, we made an --

4  Q.   Possession and receipt of child pornography?

5  A.   We did make an arrest in that case.

6  Q.   There was no local victim in that case, was

7  there?

8  A.   No, but given Mr. Slaight's past criminal

9  history, that's what influenced that decision.

10  Q.   Does anyone else --

11      MR. McCOY:   Your Honor, if I could object

12  here.   I believe that the question has been

13  misrepresented -- my question here.   And obviously

14  I can deal with this on redirect if the Court would

15  prefer, but I think the question was on-site

16  arrests; not arrests, period, but on-site arrests.

17      MR. TASEFF:   I'll rephrase because this is

18  really important.

19      THE COURT:   Why does it -- tell me what

20  specific issue it goes to.

21      MR. TASEFF:   They're making -- in fact, I

22  objected earlier about this whole thing about in

23  what number of cases do they make on-site arrests.

24      THE COURT:   All right.   Go ahead and ask.

25  BY MR. TASEFF:

1    Q.   Typically, I believe you said, you normally do

2    not make on-site arrests for possession of child

3    pornography, correct?

4    A.   When possession is -- yeah, is the only charge

5    that we have, yes.

6    Q.   But that is what you did in the Slaight case?

7    A.   We did make an arrest in that case, yes, sir.

8    Q.   Now, when you commenced your interview -- and

9    we've got a transcript, and we've got the tapes so

10   we have listened to it extensively.  You made a

11   point -- do you have a copy of your transcript, the

12   transcript of the interview?

13        MR. TASEFF:  May I approach, Judge?

14        THE COURT:  You may.

15   BY MR. TASEFF:

16   Q.   I'm going to show you one of the transcripts

17   we have that's time-coded to the left.

18        At 1:02, do you see where you're saying,

19   You're not under arrest, okay, but in order to

20   ensure you understand your rights?

21        Do you see that portion of the transcript?

22   A.   Yes.

23   Q.   That's the first time during the course of

24   this interview that you tell him that Seiver is not

25   under arrest, correct?

A.   Yes.

Q.   1:13 you go on to say, I don't plan to arrest
you, correct?

A.   Yes.

Q.   1:15 you say, This is a formality that we have
to do as part of our job to make sure you
understand your rights.

     What formality are you referring to?

A.   It was just a way to formally introduce
Miranda.

Q.   Okay.  The Miranda ruling and the warnings are
a formality in your mind, that you have to as part
of your job?

A.   I, I do -- now, with every interview I
conduct, I make sure I read Miranda.  Yes, sir.

Q.   Going to 2:28, that's where you say, Uh,
you're not in custody.

     And then 2:35, I'm gonna line through that
because you're not in custody, correct?

A.   Correct.

Q.   Then going on to 2:50 -- 2:45, I should say,
You're just saying, uhm, you're waiving your
rights, saying you understand your rights and that
you still agree to speak to us.  Okay, you're not
admitting any guilt if that's what --

1    And that's when Seiver interjects at 2:54, No,

2  I just wanted to know what I'm signing.

3    Do you remember that passage?

4  A.  Yes.

5  Q.  What prompted you to say -- what did you mean

6  when you said, "You're not admitting any guilt if

7  that's what"?

8  A.  Because it's been my experience that -- in the

9  past, in dealing with the public, when they sign

10  that waiver, some people get the misconception that

11  they're admitting that they're guilty of some sort

12  of an offense by signing that.  So, I wanted to

13  make sure he understood that he's not admitting to

14  any type of guilt by signing that; that he just

15  agrees that he's waiving his rights and agreeing to

16  speak with us.

17  Q.  Going on to the next page, 3:33, where it says

18  TB:  Okay.  Uhm, so we -- you're not in custody.

19    By my count, that's the third or fourth time

20  that you've told him you're -- Seiver is not in

21  custody, correct?

22  A.  Yes.

23  Q.  What do you understand that term to mean as

24  you were using it on that morning of Mr. Seiver's

25  interview?

1  A.   I understand --

2  Q.   What does "custody" mean to you when you're

3  using it that repeatedly?

4  A.   I take it to understand that he was not under

5  arrest, that we weren't -- that we weren't

6  transporting him to any sort of detention facility,

7  and that he was free to leave if he wanted to.

8  Q.   Well, did you tell him he was free to leave at

9  any time during the hour and a half or so that you

10 interviewed him?

11 A.   I, I mean other than the Miranda warning, I, I

12 didn't specifically say, "You're free to leave."

13 Q.   You did not, did you?

14 A.   I don't recall saying that, no.

15 Q.   You never once said on tape that, "Mr. Seiver,

16 you are free to leave," correct?

17 A.   Correct.

18 Q.   You never told him that he would not be

19 transported to a detention facility as you earlier

20 said, correct?

21 A.   Correct.

22 Q.   If Seiver had stood up and walked out of the

23 house and gotten in his father's car to drive away,

24 would you have let him go, under these

25 circumstances, based on what you knew from your

1  investigation and from what you were shown or told
2  about that preview?  You would have allowed him to
3  leave the premises, leaving behind that computer
4  and thumb drive?  Is that your testimony, sir?
5  A.  Well, that's a -- that's a hypothetical
6  situation that you --
7  Q.  It is.
8  A.  -- are presenting us with.  He never
9  attempted to leave.  He never asked to leave.  He
10  never stood up.
11  Q.  You never told him he could leave, did you?
12  A.  No, I didn't tell him he could leave.
13  Q.  And that would have required that he get up
14  from your presence and Agent Haferkamp's presence
15  and the seven or eight other police officers armed
16  and at his residence and leave their presence, too,
17  with that computer that you were told by TFO Price
18  contained images of child pornography.  That's kind
19  of unlikely, isn't it?
20  A.  I mean, you're speaking hypothetically there,
21  so --
22  Q.  Well, would you agree or disagree, it was very
23  unlikely he was going to be allowed to leave at
24  that time?
25  A.  No, he would have been allowed to leave.

1  Q.  I believe there was a passport found in his

2  bedroom?

3  A.  Yes.

4  Q.  Would you have given him the passport and

5  wished him bon voyage if he had told you that he

6  was going overseas?

7  A.  He didn't -- he didn't ask for his passport.

8  Q.  You never told him he could leave, correct?

9  A.  Well, I mean, if we went down that road, there

10  were a number of things I didn't tell him that he

11  could do or go or --

12  Q.  Well, but you made a point on three occasions

13  to say that he was not in custody, correct?  At

14  least three occasions?

15  A.  Yes.

16  Q.  You told him twice that he wasn't under arrest

17  and that you weren't planning on arresting him,

18  correct?

19  A.  I -- well, yeah, I stated once that I didn't

20  plan on arresting him.  Yes, I told him he wasn't

21  under arrest.

22  Q.  And you make all those statements to him

23  knowing what you've told us you and other agents

24  knew about Mr. Seiver's circumstance and what led

25  ten armed federal and state law enforcement

1  officers to that particular residence on the

2  morning of August 24th?

3  A.   There were many other cases we had with the

4  same sets of circumstances where we didn't make an

5  arrest when we completed the search.

6  Q.   Throughout the first 20 minutes or so of this

7  interview -- you've had a chance, haven't you, to

8  listen to the tape?

9  A.   Yes.

10  Q.   You can hear the mother -- who's in the

11  courtroom today.  You can hear the mom groaning in

12  pain at various portions of the interview, correct?

13  A.   Yes.

14  Q.   You could actually see her in the living room,

15  couldn't you, on the couch?

16  A.   I could see the commotion in the living room.

17  I didn't actually see her on the couch, but yes, I

18  agree I could hear that there was a situation going

19  on in the next room.

20  Q.   You knew she was in distress, correct?

21  A.   Yes.

22  Q.   You knew that EMS people were called, correct?

23  A.   Yes.

24  Q.   At one portion of the interview, you saw fit

25  -- this is 16:50 -- to bring up the whole

1  Blagojevich thing.  Why did you broach that

2  subject, the Blagojevich thing?

3  A.   Because I felt that Mr. Seiver wasn't, wasn't

4  being entirely honest with me and wasn't giving me

5  the whole story so I wanted to put that out on the

6  table to try to coax him into being more

7  forthcoming.

8  Q.   Okay.  And at that point he's still free to

9  leave, I take it?  Could have walked out of your

10  presence, suspecting that he was lying to you?

11  A.   He was -- yeah, he still was not in custody at

12  that point.

13  Q.   Well, because you go on at 17:04 to say, Okay.

14  When Seiver says, No, I don't know about the

15  Blagojevich thing, you then posit, 17:04, Okay.

16  It's a federal felony to lie to a federal agent,

17  okay.  And you go on to say how you and the other

18  officers are federal agents and lying to us is a

19  crime.

20      I believe you just told us that you were

21  suspecting that Seiver wasn't being entirely

22  truthful.  You suspected he was lying to you,

23  didn't you?

24  A.   I, I didn't have anything to hang my hat on at

25  that point.

1  Q.  Those images that Price showed you, that

2  didn't enter into your analysis or calculus?

3  A.  Not at that point, no.

4  Q.  So, at the bottom of that page then, from

5  Seiver it says, I'm not lying.  I'm telling you the

6  truth.

7      You go on to say, Hang on.  17:54.  It's

8  better to just tell us the truth and get it out

9  there on the table than stand a chance of getting

10 yourself in trouble for kind of, kind of BS, okay?

11     What did you mean by "BS"?

12 A.  I mean, that's a common term for bullshit,

13 yes.

14 Q.  So your interpretation is mine then, correct?

15 A.  Yes.

16 Q.  Okay.  And that's when we hear the mother

17 wailing in the background, right, right about that

18 time?

19 A.  I mean, I don't know if it was exactly then,

20 but yes, I, I -- it was taking place.

21 Q.  Because let's look at 18:04.  And that's when

22 you interject, What's the matter with her?

23     Seiver:  She had a stroke.

24     Berola:  How long ago?

25     Seiver:  Uhm, last year.

1          Berola:  Is she all right?

2          Seiver:  And she is -- sometimes she's not --

3     she has fibromyalgia.

4          Berola:  Oh.

5          Seiver:  It's pretty bad.

6          Berola:  That hurts.

7          Seiver:  Yeah.

8          Do you remember that exchange?

9     A.   Yes.

10    Q.   And by that time, you know for certain the mom

11    is in real distress and that EMS people are coming

12    to take her by ambulance to a hospital, correct?

13    A.   Well, yeah, I understand there's a medical

14    situation going on.

15    Q.   Okay.  While you're interviewing her son --

16    A.   Yes.

17    Q.   -- in an adjoining room?

18    A.   Yes.

19    Q.   Now, at any time did you or Haferkamp say,

20    Look, Ronald, we can take a break right now.  Do

21    you want to talk to your mom because you're not

22    under arrest.  You're not in custody.  We didn't

23    tell you you're free to leave but, yeah, you're

24    free to leave.

25         I mean, you never take a break at that time,

1   do you?

2   A.   We did not take a break.

3   Q.   You never told him or asked him if he wanted a

4   break, correct?

5   A.   Correct.

6   Q.   You never asked him if he was okay, correct?

7   A.   If he was okay?

8   Q.   Yes.

9   A.   No.

10   Q.   If Ronald was okay.

11       You never asked him if he was concerned enough

12   about his mother's condition to answer your

13   questions after she went to the hospital, correct?

14   A.   Correct.

15   Q.   Why didn't you ask him that?

16   A.   There were other family members in there, in

17   with her at the time.  I believe the stepfather was

18   in there, and I believe his sister may have also

19   been in there with her.

20   Q.   The sister who was being questioned about some

21   things on her computer?

22   A.   I don't know what time she was questioned.  I

23   wasn't involved with that.

24   Q.   But she was questioned, wasn't she?

25   A.   At some point during the day she was.

1  Q.   Now, rather than offer to take a break, you go

2  on to say, at 18:41, It's not my goal to embarrass

3  you.  I've been doing this a long time.  Nothing's

4  going to shock me.

5       I'm sure nothing would shock you because how

6  many cases did you say you've done; 50 to 100?

7  A.   Yes.

8  Q.   Did you know at the time you interviewed

9  Ronald Seiver that he had ever been in trouble with

10 the law at any time in his life?

11 A.   I, I don't recall exactly what, if any,

12 criminal history Mr. Seiver had.

13 Q.   Well, at your pre-raid meeting, didn't you

14 discuss any criminal history or violent tendencies

15 or prior arrests?  There were none for any of the

16 family members there, correct?

17 A.   That would have been discussed, yes.  That

18 would have been something we would have discussed

19 at the meeting.

20 Q.   Indeed, from the earlier conversation when we

21 talk about whether he's in custody and the Miranda

22 warnings, you even noted there was some confusion

23 on his part as to what his legal rights were and

24 what this waiver meant and when those rights were

25 waived and whether he could get them back, correct?

1  A.   Yes.

2  Q.   So, rather than ask him if he wanted a break

3  -- let's go to 19:03.  You then said after you're

4  not going to pass judgment, you're not going to

5  form any opinions, but, quote, I've got to ask

6  questions.

7       Seiver:  Unintelligible.

8       19:06, Berola:  'Cause I need all the details,

9  okay?

10      19:07:  Unintelligible.

11      And the questioning goes on and on, correct?

12  A.   Yes, the questioning continues.

13  Q.   For another 45 minutes or so, correct?

14  A.   Yes.  Yes.

15  Q.   The questioning continues even as the EMS

16  people are taking the mother out on a stretcher,

17  correct?

18  A.   Yes.

19  Q.   Let's go to 54:35.  It's on page 52 of the

20  interview; it's near the end.  54:35.

21  A.   Okay.

22  Q.   Near the end of the interview, after you've

23  confronted him about Brittany Miller, after you've

24  confronted him about other information, chats and

25  all kinds of stuff, 54:35, Berola:  Okay.  Okay.

1  Is there anything else that they're gonna bring me
2  a note on that you probably should tell me?
3      Seiver:  Nope.  No, I've told you everything
4  as far as I know.  As best I know.
5      Berola:  Okay.
6      Seiver:  I don't have anything to hide.  I
7  don't want to hide anything.
8      Berola:  Okay.
9      Seiver, 55:06:  I don't want to get in any
10  trouble or anything like that.
11      Berola:  I understand that.
12      Do you remember that passage?
13  A.  Yeah.
14  Q.  Seiver is telling you he doesn't want to get
15  in any trouble some 55 minutes into the interview,
16  after you had persisted on questioning him about
17  various things that were found on the computer,
18  correct?
19  A.  Correct.
20  Q.  Okay.  Ultimately you told Mr. Seiver that he
21  was under arrest, correct?
22  A.  No, I was not the one that told him he was
23  under arrest.
24  Q.  Who did?
25  A.  I believe Agent Haferkamp did.

1  Q.   Were you present when Haferkamp told Seiver

2  that Seiver was under arrest?

3  A.   No, I believe I was not present when he made

4  that arrest.

5       MR. TASEFF:  No further questions.

6       THE COURT:  Mr. McCoy?

7       MR. McCOY:  No more questions, Your Honor.

8       THE COURT:  All right.  You may step down,

9  sir.  Thank you.

10      Any further witnesses from the government.

11      MR. McCOY:  None from the government, Your

12  Honor.

13      THE COURT:  Any witnesses from the defense?

14      MR. TASEFF:  May we take five minutes, Judge?

15      THE COURT:  Sure.  Let's do that.

16      THE CLERK:  Court is in recess.

17      (Recess at 2:35 to 2:41 p.m.)

18      THE COURT:  Mr. Taseff, anything from the

19  defendant?

20      MR. TASEFF:  Judge, we call Ronald Seiver.

21      THE COURT:  All right.  Mr. Seiver, do you

22  want to come forward, please?

23          **(Defendant sworn by the clerk.)**

24                  **RONALD SEIVER,**

25  **called as a witness, was examined and testified**

1  **upon his oath as follows:**

2  **DIRECT EXAMINATION**

3  BY MR. TASEFF:

4  Q.  Ronald, please tell us your name.

5  A.  Ronald Seiver.

6  Q.  Can you pull that microphone closer to you so

7  we can hear you clearly?

8  Ronald, how old are you?

9  A.  30.

10  Q.  How far have you gone in school?

11  A.  I graduated high school.

12  Q.  What year did you graduate?

13  A.  1998.

14  Q.  From which high school?

15  A.  Avon High School.

16  Q.  In Avon, Illinois?

17  A.  Yes.

18  Q.  Your mother and stepfather are here today in

19  court, are they not?

20  A.  Yes, they are.

21  Q.  Their names are?

22  A.  Douglas Alexander and Jeannie Alexander.

23  Q.  How old is your mom?

24  A.  63, I think.  62 or 63.

25  Q.  Your stepdad?

1    A.    He just turned 66.

2    Q.    Have you ever been arrested for --

3    A.    No.

4    Q.    -- any criminal offense at any time in your

5    life?

6    A.    No.

7    Q.    Have you ever been subject to police

8    interrogation?

9    A.    No.

10    Q.    These rights that were contained on the form

11    that we've heard so much information about, prior

12    to this episode at your home on August 24th, 2010,

13    did you know what Miranda rights were?

14    A.    Yeah, I knew what they were.

15    Q.    What did you understand them to be?

16    A.    I thought that's what the police read to you

17    when they were arresting you.

18    Q.    Now --

19          THE COURT:  Mr. Taseff, one second.

20          Go ahead.

21    BY MR. TASEFF:

22    Q.    On the morning of August 24th, 2010, at about

23    9:30, we've heard testimony from the officers as to

24    how they executed the search warrant.  Do you

25    remember that morning?

1  A.   Yes.

2  Q.   And do you remember being taken from the

3  bedroom and being placed in the front yard?

4  A.   Yes.

5  Q.   Tell us what you did for that period of time

6  while you were in the front yard.

7  A.   I just sat there the whole time.

8  Q.   In the grass?

9  A.   Yes.

10 Q.   Were any police officers watching you or

11 standing near you?

12 A.   Yes.

13 Q.   How many?

14 A.   There was one standing behind me to my right.

15 Q.   While sitting on the grass outside your

16 parents' home, were you handcuffed?

17 A.   I don't believe so.

18 Q.   You were handcuffed initially out of your

19 bedroom, correct?

20 A.   Yes.

21 Q.   But at some time after you were removed from

22 the bedroom area, one of the officers took the

23 cuffs off of you.  Is that true?

24 A.   Yes.  Yes.

25 Q.   So you were outside the home in the front

1  yard, correct?

2  A.  Yes.

3  Q.  Could you see where your mother and your

4  stepfather and sister were?

5  A.  Yes.

6  Q.  Were all of you within eyesight of each other?

7  A.  Yes.

8  Q.  Were you able to talk amongst yourselves?

9  A.  No.

10  Q.  How long were you outside in the grass?

11  A.  I don't know exactly.  Quite awhile.

12  Q.  Were you later taken back into the house?

13  A.  Yes.

14  Q.  Where did the officers take you?

15  A.  They took me through the dining room into the

16  kitchen.

17  Q.  We've seen diagrams, and I'll show you Defense

18  Exhibit 2 on the ELMO.  In the upper right-hand

19  portion of the diagram is a portion of the diagram

20  denominated Kitchen.

21       Does that accurately reflect where the kitchen

22  was in the configuration of the first floor of your

23  parents' home?

24  A.  Yes.

25  Q.  And you see where it says "Ron Berola" and

1  "Haferkamp" around the table.  Does that accurately

2  reflect which of the three of you occupied each of

3  those chairs?

4  A.  Yes.

5  Q.  Now, once you were seated at that table in the

6  kitchen, did there come a time when you suspected

7  that your mother was having health problems?

8  A.  Yes.

9  Q.  When?

10  A.  When I could hear her, you know, pretty much

11  moaning and groaning in pain after they brought her

12  into the house.

13  Q.  Had the interview already commenced when you

14  first noticed she was in distress?

15  A.  Yes.

16  Q.  Tell us about your mother's condition.  What

17  did you know about it?

18  A.  I know she had previously had a stroke.  She

19  has arthritis, fibromyalgia.  She has heart

20  problems, about 40 percent blockage in her heart or

21  something like that.

22  Q.  You mentioned a stroke.  When did that stroke

23  occur in relation to August of 2010?

24  A.  I believe it was in mid to late 2008.

25  Q.  Were you present in Illinois at the time she

1  had that stroke?

2  A.   Yes, I was.

3  Q.   Were you present in the home or with her when

4  she had her stroke?

5  A.   Yes, I was.

6  Q.   Did you accompany her to the hospital?

7  A.   Yes, I went to the hospital.

8  Q.   Did you stay with her or see her in the

9  hospital?

10  A.   Yes, I did.

11  Q.   Talk to her doctors?

12  A.   Yes.

13  Q.   Assist her in her recovery?

14  A.   Yes.

15  Q.   In the months thereafter?

16  A.   Yes.

17  Q.   Fair to say you were pretty familiar with her

18  circumstance?

19  A.   Yes.

20  Q.   Now, at the outset of this interview at the

21  kitchen table, Agent Berola asked you if you had

22  seen TV and seen police shows, and do you know what

23  happens when people are read their rights.

24       Do you remember that --

25  A.   Yes.

1  Q.   -- at the outset?

2       And Agent Berola says to you, You're not under

3  arrest, but in order to ensure you understand your

4  rights, I'm going to go ahead and read you the

5  Miranda rights, correct?

6  A.   Yes.

7  Q.   The transcript that we have says that at that

8  time Berola says, I don't plan to arrest you.

9  A.   Yes.

10  Q.   And you said, Okay.

11       Then he goes on to talk about, This is a

12  formality that we have to do as part of our job to

13  make sure you understand your rights.

14       What impact, if any, did Berola's statement to

15  you that you are not under arrest and he did not

16  plan to arrest you, what impact did that have on

17  your understanding of what your status was?

18  A.   I thought I could talk to him, and I wouldn't

19  ever be arrested for it or for whatever I would

20  tell them.

21  Q.   What made you think that?

22  A.   That's what he told me, that I wasn't going to

23  be arrested.

24  Q.   Did you believe that you could get up out of

25  that chair and walk away?

1  A.   No.

2  Q.   You've heard my questions to the officers

3  about your getting up and announcing you wanted to

4  go to the airport or drive away.  Did you even

5  contemplate at that time that you could have done

6  that?

7  A.   No.

8  Q.   Well, why?

9  A.   Well, there was, you know, all those federal

10  agents there.  They were asking me all these

11  questions.  They were interviewing me.  I just

12  didn't think I was free to leave, you know, based

13  on some of the questions they were asking me and

14  the way they were acting.  I mean, I was scared to

15  death.

16  Q.   Did there come a time in the interview where

17  Agent Berola talked about a rude awakening?

18  A.   Yes.

19  Q.   Do you remember that particular portion of the

20  interview?

21  A.   Yes, I do.

22  Q.   At 12:06, I was half asleep, you said, when I

23  heard you guys.  Didn't know what was going on.

24       And Berola said to you, It's kind of a rude

25  awakening.  12:16:  I understand that.  I mean

 1 | that's the true definition of a rude awakening.

 2 |       Did you consider that a rude awakening when

 3 | the agents?

 4 | A.   It was --

 5 | Q.   -- pointed their guns at you?

 6 | A.   It was not a pleasant way to wake up.

 7 | Q.   Well, did you believe that -- in the kitchen

 8 | that you had the authority, the opportunity to get

 9 | up and leave?

10 | A.   No.

11 | Q.   And walk away or drive away from the house?

12 | A.   No.

13 | Q.   The officer goes on to read the form to you.

14 | Do you remember reading the form with him?

15 | A.   Yes.

16 | Q.   Do you remember him reciting the Miranda

17 | rights?

18 | A.   Yes.

19 | Q.   Do you remember this thing about waiving

20 | rights?

21 | A.   Yes.

22 | Q.   At one point you told him you didn't like that

23 | idea.  What did you mean by that?

24 | A.   I, I didn't like that -- I thought, you know,

25 | I was waiving my rights here or -- I don't remember

1   exactly.  I was -- trying to find the words.  I

2   didn't like the way he was explaining it to me

3   pretty much.  But he told me I wouldn't be under --

4   I wasn't going to be arrested so, you know, I

5   thought I could -- I was free to talk to him.

6   Q.   What did you think the officers were there

7   for?

8   A.   I had no idea.

9   Q.   What did you think they would do with respect

10  to the computer or with you, your family?

11  A.   I had no idea.

12  Q.   When the officers said to you two other times

13  that you're not in custody and that by signing this

14  form you're not admitting any guilt, what did you

15  understand that to mean about your situation at

16  that moment?

17  A.   I thought that whatever I said to them, I

18  wasn't, you know, saying I was guilty of anything.

19  Q.   Did you contemplate from that moment on that

20  you could speak to the agents without fear of

21  incrimination?

22  A.   Yes.

23  Q.   Later on, as I asked Agent Berola, at 54:35

24  when the agent asked you, Is there anything else

25  that they're gonna bring me a note on that you

1  probably should tell me?

2      Nope, I've told you everything as far as I

3  know.

4      Do you remember at that point saying to Agent

5  Berola, 55:01, I don't have anything to hide.  I

6  don't want to hide anything?  And then saying, I

7  don't want to get in any trouble or anything like

8  that.

9      Do you remember that exchange?

10  A.  Yes, I do.

11  Q.  Now, 55 minutes into the interview, you'd

12  covered a lot of subjects by that time, hadn't you?

13  A.  Yes.

14  Q.  Did you still believe that you didn't want to

15  get in any trouble and wouldn't get in any trouble?

16  A.  Yes.

17  Q.  When did these agents tell you that you were

18  actually under arrest?

19  A.  I think it was about a quarter to one, 1:00,

20  somewhere in there.

21  Q.  Was that following this discussion about your

22  signing a piece of paper about accounts?

23  A.  Yes, it was after that.

24  Q.  And I believe your testimony -- or your

25  statement to the officers, as they've related to

1  us, is that you were willing to give consent, but

2  you didn't want to lose all of the data from those

3  accounts?

4  A.   Yes, that's true.

5  Q.   So at some time after that, you were told you

6  were under arrest?

7  A.   Yes.

8  Q.   Who told you that?

9  A.   I believe it was Agent Berola, the one that

10  conducted the interview.

11  Q.   Because you just heard Berola say that he

12  never told you that you were under arrest.  Did you

13  hear him --

14  A.   Yes, I heard him.

15  Q.   -- testify before?

16      But it's your testimony you believe it was

17  Berola who told you?

18  A.   Yes, he read me my rights again when I was

19  arrested.

20  Q.   There was a second Miranda admonishment?

21  A.   Yes.

22  Q.   Tell us about that.

23  A.   When they arrested me, they read me my rights

24  again.

25  Q.   Did they tell you you were under arrest before

1  advising you of your rights once more?

2  A.  It was at the same time pretty much.

3  Q.  What, if any, response did you make at that

4  time when they gave you the rights the second time

5  after telling you that you're under arrest?

6  A.  I immediately said I wanted a lawyer.

7  Q.  Why did you ask for a lawyer at that point and

8  not earlier, some hour and a half earlier?

9  A.  Because they had told me I wasn't admitting

10  guilt; I wasn't going to be arrested.

11  Q.  During the course of the interview, we hear

12  your mother in distress, correct?

13  A.  Yes.

14  Q.  Do you remember this exchange between you and

15  Berola about your mother having a stroke?

16  A.  Yes.

17  Q.  At that point in the conversation, we can hear

18  your voice is somewhat muffled, correct?

19  A.  Yes.

20  Q.  Did the agent ever ask you if you wanted to

21  take a break to ask about or attend to your mother?

22  A.  No.

23  Q.  Did you at any time contemplate asking them if

24  you could have a break to see if your mother was

25  okay?

1   A.   No, I didn't know that I could.

2   Q.   Why didn't you ask them?

3   A.   I didn't know that I could ask them to take a

4   break or, you know, to let me check on her to make

5   sure she's okay or what was going on.

6   Q.   Had they controlled your movements from the

7   time of your encounter with them in the bedroom?

8   A.   Yes, pretty much.

9   Q.   Did you at any time think you could get up

10  from that table and go to the living room to check

11  on your mother without their permission?

12  A.   No.

13  Q.   Did you believe that they would grant you that

14  permission?

15  A.   No.

16  Q.   Did they continue to persist in asking you

17  questions?

18  A.   Yes.

19  Q.   What impact did your mother's condition have

20  upon your state of mind as you were sitting in the

21  kitchen, listening to her, while being questioned

22  by Agent Berola?

23  A.   I was worried.  I didn't know if she was okay

24  or not.

25  Q.   Did you believe you had to talk to them under

1  those circumstances?

2  A.   Yeah.   After it started, I, I thought I had to

3  talk to them.

4       MR. TASEFF:   Those are my questions, Judge.

5       THE COURT:   Mr. McCoy?

6       MR. McCOY:   Your Honor, the government wasn't

7  aware the defendant was going to be called to the

8  stand.   There's just a couple issues that came up

9  through his direct.   I was wondering if I could

10 have just two minutes to consult with the agents,

11 to try to confirm something?

12      THE COURT:   Yes, go ahead.   Do you want us to

13 recess or just -- we'll recess for a couple

14 minutes.

15      Do you want to step down, sir?

16      I might just stay put.   Well, actually, I'll

17 visit with you for a second.

18      THE CLERK:   Court is in recess.

19      (Recess at 2:59 to 3:04 p.m.)

20      THE COURT:   Mr. McCoy, ready?

21      MR. McCOY:   Yes, Your Honor.   Thank you.

22      THE COURT:   Mr. Seiver, do you want to come

23 back to the stand, please?

24      All right.   Let's proceed.

25                      **CROSS-EXAMINATION**

**BY MR. McCOY:**

Q.  All right.  Mr. Seiver, you said that -- you
talked about with Mr. Taseff the Miranda warnings
and that you thought that Miranda warnings are, if
I'm correct here, what police read to someone when
they're arrested.  Is that correct?

A.  Yes.

Q.  And so at the time that these warnings were
advised to you or read to you, did you believe you
were under arrest at that point?

A.  No.

Q.  Why didn't you believe you were under arrest?

A.  They told me I wasn't under arrest and I
wouldn't be arrested.

Q.  They told you you weren't under arrest and
that you would not be arrested?

A.  Yes.

Q.  Who told you that you would not be arrested?

A.  Agent Berola.

    MR. McCOY:  May I approach the witness, Your
Honor?

BY MR. McCOY:

Q.  This is a transcript, Government Exhibit 5.
Just have you hold onto that.

A.  All right.

1   Q.   At the bottom of the first page -- let me ask
2   you this:  When exactly did they tell you that you
3   were not going to be arrested?
4   A.   It was when they were going over the piece of
5   paper, the Miranda rights paper.
6   Q.   So it was when the interview started, correct?
7   A.   Yes.
8   Q.   And so at some point during the audio
9   recording that we've been listening to today, we
10  would be able to find somewhere one of the agents
11  telling you that you're not going to be arrested?
12  A.   Yes.
13  Q.   Where would that be exactly?
14       I'm looking down at 1:13.  Is that what you're
15  referring to there?
16  A.   Yes.
17  Q.   And that's when Agent Berola said, I don't
18  plan to arrest you?
19  A.   Yes.
20  Q.   Do you think there's a difference between "I
21  don't plan to arrest you" and, "You're not going to
22  be arrested"?
23  A.   No.
24  Q.   There's no difference between that?
25  A.   I don't believe there is.

208

1    Q.   Now, when he -- when Agent Berola was -- or
2    Investigator Berola, rather, was advising you of
3    these rights -- I'll have you turn to the second
4    page.  He showed you the Rights Waiver Form,
5    correct, what we've seen earlier?
6    A.   Yes.
7    Q.   And was that sitting in front of you while he
8    was advising you of your rights?
9    A.   I believe he eventually put it in front of me
10   so I could read that one passage.
11   Q.   Okay.  And he read through it from the top to
12   the bottom of that rights advisement list, correct?
13   A.   Yes.
14   Q.   He told you that you had the right to remain
15   silent, correct?
16   A.   Yes.
17   Q.   Do you understand what that means?
18   A.   Yes.
19   Q.   What does it mean to have the right to remain
20   silent?
21   A.   Pretty much not talk.
22   Q.   Okay.  Was there any part of what he told you
23   when he said you have the right to remain silent
24   that you did not understand?
25   A.   No.

1  Q.   All right.  He told you you had the right to
2  an attorney, correct?
3  A.   Yes.
4  Q.   Do you know what that means?
5  A.   Yes.
6  Q.   What does that mean?
7  A.   That I can have a lawyer if I wanted one.
8  Q.   All right.  Did you tell him at that point
9  that you wanted a lawyer?
10 A.   No.
11 Q.   At any point during that interview did you
12 tell him that you wanted a lawyer?
13 A.   No.
14 Q.   Did he tell you or did he read to you -- he
15 did read to you, I should say, that if you couldn't
16 afford a lawyer they'd get one for you for free; is
17 that correct?
18 A.   Yes, I believe so.
19 Q.   And then he had you read the final entry
20 there, did he not?  And I'm looking at particularly
21 1:57 on page two.  He had you read that, correct,
22 to make sure you could read?
23 A.   Yes.
24 Q.   And you read, If you decide to answer
25 questions now, you will still have the right to

1   stop the questioning at any time or stop the

2   questioning for the purpose of consulting an

3   attorney.

4       Did you understand that right when you read it

5   to yourself?

6   A.   Yes, I believe so.

7   Q.   Okay.  So you read this right to yourself,

8   correct?

9   A.   Yes.  I read it out loud to them.

10  Q.   Okay.  And you were reading it off of a piece

11  of paper?

12  A.   Yes.

13  Q.   Was there any part of what you read to

14  yourself that you didn't understand about stopping

15  questioning and asking for an attorney?

16  A.   No.

17  Q.   Now I want to take your attention now to the

18  third page, particularly 2:14.  And this is

19  Investigator Berola.

20      Are you there?

21  A.   Yes.

22  Q.   Okay.  He says, It says here that I waive them

23  freely -- he's talking again on your rights

24  advisement.  I waive these rights freely and

25  voluntarily without any threat or intimidation,

1  without any promise of reward or immunity.

2      And then he asks you, Has anybody promised you

3  anything to speak with us today?

4  A.  Yes.

5  Q.  Did you understand that?

6  A.  Yes.

7  Q.  And had anybody promised you anything in

8  return for speaking with them today -- that day?

9  A.  No, not specifically.

10  Q.  All right.  Had anybody promised you that you

11  would not be arrested?

12  A.  He didn't say it was a promise, but he said he

13  didn't plan to arrest me.

14  Q.  He said he didn't plan to arrest you, correct?

15  A.  Yes.

16  Q.  Now, you mentioned -- Mr. Taseff covered with

17  you the issue of Special Agent Mitchell coming into

18  your bedroom that morning, correct, and the other

19  agents moving into your bedroom?

20  A.  Yes.

21  Q.  And prior to the agents entering your house,

22  were you sleeping at that time?

23  A.  Yes, I was.

24  Q.  Okay.  Had you been asleep that entire

25  morning?

1  A.   No, not the entire morning.

2  Q.   Okay.   When had you woken up that day?

3  A.   I believe around 7:30.

4  Q.   And what did you -- what did you do at 7:30

5  when you woke up?

6  A.   I woke up, and I put some of my dirty clothes

7  in the washing machine.

8  Q.   And then what happened?

9  A.   And then I asked my mom if she'd put them in

10  the dryer while I went back to sleep.

11  Q.   What time, approximately, did you go back to

12  sleep?

13  A.   It wasn't very long after that.

14  Q.   Very long after 7:30?

15  A.   It was probably 15, 20 minutes later.

16  Q.   When in the process of the agents coming to

17  the house did you wake up?   What did you hear?

18  What woke you up?

19  A.   I heard people running up the stairs; a loud,

20  you know, commotion coming up the stairway.

21  Q.   And how long was it before -- between the time

22  that you heard this commotion and the time that the

23  agents came into your bedroom?

24  A.   Maybe not even a minute.   30 seconds,

25  45 seconds maybe.

1   Q.   What did you do during that 30 to 45 seconds?

2   A.   I sat up.  I looked at my laptop.  And I was

3   getting ready to get up and go out the door and

4   that's when -- you know, see what was going on and

5   that's when they came in.

6   Q.   Why were you typing on your laptop when they

7   came in the door?

8   A.   I wasn't typing at all.

9   Q.   What were you doing with your thumb drive?

10  A.   I wasn't doing anything with it.

11  Q.   Why was it underneath your mattress?

12  A.   That's where I had kept it and that's where it

13  had been previously.  I had not touched it at all

14  that morning.

15  Q.   So you had not touched your thumb drive at all

16  that morning?

17  A.   No.

18  Q.   And you had not slipped it under the mattress?

19  A.   No.

20  Q.   You're picked up, and you're brought outside,

21  correct, and you were handcuffed at that point?

22  A.   I was pulled off my bed, out into the hallway.

23  Q.   When Agent Mitchell came into the room, he

24  told you basically to get up, correct?

25  A.   I had -- when he came in the door, I had the

1  guns in my face, and I immediately put my hands up.

2  I believe he said, Get up.  Get up.

3      And I was getting up, and he grabbed me by the

4  arm and pulled me off the bed.

5  Q.  What were you doing with your computer at that

6  time?

7  A.  I wasn't doing anything with it.

8  Q.  Were you sitting in front of the computer?

9  A.  It was kind of diagonal to me, but I wasn't

10  sitting directly in front of it, no.

11  Q.  And you were handcuffed, correct?

12  A.  Yes, out in the hallway.

13  Q.  Were you ankle-cuffed?

14  A.  I don't believe so.

15  Q.  You've filed a motion to suppress, correct, in

16  this case, obviously?

17      MR. TASEFF:  Objection on the same grounds

18  that they raised on me, Judge.

19      THE COURT:  Mr. McCoy?

20      MR. McCOY:  Yes, Your Honor.

21      THE COURT:  All right.  Let's move on.

22  BY MR. McCOY:

23  Q.  Were you ankle-cuffed at all?

24  A.  I believe after I was arrested.

25  Q.  After you were arrested.  So I'm not -- I'm

1    talking about when you were initially picked up in

2    your bedroom.

3    A.   No, I was handcuffed when I was taken out into

4    the hallway.

5    Q.   What happened after you were taken in the

6    hallway?

7    A.   They took me down the stairs and out through

8    the kitchen area into the dining room and then out

9    the front door into the yard.

10   Q.   As soon as they brought you out into the yard,

11   they took the handcuffs off, correct?

12   A.   It was either then or when they were taking me

13   inside.  I can't remember exactly.

14   Q.   Either then or an hour later when they took

15   you back inside for the interview?  Is that what

16   you're saying?

17   A.   It was at one of those times.

18   Q.   Well, that's a huge difference, isn't it?  So

19   you either had your handcuffs off within the first

20   five minutes or an hour and five minutes later.

21   You don't remember which it is?

22   A.   Well, I was scared to death still from when

23   they took me outside, and I had guns in my face

24   so --

25   Q.   But you said to the defense attorney that

1  you're sitting on the grass, correct?

2  A.   Yes, I was.

3  Q.   Were your handcuffs on when you were sitting

4  on the grass?

5  A.   I don't believe so.

6  Q.   Okay.  So they were taken off --

7  A.   It would have been when they took me outside.

8  Q.   So within five minutes of them being placed on

9  your hands?

10  A.   I don't know exactly how long it took to go

11  downstairs and outside, but probably about five,

12  ten minutes.

13  Q.   Well, then, would you agree at least that your

14  handcuffs were on from the point you left your

15  bedroom to the point you got to the front yard?

16  A.   Yes.

17  Q.   Now, you could see your mom -- you explained

18  to Mr. Taseff that you could see your mom, your

19  sister and your dad sitting over on the porch,

20  correct?

21  A.   Yes.

22  Q.   You also stated that there was some officer

23  who was standing near you the entire time you're

24  out on the grass, correct?

25  A.   Yes.

1  Q.   Did you notice anybody standing next to your
2  mom and dad and sister on the porch?
3  A.   I think the sheriff was over there.
4  Q.   So there was someone standing next to them as
5  well, correct?
6  A.   Yes.
7  Q.   When your mom had her medical condition, your
8  dad was allowed to leave with her, correct, and go
9  to the hospital?
10 A.   I think so.  I'm not quite sure.
11 Q.   Even though he had been sitting on the porch
12 with someone watching over him as well, correct?
13 A.   I -- yes.
14 Q.   Now, your mom's health problem, sadly she had
15 a stroke; and you explained that was about a year
16 before this happened.  Is that correct?
17 A.   Yes.
18 Q.   And she suffers from fibromyalgia?
19 A.   Yes.
20 Q.   Had the paramedics been called to your
21 parents' address -- or how many times had
22 paramedics been called to your parents' address
23 prior to August, let's say in the 12 months that
24 preceded this event?
25 A.   Maybe three or four times.

1  Q.  And each time did your mom go off to the
2  hospital?
3  A.  Yes.
4  Q.  Did you go with her each time?
5  A.  I didn't go with the ambulance, but I went
6  after; like after they left, I drove there.
7  Q.  All right.  So the paramedics showed up to
8  your house three to four times before this, over
9  this span of 12 months that led up to this; is that
10 correct?
11 A.  Yes, something like that.
12 Q.  And you said that you were worried about your
13 mom and her condition while you were being
14 interviewed, correct?
15 A.  Yes.
16 Q.  But you never expressed that to either
17 Investigator Berola or, or Agent Haferkamp, did
18 you?
19 A.  I believe I said, "I hope she's okay," but I
20 don't know if you could hear that in the actual
21 audio recording.
22 Q.  Well, let's see here.  Let's see.  And we can
23 play the audio again, too, if you -- if we need to.
24     I don't have a page number, but if you look on
25 the left there's the time stamps.  If we could go

1  to -- let's go to 18:17.

2     Okay.  Are you there?

3  A.   Yes.

4  Q.   All right.

5     Agent Berola.  So you -- obviously, I'll go

6  one line above it, 18:04, and you hear background

7  noise.  That's when we heard on the audio your mom

8  moaning as she's coming into the house.

9     Agent Berola:  What's the matter with her?

10     Your response:  She had a stroke.

11     How long ago?  Agent Berola.

12     Your response:  Last year.

13     Agent Berola:  Is she all right?

14     Your response:  And she is -- sometimes she's

15  not.  She has fibromyalgia.

16     Now, when you said that "she is," what were

17  you talking about?  She is all right?

18  A.   No.  Sometimes she is, and sometimes she's

19  not.

20  Q.   All right.

21  A.   That part was cut off.

22  Q.   Sometimes she is, and sometimes she's not when

23  she has this fibromyalgia attack?

24  A.   Yes.

25  Q.   Agent Berola:  Oh.

1      Your response:  It's pretty bad.

2      Agent Berola:  That hurts.

3      And your response:  Yeah.

4      Now, you said that you might have expressed at

5  some point that was unintelligible a concern about

6  your mom or expressing concern about her.  Where in

7  that dialogue there would that have been?

8  A.   I, I believe it was at 18:35 after I said

9  fibromyalgia.

10 Q.   Okay.  And what did you say?

11 A.   I said, I hope she's okay.

12 Q.   You said you hope she's okay?

13 A.   Yes.

14      MR. McCOY:  Can we play that, please?  This

15 would be clip two.

16      MS. VERBEKE:  It's not coming through on the

17 speakers.

18      MR. McCOY:  I'm sorry.  Clip three.  Clip

19 three.

20      (Audio commenced and paused.)

21      MR. McCOY:  Thank you.

22 BY MR. McCOY:

23 Q.   So, the unintelligible part is someone else

24 talking in the background, right?

25      Did you hear anything that you said at that

1  point?

2  A.   I couldn't hear it during -- when you just

3  played it now.

4  Q.   Okay.  So, at any other point -- including

5  this point, I should say, did you ever say to the

6  agents, Can we stop so I can go check on my mom?

7  A.   No, I never said that.

8  Q.   Did you know that you could stop the

9  questioning?

10  A.   No.

11  Q.   You didn't know that?

12  A.   No.

13  Q.   Okay.  Well, let's go to --

14       MR. McCOY:  Excuse me, Your Honor, for just

15  one moment.

16  BY MR. McCOY:

17  Q.   All right.  3:14, which I think is on page

18  three or four.

19       This is Agent Berola:  Well, you can still --

20  you can exercise your rights at any time.

21       Your response:  All right.

22       It's not like you've thrown them out the

23  window and --

24       Okay, your response.

25       And you can't get them -- go back to them.

1       Your response:  Okay, just making sure.

2       Yeah.

3       I don't have anything to hide.

4       Yeah.  No, this just says you understand them,

5  and you're gonna talk to us, but it doesn't mean

6  you've given them up for all time.

7       Now, one of the rights that he had just

8  previously told you, which we've covered before, is

9  that you had the right to remain silent, correct?

10 A.  Yes.

11 Q.  And that you had the right to stop the

12 questioning; is that correct?

13 A.  Yes.

14 Q.  Now, you testified that Agent Berola arrested

15 you.  Are you certain about that?

16 A.  I believe so.

17 Q.  And --

18 A.  It was him or Agent Haferkamp, but I know

19 Berola read me my Miranda rights again when I was

20 being arrested.

21 Q.  You're certain of that?

22 A.  Yes, I'm certain that he was the one that read

23 them.

24 Q.  Okay.  A little while ago you were certain

25 that Berola was the one who arrested you as well.

1   Now you're saying maybe Haferkamp?

2   A.   It could have been -- it might have been

3   either one of them.  I mean, I wasn't really, you

4   know, thinking right because I had just been

5   arrested, and I didn't really know what was going

6   on so --

7   Q.   At the time they arrested you, did they tell

8   you why they were arresting you?

9   A.   No.

10  Q.   So you didn't know why you were being

11  arrested?

12  A.   No.

13  Q.   Did you have an idea why you were being

14  arrested?

15  A.   I did not know at all.

16  Q.   Did you think it might be related to Brittany

17  Miller?

18  A.   I thought so, but I didn't know for sure.

19  Q.   During the interview when you were talking

20  about Brittany Miller, you told the agents that you

21  had sex with her, correct?

22  A.   Yes.

23  Q.   And you told them -- you admitted to them that

24  you knew she was underage, correct?

25  A.   Yes.

1  Q.  At any point did you think, after saying that,

2  that you needed to ask for an attorney, or did you

3  ask for an attorney?

4  A.  No, I didn't.

5  Q.  Did you know at the time that having sex with

6  a girl under the age of 18 as a 27-year-old man was

7  against the law?

8  A.  Yes, I did.

9      MR. McCOY:  Those are all the questions I

10  have, Your Honor.

11      THE COURT:  Mr. Taseff?

12                **REDIRECT EXAMINATION**

13  BY MR. TASEFF:

14  Q.  How tall are you?

15  A.  I'm 5'9".

16  Q.  And your weight?

17  A.  I'm not sure what it is now, but at that time

18  it would have been about 230.

19      MR. TASEFF:  No further questions.

20      THE COURT:  You may step down.  Anything

21  further from the defense?

22      MR. TASEFF:  No.

23      THE COURT:  From the government?

24      MR. McCOY:  No, Your Honor.

25      THE COURT:  Okay.  Argue, and then include the

1  warrant issue as well.

2      MR. TASEFF:  I'll address the warrant issue,

3  Judge, and the statement question.

4      Respectfully, when we come to the warrant

5  question, Judge, the government is attempting to

6  pound a square peg into a round hole, and they're

7  relying upon cases to defeat a claim of staleness

8  that involves peer-to-peer distribution of child

9  pornography that would give an inference -- a

10 reasonable inference of continuing criminal

11 activity.

12     The agent says in his affidavit -- a form that

13 was given him for use within, I assume, their data

14 bank of search warrant affidavits because this was

15 the first time he'd ever done one of these, he

16 says.  For the probable cause basis, he lays out

17 the facts of the investigation in a very clear and

18 precise way.  He talks about in January of 2010

19 Canadian authorities are contacted by Mom who

20 protests the Facebook e-mail, da, da, da, da, da,

21 da, where you've got all the facts laid out in that

22 application for search warrant.

23     And further in the search warrant affidavit,

24 starting in paragraph 27 and particularly page 18

25 of the search warrant affidavit, subparagraph C and

1  B, the agent recites that child pornography

2  collectors typically retain pictures, videotapes

3  and such for many years.

4      Now, we've done a lot of child pornography

5  cases, and the government and defense counsel have

6  cited a number of cases that deal with this issue.

7  There has never been a child pornography case in

8  this district that I can recall that has a

9  situation such as this where an individual is

10  contacting the mother of a minor to alert her to

11  what the daughter is posting on the Internet with a

12  bevy of still photographs taken from the video file

13  that the minor herself posted on the Internet with

14  links to her identifying information and presumably

15  that of the mother.

16      What collector of child pornography is going

17  to be alerting the activities of a minor to the

18  minor's mother for purposes of collecting child

19  pornography and erotica?

20      The significance of this is in January then,

21  based on this one e-mail with these 16 images, only

22  which two would meet the agent's definition of

23  child pornography, in early January of 2010 an

24  investigation is then conducted which, on

25  April 28th, the agent in Springfield -- Haferkamp

1  -- receives confirmation from Frontier

2  Communications out of Buffalo, New York, that the

3  I.P. address for the computer that uploaded those

4  images is registered to one of their customers,

5  Ronald Seiver.

6      So for the entire month of May, for the entire

7  month of June, for the entire month of July and for

8  at least two weeks or so of August, no further

9  activity, no further data, nothing of substance

10  that would tend to provide specific, objective fact

11  and data that would lead a reasonable person to

12  believe that child pornography would be at the

13  Seiver residence in Roseville, Illinois.

14      Every other case deals with peer-to-peer

15  communication, using sharing -- file-sharing

16  programs that allow distributors and collectors to

17  trade images with one another.  And it's that

18  continuing series of criminal activity that the

19  government will try to investigate in child porn

20  cases, in drug cases to avoid a staleness claim so

21  as to refute the contention that one and only

22  instance some eight months ago gives rise to a

23  reasonable inference there will be child

24  pornography where they suspect.

25      So in this case, on its face, we are

1    submitting that the government's reference to what
2    collectors of child pornography normally do does
3    not fit within this context.  And I cite two cases,
4    one from the Court of Appeals, Second Circuit,
5    United States vs. Zimmerman, 277 F3d. 26.  That's
6    the Third Circuit.  And I quote, "Rambling
7    boilerplate recitations in a search warrant
8    affidavit designed to meet all law enforcement
9    needs do not produce probable cause."
10        And then U.S. vs. Weber from the Ninth
11   Circuit:  "An affidavit did not establish probable
12   cause that the defendant was a child molester when
13   it was clear that the expert portion of the
14   affidavit was not drafted with the facts of this
15   case or this particular defendant in mind."
16        I challenge the government to show me any case
17   in all reported jurisprudence where someone alerts
18   a parent or guardian of a minor who's posting
19   illicit images on the Internet, with the very image
20   being posted, and that constitutes a collector of
21   child pornography under federal law enforcement's
22   criteria, because that whole collector badge
23   they're trying to pin on Ronald Seiver in this case
24   is their only way to avoid a staleness claim in
25   this case.

1        Other cases that talk about staleness a year

2   or two later do not arise out of facts such as this

3   where the reason the police investigated this

4   particular matter is a complaint to the mom, if you

5   will, that her daughter's doing stuff; and here's

6   the proof that your daughter's doing it.  Tell her

7   to stop it.  She's making these outlandish claims.

8        So, respectfully, the affidavit on its face

9   does not establish probable cause that on

10  August 16th, some eight and a half months removed

11  from January 7th, there was probable cause to

12  believe that the agents who raided that house in

13  Roseville would find child pornography on a

14  computer in that residence.  And for that reason we

15  say there's no probable cause.

16       For the same reasoning, those two very cases I

17  cite categorically reject the good-faith defense

18  that the government posited in those cases; that

19  officers have a good-faith obligation to know the

20  status of the law that they're sworn to uphold.

21  And one of the cases says it far better than any

22  lawyer can ever state.  U.S. vs. Zimmerman, 277

23  F3d, page 437.  Quote:  "The good-faith exception

24  to the exclusionary rule is not a magic lamp for

25  police officers to rub whenever they find

1  themselves in trouble," unquote.

2      And that's precisely what we have here.  The

3  government asserts, Well, if there is no probable

4  cause and if this is fatally stale information the

5  officers are relying upon, then the good-faith

6  defense should bail them out.  And I respectfully

7  submit that in this case it's tantamount to what

8  they had in U.S. vs. Owens from the Seventh Circuit

9  and that is basically a boilerplate warrant that

10 did not specifically provide facts related to the

11 defendant and the specifics for probable cause for

12 believing that there would be evidence to be

13 located in the place to be searched.

14     So, on the Fourth Amendment claim I

15 respectfully submit the warrant should be quashed,

16 and all evidence seized as a result ought be

17 suppressed.

18     The Fifth Amendment question is very, very

19 interesting and troubling.  You know, this is

20 deja vu all over again.  When I mentioned that

21 through one of my questions, the case of U.S. vs.

22 Slaight, 620 F3d. 816 from the Seventh Circuit.  We

23 encountered these very officers two years ago on

24 another warrant, and the whole question devolved

25 into one of these --

1          THE COURT:  Let me short-circuit the Fifth
2    Amendment issue.  I'll let you both address it
3    again, but I believe that I should find that
4    Mr. Seiver was in custody.
5          Now tell me why the Miranda wasn't a knowing,
6    intelligent --
7          MR. TASEFF:  I believe under the Orozco
8    decision from the U.S. Supreme Court, Orozco vs.
9    Texas where there was a custody finding by the
10   Supreme Court of a defendant in his house held at
11   gunpoint.  Assuming the Court finds custody, then
12   any assertion that, "We do not plan to arrest you.
13   You are not under arrest.  We do not plan to arrest
14   you," three more assertions that, "You're not in
15   custody," in the face of what a reasonable person
16   would have believed existed -- a custodial
17   situation.  And that's misleading and that's
18   deceptive.
19         THE COURT:  Well, do you think that it's
20   misleading to the point that a reasonable person
21   could believe that he could admit to just about
22   anything and then not be arrested?
23         MR. TASEFF:  Why would they tell him these
24   things?  These are loaded legal terms, Your Honor.
25         THE COURT:  This is my question:  Do you think

1  that any -- if you're told you're not -- "We don't

2  plan to arrest you," and said it four times or five

3  times, that that means that anybody who's otherwise

4  reasonable could think they could admit to anything

5  and then not be arrested?

6         MR. TASEFF:  Well, any person, anything?

7         THE COURT:  I think that's the issue.

8         MR. TASEFF:  I can't really answer the

9  question to that extent.

10        THE COURT:  Okay.

11        MR. TASEFF:  But in this instance, it would be

12 reasonable for Ronald Seiver to believe that what

13 they came for they were going to get, and that was

14 the computer and that they had no intention of

15 arresting him.  Now, whether they would prosecute

16 him years or months or weeks later, who knows?

17        THE COURT:  Okay.

18        MR. TASEFF:  But to inject that kind of claim

19 to a suspect -- and I respectfully submit in this

20 instance, a target -- to use those terms and not

21 define them or explain them in any way.

22        And anticipating one of the government's

23 arguments, Well, it wasn't our intention.  The U.S.

24 Supreme Court, Stansbury vs. California is the

25 case.  It's cited in Slaight.  Stansbury says the

1 intentions don't matter; the subjective intention

2 of the officer or the subjective intentions of the

3 target.  It's what a reasonable person would have

4 understood his situation at the time of the

5 interrogation.  So, a reasonable person who's told

6 multiple times within this context.

7       And then I really think it's important, too,

8 not just the assertions about, "We don't plan to

9 arrest you.  You're not under arrest.  You're not

10 in custody.  You're not in custody.  You're not in

11 custody.  And, Look here, we're even striking out

12 the portion that says you're in custody."

13       THE COURT:  Okay.  I'm beyond that.

14       MR. TASEFF:  He says --

15       THE COURT:  Now tell me why it wasn't a

16 voluntary or a knowing and intelligent waiver.

17       MR. TASEFF:  Because this is a formality that

18 we have to do as part of our job.

19       Seiver goes on to say -- he says, Okay.

20       This is what Berola says at 2:48:  You're not

21 admitting any guilt if that's what --

22       No, I just want to know what I'm signing, he

23 says.

24       And again, that is putting in his mind that

25 he's free to speak.  I believe I even asked him,

1  Did you believe at that time that you could speak

2  to them free without, without risk of

3  incrimination?

4      And his testimony was, Yes, I believed I

5  could; that I was not going to be arrested; I was

6  not going to be put in custody.

7      That's how he interpreted it.  And I would

8  respectfully submit that any reasonable person in

9  his shoes would feel the same way.  They wanted to

10  get to the bottom of things.

11      So it begs the question, Why in the world

12  would the officers implant or impart these terms to

13  a man in Ronald Seiver's circumstance?  How

14  misleading can that be?  What is a layperson who's

15  never been in trouble before to think when officers

16  make that kind of entrance?  He believed they read

17  Miranda when you're going to be arrested.

18      Oh, but don't worry.  It's just a formality

19  here, and we're going to proceed, but we want to

20  make sure you understand you're not under arrest,

21  and we don't plan to arrest you.

22      So that puts him at ease in believing that

23  he's not going to jail that day.  And that's,

24  respectfully, where the coercion comes in and the

25  misleading.

1          And then to top it all off, when Mom goes into

2     distress, and the agents do this little dialogue

3     there with him, Well, what's wrong with her?

4          And I -- again, Mr. McCoy asked Ronald all

5     these questions about the first portion, 18:04 to

6     18:40.  But let's go on and see what Berola does

7     after that.

8          18:41:  Listen, it's not my goal to embarrass

9     you.  I've been doing this a long time.  Nothing's

10    going to shock me.  I've got -- I've got to ask

11    certain questions (unintelligible) 'cause I need

12    all the details.

13         And the questioning goes on from there, where

14    they're really boring in on the details of Brittany

15    Miller and everything else.

16         Now, him being told, "You're not under arrest.

17    We don't plan to arrest you.  You're not in

18    custody," he then believes that he could talk to

19    them.  And then when it really gets dicey and Mom

20    goes into the seizure, Berola makes it clear, Dude,

21    you're not leaving here because we're going to keep

22    talking.  And by that time he's got the guy going.

23    You wind him up, let him go and keep talking so he

24    keeps saying things.  And that's what turns this

25    into their overcoming his will.

1          This is where we have an involuntary situation
2     evolving at their control and by their tactics.
3     These parties aren't dealing at arm's length with
4     each other.  You've got an officer with 50 to 100
5     investigations.  And the Court can take notice from
6     the Seventh Circuit in Slaight that these kinds of
7     terms used in this context will bear certain
8     impressions upon uneducated or at least
9     ill-informed lay people who are not schooled in the
10    technical variations of legal terminology and
11    constitutional jurisprudence.  But to think -- to
12    think that this is voluntary, not the product of
13    duress or coercion, the product of a free and
14    rational choice, we don't have that here, Judge.
15    We don't have that in this instance, and this is
16    why the entire statement and all fruits thereof
17    ought be suppressed.

18         They put this, this game plan together.  They
19    knew what they were doing.  They led him down that
20    path.  And they got what they wanted -- the
21    computer, the thumb drive and a full-blown
22    confession after conducting this interrogation in
23    the way that we can read and we can hear precisely
24    what they're doing.  This is not the kind of
25    interrogation session that should be conducted of

1    any citizen, and I respectfully submit the whole
2    matter should be suppressed.
3         THE COURT:  Thank you.
4         Mr. McCoy?
5         MR. McCOY:  Yes, Your Honor.  Your Honor, does
6    the Government (sic) prefer I take up the search
7    warrant issue first or --
8         THE COURT:  Please.
9         MR. McCOY:  There's two parts to the
10   defendant's argument as the Court's correctly
11   pointed out.  One is whether or not the search
12   warrant affidavit set forth specific facts from
13   which Magistrate Judge Shields could have
14   reasonably concluded that there was probable cause
15   to search the defendant's residence for evidence of
16   child pornography.  And the second related issue is
17   whether or not the facts set forth were stale
18   because of the -- they were over seven months old
19   at the time.
20        Taking the first part of that argument -- of
21   the defendant's argument first, Your Honor, what
22   was in the search warrant affidavit that would have
23   given the magistrate probable cause to believe the
24   evidence of child pornography would probably -- not
25   definitely, not certainly; those are not the

1  standards here -- but that would give him probable

2  cause to believe that probably -- or cause to

3  believe that probably there was evidence of child

4  pornography are several things:

5      First and foremost is there was a trail, a

6  trail that led from this yfrog uplink right back

7  down to the defendant's house.  Now, the defense

8  attorney's talking about -- goes on about this

9  message that was sent to this stepmother up in

10 Canada saying, Well, how would it be a collector of

11 child pornography would send a message to this

12 woman?  Well, first of all, we don't know who that

13 message came from.  The I.P. address is not for

14 that message; the I.P. address is for the link that

15 was connected to that message that brought it back

16 to the defendant's address.  So, it's not the

17 message -- the Facebook message that was sent that

18 was linked back to the defendant.  It is the link

19 that was attached to that message.

20     Now, could the defendant have been the one who

21 sent that message?  Possibly.  We just don't know,

22 as Agent Haferkamp stated.  It's interesting the

23 message itself, though, doesn't appear to be the

24 message that a concerned citizen would necessarily

25 send to a mother.  I'm not going to repeat the

1  language; the Court heard that language.  But

2  calling her daughter a slut and talking about what

3  she's exposing and how many times she's had sex,

4  probably not the actions of a concerned citizen.

5      Nevertheless, what we do have here and what we

6  did know and what was stated in the affidavit is

7  that the I.P. address from which these 16 images

8  were uploaded onto was tracked right back not only

9  to the defendant's residence but also to an account

10  that was registered to him.

11      And there were 16 images.  And I think that's

12  important to point out here.  16 images that were

13  uploaded, two of which, as Agent Haferkamp

14  testified, qualified under his opinion as child

15  pornography because they showed the lewd and

16  lascivious display of the genitalia of this girl.

17  And he outlined all -- described all 16 of these

18  images in the affidavit he presented to Judge

19  Shields, stating, in fact, on those two images that

20  was the lewd and lascivious display of the

21  genitalia.

22      But it's important to point out that these 16

23  images were taken from an audio/video file that was

24  over ten minutes in length.  This video, obviously,

25  by itself would be classified as child pornography

by itself because there were images within it
showing this girl undressing and masturbating.  So,
it wasn't just two images; it was two images within
a child pornography video -- that would be
classified as a child pornography video that was
uploaded to the yfrog account.

Now, this is significant, the connection to
the I.P. address.  The I.P. address is the
thumbprint in these types of cases.  It's the blood
drops that lead back from the murder scene to the
house or the kerosene drops that lead back from the
arson scene to the defendant's house.  It takes
them right back to where these files were uploaded,
and that's the information the judge had.  He knew
what house they had been uploaded at.  They knew it
was linked back to this home in Roseville, the
defendant's residence.  And those things would give
any magistrate probable cause to authorize a search
warrant, the government would respectfully submit,
in those situations, as it should here in this
situation.

You know, obviously, as the Court is aware,
Your Honor, the seminal case in regards to probable
cause is Illinois v. Gates, and if I could just
quote a portion of that case.  It says, "Proof

beyond a reasonable doubt or by a preponderance of
the evidence useful in criminal trials has no place
in the magistrate's decision.  It is clear that
only the probability -- not a prima facie showing
of criminal activity -- is the standard of probable
cause."  So, you have the I.P. address where these
images were uploaded taking you right back to the
house.

Oh, but what about the fact that they're seven
months old?  Well, seven months old would be a
significant period of time, Your Honor, if we were
talking about many other types of investigations or
cases -- for instance, drugs, narcotics, a crack
case.  If the evidence for a search warrant to
search a home for crack cocaine was that, "Seven
months ago I saw the defendant possess crack
cocaine in his house," probably pretty stale.  But
that's not the case in crimes like this that are
computer-based, where even if the defendant -- even
if the person who's committing the crime
intentionally deletes, erases these images from his
computer, forensic analysis has gotten so good that
years later they can go back and find these images
again and pull them back up again.  So, when you're
talking about a computer-based crime like this,

1    staleness is -- first of all, there's no
2    bright-line rule in regards to when things become
3    stale.  But certainly that rule, if there is one,
4    is expanded way out because of the fact that
5    forensic analysis is capable of going back in and
6    finding evidence that in many other types of
7    investigations they would not be able to do.  Here,
8    they were.
9         And again on the issue of staleness, the
10   standard is a fair probability that the evidence
11   sought is going to be found at that time in the
12   place to be searched, and the government
13   respectfully submits that that was the case in this
14   case.  It's not a fleeting crime, Your Honor.  This
15   was definitely a non-fleeting crime here.
16        Excuse me for a moment, Your Honor.
17        THE COURT:  Take your time.
18        MR. McCOY:  Just point out two cases, one out
19   of the Sixth Circuit and one out of the Seventh
20   Circuit.
21        The one out of the Seventh Circuit is Newsome.
22   In that case, we had year-old information, 12
23   months.  And out of the Sixth Circuit, the case is
24   Frechette.  I've cited these both in my brief.
25   That was a case where we had 13 months.  In both

1   cases the courts held that the information was not
2   stale at that point.
3        And recently the Seventh Circuit, there's a
4   case that they just decided upon actually last
5   year, the Pappas case.  And they go on to explain
6   in their -- in their ruling that, "While the
7   recency of information contained in a search
8   warrant application is one factor bearing on the
9   question of probable cause, there's no bright-line
10  rule for when information is stale," as I
11  previously said.  And in that case we had 11 images
12  that were 18 months old between the transmission
13  and when the search warrant was issued.
14       Now, the government believes that there is
15  sufficient probable cause to support the warrant.
16  But assuming, arguendo, that there's -- the Court
17  decides that there wasn't sufficient probable
18  cause, we believe that this case definitely is a
19  great example of good faith.  And why is that?
20  Well, just citing Leon -- as the Court is aware,
21  that's the seminal case here.  In that case the
22  Supreme Court ruled that, "Suppression is
23  appropriate only if the officers were dishonest or
24  reckless in preparing their affidavit or could not
25  have harbored an objectively reasonable belief in

1  the existence of PC."  Well, there's been no
2  evidence of dishonesty here, none presented at all
3  and, to my knowledge, even argued here by the
4  defense attorney.

5      Regarding harboring an objectively reasonable
6  belief in the existence of probable cause, let's
7  just look at the facts surrounding the issuance of
8  the warrant to begin with.  What did Agent
9  Haferkamp do?  Yes, this was his first search
10  warrant; that's correct.  But he went to his
11  supervisor; he went to the U.S. Attorney's Office.
12  And first and foremost, he sought a warrant to
13  begin with.  He sought a warrant.  They didn't go
14  and do a search of his house, a warrantless search.
15  They actually said, "Let's go and get a warrant.
16  We think there's probable cause here to search this
17  house."

18      And a magistrate judge issued that warrant.
19  The knowledge magistrate judge agreed that there
20  was probable cause to conduct the search of that
21  house.  The fact that he consulted with the U.S.
22  Attorney's Office, Your Honor, prior to seeking a
23  warrant further demonstrates his good faith.
24  Although seven months passed, separated the upload
25  of these images onto yfrog from when the search

1  warrant was requested, the delay was not so great

2  as to overcome the presumption of good faith.

3  Based on the language he put in his own affidavit,

4  this stuff tends to sit there for a long period of

5  time.  He just talked about that in his affidavit,

6  that it's not unreasonable -- and I think it was in

7  paragraph 27 -- it's not unreasonable to find these

8  images months, if not years after they're uploaded

9  or possessed.

10      Nor, Your Honor, was there any impermissible

11  -- there was nothing impermissible in including

12  information about CP collectors.  In fact, in the

13  case I just cited, Pappas, the court held or talked

14  about the issue of collectors.  If I could quote

15  that as well.  They said that -- excuse me, Your

16  Honor -- "There is nothing especially unique about

17  individuals who are collectors of child

18  pornography; rather, it is the nature of child

19  pornography -- i.e., its illegality and the

20  difficulty procuring it -- that causes recipients

21  to become collectors."

22      So, whether it's 2 images or 220 images, it's

23  not easy to come by images of child pornography,

24  and that's the point here.  Once you have them,

25  you're not likely to just let them go.  And that

1  was the case here.

2      Consequently, Your Honor, the government

3  respectfully submits that the Court should not

4  suppress any evidence obtained as a result of the

5  search warrant because the search warrant was

6  supported by probable cause.  And even if it

7  wasn't, the officers relied upon it in good faith.

8      And if I could address the Fifth Amendment

9  issue.  I guess I would say up-front that the

10  government's not waiving the issue of custody.

11      THE COURT:  Right.  And you are more than

12  welcome to make your record -- any additional

13  record you want to make on that, and I just believe

14  at this point --

15      MR. McCOY:  Sure.

16      THE COURT:  -- at least from what I've heard,

17  unless you can convince me differently in

18  argument --

19      MR. McCOY:  Yes.

20      THE COURT:  So go ahead and make your record,

21  but I do believe that I would -- at this point,

22  there will be a finding that he was in custody.

23      MR. McCOY:  Yes, Your Honor.

24      Well, obviously, we're arguing that the

25  defendant was not in custody.  The fact of the

matter is that yes, he was put in handcuffs when he
was first discovered in the house and brought down.
Those handcuffs were quickly removed, and he was
seated on the grass for a period of an hour before
the interview even started.

Now, the defense makes a big deal of the fact
that the agents entered this home with their guns
drawn and shouting, "Police," and, "Search
warrant."  Well, that's, that's standard practice
and that's particularly standard practice when, in
the process of preparing to execute this search,
they had received information that there were four
or five FOID cards assigned to people living in
this house and that they confirmed that there was
at least one weapon purchased by someone in the
house.  And they found a weapon in the house.

So, obviously, you know, the Courts have
repeatedly held that officers have the right and
should be protecting themselves or at least making
sure they're not putting themselves in a situation
where they're sitting ducks when they're executing
a search warrant.  So, I think it's less
significant that they had their guns drawn.

But as soon as the house is secure, as each of
these witnesses stated, the guns went away.  And as

soon as the defendant was taken out of the house,
his handcuffs were taken off.  Why was he
handcuffed?  Well, because when they entered his
bedroom -- when Special Agent Mitchell entered his
bedroom, what did he see?  He saw the defendant
sitting there, according to Agent Mitchell, doing
something on his laptop and trying to slip
something or seeing him slip something under the
mattress; so, there was a concern there that this
guy was trying to either destroy evidence or what
they didn't know, but clearly he was not doing what
they were supposed to do.

     I find it interesting the defendant says that
it was somewhere between 45 seconds and a minute
after he first woke up before Agent Mitchell came
into his room.  And yet where was he?  He was still
sitting in bed.  I mean, if he's so startled by
what he's hearing, don't you think it's like an
earthquake?  You'd jump up and go, "Oh, my God,
what's going on?" and go out the door.  No, he was
too concerned, sitting in front of his laptop
computer.  So, there was concern about what he was
doing; they handcuffed him.  But the handcuffing
only happened -- or only lasted as long as
necessary to bring him outside of the house.

1     The courts repeatedly stated, Your Honor, that
2  the officers have the right to detain individuals
3  during the course of executing a search warrant,
4  and that detention does not rise to the level of
5  custody.  There's been many cases and many cases
6  I've had with Mr. Taseff where, during the
7  execution of the search warrant, the occupants of
8  the house are brought to a central location,
9  handcuffed many of the times until they secure and
10  -- until they clear and secure the house and make
11  sure there's no weapons, nothing that could be used
12  against them or any evidence that could be
13  destroyed.  And then they release them; they
14  release the handcuffs as they did with the
15  defendant.  He was sitting there, yes, on the grass
16  with somebody watching over him; that is correct.
17  But so were his mom and his dad and his sister
18  sitting on the porch with somebody watching over
19  them.
20     I think it's worth pointing out that when the
21  mom had her situation, what happened?  They bring
22  her to the living room.  They call the paramedics.
23  The paramedics come.  They pick her up; they take
24  her into the ambulance.  The stepdad asks, "What
25  should I do?"  And what's the response back from

1    TFO Price to him?  "You need to be with your wife.
2    Go."  This is the same guy who was also handcuffed,
3    by the way, when the search began, was also sitting
4    with someone standing over him during the -- during
5    the pendency of that period of time leading up to
6    the wife's condition.  And yet what's the agent's
7    response?  "You need to be with your wife.  Go."
8    He goes with her.
9         So, how different was that from the
10   defendant's situation who was also sitting,
11   unhandcuffed on the lawn, brought in for an
12   interview an hour later?  And it is just one hour
13   later before that interview takes place.  Where
14   does the interview take place?  Takes place in his
15   kitchen, literally at his kitchen table.  He's
16   sitting there.  He's not in a police car.  He's
17   certainly not at a jail.  I mean, the defense keeps
18   raising the Slaight case.  I feel like the, the
19   poet who said, "How do I love thee?  Let me count
20   the ways."  In this case, there's no example here
21   between --
22        THE COURT:  Nobody cited Slaight, right?
23        MR. TASEFF:  I mentioned it in argument,
24   Judge.  I have a copy if you would like to see it.
25        THE COURT:  In the argument, in your --

1     MR. TASEFF:  It's not in the brief.  It's not

2 in my motion, but I have a copy in my --

3     THE COURT:  Right.  I understand.  You

4 mentioned it here.  I'm just saying I wasn't -- I

5 don't know anything about Slaight, so you -- I'll

6 just take what you guys argue.

7     MR. TASEFF:  Slaight was the case that the

8 agent said, Yeah, in that case we arrested him for

9 possession.

10     THE COURT:  I gathered something had to do

11 with these agents, but let's move on.  I want to

12 make sure nobody cited it in their motions or

13 response, right?

14     MR. McCOY:  Yes, Your Honor.

15     THE COURT:  Okay.

16     MR. McCOY:  So, Your Honor, the government

17 believes the defendant was not in custody.  He had

18 not been told he was under arrest.  He was not

19 handcuffed, and he was sitting in his own kitchen

20 at the time that the interview started.

21     Now, in regards to the voluntariness issue of

22 his waiver, I think the seminal case is the case of

23 Haynes vs. Washington, the Supreme Court case.  And

24 in that case the court held, "In order to exclude a

25 statement as involuntary" -- and this is, I

believe, cited in my brief -- "a court must find,
in view of the totality of the circumstances, that
law enforcement officials overborne the will of the
accused."  Overborne his will.  So, basically he
was -- the law enforcement officials, in essence,
were -- the pressure that they placed on him made
it so that he could not exert his own free will in
deciding whether or not to waive his rights.

    That is not the case here.  Absolutely not.  I
mean, what do they do?  Putting aside the custody
issue, they still advise him of his Miranda rights.
That's the first thing they do.  And not just
verbally, not just taking out their card and
reading it off the back of their police card.  They
actually present him with a form for him to follow
along with.  They read him his rights.  At one
point they stop and say, Listen, will you read your
rights, too, to make sure you understand this, that
you're able to read and that you understand what
you're agreeing to?  He reads them.  They
repeatedly ask him, Do you understand that right?
Yes.  Do you understand that you have the right to
remain silent?  Yes.  Do you understand you have
the right to have an attorney?  Yes.  Explained
that if he can't afford an attorney, they'll

1   appoint one for him.  And they tell him that he has
2   the right to stop questioning at any point.  He
3   says yes each time.

4        To just establish that he was fully engaged in
5   this conversation, that this wasn't some -- you
6   know, two huge agents towering over him, telling
7   him, "You need to sign this form," he engages them.
8   He actually questions about some of the rights they
9   just advised him on.  You know, What does it mean
10  if I do this?  Does it mean I'm giving everything
11  up?

12       Berola's response is no.  And he reiterates,
13  You can come back to these rights whenever you want
14  to.  I think the phrase he used is, You're not
15  throwing them out the window.  You can come back to
16  them whenever you want to.

17       And what does the defendant do then?  He
18  freely and voluntarily signs his name -- prints and
19  signs his name to this form, states that he has no
20  further questions about it, and then proceeds to
21  tell the agents a rather significant story about
22  having a sexual relationship with a 15-year-old
23  girl.  Now, as the Court pointed out and I
24  reiterate the question, Did he really believe that
25  he could get away with providing information about

those crimes -- he admitted that he knew it was a
crime -- and have no consequences to it?  I find
that hard to believe.  Would a reasonable person --
obviously, which is the standard here -- believe
that?  No.  Absolutely not.

In regards to the mother's situation, Your
Honor, you know, it's tragic that she was suffering
that condition when she was, but the Court heard
that tape and has read that portion of the
transcript.  We've down it now three or four times
since hearing the tape.

First of all, in listening to the tape, the
defendant's voice doesn't change.  His demeanor
doesn't appear to change.  He's just answering the
questions.  What's wrong with her?  She had a
stroke about a year ago.  She has fibromyalgia.
Sometimes it's bad.

And in those types of situations he never once
says, "Oh, my God, I need to go see my mom," or not
even saying, "Oh, my God."  He doesn't say, "What's
my mom's condition?" or, "Can I go and check on my
mom's condition?" even though Berola had explained
to him, Listen, you can go back to these rights
whenever you want to.  Quote-unquote, You are not
throwing them out the window.

Now, did Berola have some sort of obligation
to keep reiterating to him, Hey, you didn't throw
your rights out?  Did he have some obligation to
say, Hey, do you want to go be with your mom?  No.
Did the fact that he didn't say that make this
waiver, which had happened at that point 15, 18, 20
minutes beforehand, involuntary?  No.  The
government would respectfully submit that it didn't
at all.

The defense talks about the fact that the
defendant kept saying, I have nothing to hide.  I
don't want to get in trouble.  Well, yeah,
apparently he did have something to hide.  But I
think he believed -- and this is part of his
knowing, voluntary waiver -- that he could talk
himself out of this somehow.  And that's the
problem here.

But he was fully aware of what he was doing.
He had been advised of his rights on paper, in
writing and verbally.  He had a conversation with
the agents about those rights, and he waived those
rights voluntarily.  His will was not overborne,
not at the beginning of the interview and certainly
not in the middle of the interview, not at any
point in the interview, quite frankly.  So for that

1  reason, Your Honor, we believe the defendant's

2  Fifth Amendment rights were not violated, and his

3  statements should come in.

4      Thank you.

5      THE COURT:  Thank you.

6      MR. TASEFF:  Just a very brief rejoinder.

7      THE COURT:  Okay.

8      MR. TASEFF:  The very argument --

9      THE COURT:  I'll hold you to that.

10      MR. TASEFF:  The very argument that government

11  counsel is making that, "Here's the portion where

12  the concern about the mother is discussed.  What

13  should Berola have done?"  We know what Berola did.

14  He bore right back into the questioning:  I've got

15  to ask certain questions 'cause I need all the

16  details.  Okay?

17      He cut off any opportunity to discuss the

18  mom's situation any further.  He made it very clear

19  to any reasonable person she's on her way out of

20  here on a stretcher, but we've got to ask these

21  questions because I need all the details.  So, what

22  reasonable person then would feel like, "I'm

23  getting up to go assist my mother," when the

24  officer tells him something like that following so

25  quickly on the heels of this discussion about her

1  stroke and it being pretty bad and it hurting.

2      THE COURT:  Do you want to respond?

3      MR. McCOY:  No, Your Honor.

4      THE COURT:  All right.  Okay.  Gentlemen, I've

5  reviewed the motions, the briefs.  Now having heard

6  the arguments and the testimony, I'm going to make

7  my ruling and then issue a written order to follow.

8      With regard to the issue on the search

9  warrant, I do believe that there were sufficient

10  facts to establish probable cause for the

11  magistrate to sign off on it.

12      With regard to the specific issue as to

13  whether it was stale, it's my finding that it would

14  not be considered stale.  I believe there's other

15  information that indicated reliability -- the I.P.

16  address, the personal observations of the home

17  after tracking it down based on the I.P. address.

18  And a computer, unlike drugs, is not generally

19  disposed of.  And I cite United States vs. Newsome

20  for the proposition that -- noted that collectors

21  of child pornography value their material and store

22  it for long periods of time.

23      So, on the issue of the search warrant, I

24  believe that the motion to suppress the search

25  warrant would be denied.

1          With regard to then the issue of Miranda and

2     the Fifth Amendment, I do find that when looking at

3     the circumstances surrounding the interrogation and

4     asking would a reasonable person have felt free to

5     leave, I do not believe that to be the case and

6     believe that Mr. Seiver was in custody or should be

7     considered in custody for the purpose of this

8     hearing and this case.

9          But applying that same reasonable standard

10    then to whether or not he gave an intelligent and

11    knowing waiver of Miranda and a voluntary waiver,

12    when factoring in the length, which I don't believe

13    was long, much -- started with the details actually

14    before his mother became ill, his education, his

15    understanding of the meaning of the words, it's a

16    leap, I think, to say that he thought he could say

17    whatever he wanted to say without the risk of

18    arrest.  I don't think his will was overcome.

19         I'll put all this in a written order with my

20    findings, but I thought that you should hear today

21    what the ruling would be.  So, I believe the motion

22    to suppress -- I believe that Miranda was an

23    intelligent and knowing waiver and that it was

24    voluntary, so the statement will remain.

25         With that in mind, then, this was also a

1  pretrial, right, because we have a trial date in
2  June.  Should we just leave the pretrial -- or the
3  trial date the same?  Do you believe there's
4  anything else that would -- need another pretrial
5  date?
6      MR. TASEFF:  Judge, that trial date is set
7  for?
8      THE COURT:  June 6th, I think.  Is that right?
9  Is that in Rock Island apparently?  Do you want to
10 address the trial date now, or do you want to set
11 it for another status hearing, given that it's only
12 April?
13     MR. McCOY:  Could we set it, Your Honor, for
14 another status hearing possibly?
15     THE COURT:  That would be fine.
16     MR. McCOY:  If that's amenable to the defense?
17     MR. TASEFF:  That would work, Judge.  Yes.  In
18 fact, I am available the week of June 6th, but
19 Mr. Seiver and I will have some discussions before
20 then.
21     THE COURT:  Yes.  Why don't we think -- I'm in
22 Rock Island Friday, May 13th.  Do you want to do it
23 at 9:00 that day?  Or otherwise it would be --
24 that's a month off.  That would give you some time
25 -- if there is going to be any change, that will

1 give us plenty of time.  How about that?

2     MR. McCOY:  That's fine from the government,

3 Your Honor.

4     THE COURT:  May 13th at 9:00 in Rock Island

5 for -- we'll call it a pretrial and leave the trial

6 date set.  And if there are any issues that need to

7 be addressed, to change the trial date or to set a

8 different hearing, we'll do so.  Okay?

9     Thank you, gentlemen.  Anything else before I

10 recess?

11     MR. McCOY:  Nothing from the government.

12     MR. TASEFF:  Judge, I offer Exhibits 1 and 2,

13 the diagram and the criminal complaint that we

14 offered.

15     THE COURT:  All right.

16     MR. McCOY:  Your Honor, I would offer

17 Government Exhibits 1, 1A, 2A through U, Government

18 Exhibit 3, 4, 5 and 6.

19     And I would ask, if possible, Your Honor,

20 Government Exhibits 1 and 1A, that they be filed

21 under seal because they have original signatures on

22 them of both the judge and --

23     THE COURT:  Do you wish to be heard on that,

24 Mr. Taseff?  1 and 1A are the application and the

25 warrant.

1      MR. McCOY:  Yes, Your Honor.

2      THE COURT:  They can be -- they can be filed

3  under seal.

4      MR. McCOY:  And actually, Your Honor, if I

5  could, also ask that 3 and 6 be filed under seal.

6  They've got the agents' signatures on them as well,

7  3 being the rights waiver and 6 being the consent

8  waiver.

9      THE COURT:  Miranda rights and waiver.

10      Mr. Taseff, how about 3 and 6?  The

11  government's moved to have those exhibits admitted

12  under seal.  And do you want to be heard on that?

13      MR. TASEFF:  No objection.

14      THE COURT:  That will be allowed.  All right.

15      Anything else?

16      MR. McCOY:  No.  Thank you, Your Honor.

17      THE COURT:  Thank you, gentlemen, and

18  Miss Verbeke.

19      THE CLERK:  Court is adjourned.

20      THE COURT:  Back on one second.

21      Mr. McCoy, for the public record, can you

22  submit also redacted copies?

23      MR. McCOY:  I can, of all those documents.  In

24  fact, I've got --

25      THE COURT:  Let's do that.

1        MR. McCOY:  -- two of them right now, and I

2   can send two more later.

3        THE COURT:  All right.  Thank you.

4        (Proceedings concluded at 4:08 p.m.)

5

                         CERTIFICATE

6

7

8

9        I, JENNIFER E. JOHNSON, CSR, RMR, CBC, CRR,
    certify that the foregoing transcript constitutes a
    true and accurate transcript of the original
10  shorthand notes of the proceedings had at the time
    and place aforesaid before the HONORABLE JAMES E.
11  SHADID, U.S. District Judge.

12

13

14                      s/ Jennifer E. Johnson
                        JENNIFER E. JOHNSON
15                      CSR, RMR, CBC, CRR
                        License #084-003039
16

17

18

19

20

21

22

23

24

25