1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF ILLINOIS
2

3

4   UNITED STATES OF AMERICA,    )
                                 )
5              Plaintiff,        )
                                 )   Criminal No. 4:10-40091
6        vs.                     )   Peoria, Illinois
                                 )
7   RONALD ALAN SEIVER,          )
                                 )
8              Defendant.        )

9
                    RECORD OF PROCEEDINGS
10                   SENTENCING HEARING
                    NOVEMBER 30, 2011
11
                         BEFORE:
12           THE HONORABLE JAMES E. SHADID,
              United States District Judge
13

14  APPEARANCES:

15  For the Government:      MICHAEL McCOY, ESQUIRE
                            Asst. United States Attorney
16                          1830 Second Avenue
                            Rock Island, Illinois 61201
17                          (309) 793-5884

18

19  For the Defendant:      GEORGE F. TASEFF, ESQUIRE
                            Federal Public Defender
20                          401 Main Street, Suite 1500
                            Peoria, Illinois 61602
21                          (309) 671-7891

22

23          Jennifer E. Johnson, CSR, RMR, CRR
              U.S. District Court Reporter
24            Central District of Illinois

25  Proceedings recorded by mechanical stenography;
    transcript produced by computer

```
 1                           INDEX
                                                 PAGE
 2

 3    WITNESSES FOR THE GOVERNMENT:

 4      DWAYNE ROELFS
              Direct Examination                  6
 5            Cross-Examination                   14
              Redirect Examination                23
 6            Recross-Examination                 24
              Further Redirect Examination        24
 7            Further Recross-Examination         25

 8      BRANDON KAOPUIKI

 9            Direct Examination                  28
              Cross-Examination                   45
10
        JAMES BUCK
11
              Direct Examination                  58
12            Cross-Examination                   67

13      DWAYNE HAFERKAMP

14            Direct Examination                  72
              Cross-Examination                   97
15            Redirect Examination               110
              Recross-Examination                117
16

17

18

19

20

21

22

23

24

25
```

1    THE COURT:  This is the matter of the United

2  States vs. Ronald Seiver, 10-CR-40091.

3  Mr. Seiver's present with Mr. Taseff.  Government

4  by Mr. McCoy.  This matter is set, pursuant to a

5  plea, for sentencing today.  A number of objections

6  have been made; those will need to be addressed.

7    Are the parties prepared to proceed?

8    MR. McCOY:  Government is, Your Honor.

9    MR. TASEFF:  Yes.

10    THE COURT:  Okay.  First of all, let's

11  identify the objections.  The government has

12  indicated no objections, and the defense has

13  indicated a number of objections.  And we should

14  just go through these one by one, or let me ask

15  this:  How would the parties prefer to address

16  these?  Is there any formal evidence to be

17  presented?

18    MR. TASEFF:  There is, Judge.  And if I may

19  propose a protocol for us in presenting these

20  objections.  I filed a sentencing commentary

21  November 28th, on Monday.  Because of my review --

22  and this being a very complicated case with

23  multiple paragraphs and fact-based objections.

24  When we initially responded to the initial draft of

25  the presentence report, I communicated those

1  objections to Probation by way of letter using the

2  numbering -- paragraph numbering, a system of the

3  earlier draft of the PSR.

4      When Probation responded to our objections and

5  issued the final draft, there were some paragraphs

6  deleted from that initial PSR that didn't appear in

7  the final draft, so the numbering of my objections

8  as contained in the addendum is not entirely

9  accurate.  So, I basically cleaned up matters by

10 way of my commentary so that we accurately identify

11 each paragraph that we're objecting to.

12      THE COURT:  Okay.

13      MR. TASEFF:  And I believe Government Counsel

14 has a number of witnesses who will offer live

15 testimony.  There will be documents presented and

16 audiotapes played.

17      The first three objections that we're raising

18 are fact-based objections where Mr. Seiver is

19 saying, I object to this occurring.  I object to

20 the truthfulness of the content of the paragraph.

21 It lacks sufficient indicia of reliability to

22 support its accuracy.

23      There are then objections later raised in our

24 commentary where Probation is drawing a legal

25 conclusion with respect to specific offense

1   characteristics applying that are based upon those
2   earlier paragraphs of the offense conduct in the
3   PSR.
4        So in talking with Mr. McCoy this morning,
5   given the number of witnesses he intends to call, I
6   believe we would propose that the government would
7   proceed with its evidence in aggravation.  We'll
8   put on all the evidence and testimony for the
9   Court.  And then we can go back and address each
10  particular paragraph that we're objecting to, and
11  the Court can then have the factual basis before it
12  to rule on each objection that we're raising.
13       THE COURT:  Fair enough?
14       MR. McCOY:  Fair enough, Your Honor.
15       THE COURT:  That seems to make sense.  Okay.
16  Now, I'm not at all opposed to going through the
17  noon hour normally; did so yesterday.  But today I
18  can't, so I don't know how long you have, but if we
19  have to break today over the noon hour, I don't
20  have any choice.  And we can resume right after
21  lunch.  Now, how does that fit with your schedules?
22       MR. TASEFF:  That's fine.
23       MR. McCOY:  Fine, Your Honor.
24       THE COURT:  All right.  We'll just see where
25  we are.

1          MR. McCOY:  Sure.

2          THE COURT:  Okay then.  With that in mind,

3     let's move forward.

4          MR. McCOY:  Sure, Your Honor.  The government

5     would call first Detective Dwayne Roelfs.

6          THE COURT:  Okay.

7          **(Witness sworn by the clerk.)**

8                         **DWAYNE ROELFS,**

9     **called as a witness, was examined and testified**

10    **upon his oath as follows:**

11                   **DIRECT EXAMINATION**

12    BY MR. McCOY:

13    Q.   Would you please state your full name and

14    spell your last name for the court reporter?

15    A.   Dwayne Roelfs, R-o-e-l-f-s.

16    Q.   Where are you currently employed?

17    A.   The Champaign County Sheriff's Office.

18    Q.   And what is your position with the sheriff's

19    office?

20    A.   I am an investigator with the -- our sheriff's

21    office.

22    Q.   How long have you been an investigator?

23    A.   I've been an investigator since the year 2000,

24    so for the last 11 years.

25    Q.   And is that the entire period of time you've

1  been with the sheriff's department, or were you
2  working with them before that?
3  A.   I was actually employed in 1994, was when I
4  started, so for the last 16 -- about 16 years I've
5  been employed there.
6  Q.   And as an investigator with the sheriff's
7  department, did you have an occasion to participate
8  in the investigation involving the defendant in
9  this case, Mr. Ronald Seiver?
10 A.   Yes, I did.
11 Q.   And can you tell us how you got involved in
12 that investigation?
13 A.   My agency was notified by the I.C.E. agent,
14 Mitchell -- Immigration and Customs Enforcement
15 agent -- Special Agent Mitchell regarding
16 Mr. Seiver and this case.  That's how we became
17 aware of it.
18 Q.   And what did Mr. Mitchell inform you about
19 this case?
20 A.   That he was working on a child pornography
21 case that involved images that had been seized and
22 were on a -- he had them on a DVD.  He sent the
23 images or sent that DVD to our agency under the
24 belief that one of the victims was a young female
25 that lived in our county.

Q.   And were you able to confirm who the victim or
who the female was that was depicted in these
images?

A.   Yes, we did.

Q.   And who was that?

A.   Brittany Miller.

Q.   Once you received the disk and you were able
to confirm her identity, what did you do next?

A.   Well, we attempted to locate her to interview
her and speak with her and take a statement from
her.

Q.   And what did she tell you?

A.   Once we found her and she came to our
sheriff's office, we interviewed her.  She stated
that -- well, initially we showed a picture, a
photograph of Mr. Seiver and asked her if she
recognized him.  And her answer was that was her
ex-boyfriend that she knew by the name of Ron.

Q.   Did she say how she had met him?

A.   She stated that she had met him online during
a video game called World of Warcraft, I believe.
They communicated for approximately six months
online.  At some point around that time, she said
that he sent a cell phone to her in the mail.  And
then she spoke with him on the phone at some point

1  after that.

2  Q.  And how did the friendship progress from

3  there?

4  A.  She stated that eventually he -- she -- he

5  began a sexual relationship with her, eventually

6  coming to meet her.  They would -- or he would make

7  arrangements to meet at or take her to a local

8  motel in Urbana, which is in our county, not far

9  from her grandparents' house.

10  Q.  And I should have asked this earlier and maybe

11  you've already said it, but what was the age of

12  Brittany at the time?

13  A.  Brittany was 15.  She was -- her 16th birthday

14  would have been in October.  The meetings that she

15  had at the motel would have been in July -- excuse

16  me, July of 2008 for three nights and then also

17  September for three nights in 2008.

18  Q.  So, during those meetings she would have been

19  15 years of age?

20  A.  Yes.  And then at some point she received

21  flowers for her 16th birthday from Mr. Seiver.

22  They were delivered to her.

23  Q.  And how many flowers were sent?

24  A.  There was ten dozen roses sent along with two,

25  two balloons and a message card as well indicating

1    "Happy 16th Birthday," I believe.

2    Q.   Now, you said that they would -- the defendant

3    acquired this motel room where he met with

4    Brittany.   What, what was the nature of their

5    meetings when they -- when they met in that motel

6    room?

7    A.   There was sexual activity that occurred

8    between them.   She stated that he had vaginal

9    sexual intercourse with her.   He had fingered her a

10   couple times vaginally.   And she said that he

11   performed oral sex on her and that she performed

12   oral sex on him at least once.

13   Q.   Did she say whether or not any pictures or

14   video was taken of the acts?

15   A.   We asked about that.   She was concerned that

16   that had, in fact, occurred.   We asked why she was

17   concerned.   She said that she thought he had a cell

18   phone that maybe had video.   Again asked her why

19   she thought that.   He said to her -- later on he

20   said to her that if she broke up with him or

21   wouldn't stay involved with him that he was going

22   to post images and pictures of her online; and so

23   she was concerned about that and believed,

24   therefore, that there were images of her that he

25   took.

1  Q.   During these acts?

2  A.   That's what she would be concerned about, yes.

3  Q.   Now, had she previously, however, sent images

4  of herself to him?

5  A.   Had she sent images of herself to him?

6  Q.   Yes.  Did she say anything about that?

7  A.   I'm not sure about that.

8  Q.   Had she told the defendant her age?

9  A.   Yes.  She said that she told him that in a

10  text and then also in person, so there was at least

11  two occasions where she told him that she was, in

12  fact, 15 years old.

13  Q.   Now, in addition to the flowers and the

14  telephone that you had previously mentioned, did

15  Brittany talk about any of the other gifts or items

16  that the defendant had provided her during the

17  course of their friendship?

18  A.   Yes.  She stated that he sent a number of

19  different items to her, including an iPad -- or,

20  I'm sorry, an iPod device, a necklace described

21  with -- what she believed to be diamonds, silver

22  necklace, some jeans, Hollister brand jeans.  And I

23  believe there was another item; I can't quite

24  remember what that is right offhand.  Oh, there was

25  thong underwear, too, that he mailed her or sent

1   her.

2   Q.   In total, how long did they -- were they

3   communicating or seeing each other, do you know,

4   from their initial contact on World of Warcraft

5   until Brittany called it off?

6   A.   It was during 2008, sometime during that point

7   when she said that she ended the relationship with

8   him.  You know, as far as the initial point of when

9   she met him, on a specific date, I'm not sure what

10  date that would be.  But she said that there had

11  been six months worth of communication online that

12  they did before he ever met; so if you take the six

13  months of that and then you add the dates in July

14  and September of 2008, I guess if you add that

15  together then that can give you a rough estimate.

16  Q.   Now, you said -- previously testified that she

17  had told the defendant she was 15 at the time.  Did

18  he -- did she say, when they first met, what age he

19  told her he was?

20  A.   Yes.  She, she believed him to be 19 years of

21  age.  That's what he told her.  I believe that was

22  online, during their initial meeting.  And then he

23  also sent a photograph of a male that he was

24  portraying to be himself, which turned out it was

25  not, in fact, him.  So she was under the initial

1    belief of this picture, in fact, being Ronald, and

2    it turned out it was not him.

3    Q.   Do you recall when she discovered that the

4    image that he had sent her as well as the age that

5    he had given her was not accurate, was not him?

6    A.   She realized that eventually when he came to

7    meet so that would be in approximately July 2008,

8    September 2008.  Maybe shortly before that in 2008.

9    Q.   Now, I want to go back to something you had

10   previously testified to, and that's dealing with

11   the period of time at the end of 2008 when she

12   decided to end their friendship.

13        You had said that that's when she believed

14   that he had taken photographs or videos of their

15   encounters together, sexual encounters.  What

16   specifically did he tell her?  What specifically

17   did she say he told her regarding what he would do

18   with those images if she ended the relationship?

19   A.   That he would post those images online.

20   Q.   Did he say where online?

21   A.   One of the -- yes.  She said that he said that

22   he would post them on porn sites as well as just

23   online.

24   Q.   Would he -- in addition to the images

25   themselves, did he say if he would post any other

1  information with them?

2  A.  I'm not -- I'm not sure about that.  I want to

3  say that he mentioned that he would post her phone

4  number, but I -- I'd have to look at the report on

5  that to be sure.

6      MR. McCOY:  If it's all right, Your Honor, can

7  he refresh his memory by looking at the report?

8      THE COURT:  All right.

9      THE WITNESS:  Yes.  I'm ready.

10 BY MR. McCOY:

11 Q.  What else, what other information did --

12 A.  After reviewing the report, I did see that she

13 was saying that he would post videos and images of

14 her online.  I don't see any reference to a phone

15 number.

16 Q.  Okay.  All right.

17     MR. McCOY:  Those are all the questions I have

18 right now, Your Honor.

19     THE COURT:  Mr. Taseff?

20                 **CROSS-EXAMINATION**

21 BY MR. TASEFF:

22 Q.  Sir, how computer-literate are you on a scale

23 of one to ten, in your opinion?

24 A.  In my opinion -- I don't know.  Approximately

25 probably five; average.

1  Q.  Being an old-school kind of guy, I'm probably

2  a one so if you could just bear with me on this.

3  Tell us about World of Warcraft.  What kind of

4  video online game is that, and how does one play

5  that game?

6  A.  That's beyond me because I've never played it.

7  Q.  So, when this young girl -- young woman told

8  you that she met this alleged sex offender on World

9  of Warcraft, that term "World of Warcraft" did not

10  provide you any means for understanding what she

11  was referring to?

12  A.  I assumed that it meant that she was playing

13  an online video game with him and that's how she

14  came to know him.

15  Q.  An online video game of some sort?

16  A.  Yes.

17  Q.  Is it an online video game that's played on a

18  personal computer?

19  A.  Don't know.  I'm assuming a personal computer.

20  I don't know if there's more than just that way of

21  using a personal computer.  I really don't know

22  because I've never played the game.

23  Q.  Well, if one is using a personal computer to

24  do an online video game, does it stand to reason

25  that one would have some kind of Internet

1  account --

2  A.   Possibly.

3  Q.   -- that would enable one to have access to the

4  Internet and to engage in online activity with

5  other people?

6  A.   It's possible, yes.

7  Q.   Now, when you met with Brittany Miller, you

8  were assigned to further the investigation at the

9  behest of an I.C.E. agent, correct, Agent Mitchell?

10  A.   Yes.

11  Q.   He prepped you on the facts?

12  A.   We had a summary of facts, yes.

13  Q.   He advised you, in so many words, that a

14  search warrant was executed at Mr. Seiver's

15  parents' residence and a thumb drive was found with

16  various images or information that led I.C.E.

17  agents to believe that a contact had been made with

18  one Brittany Miller in Champaign County, correct?

19  A.   That sounds correct.

20  Q.   So that's what you started with, correct?

21  A.   Yes.

22  Q.   And then you made the personal contact with

23  Brittany?

24  A.   Investigator David Sherik (phonetic) and I

25  did.

1   Q.   Now, when you made that initial contact with

2   Brittany, you said you asked her to come to the

3   police department?

4   A.   Yes, that was a decision that was made.

5   Q.   Did her mother accompany her?

6   A.   Yes, she did.

7   Q.   Was the mother present during the interview

8   that you conducted with Brittany Miller?

9   A.   No, she was not.

10  Q.   Whose idea was it to exclude the mother?

11  A.   Both of ours.

12  Q.   Okay.   Was Brittany Miller still a minor at

13  the time that you interviewed her?

14  A.   Yes.

15  Q.   So the mother -- the child -- the minor was

16  interviewed without the parent being present,

17  correct?

18  A.   With her consent but not present, yes.

19  Q.   With whose consent?

20  A.   Her mother's.

21  Q.   The mother opted to stay out of the room?

22  A.   Yes.

23  Q.   And as I understand from reading your report,

24  Brittany at some point in that -- in that

25  discussion with you told you that Mom knew of the

1    relationship that Brittany was having with Ron,

2    correct?

3    A.   At some point she became aware of it.

4    Q.   Now, during this discussion with Brittany

5    Miller, did you have occasion to visit her home?

6    A.   Initially we went to the home to try to find

7    her, spoke with her stepfather.  Didn't actually

8    enter the home.

9    Q.   Did you ever confirm whether Brittany Miller

10   owned a personal computer --

11   A.   No.

12   Q.   -- during the relevant time in question?

13   A.   Nope.  Did not.

14   Q.   Did you ever confirm from Brittany Miller

15   whether she had any kind of Internet service

16   account of any kind?

17   A.   No, we did not.

18   Q.   Did you confirm what cell phone provider she

19   was utilizing to communicate with people via the

20   cell phone?

21   A.   No, we did not.

22   Q.   Or any texting service?

23   A.   No.

24   Q.   So, I take it your agency and your

25   investigation did not involve you or anyone in your

1  department serving subpoenas to any communications

2  companies in an effort to corroborate one word of

3  what this girl was saying with respect to online

4  activity she was allegedly having with Mr. Seiver,

5  correct?

6  A.   No, we did not serve any subpoenas.

7  Q.   These threats that you talk about, you're

8  saying that Brittany said that Ronald made a threat

9  or multiple threats to post pictures online.  Is

10  that what you're --

11  A.   That's --

12  Q.   Is that what she told you?

13  A.   That was her concern.  She was concerned about

14  images of herself being posted online.

15  Q.   Did this minor elaborate further and tell you

16  exactly what the wording of the threat was?

17  A.   No, not any further than what I indicated in

18  the report.

19  Q.   Did the minor tell you how the threat was

20  communicated?

21  A.   Specifically, I don't recall her saying

22  exactly how it was communicated to her.

23  Q.   Did the minor tell you when the threat or

24  threats were communicated?

25  A.   It was after her -- would be after her contact

1  with him, some point after 2008, with her last

2  contact with him.

3  Q.   Sometime in 2008?

4  A.   Sometime after her last contact with him.  The

5  specific date she didn't mention, and we did not

6  get into that with her.

7  Q.   That's, that's as specific as she got with

8  respect to when the threat or threats may have been

9  made, correct?

10  A.   That's as specific as she got, and probably

11  due in part because we did not pursue a specific

12  date with her.

13  Q.   Now, did Brittany Miller explain to you how

14  this filming or photographing occurred?  Did she

15  say there was a video camera used?

16  A.   She assumed -- she said she -- well, she

17  assumed that there would be a cell phone video.

18  Q.   A cell phone video.  Did she explain to you

19  how Mr. Seiver, while engaged in various sexual

20  acts upon her, is going to videotape those acts

21  with a cell phone?

22  A.   She didn't go into detail.

23  Q.   That doesn't seem to make much sense to you as

24  an experienced criminal investigator, does it,

25  because you know from the description given and

1   even some of the photographs you were shown by

2   I.C.E. that the two were seen engaged in various

3   sex acts which makes it impossible to videotape

4   with a cell phone under those circumstances.

5   Wouldn't you agree?

6   A.   I'd have to review all the videos and images.

7   I don't remember if it's impossible.  I can't say

8   that.

9   Q.   You advised us today that one of the

10  photographs showed Mr. Seiver engaged in oral sex

11  with the minor in the motel room, correct?

12  A.   I don't recall stating that that was the case.

13  Q.   Your report says that because that's what she

14  reported to you as occurring, correct?

15  A.   I don't recall.

16  Q.   And have you seen or do you have any evidence

17  that any of those videos or photographs from the

18  thumb drive depict Mr. Seiver engaged in sex with

19  Brittany Miller with a cell phone camera in his

20  hand?

21  A.   I don't -- I don't recall seeing, seeing that,

22  but I'd have to review all those images.

23  Q.   And indeed --

24  A.   Those images actually were reviewed by the

25  I.C.E. agents, and so I didn't go through each

1  individual image and video, combing it thoroughly
2  like that to look for --
3  Q.  So, Brittany Miller told you that it was her
4  understanding and belief that Seiver had her
5  captured on a cell phone camera and that was her
6  concern about these so-called threats, correct?
7  A.  Her concern was that it was images that would
8  be taken with a cell phone camera, yes, or video
9  camera.
10  Q.  That could conceivably then be transmitted to
11  an online site, correct?
12  A.  That would be a fear, yes.
13  Q.  But certainly a typical video camera would not
14  have the capability of doing that, would it?
15  A.  Possibly could.  I don't know without knowing
16  what kind of camera.
17  Q.  Well, you, you have a video camera, don't you?
18  A.  No, I don't.  Just a phone.
19  Q.  Does your department have one, a hand one?
20  A.  There's different -- yeah, we've had them,
21  yes.
22  Q.  Those aren't usually used to transmit visual
23  images, are they?
24  A.  No, not usually.  I'm sure there's maybe a
25  device out there that does, though.

1  Q.  In your report, then, you indicate that

2  Brittany says there were times that Ron would come

3  to Champaign, correct, and meet with her?

4  A.  Yes.

5  Q.  Your report does not say how many separate

6  sexual encounters the two of them allegedly had at

7  the hotel, do you?

8  A.  No.

9      MR. TASEFF:  Those are my questions.

10     THE COURT:  Mr. McCoy, any follow-up?

11     MR. McCOY:  Just briefly, Your Honor.

12                **REDIRECT EXAMINATION**

13  BY MR. McCOY:

14  Q.  On the last point there, as far as the number

15  of sexual contact -- the amount of sexual contact

16  that Brittany had with the defendant, you

17  previously testified that on two separate occasions

18  in July and September of 2008 the defendant rented

19  a motel room; is that correct?

20  A.  Yes.

21  Q.  And where was that motel?

22  A.  The Manor Motel on -- it's on North Cunningham

23  Avenue in Urbana.

24  Q.  Did Brittany corroborate that information?

25  Did she say that she had met with him twice at this

1  motel?

2  A.   Yes.

3  Q.   And what did she say happened when she met

4  with him those two times?

5  A.   There was sexual activity that occurred

6  between he and her in the motel room.

7       MR. McCOY:   Thank you.

8                **RECROSS-EXAMINATION**

9  BY MR. TASEFF:

10  Q.   On how many occasions?  On how many occasions

11  does your report indicate the two of them had sex

12  in the hotel room?

13  A.   The report doesn't indicate that.

14       MR. TASEFF:   Thank you.  No further questions.

15             **FURTHER REDIRECT EXAMINATION**

16  BY MR. McCOY:

17  Q.   Well, just to be clear for the sake of the

18  Court, she told you that there were two different

19  times she went to the motel room, correct?

20  A.   Yes.

21  Q.   And that at least once at each different time

22  they had sexual contact, correct?

23  A.   Yes.

24  Q.   So there would be -- would have been two

25  different events?

1  A.  At minimum, yes.

2  Q.  At minimum.

3  **FURTHER RECROSS-EXAMINATION**

4  BY MR. TASEFF:

5  Q.  But that's not how you recorded it in your

6  official report, correct?

7  A.  Investigator Sherik's narrative doesn't state

8  that, no.

9  Q.  Were you taking notes during this time?

10  A.  Yes, there was notes.

11  Q.  What happened to the notes?

12  A.  They're destroyed.  We don't retain notes.

13  Q.  You don't retain your notes of this minor

14  person whom you interviewed about a federal

15  criminal case, correct?

16  A.  We just don't retain notes -- case notes

17  unless it's a homicide investigation.

18  Q.  You have access to taping equipment at the

19  police department you work at, don't you?

20  A.  We do.

21  Q.  Audio recorders?

22  A.  We do.

23  Q.  Tape-recorders, video recorders?

24  A.  We do.

25  Q.  Did it ever cross anyone's mind to tape-record

1   the interview with this minor to lock her in so we

2   wouldn't be here today, months later, debating what

3   was actually said?  Did that ever cross anyone's

4   mind when they were interviewing Miss Miller?

5   A.   Yes, it did.

6   Q.   Why didn't they do it?

7   A.   On the initial interview we had with her, we

8   did not know the extent of what -- we did not

9   actually even know to the extent of what kind of

10  sexual activity occurred.

11       So, there are times where we use a different

12  facility to do those interviews, which would be a

13  children's advocacy center in our county.  So there

14  are times where we do those interviews at that

15  facility.

16       But on this initial interview with her, we had

17  not even met with her so that determination had not

18  been made at that point.

19  Q.   Did anything prohibit you from following up

20  with her later that day or any other time?

21  A.   It could have been, but we were under the

22  impression that Mr. Seiver had already confessed to

23  his account of having sexual activity with her.

24  Q.   Did you have a copy of that confession?

25  A.   No, I did not have a copy of it, but that

 1 | was --
 2 | Q.   That was passed along to you by the I.C.E.
 3 | agent, correct?
 4 | A.   That was passed along by the I.C.E. agent,
 5 | yes.
 6 | Q.   So, on that basis you chose not to follow
 7 | through with an interview with her on the record,
 8 | correct?
 9 | A.   To go any more thoroughly into the interview
10 | with her, the decision was made not to do so based
11 | on the fact that he had already admitted to having
12 | sexual intercourse with her.
13 | Q.   A confession that you hadn't seen, nor did you
14 | know the contents of, correct?
15 | A.   Directly, no.  I didn't see it.
16 |       MR. TASEFF:  Thank you.  No further questions.
17 |       MR. McCOY:  Nothing further, Your Honor.
18 |       THE COURT:  Thank you, sir.  You may step
19 | down.
20 |       MR. McCOY:  At this time, the government would
21 | call Special Agent Brandon Kaopuiki.
22 |       THE COURT:  Do you want to raise your right
23 | hand, please?
24 |       **(Witness sworn by the clerk.)**
25 |                 **BRANDON KAOPUIKI,**

**called as a witness, was examined and testified**

**upon his oath as follows:**

### DIRECT EXAMINATION

BY MR. McCOY:

Q.   Would you please state your full name and
spell your last name for the court reporter?

A.   Brandon Kaopuiki, K-a-o-p-u-i-k-i.

Q.   And if it's all right, can I refer to you as
Brandon so that I don't repeatedly butcher your
name?

A.   That's fine.

Q.   Brandon, where are you currently employed?

A.   I work for the Oregon Department of Justice.

Q.   Okay.  And how long have you worked with the
Department of Justice?

A.   Just over two years.

Q.   And what's your position with the Department
of Justice?

A.   I'm a special agent assigned to the Internet
Crimes Against Children Task Force.

Q.   And have you held that position that entire
two-year period?

A.   Yes.

Q.   What were you doing prior to joining the
Department of Justice?

A.   Prior to the Department of Justice I was
employed by the City of Gresham Police Department
in Oregon for 11 years as an officer and then, at
the end, a child abuse detective.
Q.   I'm sorry, what type of detective?
A.   A child abuse detective.
Q.   And how long were you a child abuse detective?
A.   About three and a half years total.
Q.   Now, as part of your role with the Department
of Justice, did you participate in an investigation
that ultimately was found to involve the defendant
in this case, Ronald Seiver?
A.   Yes, I did.
Q.   And can you tell us a little bit about how
this investigation commenced and progressed?
A.   Sure.  In December 2009 a report was made with
the Oregon Department of Human Services and also
with the Portland Police Bureau regarding a
13-year-old girl named Brianna who had been engaged
in sexually-explicit communication via MySpace with
an unknown person.  And that report was referred to
my office for further investigation.
Q.   And who had made that report to the police
initially?
A.   Initially it was Brianna's adult sister and in

1  consultation with her mother.

2  Q.  And once you received this report, what

3  actions and steps did you take?

4  A.  I met with Brianna and her sister and her

5  mother, obtained access to Brianna's MySpace

6  account where I was able to review messages

7  exchanged between her and the other user.  We took

8  custody of the computer that she had used and

9  examined that for any evidence that might be

10 present.  And then I subpoenaed records from a

11 number of Internet service providers.

12 Q.  Whose computer was it?

13 A.  The computer belonged to Brianna's older

14 sister, Stephanie.

15 Q.  And in your initial contact with Brianna, her

16 mother and Stephanie, the sister, did they inform

17 you how they came to discover this information and

18 report it?

19 A.  Sure.  Brianna had been using Stephanie's

20 computer.  And Stephanie, in looking at her own

21 computer, discovered the messages that had been

22 exchanged between Brianna and this other person on

23 MySpace.  And so then Stephanie, having discovered

24 that information, confronted Brianna and her mother

25 about it and made the report.

1  Q.   These messages were taking place on MySpace;
2  is that correct?
3  A.   Correct.
4  Q.   Upon this initial meeting in December of '09,
5  did you have occasion to speak with Brianna?
6  A.   Yes, I did.
7  Q.   And how detailed or how in-depth was your
8  conversation or interview of Brianna?
9  A.   It was not detailed at that time.  It was
10 essentially detailed enough that I was able to
11 inquire of her whether or not she had engaged in
12 sexually-explicit communication and a display of
13 sexually-explicit conduct for this other person to
14 view, and she indicated that that was correct and
15 that she did so at his request.  But she was
16 clearly not comfortable talking with me about it,
17 so I offered to her an opportunity to discuss it
18 further with a female detective that I had worked
19 with.
20 Q.   And why did you do that?
21 A.   My experience as a child abuse detective
22 informed me that oftentimes children are
23 uncomfortable enough talking about exploitation and
24 abuse, regardless of who committed it.  And
25 generally they are more willing to discuss those

1   incidents with an investigator of the same gender.

2   Q.   Stephanie, obviously, you've previously

3   testified that she gave you the computer, correct?

4   A.   Correct.

5   Q.   And consented to you looking at the computer?

6   A.   Yes.

7   Q.   Did you also receive consent from Brianna to

8   access her MySpace records?

9   A.   Yes, I did.

10  Q.   And what were you able to discover when you

11  began to look at these records -- these MySpace

12  records?

13  A.   By viewing the MySpace content, I saw messages

14  exchanged between Brianna's profile and a profile

15  of a person who was known only as the initials

16  J.C., and those messages were sexually explicit in

17  nature, discussing a variety of sexual acts and

18  making reference to video chat services and other

19  electronic service providers.

20       MR. McCOY:   Your Honor, may I approach the

21  witness?

22       THE COURT:   You may.

23  BY MR. McCOY:

24  Q.   Can you tell us what that is?

25  A.   This is a printout of the publicly viewable

1   portion of a MySpace user profile, and this profile

2   in particular belonging to that subject as part of

3   this investigation, the profile name being only

4   J.C.

5   Q.   So this was -- this is the -- forgive my

6   ignorance on computer stuff, but this is the home

7   page, if you will, of J.C.'s MySpace account.   Is

8   that a good way of putting it?

9   A.   Sure.

10  Q.   And this was located on Stephanie's computer;

11  is that correct?

12  A.   Not necessarily.   I was able to view this by

13  accessing Brianna's account through her consent,

14  determining with whom she had exchanged the

15  messages, and then following a link from the

16  message saying, This is from J.C., to this page.

17  Q.   Okay.   And so this page and the information

18  that follows it, the messages that follow it, exist

19  out on the Internet; is that correct?

20  A.   Correct.

21  Q.   So you can access it from that computer or you

22  can access it from another computer --

23  A.   Yes.

24  Q.   -- if you had the information on the MySpace

25  account?

1  A.   Yes.

2       MR. McCOY:   If possible, I would like to admit

3  this as Government Exhibit 1.

4       THE COURT:   Any objection?

5       MR. McCOY:   May I put it on the ELMO, Your

6  Honor, so the Court can see it?  I don't know if

7  you can see it up there or -- oh, I'm sorry.

8       THE COURT:   I can see it.  Everybody can see

9  it.  Do we need this screen?

10       MR. McCOY:   I think we're fine.

11  BY MR. McCOY:

12  Q.   So this is the home page for J.C. basically?

13  And again, I'm probably not using the proper term,

14  but his MySpace account page, correct?

15  A.   Yes.

16  Q.   Were you able to find any information about

17  who this J.C. was?

18  A.   I was.

19  Q.   Okay.

20  A.   I -- using this information, I was able to

21  identify the MySpace friend I.D., which is a unique

22  identifier that MySpace uses for each profile.  I

23  subpoenaed records from MySpace for that friend

24  I.D., that account; and they provided, among other

25  records, a log of I.P. addresses used to access

1  that account.

2      From that log, I identified an I.P. address

3  that was used on the date that Brianna had engaged

4  in the communication with this person, determined

5  that that I.P. address was serviced by Frontier

6  Communications, and then subpoenaed records from

7  Frontier Communications about who the subscriber

8  associated with that I.P. address was.

9  Q.   And what did that subpoena reveal?

10  A.   Frontier Communications provided records

11  indicating that that particular I.P. address on

12  that date and time was assigned to Internet service

13  in the name of Ronald Seiver at an address in

14  Roseville.

15  Q.   And the date and time that you're referencing,

16  do you remember what that date was?

17  A.   It was December 6th, 2009.  I would have to

18  check on the exact time.

19  Q.   And had Brianna or had you independently

20  determined whether or not on that date there had

21  been messages exchanged of a sexual nature between

22  Brianna and J.C.?

23  A.   Yes.  In my review of the messages on MySpace,

24  I noted that each message has a date and time stamp

25  on it, and so I was able to associate particular

1  messages with particular dates and times that they

2  were sent or received.

3  Q.   Just to reiterate then, the subpoena revealed

4  the I.P. address on that date, December 6th, 2009,

5  linked back to where?

6  A.   To Ronald Seiver's address in Roseville.

7  Q.   And did it also include his name?

8  A.   It did, yes.

9  Q.   What other investigative steps did you take?

10 A.   Included with the MySpace records as well as

11 -- besides the I.P. address log were other

12 information provided by the subscriber, the person

13 who uses the account.  And one piece of information

14 was an e-mail address; that e-mail address was

15 frayed_edges@hotmail.com.

16      So, I sent a subpoena to my -- or to

17 Microsoft, which operates Hotmail e-mail service,

18 requesting records associated with that account.

19 And they provided additional I.P. address logs and

20 other user information.  Again, the user

21 information is user-provided and not verified.  And

22 so the user name associated with that account was

23 again just two initials, J.Z. this time.

24      But in addition to that user-provided

25 information, Microsoft provided billing information

because the user associated with that e-mail
account had purchased services from Microsoft's
Xbox Live gaming system.  And that purchase was
made using a Visa credit card with a billing
address that matched the service address provided
by Frontier Communications as the home of Ronald
Seiver.

Q.   Did you also check or try to find some
information regarding Skype?

A.   Yes.

Q.   And what, if anything, did you find out
through that?

A.   One of the messages exchanged from the user
J.C. to Brianna directed her to communicate with
him through Skype, which is an Internet
communication service through which you can do
texts, voice and video chat.  So, I subpoenaed
records -- oh, and he identified his user name on
Skype as solecutter21.

     I then subpoenaed records from Skype
associated with that user name, solecutter21, and
Skype provided records indicating that the user
solecutter21 had used both the free services and
paid services and had paid for those services using
a credit card ending in the same four digits that

1    Microsoft had reported had been used on their

2    system with the billing address and name of Ronald

3    Seiver at Roseville.

4    Q.   At some point did you search this Roseville,

5    Illinois, address -- at some point did you do a

6    search through the Illinois -- the Department of

7    State to determine if there was a connection

8    between this person Ronald Seiver and the address

9    that continued to pop up --

10   A.   Yes, I did.

11   Q.   -- through your searches?

12        And what did that search reveal?

13   A.   We found an Illinois driver's license record

14   identifying Ronald Seiver at that same address that

15   had been reported by Frontier and Skype.

16   Q.   Was that -- what was that address; do you

17   remember?

18   A.   If I could look in my report?

19   Q.   Sure.

20   A.   The address is 1042 -- 1-0-4-2 -- U.S. Highway

21   67, Roseville, Illinois, 61473.

22   Q.   So this address, this 1042 U.S. Highway 67,

23   this is -- just to recap, this is the same address

24   that was assigned to the I.P. address on

25   December 6th, 2009, that was used for the

1  communication between the two?

2  A.  Correct.

3  Q.  It's the same address that was used as the

4  billing address for -- on Skype for user name

5  solecutter21?

6  A.  Correct.

7  Q.  And it's the same address that was used as a

8  billing address for Microsoft for services paid in

9  association with this Hotmail account, the

10  frayed_edges@hotmail.com?

11  A.  Correct.

12  Q.  Is that the proper way of saying it?

13  A.  Yes.

14  Q.  Okay.  All right.  Is there anything else that

15  you'd like to say in regards to this initial part

16  of your investigation?

17  A.  I don't think so.

18  Q.  Okay.  Now, at some point -- you mentioned

19  previously that you did not interview the victim

20  because she seemed clearly uncomfortable talking to

21  you as a man?

22  A.  Correct.

23  Q.  At some point did this female detective that

24  you previously mentioned, did she sit down and

25  interview the defendant?

A.   Yes, she did.

Q.   Or not the defendant, I'm sorry.  Brianna.

A.   Yes, thank you.

Q.   And what, if anything, did she learn -- first
of all, did you have an opportunity to review her
report of interview?

A.   Yes, I did.

Q.   All right.  And based on your review and your
investigation of this matter, what, if anything,
did Brianna tell the female detective about her
interactions with J.C.?

A.   Brianna disclosed that she had communicated
with J.C. through MySpace.  J.C. requested that
Brianna produce an image of herself topless,
exposing her breasts.  Brianna indicated that she
did that and provided it to J.C.  And then J.C.
threatened to share that image with her online
friends and family, who would have been visible to
him and anyone else with access to her MySpace page
or her friends list would have been seeing, unless
she agreed to engage in additional explicit conduct
through a live video chat.

Q.   Again, forgive my ignorance.  I don't have
MySpace or Facebook, and I'm pretty sure that maybe
many others in the courtroom don't either, but how

1  does this work?

2       You said that on her MySpace account there

3  would be clear links to friends and family.  How

4  does that work?

5  A.   MySpace is a social networking site; and as

6  that term suggests, the idea is to network

7  socially.  And so one of the primary ways it allows

8  people to do that is to create links with other

9  users online, identifying them through some sort of

10 relationship, whether it's a friend or, on

11 Facebook, you can designate people as family

12 members.

13      And so when you view a MySpace user's profile,

14 very often there's a section on the side that lists

15 that user's friends.  And various MySpace user

16 images and links would be within that section of

17 the page identifying all those people as having

18 some sort of relationship to the person of the

19 profile that you're actually viewing.

20 Q.   So if someone wants to upload photographs of

21 someone else or an event or whatever and they

22 upload it onto MySpace or Facebook, do the friends

23 of the people -- of the person who's having the

24 pictures uploaded onto their site have -- are they

25 able to view them, basically?

1  A.   Generally, yes, although there are a number of
2  ways that one could share images with other users.
3  You could, depending on the service, post to
4  someone's profile page.  You could simply send an
5  image attached to a message directly to a
6  particular user or a list of users such as the
7  person's friends.  Or you could post a link -- a
8  URL -- to a user's profile page that would be
9  viewable by others that, if they clicked on it,
10 would lead them to the image or another website
11 where the image was displayed.
12 Q.   Now, again, you said that the defendant
13 threatened -- or J.C. -- according to Brianna, J.C.
14 threatened to post this topless picture of her if
15 she didn't produce more images; is that correct?
16 A.   Correct.
17 Q.   What specifically was J.C. asking her to do?
18 A.   Based on my review of the MySpace messages,
19 specifically J.C. was directing Brianna to go to an
20 external site not on MySpace, a site called
21 tinychat.com which is a -- it's another chat
22 service through which people can engage in text,
23 video and voice chat and display herself to him
24 there.  And he provided explicit direction and a
25 link for her to click on to access that site, to

1  engage in the video chat.

2  Q.  And did she say what she did when she clicked

3  on that link?

4  A.  Yeah.  Brianna disclosed during her interview

5  that she engaged in the video chat and exposed her

6  breasts and her genitals to J.C. through the video

7  chat -- through the camera on the computer she was

8  using, and she masturbated by touching her genitals

9  and inserting her fingers into her vagina.

10  Q.  Did she say how long the event took place?

11  A.  I don't recall if she said, but from my review

12  of the messages it's evident that there is a

13  20-minute gap in one exchange of messages between

14  the time J.C. directs her to go to this video chat

15  site and the next message she posts, which was

16  inquiring of him whether or not her actions had

17  been sufficient.

18  Q.  And then how did it end?  Did she say?

19  A.  If I could review that report?

20  Q.  Sure.

21  A.  And actually if I can go back, I do now see

22  that Brianna, she estimated that the display lasted

23  about an hour.

24      And she said that she terminated the

25  communication by telling J.C. that she had to go

1  and that she would talk to him later.

2  Q.   Did she have any further communication with

3  him?

4  A.   I don't believe so.

5  Q.   So you're referring to these messages where

6  there appears to be that 20-minute gap in time.

7  What date were these messages being exchanged on?

8  A.   That was on December 6th, 2009.

9  Q.   December 6th is the date that the I.P. address

10 was linked to Ron Seiver at 1042 U.S. Highway 67;

11 is that correct?

12 A.   Yes, but also every I.P. address provided by

13 MySpace is matched in the Frontier records as

14 having been associated, so basically MySpace

15 provided records listing every available I.P.

16 address that had access to that profile of J.C.

17 And compared to the Frontier records, that shows

18 that the MySpace access happened exclusively from

19 service at Ronald Seiver's residence, not merely on

20 that date.

21 Q.   Okay.

22      MR. McCOY:   Those are all the questions I have

23 right now, Your Honor.

24      THE COURT:   Mr. Taseff?

25                 **CROSS-EXAMINATION**

1  BY MR. TASEFF:

2  Q.   You authored an extensive investigation report

3  in this case, did you not?

4  A.   I authored a report.

5  Q.   And the report was some four pages,

6  single-spaced, typewritten?

7  A.   Yes.

8  Q.   That chronicles pretty much what you've told

9  us today, correct?

10  A.   Yes.

11  Q.   By my count and by my review of your report,

12  you've utilized the power of subpoena extensively

13  in your investigation here, didn't you?

14  A.   Yes.

15  Q.   You had at least four subpoenas issued to

16  various online services to acquire documents that

17  would allow you to piece together a chain of

18  communications between persons from one I.P.

19  address to another, correct?

20  A.   Correct.

21  Q.   So as I understand your testimony, you issued

22  subpoenas to MySpace, correct --

23  A.   Correct.

24  Q.   -- to get the content of all communications

25  that Brianna is alleged to have had under her

1  account?

2  A.   No.

3  Q.   You got the MySpace records, did you not?

4  A.   I got records, but not content.  Content is

5  available only under court order or search warrant.

6      What I obtained from MySpace under subpoena

7  was subscriber information and I.P. address logs

8  for the J.C. user account.  I obtained the content

9  from MySpace under consent from Brianna by

10 accessing her account directly and later by

11 providing a signed consent form to MySpace to get

12 the content from her account only.

13 Q.   Thank you for that clarification.  Because by

14 securing her consent, then, you got full access as

15 if you had had a court order or a search warrant,

16 correct?

17 A.   Access to her account.

18 Q.   To her account.

19 A.   Yes.

20 Q.   So you are satisfied, as a criminal

21 investigator, that you had full access to her

22 account by virtue of her consent?

23 A.   Yes.

24 Q.   And you have -- you have reviewed those

25 records thoroughly, haven't you?

1  A.   It has been some time, but yes, I did.

2  Q.   And you combed through that body of records to

3  find snippets or portions of chat or text that

4  would corroborate the girl's account of what

5  allegedly happened, correct?

6  A.   No.  When Stephanie, the sister, made a report

7  she had already, upon discovering the messages,

8  separately identified those messages and saved them

9  to a separate folder to preserve them for law

10  enforcement.  So when I accessed the account, the

11  messages had been saved.  I reviewed those

12  messages.  I also reviewed other messages and found

13  no other messages exchanged between J.C. and

14  Brianna, only those that had been saved by

15  Stephanie.

16  Q.   This Stephanie is the older sister, correct?

17  A.   Correct.

18  Q.   How much older?  How old is Stephanie?

19  A.   If I could check my report, I could tell you.

20  Q.   Please.

21  A.   Stephanie's about 12 years older.

22  Q.   Mid-20s.  Fair?

23  A.   Yes.

24  Q.   So, you had the content of this messaging that

25  was saved by Stephanie for your review as well as

1  the content of messages that you acquired by virtue
2  of the consent, correct?
3  A.   Correct.
4  Q.   Now, with respect then to the MySpace records
5  and your review of them, did you find any snippet
6  or portion of text that J.C. made a request via
7  MySpace to have Brianna send him a topless image?
8  A.   If I could review the messages I have here?
9  Q.   Please.
10 A.   Thank you.
11 Q.   What I'm looking for is you've testified today
12 -- maybe as a preface to my next question, let me
13 pose this to you:  As I understand your testimony,
14 Brianna told you or your partner, the female
15 investigator, that sometime during the course of
16 this online relationship J.C. requested of her, via
17 MySpace, to pose topless and send that image to
18 J.C.  Is that what she told you, sir?
19 A.   That is what she disclosed, yes.
20 Q.   Now, my question is, In your review of all the
21 MySpace records, did you find any communication
22 between J.C. and Brianna to corroborate that very
23 request?
24 A.   I do not see that we have a message
25 specifically requesting that initial image.  What

1   we have are messages referencing the image that had
2   been produced.
3   Q.   Well, that could mean that the image was
4   produced without a request, correct?
5   A.   The initial image, yes, it is --
6   Q.   The topless image.  It could very well have
7   been something that Brianna did on her own, as many
8   other teens, unfortunately, do.  You've heard the
9   term "sexting," haven't you?
10  A.   The answer -- yes.
11  Q.   Okay.  What is it?
12  A.   Well, sexting is a term that has been applied
13  in popular media to the self-production of
14  sexually-exploitative images.
15  Q.   That some teenagers or even some congressmen
16  have engaged in, correct?
17  A.   Certainly.
18  Q.   So we have many examples in the local -- in
19  the popular media culture these days to give us an
20  idea of what sexting is; posting images, correct?
21  A.   Yes.
22  Q.   Graphic images.
23       And MySpace records do not contain any
24  reference to a request by J.C. for a topless image,
25  do they?

1   A.   There does not appear to be a request for this

2   specific topless image that she disclosed she

3   produced at his request.

4   Q.   So you cannot tell Judge Shadid at this time

5   that J.C. requested that, can you?

6   A.   What I am testifying to is Brianna's

7   disclosure.

8   Q.   Her disclosure, correct?

9   A.   Yes.

10   Q.   Which is not corroborated in any way by those

11   messages, correct?

12   A.   There is a message that corroborates the

13   presence of the image.

14   Q.   The request is what I'm referring to.

15   A.   The initial request.

16   Q.   You don't have anything to corroborate a

17   13-year-old's statement to an investigator some six

18   months to a year after the alleged fact?

19   A.   I think the statement to the investigator was

20   three months later.

21   Q.   After being called out by the elder sister,

22   correct?

23   A.   Correct.

24   Q.   These threats that Brianna claims were made to

25   her, as I understand your testimony, that once the

1  topless image was requested and obtained, then that

2  was used as leverage to get the video, correct?

3  A.   Correct.

4  Q.   And the threat that she's referring to is,

5  Well, if you don't give me this, I will post or

6  transmit that image to others who are on her space

7  (sic), correct?

8  A.   Correct.

9  Q.   Is there any text in those MySpace records

10 that in your mind and in your opinion constitute a

11 threat?

12 A.   Yes.

13 Q.   And have you identified those?

14 A.   Yes.

15 Q.   And have you identified those to the U.S.

16 attorney who's prosecuting this case?

17 A.   I, I did not show them, but they are included

18 in the MySpace logs that have been provided, is my

19 understanding.

20 Q.   I better ask this or I'm sure Mr. McCoy will:

21 Tell us what that alleged threat consisted of.

22 A.   The -- there appears to have been a discussion

23 about J.C. trying to get Brianna off MySpace to

24 this other chat site, and Brianna's explaining how

25 she's having problems with her computer.  And J.C.

1  apparently thinks that --

2  Q.   I don't mean to interrupt, but this tinychat

3  then is what we're talking about, right?

4  A.   Yes.

5  Q.   You're saying then that the J.C. person is

6  alleged to have said, Okay, let's go offline.

7  Let's go to a different media?

8  A.   Yes.

9  Q.   Tinychat, correct?

10  A.   Uh-huh.

11  Q.   What is tinychat?

12  A.   Tinychat is a free, online chat service that

13  anyone can use, and you can create a chat room

14  where one or more people can meet you there to

15  engage in communication.  It's not a subscription

16  service where a user would necessarily have to

17  provide billing information and that type of thing.

18  Q.   Does this -- does tinychat maintain offices?

19  Can they be contacted and subpoenaed for their

20  records?

21  A.   Likely.  I don't know.

22  Q.   Was that done in this case?

23  A.   I did not.

24  Q.   So no confirmation with tinychat records to

25  confirm what this alleged video consisted of, the

1  20-minute gap you were referring to?

2  A.   Correct.

3  Q.   We've heard of 18-minute gaps in other

4  contexts, in political culture.  But this 20-minute

5  gap is what is revealed, you're saying, by Frontier

6  and MySpace together?

7  A.   No.  Just in the exchange of messages which

8  often go back and forth within a matter of one or

9  two minutes, there's a break on December 6th, 2009,

10 at 12:02 a.m. Pacific time -- or 2:02 a.m. Pacific

11 time until 2:23 a.m., so about 20 or 21 minutes

12 where there is no communication back and forth.

13     If -- to respond to your original question

14 regarding which message it is that I have

15 identified a threat in, the discussion that I was

16 leading up to about the apparent frustration in

17 getting the computer working, it appears as though

18 J.C. thinks that Brianna was intentionally avoiding

19 going to this site.  And at 1:47 a.m. Pacific time,

20 J.C. sent a message that says, quote, Since you

21 were just fucking with me, I'm sending the pic of

22 you showing your tits to all your friends.

23     One minute later, Brianna responds, What do

24 you want me to do?  The tinychat thing link is not

25 working.

1    Two minutes later -- or one minute later after

2  that, J.C. responds with a link saying, Go here to

3  http://tinychat.com/Briannabest.  You might have to

4  refresh a few times to get it to work.

5    Then we have that break in time followed by

6  the message from Brianna saying, Was that good?

7  Q.  Now, with respect to Brianna's computer and

8  her records, would her Internet service provider

9  records document her transmitting this video via

10  her web cam on that date?

11  A.  No.

12  Q.  No record of that at all?

13  A.  No.  Typically, broadband Internet service

14  providers like Frontier or Charter or Comcast

15  maintain I.P. records -- historical I.P. records

16  identifying to which subscriber an I.P. address was

17  assigned on a particular date and time.  They don't

18  capture destination I.P. records that would

19  identify every website or every service that a user

20  from that I.P. address connected to.

21    There are some mobile communications companies

22  that might capture that information, but to my

23  knowledge, that information's not available

24  retroactively from any of the traditional Internet

25  service providers, although it might be accessible

1    from a forward-looking perspective under a court
2    order or wiretap type of situation.
3    Q.   With all of the subpoenas that were issued and
4    all of the documents you've obtained and reviewed,
5    you concluded in your report that your
6    investigation has not discovered any photo or video
7    evidence of the crimes alleged?
8    A.   Correct.
9    Q.   But that you conclude further that messages
10   exchanged between the girl and J.C. corroborate
11   disclosures to Detective Smith.  Detective Smith is
12   the female detective, correct --
13   A.   Correct.
14   Q.   -- who did the interview?
15   A.   Yes.
16   Q.   So, not one visual image exists that you know
17   of that would corroborate this, correct?
18   A.   Correct.
19        MR. TASEFF:  Those are my questions.
20        THE COURT:  Mr. McCoy, any follow-up?
21        MR. McCOY:  No follow-up, Your Honor.
22        THE COURT:  Thank you, sir.  You can step
23   down.
24        THE WITNESS:  Judge, if I'm excused, may I
25   remain in the courtroom?

1      THE COURT:  Do you anticipate the agent being
2  called again?
3      MR. McCOY:  I don't anticipate him being
4  called again, Your Honor.
5      MR. TASEFF:  No.
6      THE COURT:  You may remain in the courtroom.
7      THE WITNESS:  Thank you, Judge.
8      THE COURT:  Next witness.
9      MR. McCOY:  Just a moment, Your Honor.
10      THE COURT:  How many more witnesses do you
11  have, do you think?
12      MR. McCOY:  I have at least two more, Your
13  Honor.  Probably just two more.
14      THE COURT:  Okay.  Going to have to consider
15  breaking about a quarter till, but I would like to
16  be able to get these two witnesses on since I
17  assume they're from out of town as well.
18      MR. McCOY:  One is from Chicago, Your Honor.
19  The other is local.  Perhaps what I'll do is
20  there's a -- the next witness is relatively quick.
21  Actually, this is a witness who's presenting
22  evidence in aggravation, not directly related to
23  the objections, although it does play into sort of
24  the pattern of activity so I'll call him first.  He
25  should be relatively quick.

1      This is --

2      THE COURT:  Is there any problem with resuming

3  after the lunch hour?

4      MR. McCOY:  Not with the government, Your

5  Honor.

6      MR. TASEFF:  No.

7      THE COURT:  Okay.

8      MR. McCOY:  This is Special Agent James Buck.

9      THE COURT:  All right.  And the first witness,

10  if that witness isn't going to be recalled, he can

11  stay -- he can stay in the courtroom through the

12  rest of the proceedings as well.

13      MR. McCOY:  He can, Your Honor, as far as the

14  government's concerned.  I don't know if the

15  defense plans on calling him.

16      MR. TASEFF:  I don't see any possibility of

17  that, Judge.

18      THE COURT:  Hmm?

19      MR. TASEFF:  I don't see any possibility of us

20  recalling witnesses.  If we did --

21      MR. McCOY:  I think he may be on his way home,

22  but I'll check.

23      THE COURT:  Raise your right hand, please.

24      **(Witness sworn by the clerk.)**

25                   **JAMES BUCK,**

**called as a witness, was examined and testified**

**upon his oath as follows:**

### DIRECT EXAMINATION

BY MR. McCOY:

Q.   Would you please state your full name and

spell your last name for the court reporter?

A.   James David Buck, B-u-c-k.

Q.   All right.  And you're a special agent with

the -- with Homeland Security Investigations; is

that correct?

A.   Yes.

Q.   And that's a division of the Department of

Homeland Security?

A.   Yes.

Q.   How long have you been working with Homeland

Security Investigations?

A.   With Homeland Security Investigations, since

its -- the merger in 2003.  But with HSI, since

2004.

Q.   Okay.  And what were you doing -- and what's

your current position with HSI?

A.   I'm a special agent.

Q.   And what were you doing -- what position did

you hold prior to becoming a special agent with

HSI?

1  A.   I was a border patrol agent out in Arizona.

2  Q.   For how long were you a border patrol agent?

3  A.   About four years.

4  Q.   As part of your responsibilities and role as a

5  special agent with HSI, did you have an occasion to

6  participate in an investigation that involved the

7  defendant in this case, Ronald Seiver?

8  A.   I did.

9  Q.   And can you tell the Court how you got

10  involved in that investigation and what role you

11  played in it?

12  A.   I interviewed a woman by the name of Vanessa

13  Sotelo, a resident of Chicago.

14  Q.   And how old is Vanessa?

15  A.   Currently 19.

16  Q.   And why did you come to interview this female

17  in Chicago?

18  A.   She was identified as being a possible victim

19  of Ron Seiver.

20  Q.   And did -- who identified her as a possible

21  victim?

22  A.   Agent Haferkamp.

23  Q.   And what, if anything, did he tell you?  Did

24  he send a lead report to you?  How were you

25  basically brought up to speed in regards to what

1  was going on?

2  A.  I was sent what's called a collateral

3  investigation, which is basically a side

4  investigation off of his main one.

5  Q.  And what in that collateral investigation

6  information that you received were you told about

7  the investigation and about why Agent Haferkamp was

8  interested in having Vanessa found and interviewed?

9  A.  I'm sorry.  Could you repeat the question?

10  Q.  What were you told about the investigation in

11  that report, in that collateral report?

12  A.  Oh, I was told that Mr. Seiver was going

13  through court proceedings on child pornography

14  charges, and Vanessa Sotelo was a possible victim.

15  Q.  Did the report say why she came to the

16  attention of I.C.E.?

17  A.  Yes.

18  Q.  And what did it -- what -- how, how did that

19  happen?

20  A.  She had sent Mr. Seiver a letter while he was

21  incarcerated.

22  Q.  Did you -- as part of this collateral, did you

23  receive a copy of that letter for you to review?

24  A.  I did.

25  Q.  And --

1    MR. McCOY:  Just one moment, Your Honor.  May
2  I approach, Your Honor?
3    THE COURT:  You may.  And neither of you need
4  to ask to approach.  Just indicate you are
5  approaching --
6    MR. McCOY:  Okay.
7    THE COURT:  -- for the record.  Thanks.
8  BY MR. McCOY:
9  Q.  Do you recognize that?
10 A.  Yes.  This appears to be a copy of the letter.
11 Q.  That you received from Agent Haferkamp?
12 A.  Yes.
13 Q.  Okay.  And who is the letter addressed to?
14 A.  Ron Seiver.
15 Q.  And what's the address that it was sent to?
16 A.  906 Southwest Third Avenue, Aledo, Illinois,
17 61231.
18 Q.  I don't know if you know the answer to this,
19 but do you know what that is an address for?
20 A.  I believe it's an address for a jail.
21 Q.  And so I see in the return address the name
22 Vanessa Sotelo and her address there; is that
23 correct?
24 A.  Yes.
25    MR. McCOY:  Your Honor, I'd like to admit this

1  as Government Exhibit 2.

2      MR. TASEFF:  (No audible response.)

3      THE COURT:  It will be admitted.

4      That shrug means no objection?

5      MR. TASEFF:  Yes.

6      THE COURT:  Okay.  It will be admitted, no

7  objection.

8  BY MR. McCOY:

9  Q.  Now, this address and the return address there

10  -- I guess I don't need to show this necessarily,

11  but is that right side up?

12      THE COURT:  No.  There you go.

13      MR. McCOY:  Thank you.

14  BY MR. McCOY:

15  Q.  Is that the address that you went to to try to

16  find Vanessa?

17  A.  Yes.

18  Q.  And what happened when you went to that

19  address?

20  A.  When I initially went there, I talked to a

21  woman who identified herself as Vanessa's mother.

22  She spoke very limited English, and I speak very

23  limited Spanish, but I was able to learn that

24  Vanessa was currently attending school.

25  Q.  Okay.  Did you make an appointment to come

1  back and speak with her later -- with Vanessa?

2  A.   Yes.

3  Q.   And when did you go back and speak with her?

4  A.   October 3rd.

5  Q.   All right.  And on October 3rd, did you

6  question her about her knowledge of the defendant

7  in this case, Ronald Seiver?

8  A.   I did.

9  Q.   And tell us how that happened.  How did that

10  interview progress?

11  A.   We asked to come upstairs to her apartment.

12  She gave us consent.  I showed her a driver's

13  license picture of Mr. Seiver.  She said, That is

14  the Ron Seiver I know.  And we asked her what her

15  relationship was -- with him was.

16  Q.   And did she say when and how she had met the

17  defendant?

18  A.   Yes.  She stated when she was 17 she met the

19  defendant in a Yahoo! chat room that she called

20  Teens.

21  Q.   The Yahoo! chat room was called Teens?

22  A.   That's what she told me, yes.

23  Q.   Okay.  Did she tell you what -- she said that

24  she was 17 at the time.  Did she tell you whether

25  or not she had informed the defendant at that time

1  of her age?

2  A.   Yes.

3  Q.   And what did she tell the defendant?

4  A.   She told me that he knew that she was 17.

5  Q.   What age had the defendant given her in

6  regards to how old he was?

7  A.   23.

8  Q.   And when did this communication take place?

9  What year?

10  A.   I don't recall, but it was about two years ago

11  when she was 17.

12  Q.   Tell us about the nature of their

13  communications.  They met in this MySpace -- or

14  this Yahoo, rather, chat group, but how did it

15  progress from there?

16  A.   After they communicated in this Yahoo! chat

17  room, they moved to Facebook where they posted

18  messages to each other.  Then they spoke on the

19  phone, and they exchanged letters.

20  Q.   And what was the nature of their

21  conversations?

22      Or let me make it a more specific question.

23  Did they ever engage in any conversations that were

24  of an explicit or sexual in nature?

25  A.   Yes.

1  Q.  Can you describe for us what -- or give us

2  some examples of some of those conversations?

3  A.  Mr. Seiver asked Vanessa if she was a virgin

4  and whether or not she would like to lose her

5  virginity to him.

6  Q.  And this conversation -- these conversations

7  took place when she was 17?

8  A.  I don't know when that specific took -- that

9  one took place, but --

10  Q.  Okay.  Did she send any photographs to him?

11  A.  Yes.

12  Q.  Okay.  And were any of those of her nude?

13  A.  No.  She was not nude in any of the

14  photographs.

15  Q.  Okay.  What types of photographs was she

16  sending to him?

17  A.  More of the nature of in low-cut blouses

18  showing cleavage, but no nudity was seen.

19  Q.  Now, did the communication -- did she say

20  whether or not the communication continued after

21  the defendant was arrested and brought to jail?

22  A.  Yes, it did continue.

23  Q.  Okay.  And at that point how were they

24  communicating; did she say?

25  A.  Via phone and the mail.

1  Q.   Did she tell you why she believed the

2  defendant was in jail?

3  A.   Yes.

4  Q.   What did she say?  What was her belief in

5  regards to why the defendant was in jail?

6  A.   That he was in jail for possessing child

7  pornography.

8  Q.   And did she say whether or not the defendant

9  explained in any greater detail what the

10 circumstances were involving that?

11 A.   Yes.

12 Q.   What was that?

13 A.   She stated that Mr. Seiver had told her that

14 he was in jail because he had downloaded a video of

15 what he suspected was an underage person.  He then

16 tracked this person through Facebook and contacted

17 this person's mother in Canada and told her about

18 the video.

19 Q.   And why, why did that result in his arrest;

20 did he explain that to her?

21 A.   Why did that result in his arrest?

22 Q.   Yes.  So, he notifies the mother of this girl.

23 So, what happened next --

24 A.   Oh, that mother notified --

25 Q.   -- according to the defendant?

1  A.    That mother notified the Canadian police.

2       MR. McCOY:  Those are all the questions I have

3  for this witness, Your Honor.

4                    **CROSS-EXAMINATION**

5  BY MR. TASEFF:

6  Q.    This young woman whom you interviewed back in

7  October is now a college student, correct?

8  A.    Correct.

9  Q.    Studying criminal justice of all things?

10  A.    Yes.

11  Q.    19 years old, correct?

12  A.    Currently, yes.

13  Q.    Appeared to be mature, composed, intelligent

14  in talking with you and your partner?

15  A.    Yes.

16  Q.    Didn't appear to you to be nervous or afraid

17  or withholding of any information?

18  A.    She appeared nervous, but she didn't appear to

19  withhold any information.

20  Q.    And that's generally what you experience in

21  talking to civilian witnesses; there is some level

22  of anxiety or nervousness, at least at the outset

23  of interviews, isn't it?

24  A.    Yes.

25  Q.    So nothing really out of the ordinary that you

1  can recall?

2  A.  No.

3  Q.  So, as I understand it, you begin talking to

4  her about this relationship with Mr. Seiver, and

5  she identifies his photograph, correct?

6  A.  Correct.

7  Q.  Identifies him by name, correct?

8  A.  Yes.

9  Q.  Admits that she had been having an online

10  relationship with him for some period of time?

11  A.  Yes.

12  Q.  And you noted in your report of interview with

13  her that she told you that Mr. Seiver never sent

14  her any kind of pornography, correct?

15  A.  That's correct.

16  Q.  And, indeed, you noted in your report that

17  Ms. Sotelo said to you and your partner that

18  Mr. Seiver was mostly respectful to her?

19  A.  That's correct.

20  Q.  So this conversation about her virginity and

21  that was something as part of the give and take of

22  their communications, correct?

23  A.  I don't know the context of that entire

24  conversation.

25  Q.  But she made a point of telling you that he

1  was mostly respectful of her --

2  A.   Yes.

3  Q.   -- in his communications?

4       She said that most of the pictures that she

5  had sent him were those that were taken of her

6  after she had reached the age of 18, correct?

7  A.   She said all the pictures were after she

8  turned 18.

9  Q.   All of them?

10 A.   Yes.

11      MR. TASEFF:   Thank you, sir.   No further

12 questions.

13      THE COURT:   Anything further?

14      MR. McCOY:   No, not from the government, Your

15 Honor.

16      THE COURT:   You may step down.   Sir, how do

17 you spell your last name?

18      THE WITNESS:   It's B-u-c-k.

19      THE COURT:   Okay.   Thank you.

20      Next witness?

21      MR. McCOY:   Your Honor, the government's going

22 to be calling Special Agent Haferkamp.

23      Sorry, Your Honor.   May I have a moment?   I

24 apologize.

25      (A pause was had in the record.)

1      MR. McCOY:  Your Honor, I was just speaking

2  with Agent Kaopuiki -- did I get that right?

3      MR. KAOPUIKI:  Close enough.

4      MR. McCOY:  Close enough.  I apologize,

5  Brandon.  And he has been reviewing his records,

6  has a point of clarification that he'd like to

7  make, if possible, that was in relation to a

8  question asked by the defense attorney.  I don't

9  know if the Court would allow us to recall him.

10 It's just to make that clear for the record.

11     THE COURT:  Do you want to be heard on that?

12 Do you want to visit with him first?

13     MR. TASEFF:  If I may.

14     MR. McCOY:  Yes.

15     (Counsel and the witness conferred off the

16 record.)

17     (A pause was had in the record.)

18     MR. McCOY:  Your Honor, I don't think the

19 defense -- Mr. Taseff's indicated he wouldn't

20 object to me proffering basically what the point of

21 clarification is.

22     THE COURT:  All right.  Is that correct,

23 Mr. Taseff?

24     MR. TASEFF:  Pardon?

25     THE COURT:  Is that correct?

1        MR. TASEFF:  Yes.

2        THE COURT:  Go ahead.

3        MR. McCOY:  Brandon had previously testified

4   that after this 20-minute break that had occurred

5   in the messaging that Brianna came back and said,

6   Was that good, or, Is that good?  In fact, in

7   reviewing his -- the chat, the message log, that

8   came prior to the 20-minute break that, in fact,

9   she asked, Is that good?

10       And then the defendant responded, Yes, now go

11  -- Give me some more, if that's accurate.  And then

12  there's the 20-minute break.

13       THE COURT:  Mr. Taseff, that's your

14  understanding?

15       MR. TASEFF:  Yes.

16       THE COURT:  Okay.  For the record, then.

17       MR. McCOY:  Okay.  Thank you, Your Honor.

18       THE COURT:  All right.  Thank you, sir.

19  You're still allowed to remain in the courtroom if

20  you want.  As long as this doesn't screw up

21  witnesses for this afternoon, we'll have this be

22  our last witness before we break.

23       MR. McCOY:  Yes.  This should be the last

24  witness the government calls, Your Honor.

25       THE COURT:  Okay.  Do you want to come

1   forward, please, sir?  Raise your right hand.

2   **(Witness sworn by the clerk.)**

3   **DWAYNE HAFERKAMP,**

4   **called as a witness, was examined and testified**

5   **upon his oath as follows:**

6   **DIRECT EXAMINATION**

7   BY MR. McCOY:

8   Q.   Agent Haferkamp, I know you previously

9   testified a great deal on the lead-up to this case,

10   the investigation of this case at the suppression

11   hearing back in April, so I want to, if I can, for

12   the sake of the Court and in the interest of time,

13   I'm going to focus your testimony on certain

14   developments that happened after the defendant had

15   been arrested.

16       In particular, I want to call your attention

17   to an individual by the name of Josie Little.  If

18   you can, explain to the Court who this girl was,

19   where she's from and how she came to the attention

20   of law enforcement.

21   A.   Okay.  At the time of finding out about Josie,

22   there was a picture of an address -- or, rather, a

23   mailbox with the address on it.  That's initially

24   how we found out about possibilities of a victim in

25   Georgia.

1    So we sent out the collateral to Georgia to

2  have her interviewed.  She is a -- currently --

3  trying to recall her exact age -- I believe 17, but

4  as of the time was approximately 15 years old.

5  Josie was interviewed and stated that she had met

6  the defendant on blogTV, recalled that his call

7  sign was solecutter.  Had sent --

8  Q.  If I can stop you, you said the call sign was

9  solecutter.  Was it just solecutter, or was there

10  anything else with it?

11  A.  I -- if I could refer to the report, I believe

12  it's solecutter, but it could be solecutter21.  It

13  was an I.D. that was from her -- the MSN account.

14  Q.  That's fine.  So you said she met him on --

15  met him on blogTV?

16  A.  BlogTV, yes.

17  Q.  Is that correct?

18    How did she -- did she identify the person she

19  had communicated with as the defendant, as Ron

20  Seiver?

21  A.  As Ron.  And then that her -- his last name

22  started with an "S."  But then agents asked if it

23  was Seiver and then, yes, she stated it was Ron

24  Seiver.

25  Q.  Did they ever meet in person?

1   A.   No.

2   Q.   And when was the last time they communicated

3   with each other?

4   A.   I believe it was July.  July of 2010.

5   Q.   Okay.  At the time that he -- that Brianna met

6   the defendant online, did he tell her how old he

7   was?

8   A.   I'm sorry.  Could you repeat the question?

9   Q.   Yes.  How old did the defendant say he was

10  when he met Brianna?

11  A.   Initially, I think he had told her he was 18,

12  but then subsequently after time told her he was

13  30.

14  Q.   And how did their friendship, their connection

15  online progress from that point forward?

16  A.   He requested her to get on blogTV, get naked,

17  things like that.  She sent him approximately 20

18  pictures, but I know that we recovered at least

19  three of those.

20  Q.   20 pictures of -- what type of pictures?

21  A.   Nude photos of Josie.

22  Q.   And how do you come up with the number 20?

23  Where did you get that information from?

24  A.   That information was from the report.  And

25  also subsequently when I interviewed her myself,

1  she stated that the same information was true.

2  Q.  That she had sent 20 pictures?

3  A.  I --

4  Q.  She had sent 20 pictures to him; is that

5  correct?

6  A.  Yes.

7  Q.  And you said that you found evidence of some

8  of those pictures on the thumb drive that was

9  seized --

10  A.  Yes.

11  Q.  -- during the search of the defendant's house?

12  A.  Yes.  They were labeled with the name Josie in

13  them.

14  Q.  And how many of those photographs were found?

15  A.  Three, I believe.

16  Q.  And what did those photographs depict?

17  A.  From approximately the face down through the

18  breast area and also a portion of the vagina.

19  Q.  And did they -- did any of the photographs

20  show the face of the girl depicted in those

21  pictures?

22  A.  Part of her face, yes.  From about the nose

23  down.

24  Q.  Now, when you interviewed Josie, did she

25  provide or did you ask her to provide you with any

 1  sort of physical descriptors of --

 2  A.   Yes.

 3  Q.   -- who she was?

 4  A.   Yes, I did.

 5  Q.   And what did she say?

 6  A.   She stated that she's a very thin young lady,

 7  very blond, light blond hair, mole under her right

 8  breast, mole or mark near her -- near, I believe,

 9  the right side of her belly button, and she was

10  approximately 110 pounds and A-cup sized breasts,

11  approximately.  I think, if I remember correctly,

12  she said 32A or 34A.

13  Q.   Now, the three images that you found on the

14  thumb drive that was seized from the defendant's --

15  under the defendant's bed that were titled "Josie,"

16  is that correct --

17  A.   Yes.

18  Q.   -- when reviewing those images, did they seem

19  to corroborate what you learned from Josie

20  regarding her physical description?

21  A.   Yes.

22  Q.   In what ways?

23  A.   The mole was clearly visible under the right

24  breast, pale skin, the blond hair, everything she

25  described.  She also -- I'm sorry.  She also

1  mentioned that she, at the time, was wearing or had

2  a retainer.  And in one of the pictures it kind of

3  looks like she may have had the retainer in also,

4  but it's just one more descriptor.

5  Q.  In her interview, did she say why she sent

6  these pictures to the defendant?

7  A.  Yes.

8  Q.  What did she say?

9  A.  That he requested her to do so and that she

10  felt -- she felt pressured into doing so because he

11  asked so much.

12      MR. McCOY:  Just a moment, Your Honor.

13  BY MR. McCOY:

14  Q.  You said that the communication -- previously

15  testified the communication between Josie and the

16  defendant ended in July of 2010; is that correct?

17  A.  I believe that's correct, yes.

18  Q.  And did she explain in her interview why she

19  ended the relationship/friendship?

20  A.  She, she just -- as far as I can recall, she

21  just decided she didn't want to contact him any

22  longer.

23  Q.  Did the defendant send anything to her after

24  she decided to stop contact?

25  A.  Yes.

1  Q.  What did he send her?

2  A.  Flowers.

3  Q.  Was there any note or card associated with the

4  flowers?

5  A.  Yes.

6  Q.  And what did the card say?

7  A.  I would have to refer to the report to know or

8  recall exactly.

9  Q.  Sure.  If you --

10  A.  Sure.

11  Q.  Yes.

12  A.  Okay.  It's -- may I read it directly, or

13  would you just like for me to summarize?

14  Q.  If you've had a chance to read it, can you

15  answer -- just answer the question in your own

16  words?

17  A.  Sure.  It just states that the individual's

18  sorry for what happened between them, and it was an

19  apologetic message.

20  Q.  During your interview, did Josie say whether

21  or not she received a telephone call shortly after

22  this breakup from a girl named Rebecca?

23  A.  Yes.

24  Q.  And did she know who Rebecca was?

25  A.  She knew of her.

1  Q.   Did she say how she knew of her?

2  A.   Through the defendant, I believe.

3  Q.   And what was the nature of this telephone call

4  she received?

5  A.   She had asked Rebecca what she -- what she

6  knew about Seiver.

7  Q.   So Josie had called Rebecca or Rebecca had

8  called Josie, or how did that work?

9  A.   I believe over the course of -- there was a

10 call from both, but in this instance I believe

11 Josie called Rebecca unless -- if I could refer to

12 my report again?

13 Q.   At any point did Rebecca call Josie after the

14 breakup occurred?

15 A.   I believe so, yes.

16 Q.   And what was the nature of that telephone

17 call?  Why was Rebecca calling Josie?

18 A.   During the text message that we had received

19 from the individual Rebecca, she was requested by

20 the defendant to call Josie because of a suicidal

21 issue where the defendant was stating to Rebecca

22 that he was suicidal at the time.  And he requested

23 her to call Josie.

24 Q.   Okay.  Now I want to briefly talk about, in

25 August of 2010 you conducted a search of the

1  defendant's residence, correct?

2  A.   August of 2010, yes.

3  Q.   And what -- during that search, you found

4  certain images and videos of child pornography; is

5  that correct?

6  A.   That's correct.

7  Q.   Do you remember how many you found?

8  A.   I believe the final number was approximately

9  119.

10  Q.   Images?

11  A.   Images.

12  Q.   And how many videos?

13  A.   Videos were in the 70s, I believe, if that's

14  correct.

15  Q.   Okay.  Was either Brittany -- we talked about

16  Josie, but were there images of Brittany also in

17  some of these pictures?

18  A.   Yes.  Yes.

19  Q.   Now I want to focus your attention on this

20  past summer, the summer of 2011.  At some point

21  during this past summer, were you notified by

22  Deputy Scott Shepherd of the United States Marshal

23  Service that they had intercepted certain letters

24  that had either been sent to or from the defendant

25  at his -- at the Mercer County Jail?

1  A.   That's correct.

2  Q.   All right.   And what were you informed about

3  these letters?   What were you told about these

4  letters?

5  A.   That the letters indicated some notification

6  through the sister and/or the mother to notify

7  individuals and that there may have -- may have

8  been one person that appeared to be underage that

9  -- so, the letters themselves were in question.

10  Q.   And who was this one individual who appeared

11  to potentially be underage?

12  A.   I believe that was Vanessa Sotelo.

13  Q.   Did you send a lead out then to Chicago

14  regarding her?

15  A.   I did.

16  Q.   That was to Agent Buck, James Buck?

17  A.   Yes.

18      MR. McCOY:   I'm approaching the witness, Your

19  Honor, presenting him with two letters there.

20  BY MR. McCOY:

21  Q.   Can you please explain to the Court what those

22  are?

23  A.   One is a letter to Hester Stevens in Prince

24  Rupert, British Columbia.

25  Q.   And the other?

1  A.   The other is a message sent from the defendant

2  to April Addis, his sister, to have him -- her

3  contact Rebecca on Facebook and to send the

4  particular message that was written.

5  Q.   Now I want to focus in on that letter in

6  particular right now, this letter to April.

7       MR. McCOY:  Your Honor, the government would

8  admit these two letters as Government's Exhibit 3

9  and 4.

10      THE COURT:  Any objection?

11      MR. TASEFF:  No other objections, but subject

12  to the objections raised in our PSR, Judge.

13      THE COURT:  Understood.

14 BY MR. McCOY:

15 Q.   Looks -- scroll about a quarter of the way

16 down the page.  There is a request -- or there's a

17 request in this letter for April to contact a girl

18 named Rebecca on Facebook; is that correct?

19 A.   That's correct.

20 Q.   And there's been -- there's a rather lengthy

21 message that the defendant wanted her to send to

22 his -- wanted April to send to Rebecca; is that

23 correct?

24 A.   That is correct.

25 Q.   That follows.

1    Were you able to determine who this Rebecca
2  was?
3  A.  Yes.
4  Q.  And what did you find out about her?
5  A.  That she is currently 17 but had been in
6  contact with the defendant since the age of
7  approximately 14.  She's a resident of Florida,
8  near the Tampa Bay area, and resides with her
9  mother, Susan.
10  Q.  And have you had a chance to interview
11  Rebecca?
12  A.  I have, over the phone, yes.
13  Q.  All right.  And what, if anything, did she
14  tell you about her friendship/connection with the
15  defendant in this case, Ronald Seiver?
16  A.  That they met on blogTV; that they were in
17  contact on Skype as well as MSN; that they would
18  talk about various things, but he would always
19  allude to sexual relations or trying to get her to
20  take clothes off, things like that.
21  Q.  Did she ever take her clothes off for him or
22  send him any videos or images of herself?
23  A.  She stated that she did not.
24  Q.  That she did not?
25  A.  That she did not.

1   Q.   Did he ever send her any photographs of

2   himself, either clothed or naked?

3   A.   I believe one of the texts that were sent in

4   the Skype was of his penis, but I believe the --

5   just by what you read and you can tell what she's

6   saying and -- but I believe that text, whenever we

7   looked it up, the http, whatever the remainder was

8   not able to be pulled up.

9   Q.   And just stepping back a minute, you said that

10  she met him on blogTV, correct?

11  A.   I believe so, yes.

12  Q.   Did she say how old she was when she met him?

13  A.   Between the ages of 13 and 14.

14  Q.   Now, did she say if she knew a girl named

15  Josie?

16       I'm sorry.  Did you answer?

17  A.   She knew of a girl named Josie, yes.

18  Q.   And how did she know about this girl, or what

19  did she know about her?

20  A.   The defendant had requested her, as I said

21  before, in the Skype text that we received, shows

22  that he requested her to -- or, yes, her to contact

23  her phone number.

24  Q.   Okay.

25  A.   As well as spoke about her in general as his

1  girlfriend and things like that.

2  Q.   Now I want to go back to the letter that we

3  were just talking about, the one that's addressed

4  to April that has a message going out to Rebecca on

5  Facebook.  If I can, if you can turn to page -- if

6  you can turn to page four.  Actually it's listed as

7  five on the top as the fax number page.  And just

8  review that paragraph.

9  A.   The top paragraph?

10 Q.   Yes, exactly.  What is the defendant asking

11 her in that paragraph?  Who is he talking about?

12 A.   He's talking to Rebecca, saying that Josie

13 told the police on Rebecca.

14 Q.   Okay.

15 A.   That she had just mentioned her name to the

16 police.

17 Q.   In this letter, did the defendant ask Rebecca

18 to send him any pictures of herself?

19 A.   I believe so, yes.  I don't recall.

20 Q.   I'm just advancing forward to the end of the

21 letter itself here.  So, this is -- just to be

22 clear, this is a message that he wants sent to

23 Rebecca, correct --

24 A.   Yes.

25 Q.   -- that preceded this?  And then there's a

1  break.  And then there's another message that he
2  wants sent to some girl named Jamie?
3  A.   To Jamie, correct.
4  Q.   And these letters were intercepted by the
5  jail; is that correct?
6  A.   That is correct.
7  Q.   Now, did Rebecca tell you how she had been
8  communicating with the defendant after his arrest
9  in August of 2010?
10  A.   By phone as well as, I guess, just simply
11  through April on Facebook.
12  Q.   And why is it that the defendant was having
13  April send these messages on Facebook and he
14  wasn't?  This sounds like a self-obvious question,
15  but if you could answer it?
16  A.   It would be because no access to the Internet
17  in the jail.
18  Q.   So she said that she had been communicating
19  with him over the telephone when he was in jail; is
20  that correct?
21  A.   That's correct.
22  Q.   After you received this information, did you
23  attempt to acquire some of the telephone calls --
24  the recordings of telephone calls made by the
25  defendant from the Mercer County Jail?

1   A.   Yes.

2   Q.   And did you acquire those recordings?

3   A.   I did.

4   Q.   Did -- when you were provided with the

5   recordings, were they broken down into two groups

6   -- one collect calls and one prepaid calling card

7   type calls?

8   A.   Yes, they were.

9   Q.   I want to focus just on the prepared calling

10  card type calls if we can and not worry about the

11  collect calls.

12       With those calls, how many in total -- let me

13  ask this question:  What was the time frame covered

14  with the calls that you received from the Mercer

15  County Jail, the recordings of calls?

16  A.   Approximately September -- late September of

17  2010 until July of 2011.

18  Q.   Okay.  And why is -- what happened in July of

19  2011 that would have stopped these calls from

20  coming from the Mercer County Jail?

21  A.   Being transferred to Knox County.

22  Q.   Who was transferred to Knox County?

23  A.   The defendant.

24  Q.   Okay.  So this is the time frame then.

25  That's, what, approximately ten months of telephone

1   calls?

2   A.   Approximately.

3   Q.   During that ten months of telephone calls, how

4   many prepaid calls had been made by the defendant?

5   A.   I believe we counted close to 120.

6   Q.   And of those 120 calls, were you able to

7   determine how many had been made to Rebecca?

8   A.   Yes.

9   Q.   How many?

10  A.   Approximately 32 to 35.

11  Q.   And how were you able to determine that

12  number?

13  A.   By the, the number -- the phone number itself

14  is located next to the phone call itself.  And the

15  phone number was confirmed that it was Rebecca's

16  during the interview and other lead -- like through

17  Clear and things like that.

18  Q.   What's the area code for that number?

19  A.   813, I believe.

20  Q.   So there were approximately 32 phone calls

21  that you saw during that nine-, ten-month period

22  made to that 813 area code?

23  A.   That's correct.

24  Q.   Were there any other calls of interest that

25  you discovered when reviewing those 120 prepaid

1  calls?

2  A.   Yes.   There's another female named Morgan, and

3  I believe there's approximately 15 calls to her.

4  Q.   And where does Morgan live?

5  A.   In Massachusetts.

6  Q.   Once you were able to identify Morgan, did you

7  send a lead out to Massachusetts for her to be

8  contacted and interviewed?

9  A.   I did.

10  Q.   And what, if anything, resulted from that

11  contact?

12  A.   During the interview, she was asked what --

13  how the defendant and her began speaking.  That was

14  on a blogTV junior site.  I believe she was -- she

15  stated that she was 14 at the time.

16  Q.   She was 14 years old at what time?

17  A.   At the time of the contact.

18  Q.   First contact with?

19  A.   With the defendant.

20  Q.   And how did she identify the defendant?  How

21  did she know that, that she was communicating with

22  Ron Seiver?

23  A.   I believe at first she, she stated that she

24  knew his name started with an "R"; it was Ron or

25  Robert.  And when agents asked her if the name

1  sounded familiar, she stated yes.  I believe she

2  also called him Slice or something like that, like

3  that was his name online.

4       THE COURT:  Mr. McCoy?

5       MR. McCOY:  Yes.

6       THE COURT:  Is this witness planning to leave

7  after his testimony, or would he be available this

8  afternoon?

9       MR. McCOY:  He's available all day, Your

10  Honor.

11       THE COURT:  Is that correct?

12       THE WITNESS:  Yes.

13       MR. McCOY:  I won't speak for him, but that's

14  my understanding.

15       THE COURT:  So would it be okay if we broke

16  here because I do have a commitment at noon and

17  that way we don't rush the rest of you, and we

18  don't rush Mr. Taseff.

19       MR. McCOY:  Yes, Your Honor.

20       THE COURT:  Fair enough?

21       MR. TASEFF:  Yes.

22       THE COURT:  All right.  Let's recess until --

23  we'll resume again no later than 1:30.  Let's plan

24  on 1:30.  Okay?  Thank you.

25       MR. TASEFF:  1:30, Your Honor?

1          THE COURT:  Pardon?

2          MR. TASEFF:  1:30, you said?

3          THE COURT:  1:30.

4          MR. TASEFF:  Thank you.

5          THE CLERK:  Court is in recess.

6          (Recess at 11:55 a.m. to 1:43 p.m.)

7          THE COURT:  All right.  Mr. McCoy, ready to

8   resume?

9          MR. McCOY:  Yes, Your Honor.

10  BY MR. McCOY:

11  Q.  Agent Haferkamp, we'll pick up where we left

12  off.  We were talking about Morgan.

13  A.  Okay.

14  Q.  And you came upon this girl's name and

15  telephone number when reviewing some of the

16  recorded jail calls from the defendant out at

17  Mercer County Jail; is that correct?

18  A.  That's correct.

19  Q.  Okay.  So a lead was sent out to where Morgan

20  lives?

21  A.  That's correct.

22  Q.  And where does she live?

23  A.  In Massachusetts.

24  Q.  And was she subsequently interviewed?

25  A.  Yes, she was.

1  Q.  And what did she tell agents during the

2  interview?

3  A.  She stated that -- she stated her age to be

4  approximately 14 years old at the time of contact

5  with the defendant, that they had met through

6  blogTV.  But specified that there is two sections

7  of blogTV, that being Juniors and Seniors and that

8  they met through the Juniors section.

9  Q.  Was she asked or did she -- well, did she say

10 whether or not the defendant knew her age at the

11 time that they were communicating on blogTV?

12 A.  Yes, she stated that the defendant was aware

13 that she was 14 years old.

14 Q.  At any point during the interview did -- was

15 she asked and did she know about a girl named

16 Josie?

17 A.  Yes.  I believe the agents asked if she was

18 aware of or recognized a "josie says hi" as a blog

19 name.

20 Q.  And what did she say?

21 A.  Yes.

22 Q.  Did she say anything else about any contact

23 she had with Josie or any activity she had in

24 relation to that particular account?

25 A.  During the interview I don't believe so, but

1    through phone calls, there was other contact.

2    Q.   So she said nothing during the interview about

3    Josie and blogTV?

4    A.   There -- I could refresh my memory by the

5    report if you want.

6    Q.   Yes, if you could, please.

7    A.   More specifically that the defendant asked

8    Morgan to view her profile.

9    Q.   To view whose profile?

10   A.   Josie.  The "josie says hi" profile.

11   Q.   And on what site was she asked to do that?

12   A.   On blogTV, I believe.  Yes, that's correct.

13        MR. McCOY:  I'm approaching the witness, Your

14   Honor.

15        THE COURT:  You may.

16   BY MR. McCOY:

17   Q.   Do you recognize this?

18   A.   I do.

19   Q.   What is it?

20   A.   This is a transcript of a phone call made from

21   the defendant to Morgan at an area code of -- or

22   the phone number 774-289-5782.

23   Q.   Were you able to determine during the course

24   of your investigation whose phone number that was,

25   the 774 number?

1  A.  It was all back to the Massachusetts area

2  initially; and that the phone number itself is

3  actually owned by her father, but the phone number

4  itself was given to Morgan to use.

5  Q.  Did she admit during the interview that that

6  was the phone number that she had?

7  A.  Yes.

8  Q.  And this is a transcript of a -- one of the

9  recorded jail calls that occurred between the

10  defendant and Morgan?

11  A.  That's correct.

12  Q.  And what date again is that?

13  A.  1/17/11.

14  MR. McCOY:  Your Honor, I'd like to admit the

15  transcript as Government Exhibit 5.

16  THE COURT:  Any objection?

17  MR. TASEFF:  No.

18  MR. McCOY:  I also, Your Honor, would like to

19  play a portion of that -- actually two portions of

20  that call if the Court would allow.  I have here

21  the audio-only recordings as an exhibit as well.

22  This will be Government Exhibit 6 for the Court.

23  THE COURT:  Any objection?

24  MR. TASEFF:  No.

25  THE COURT:  Be admitted.  You may.

1     MR. McCOY:  At this time I'd like to play clip
2  two from that January 17th call.
3     (Audio commenced and paused.)
4     MR. McCOY:  At this time, Your Honor, I'd like
5  to play a second clip from the same call.  It's
6  clip three, starting about a minute later.
7     (Audio commenced and paused.)
8  BY MR. McCOY:
9  Q.  All right.  Before we broke for lunch, you
10  mentioned another -- a telephone number that was
11  linked to a girl in Florida, correct?
12  A.  Yes.
13  Q.  And that was Rebecca?
14  A.  Yes.
15  Q.  Her number was an 813 area code?
16  A.  That's correct.
17     MR. McCOY:  Approaching the witness, Your
18  Honor.
19  BY MR. McCOY:
20  Q.  Do you recognize that?
21  A.  I do.
22  Q.  What is it?
23  A.  It is the transcript of the call from the
24  defendant to Rebecca on 9/29/10.
25  Q.  Did you listen to that call?

1  A.  I have.  I've also read the transcript as

2  well.

3  Q.  Does the transcript accurately reflect what

4  you heard on the call?

5  A.  Yes.

6      MR. McCOY:  Your Honor, I'd like to admit this

7  as Government Exhibit 7.

8      THE COURT:  Any objection?

9      MR. TASEFF:  No.

10     MR. McCOY:  It's also included on the audio

11  which has been admitted as Government Exhibit 6.

12  If the Court would allow, I'd like to play a single

13  clip from this call as well.

14     THE COURT:  You may.

15     MR. McCOY:  That will be clip three, I

16  believe.

17     (Audio commenced and paused.)

18  BY MR. McCOY:

19  Q.  I think you might have already stated this,

20  Agent Haferkamp, but what was Rebecca's age at the

21  time this phone call was made in September of 2010?

22  A.  September of 2010, she -- I know that her

23  birthday's somewhere around that, so she would have

24  been either 15 or turning 15.

25  Q.  And how old was Morgan at the time of the call

1  in January of 2011?

2  A.   I think she was -- I can't be exact, but --

3  without looking at her date of birth, but I believe

4  she was 14 or 15.

5       MR. McCOY:  Those are all my questions, Your

6  Honor.

7       THE COURT:  Mr. Taseff.

8                    **CROSS-EXAMINATION**

9  BY MR. TASEFF:

10 Q.   We have sat in this courtroom and heard this

11 term "blogTV" over and over and over.  Do you know

12 what blogTV.com is, Agent?

13 A.   It's a site where you can go and social --

14 it's a social site.  You can get on it --

15 Q.   Social networking site similar to MySpace --

16 A.   Somewhat, yes.

17 Q.   -- Facebook, the other sites that we've heard

18 about as well, correct?

19 A.   Yes.

20 Q.   It's like the other sites where other officers

21 issued subpoenas to get copies of records to

22 confirm with solid proof what's being posted there,

23 correct?

24 A.   Some of the other officers may have done that.

25 That's correct.

1    Q.   Well, did you or any other officer connected

2    to this case serve a subpoena upon blogTV.com to

3    confirm what it is that Josie Little had posted

4    there as we heard from the phone conversation

5    between Morgan and Ronald Seiver this past year?

6    A.   I personally -- I personally have not, but I

7    have tried to get in contact with blog Television.

8    Q.   But you're the case agent, right?

9    A.   That's correct.  But once --

10   Q.   And this case has been pending for over a

11   year, correct?

12   A.   As I just said, I have tried to contact blog

13   Television, and they are based out of, I believe,

14   Sri Lanka -- not Sri Lanka, but some foreign

15   country where you can't even contact them by

16   Internet or --

17   Q.   What agency do you work for?

18   A.   Immigration and Customs Enforcement.

19   Q.   Immigration and Customs Enforcement.  And you

20   can't get something from Sri Lanka or any other

21   international business entity?  Is that what you're

22   telling Judge Shadid?

23   A.   I can't say there's no possible chance of

24   doing so, but --

25   Q.   Well, let me ask you this:  You had -- as case

1  agent, you referred a collateral to agents in

2  Atlanta, Georgia, didn't you?

3  A.   I did.

4  Q.   And those agents out of Atlanta went to

5  interview Josie Little in person, didn't they?

6  A.   That's correct.

7  Q.   And, indeed, they went to see her on

8  November 10th of 2010, was it?

9  A.   That's correct.

10  Q.   My, how time flies.

11       And back in 2010 when the agents went to talk

12  to Josie Little, they interviewed her in the

13  presence of both of her parents, didn't they?

14  A.   That's correct.

15  Q.   And Josie Little told the Atlanta agents in

16  the presence of both of her parents that she did

17  not send any pictures to Ronald Seiver, correct?

18  A.   I believe that's what she stated initially.

19  Q.   That's what she said in the presence of her

20  parents to two federal law enforcement officers who

21  interviewed her in November of 2010?

22  A.   I believe she also recanted in the same --

23  Q.   Well, she denied sending pictures, correct?

24  A.   Initially.  In the interview --

25  Q.   And then the agents who aren't here to testify

1  said something to the effect about giving false

2  statements to federal agents?

3  A.   I believe -- I can read verbatim from the --

4  from the report if you'd like me to.

5  Q.   Well, it says here, Agent Scott asked her to

6  be completely honest in her answers.

7       Is that what Agent Scott actually said?

8  That's what the report says.

9  A.   Right.  And the --

10  Q.   But the interview was never recorded, was it?

11  A.   I don't believe it was audio recorded.

12  Q.   We don't have the agent's handwritten notes,

13  do we?

14  A.   I don't --

15  Q.   They're probably destroyed, weren't they?

16  A.   I'm not sure about that, sir.

17  Q.   So, Josie initially says, I never sent him

18  pictures.  But when confronted and told, It's

19  really important to tell the truth, and with Mom

20  and Dad sitting right there, now she starts talking

21  about Ronald Seiver and mentioning that she sent

22  approximately 20 photographs to him over the course

23  of the relationship, correct?

24  A.   Correct.

25  Q.   Now, since we've never subpoenaed blogTV or

1  know what Josie Little was posting on that social

2  network, we don't know whether she was posting her

3  own nude pics on blogTV, do we?

4  A.   From, from what was interviewed with the

5  agents --

6  Q.   We don't know that, do we, Officer?

7  A.   I can't say yes to that.  No.

8  Q.   So we take the girl's word for it that she

9  sent as many as 20 images, according to this

10 report, correct?

11 A.   That's correct.

12 Q.   Now, you were part of the search team that

13 searched Mr. Seiver's home in August of 2010,

14 correct?

15 A.   That's correct.

16 Q.   So, Josie would have been interviewed a month

17 or two later?

18 A.   Yes, approximately.

19 Q.   You seized a thumb drive, didn't you?

20 A.   That's correct.

21 Q.   And on that thumb drive were pictures of

22 various young girls, correct --

23 A.   That's correct.

24 Q.   -- according to the forensic report that was

25 done by Agent Price?

1   A.   That's correct.

2   Q.   And there were three photographs on that thumb

3   drive --

4   A.   That's correct.

5   Q.   -- weren't there?

6   A.   Yes, with the name Josie in them.

7   Q.   Now, was Josie Little ever furnished with hard

8   copies of those photographs to confirm that that's

9   her?

10  A.   No.

11  Q.   Have you or any forensic agent been able to

12  confirm where those images came from, the source of

13  the images?

14  A.   The forensics agent may have put that in her

15  report.   It's a very lengthy report, as you've

16  seen.

17  Q.   And much of it is in computerese, and I can't

18  make sense of it.

19  A.   Right.

20  Q.   We can't tell whether that was retrieved from

21  blogTV or from any other social networking, can we?

22  A.   I can't say that because I'm not the forensics

23  officer.   She, she would be able to tell you

24  whether or not --

25  Q.   Well, can you give Judge Shadid any proof

1  showing conclusively where those three photographs

2  originated?

3  A.   I have viewed those myself, and from the

4  description that I have been given directly from

5  Josie of herself, it matches the description of the

6  photos exactly.

7  Q.   Well, but you've never met her in person, have

8  you?

9  A.   No.

10  Q.   You've never seen her in person?

11  A.   No.

12  Q.   She's never met you?

13  A.   That's correct.

14  Q.   And you're exchanging -- you never exchanged

15  or gave her the photographs themselves, did you?

16  A.   That's correct.

17  Q.   Nor any other agent that you know?

18  A.   That's correct.

19  Q.   Nor do you know those came from her -- how did

20  she say she sent those pictures to Seiver?

21  A.   Originally, I believe, by e-mail.  Took

22  pictures of them with her -- or herself with her

23  phone.

24  Q.   So, assuming she's got a cell phone in hand,

25  she's taking pictures of herself?

1  A.   I believe that's what's stated in the report.

2  Q.   Then transmitting those images via the

3  Internet off the cell phone, correct?

4  A.   I believe so.

5  Q.   So, if the I.C.E. agents, your agency and

6  these state -- the Illinois State -- was it

7  Illinois Attorney General that was involved in this

8  investigation?

9  A.   Yeah, part of the investigation.

10  Q.   The Department of Homeland Security, correct?

11  A.   That's correct.

12  Q.   An alphabet soup of federal and state

13  agencies.  If any one of those agencies or any

14  number of the agents had served a subpoena on Josie

15  Little's Internet service provider or phone

16  company, phone service provider, they could have

17  found proof of the transmittal of an image file off

18  of a cell phone, couldn't they?

19  A.   It depends on if it was destroyed or deleted.

20  Q.   But that was not even attempted in this case,

21  was it?

22  A.   I believe that's correct.

23  Q.   Because you and the other agents chose to take

24  Josie Little's word for it, didn't you?

25  A.   Along with the forensics that was given and

1  the description of the suspect, there's --

2  Q.   Well, in this case and on this point, we're

3  talking about Josie Little --

4  A.   Okay.

5  Q.   -- and the probation office saying that she

6  transmitted images of herself constituting child

7  pornography to Ronald Seiver at Ronald Seiver's

8  request.

9       Now, you can't prove that to Judge Shadid by

10 any other means besides her word to the agents, can

11 you?

12 A.   Or the fact that the description of her

13 exactly was in his possession, on his thumb drive.

14 Q.   The description is one thing, but the source

15 of where that came from.  If it were posted on

16 blogTV, anybody in the world with access to that

17 site could get it, couldn't they?

18 A.   That's possible, but --

19 Q.   And you didn't rule out --

20 A.   -- the suspect in the case had it in his

21 possession so I think the question itself is

22 irrelevant.

23 Q.   But how did he get it?  We don't know that, do

24 we?

25 A.   Through either e-mail or through texting, as

1  stated by the person who was interviewed.

2  Q.  By downloads?  You can do that, too, right?

3  A.  Or uploads, yeah.

4  Q.  Yes.  So you agree with me there, right?

5  A.  Sure.

6  Q.  Now, obviously from these chats or from this

7  phone traffic we're getting, Josie Little and

8  Rebecca Valdez are pretty much on a first-name

9  basis with each other, weren't they?

10 A.  They at least knew their first names, yes, I

11 believe.

12 Q.  And I believe you earlier testified -- didn't

13 I hear you say that Josie called Rebecca at one

14 point?

15 A.  Yes.

16 Q.  So, Josie in Georgia knew how to get ahold of

17 Rebecca?

18 A.  That's correct.

19 Q.  So stuff's going on between those two and

20 possibly others, all parties to blogTV as to their

21 social networking, right?

22 A.  Correct.

23 Q.  So when we listen to this phone call about

24 Seiver saying, Well, "josie says hi," she's

25 accessing -- Rebecca is accessing or Morgan is

1  accessing Josie Little's profile on blogTV?

2  A.   That's correct.

3  Q.   Now, can you tell Judge Shadid what was on

4  blogTV involving Josie Little that triggered the

5  response that Mr. Seiver is heard on that phone

6  call?

7  A.   Could you rephrase the question?  I don't

8  understand.

9  Q.   Could you tell Judge Shadid, can you show him

10  any proof what was on that site?

11  A.   On that particular one?

12  Q.   On blogTV?

13  A.   No.

14  Q.   That triggered the response of Mr. Seiver with

15  the exclamation and the expletives that we heard?

16  It stands to reason something was there that he

17  didn't approve of, correct?

18  A.   I, I heard the same thing.

19  Q.   What could that have been?  Maybe a nude pic

20  of her own that she was doing?

21  A.   Possibly, yes.

22  Q.   Yes.

23  A.   I can't speculate.  I didn't see it as

24  yourself did not see it, so --

25  Q.   Apparently Rebecca knew how to get ahold of

1  Josie because Josie claims she got a phone call

2  from Rebecca in the summer of 2010, correct?

3  A.  I believe that's correct.  And also if you --

4  if I can go into that a little bit further, texts

5  that were given to agents from Rebecca in those

6  Skype texts, the defendant also instructs her to

7  call Josie and gives her the same phone number.

8  Q.  So there's phone numbers galore here, aren't

9  there?  At least phone traffic from both sides,

10  Josie to Rebecca, Rebecca to Josie?

11  A.  I don't know how often they called each other,

12  but I believe they spoke at least a few times.

13  Q.  Well, we heard you say you counted how many

14  phone calls that Mr. Seiver made to Rebecca and how

15  many phone calls that Morgan was called, correct?

16  A.  Correct.

17  Q.  Did you or any agents ever confirm through

18  phone records how many phone calls were ever placed

19  between Rebecca and Josie?

20  A.  No.

21  Q.  Between Josie and Rebecca?

22  A.  No, we did not.

23  Q.  Between Rebecca and Ronald Seiver?

24  A.  Other than just the phone calls at -- from the

25  Marshall County Jail, no.

1  Q.   So those records weren't sought either?

2  A.   No.   They weren't -- you say were not sought

3  out?   Is that what you said?

4  Q.   Well, they were never subpoenaed, were they?

5  A.   No, they were not.

6  Q.   Now, obviously, this Rebecca -- how old is

7  she?

8  A.   Rebecca, I believe she just turned 17.   And

9  stated that they had been in contact since

10 approximately the age of 14 when she was in eighth

11 grade.

12 Q.   A young innocent she isn't, correct, in your

13 opinion?

14 A.   I, I would not give my opinion on that.

15 Q.   Well, she's obviously using -- she's talking

16 the talk, isn't she?

17 A.   Well, sure.

18      MR. McCOY:   Objection, Your Honor.   I'm not

19 sure where -- how the witness can answer that

20 question.   I'm not sure what he expects from her.

21 BY MR. TASEFF:

22 Q.   She's talking in a rather salty manner?

23      THE COURT:   Let's move on.

24 A.   Using curse words and so on, yes.   I would

25 agree with that.

1        MR. TASEFF:  Your Honor, those are my

2   questions.

3        THE COURT:  Mr. McCoy.

4        MR. McCOY:  Yes, Your Honor.

5                **REDIRECT EXAMINATION**

6   BY MR. McCOY:

7   Q.  I'm going to start with where Mr. Taseff just

8   left off and work backwards, but -- or at least

9   close to where he stopped.

10       He had asked about how she -- Rebecca got

11  ahold of Josie's telephone number.  Do you have any

12  idea how she might have gotten ahold of that

13  telephone number?

14  A.  I, I know that Rebecca was given the number by

15  Seiver -- or the defendant, sorry, through, through

16  text messages on Skype.

17       MR. McCOY:  Your Honor, I'd like to admit

18  another transcript from a call which directs --

19  which directly pertains to this issue of how the

20  phone number was given from Mr. Seiver to Rebecca.

21       THE COURT:  Mr. Taseff?

22       MR. TASEFF:  Is this within the scope of

23  cross?

24       MR. McCOY:  It is.  He opened the door when

25  saying -- questioning how she got the phone number

1    in the first place.  This clip explains exactly how
2    she got the phone number.
3         THE COURT:  Why don't you offer the exhibit
4    and then we'll address it, or ask the witness to
5    identify it and then we'll address it.
6    BY MR. McCOY:
7    Q.  Do you recognize that?
8    A.  Yes.  It's another one of the transcripts of
9    phone calls between the defendant and Rebecca.
10   Q.  And what was the date of that call?
11   A.  10/15/10.
12   Q.  Have you listened to a recording of that
13   telephone call?
14   A.  I've listened to many.  If I could just read a
15   few of the lines, I'll probably be reminded for
16   sure.
17        Yes.  I've, I've listened to it.
18   Q.  Okay.
19        MR. McCOY:  I'd like to move to admit that,
20   Your Honor, as well as play -- it's about a
21   minute-long clip.
22        THE COURT:  Any objection?
23        MR. TASEFF:  None at this time, Judge,
24   depending on what is going to be revealed.
25        THE COURT:  Okay.

1    MR. McCOY:  May I play the clip, Your Honor?

2    THE COURT:  You may.

3    MR. TASEFF:  Do we have a page or what number

4  this is on?

5    MR. McCOY:  This is starting at nine seconds

6  -- I'm sorry, I've got the wrong number.

7    THE WITNESS:  1:52.

8    MR. McCOY:  1:52.

9    (Audio commenced and paused.)

10    MR. TASEFF:  Judge, I'd object at this point.

11  This is beyond, beyond the --

12    THE COURT:  Just hold on.  All right.  This is

13  the end of it?

14    MR. McCOY:  This is it, Your Honor.

15    THE COURT:  The objection is?

16    MR. TASEFF:  Beyond the scope of the cross.

17  You cut it off right at the point where --

18    MR. McCOY:  He asked to go out --

19    THE COURT:  That's fine.  I'll sustain that

20  objection, strike the portion about dating and

21  everything thereafter.

22  BY MR. McCOY:

23  Q.  Mr. Taseff asked you a lot of questions about

24  how Rebecca would have gotten the telephone number.

25  After listening to that clip -- I'm focusing in on

1    2:37.  Mr. Seiver said -- the defendant says, Still

2    have her number?

3         The response is, No, I never had her number.

4         Is that correct?  Is that what you heard on

5    the recording?

6    A.   Yes.

7    Q.   I direct your attention at -- or 3:40 -- let

8    me get to that point.

9    A.   It's clip three, correct?

10   Q.   Based on reading that, that portion -- that's

11   right, clip three, 3:40.

12   A.   "Jail's boring in here" portion?

13   Q.   No.  3:43 on that same call.

14   A.   43, I'm sorry, yes.  Okay.  "So I'm" -- "So

15   I'm laying on the bed" portion?

16   Q.   No.  Am I giving the wrong time here?  Page

17   three.

18   A.   Okay.

19   Q.   Which transcript do you have in front of you?

20   A.   I have the 10/15/10.

21   Q.   Okay.  Are you on page three at 3:39?

22   A.   "And they have her phone"?

23   Q.   Yes.

24   A.   Okay.

25   Q.   Does it appear from that interchange that

1  follows that Rebecca knew Josie at that time?

2  A.  Yes.

3  Q.  That she did know her?

4  A.  That she did know of -- that he did know her,

5  I'm sorry.

6      Is that -- could you rephrase the question?

7  Q.  Is it clear whether or not Rebecca knew Josie

8  with that interchange that occurs between 3:49 and

9  3:48?

10 A.  It doesn't appear to from the transcripts,

11 but --

12 Q.  Mr. Taseff asked you a lot of questions about

13 these photographs.  Particularly when Josie was

14 interviewed back in November 2010 she said --

15 initially said that she did not send any

16 photographs; and then, after she was reminded about

17 how important it is to tell the truth, she admitted

18 to sending 20 photographs.  Is that correct?

19 A.  That's correct.  But it's also important to

20 point out that the officers let her know that there

21 was a disk -- or not a disk, but it states in the

22 report, but a thumb drive found with photos.  And

23 then after, after that was said, she said yes, I

24 did send photographs of myself.

25 Q.  And on that thumb drive, as you previously

1    testified, there were three photographs, correct,

2    of a girl matching the description of Josie; is

3    that correct?

4    A.   That is correct.

5    Q.   Now, you've interviewed Josie; is that

6    correct?

7    A.   Yes, I have.  Yes.

8    Q.   And when you interviewed her, did you get

9    certain physical descriptors from her?

10   A.   I did.

11   Q.   And did the descriptions that you received

12   from her match those of the girl pictured in the

13   three photographs found on the defendant's thumb

14   drive?

15   A.   They did.

16   Q.   So, in fact, she did corroborate --

17        MR. TASEFF:  Objection, argumentative.

18   BY MR. McCOY:

19   Q.   When the defense attorney asked you that there

20   was no corroboration in regards to what she said

21   about sending these photographs, is that true?

22   A.   I wouldn't say that that's true in --

23        MR. TASEFF:  Objection.  That's an improper

24   question.

25        THE COURT:  You know what?  I'll let both of

1  you argue that point to me.

2       MR. McCOY:  Okay.  Sorry, Your Honor.

3       THE COURT:  Let's move on.

4       Although I guess it would be fair to ask if he

5  would have answered that question from Mr. Taseff

6  differently at this point, given this, but let's

7  move on from this.  Let's move on.

8       MR. McCOY:  Sure.  Just a couple more

9  questions, Your Honor.

10  BY MR. McCOY:

11  Q.  The three photographs that were found on the

12  forensic analysis of the defendant's thumb drive

13  that appear to be that of Josie, were they titled

14  with anything?  Were they named anything?

15  A.  Yes.

16  Q.  And if so, what?

17  A.  In the title, the name or word "Josie" is in

18  the title.

19  Q.  And who at the forensic analysis -- had Ellen

20  Price, the forensic analysis person, had she -- was

21  she the one who titled these photographs?

22  A.  No, she did not.  They remained the same.

23  Q.  So those were the titles that had been on the

24  photographs at the time that the agents seized the

25  thumb drive?

1    A.   That is correct.

2         MR. McCOY:   Those are all my questions, Your

3    Honor.

4              **RECROSS-EXAMINATION**

5    BY MR. TASEFF:

6    Q.   This transcript of a telephone conversation we

7    heard of October 15th, 2010 --

8    A.   Yes, sir.

9    Q.   -- wherein Rebecca purports not to know the

10   phone number for Josie, correct --

11   A.   That's correct.

12   Q.   -- you commissioned the collateral report from

13   the agents in Atlanta, Georgia, correct?

14   A.   That's correct.

15   Q.   Josie Little told those agents that in the

16   summer of 2010 a girl claiming her name to be

17   Rebecca contacted her during the time when Seiver

18   was threatening to commit suicide, correct?

19   A.   That's correct.

20   Q.   The summer of 2010, Josie Little gets a phone

21   call from Rebecca?

22   A.   That's correct.

23        MR. TASEFF:   Thank you.

24        MR. McCOY:   Nothing further, Your Honor.

25        THE COURT:   You can step down.   Thank you,

1   sir.

2       Any more witnesses?

3       MR. McCOY:  No.  None from the government,

4   Your Honor.

5       THE COURT:  Any witnesses from the defense on

6   these issues?

7       MR. TASEFF:  No.

8       THE COURT:  Well, argument.  Do you want to

9   argue it since they're your objections and you

10  argue first, Mr. Taseff?

11      MR. TASEFF:  Does Your Honor have before the

12  Court my objections and commentary?

13      THE COURT:  I do.  Got it all.

14      MR. TASEFF:  I'll take the objections starting

15  on page two, and I'll refer to the pages and

16  paragraphs of the revised PSR dated September 26th.

17      THE COURT:  Okay.

18      MR. TASEFF:  So objection number one, page

19  five, paragraph ten, the offense conduct, we object

20  that Mr. Seiver categorically denies any threat to

21  post nude pictures of the Rantoul, Illinois, minor

22  on pornographic websites along with her address and

23  phone number in response to her ending the

24  relationship with him.  And we contend that the

25  information contained in that paragraph lacks

1  indicia of reliability to support its probable

2  accuracy.

3       I believe Your Honor may recall the testimony

4  from the very first agent today about these

5  so-called threats, that the agent could not

6  pinpoint any wording, any manner of communication,

7  any specific date, he couldn't give us anything in

8  support of what these threats constituted.  So, I

9  respectfully request that this information be

10 stricken.  It lacks indicia of reliability.

11      THE COURT:  Okay.  I think that objections

12 one, two and three should be argued at the same

13 time by you --

14      MR. TASEFF:  Very well.

15      THE COURT:  -- and then addressed by the

16 government.  That will, I think, make this a little

17 more orderly.

18      MR. TASEFF:  Same with paragraph 11.  This is

19 the Josie Little information about the photographs.

20 It says in this paragraph that the minor took nude

21 photographs of herself with her phone camera and

22 e-mailed the images to the defendant.

23      Now, this is really important because we know

24 from the forensic report, Your Honor, that there

25 were three photographs found on the thumb drive.

1  It's a storage medium that the agents found in
2  Mr. Seiver's bedroom when they executed the search
3  warrant.
4      Now, the point that I'm making here is because
5  there are further objections to what they call
6  specific offense characteristics where the argument
7  is that Mr. Seiver sexually exploited these minors
8  by misrepresenting his authority to them and then
9  inducing them to take nude pictures of themselves
10  and to send them to him -- to Seiver -- so he's
11  soliciting the production of a child pornographic
12  image if we accept the government's version.
13      All we know from the proof we've heard is that
14  images of a young woman were found on the thumb
15  drive.  The agents could not confirm the origin of
16  those images and how they would have been
17  transmitted and then transferred to a storage
18  medium.
19      So for the PSR to say conclusively the minor
20  took nude photographs of herself with her phone
21  camera and e-mailed the images to the defendant at
22  the defendant's request is not supported by the
23  evidence in this case.  We know that she had access
24  to this blogTV spot.  The agents did not seek phone
25  records that would corroborate the transmittal of

an image file from one I.P. address to another.  We
know with access to this blogTV where, obviously,
Josie Little is posting something that brought the
response that we heard audibly from Mr. Seiver
during that recorded phone call.  Something was
going on on Josie Little's blogTV spot.

So, is this finding of fact, is this factual
assertion in the PSR, does it have sufficient
indicia of reliability to support its probable
accuracy?  And I say it does not, especially since
Josie Little initially said, I never sent him nude
pictures.  And then, when confronted about
something with a thumb drive -- now, why would a
thumb drive cause her to recant?  A thumb drive is
a storage medium.  It would have had more impact, I
suspect, if they had said, We have his computer.
We have his Internet records.  We have your cell
phone records.  Even teenagers know the difference
between a thumb drive and a cell phone camera,
Verizon versus other phone service companies and
how these images transmitted can be traced through
an electronic digital trail.

So, I respectfully submit number -- this
paragraph assertion in paragraph 11 about Josie
Little taking nude photographs of herself and

1  transmitting them and e-mailing them to the

2  defendant also lacks indicia of reliability.

3       And especially with number 12, the same

4  objection there, where despite this particular

5  agent's credible efforts to basically subpoena

6  everything in sight, not one visual image ever

7  recorded.  And I believe -- correct me if I'm

8  wrong, Judge -- was she a blogTV person, too?  With

9  all the evidence we've heard here, I'm not sure.

10  Or was it MySpace?  The MySpace accounts?

11  Whatever.

12       We ask that the Court strike that language

13  from those three paragraphs as being unreliable.

14       THE COURT:  My notes indicate MySpace as to

15  that objection.

16       MR. McCOY:  Pardon me, Your Honor?

17       THE COURT:  My notes indicate MySpace.

18       MR. McCOY:  MySpace, that is correct.  It was

19  not blogTV.

20       THE COURT:  Go ahead, Mr. McCoy.

21       MR. McCOY:  Yes, Your Honor.  First, I think

22  it's worth saying that this is a sentencing

23  hearing; it's not a trial.  As I know the defense

24  attorney's well aware, the same standards of proof

25  are not required here.  But I think even applying a

1  higher standard of expectations and proof more than

2  establish the allegations that are made in

3  paragraphs 10, 11 and 12 of the presentence report.

4      And I'll go in order as the defense attorney

5  did, focusing first on Brittany.  How do we know --

6  when the agents searched the defendant's house,

7  they found a thumb drive which contained several

8  images of Brittany, as well as some video -- images

9  and video that had been taken during the sexual

10  encounters the defendant had with her in the motel

11  down in Rantoul or Urbana.

12      In addition to that, they also heard from the

13  defendant's own mouth that he'd had a relationship

14  with her, and they had taken -- and had taken

15  photographs during some of those sexual encounters.

16  So you have those two things working there.

17      So then they go and interview Brittany at the

18  sheriff's department down in Urbana.  What does

19  Brittany say?  Well, she basically corroborates

20  everything the defendant had previously said and

21  corroborated everything that the agents had found

22  in the defendant's bedroom on this thumb drive.

23      In addition to that she says, When I tried to

24  end the relationship, when I broke -- when I told

25  him I was breaking up, basically, ending it -- if a

1  15-year-old truly can break up with a 28-year-old

2  man -- she said that he got mad and threatened to

3  post some of these images on a website.  So,

4  everything Brittany said during that interview is

5  corroborated by what the defendant said or what was

6  found in the defendant's bedroom, except this one

7  little thing as to whether or not he was going to

8  or had the ability to take these images and post

9  them on a website.

10      Why would she lie about something like that?

11  Why would that be the one thing she makes up?  The

12  fact of the matter is he did have the ability to do

13  it.  He had images of her naked, in sexual

14  positions, obviously clearly embarrassing.  All it

15  took was taking those pictures and posting them to

16  whatever, whatever website that he wanted to or

17  publishing them to her family, whatever.

18      So, I think that there is enough indicia of

19  reliability to support that assertion as well in

20  that -- in that paragraph.

21      There is -- as the Court can see, this sort of

22  M.O., this modus operandi with the defendant here

23  in the sense that it's sort of the same thing over

24  and over and over again.  Going out, finding these

25  girls, getting them to take an initial picture or

1  video of themselves and then pushing them for more.
2  And if they don't, then he comes back and threatens
3  them.
4      We've got, in this case, with Josie.  Well, I
5  have to say it's kind of interesting because it's
6  almost as if the defense wants to look over here.
7  The issue is here; it's not over there.  The fact
8  of the matter is that three images of Josie were
9  found on the defendant's thumb drive which was
10  found under his bed in his bedroom.  They were
11  titled "Josie."  They were the same sequence as the
12  Brittany pictures.  In fact, they preceded the
13  Brittany pictures as well.
14      These three images were there.  The images of
15  this girl are identical to what she -- how she
16  described herself physically.  A mole under her
17  right breast.  A cup "A" breast size.  Another mole
18  down by her belly button.  Well, the pictures are
19  exactly of that.  And she provided that information
20  to us.  So, I think we can conclude pretty
21  certainly that these were images of Josie; in fact,
22  were images of her that were maintained by the
23  defendant under his bed on this thumb drive.
24      Moreover, in letters that the Court now has as
25  exhibits, in telephone calls that we've heard now

1  -- three of them -- the defendant continues to
2  reference Josie.  He seems obsessed with this girl
3  for whatever reason.  He's trying to talk to her.
4  She -- he expresses to Rebecca how upset he is that
5  she's blocking him, that she's not calling him.
6  He's increasingly upset that she is not
7  reciprocating when he's sitting in jail or at least
8  reaching out to him, communicating with him.
9       Again, the same thing:  Reach out, find these
10 girls, get them to produce images.  And when they
11 put up a roadblock to him or start ignoring him or
12 turn away from him, he gets upset.  And that's when
13 -- breaking into their user accounts on blogTV,
14 breaking into their accounts on MSN, breaking into
15 everything else.  Using Morgan, another 14-year-old
16 girl, to go in and look at this girl's e-mails,
17 Josie's e-mails.  Spiteful.  Spiteful, evil stuff
18 to see what she's up to.  Somehow he had her
19 password and her user name.  So, a man who
20 maintains the password and user names of some 15-,
21 16-year-old girl who's sitting over in Georgia, is
22 it a stretch to say he's capable of taking images
23 and posting them?  Is it a stretch that he's
24 capable of doing the things that he did with Josie
25 as far as soliciting these images from her?

127

1        And then finally Brianna.  I -- there are

2   about 15 arrows that were uncovered during the

3   course of this investigation by the Department of

4   Justice out in Oregon.  All 15 arrows point

5   squarely at the defendant.  We can go down the

6   list.  The I.P. address that was used on the day of

7   these communications, December 6th, 2009.  Where

8   does that I.P. address link you back to?  Links you

9   back to 1042 Highway 67 in Roseville.  And not just

10  that, not just to the physical address, but to the

11  subscriber's name on that account.  The

12  subscriber's name is the defendant's name, Ron

13  Seiver.

14       Excuse me, Your Honor.

15       You also have the Skype account, the

16  solecutter21.  The billing address for that account

17  takes you right back to Ron Seiver at 1042 U.S.

18  Highway 67 in Roseville, Illinois.  You have the

19  Microsoft billing address for the e-mail account

20  frayed_edges@hotmail.com.  Where does that billing

21  information take you back to?  Takes you right back

22  to Ron Seiver at 1042 U.S. Highway 67.  The credit

23  cards he used.  Everything, everything takes you

24  right back there.  So, we know who this J.C.

25  person, whoever he was, the account was set up by

1   the defendant.  He assumed this name as he did with

2   the other two girls, telling them he was 18 or 17

3   or whatever age he gave them, gave them this phony

4   picture to lure them in.  And once he got them and

5   convinced, in this case, Brianna to take a topless

6   picture, he had her.  So, what did he do?  He

7   threatened to once again basically blackmail her

8   with this picture.  "You will do more or I will

9   post this."  We heard the message that came across.

10  "Do this or it's going to get posted to your family

11  on MySpace and your friends on MySpace.  I'm going

12  to embarrass you."

13        So what does she do?  She sits down and she

14  masturbates on web cam for this guy for

15  approximately 20 minutes.  Is there an indicia of

16  reliability to support her?  Yes.  All the arrows

17  are pointing right to him in this case.  And again,

18  it fits the same M.O. that we saw with Josie, that

19  we saw with Brittany and, quite frankly, which you

20  see with how this whole investigation got started,

21  with the incident up in Canada.

22        How did we begin there?  Because someone from

23  an I.P. address that links you -- linked us right

24  back to the defendant at his address sent a message

25  with images attached to the stepmother of this

1    13-year-old girl saying, Look at what your slut

2    daughter's doing.  That's what the message said.

3         So, I think there is more than enough evidence

4    to support the accusations and the facts that are

5    contained in paragraphs 10, 11 and 12 of the PSR.

6         Thank you, Your Honor.

7         THE COURT:  Mr. Taseff, do you want the last

8    word on those?

9         MR. TASEFF:  No.

10        THE COURT:  All right.  The Court having heard

11   then as to objections one, two and three, relying

12   on all the information set forth in the presentence

13   report and having heard from the agents' testimony,

14   how their investigation began, what they did, how

15   they identified people and then how they followed

16   up with interviews, the Court believes that one,

17   two and three are appropriate; that there is plenty

18   of indicia of reliability and credibility to

19   support them.  And I will adopt, then, the

20   probation officer and the government's position on

21   those.

22        Do you want to move to objection four?

23        MR. TASEFF:  Yes, Your Honor.

24        Objection four, paragraph 21 through 22,

25   paragraph 21 -- 21 states in relevant part, The

1  defendant's conduct could be construed as

2  obstructing or impeding the administration of

3  justice, and then quotes some message that was

4  allegedly sent to the person in Rantoul, Illinois.

5  I'm assuming that's Brittany Miller.  PSR says that

6  the defendant's sister, April Seiver, sent this.

7      Now, I have read this numerous times.  And our

8  objection is that how can anything in this message

9  be construed as impeding the administration of

10  justice?  How can anything in this message amount

11  to threatening, intimidating or otherwise

12  unlawfully influencing a witness?  And how can such

13  information contained in some message that the

14  government is saying was sent to the Rantoul,

15  Illinois, person via the sister of the defendant --

16  the attribution is to the defendant having his

17  sister in some method communicating this to her as

18  a possible -- or consideration for obstruction of

19  justice.

20      THE COURT:  Can I ask you -- both parties what

21  the practical effect of this is?  I understand

22  where you're going with this.  No enhancement was

23  assigned by Probation, and it clearly seems to me

24  to be something that you want to have a record made

25  of and be able to argue ultimately as to a sentence

1   if Mr. McCoy makes some argument that this specific
2   conduct should factor into a certain sentence.
3        MR. TASEFF:  One matter -- if the Court and
4   Government Counsel were to say, We're not going to
5   consider this at all or in any way hold this
6   against him.  I mean, Probation is suggesting a
7   possible grounds for obstruction.  They don't
8   assign points, but that's not to prevent the Court
9   or Government Counsel from making hay of it.
10       Our concern, too, Judge, is not just how this
11   can be part of the influence of a sentencing
12   formulation, but how the Bureau of Prisons gets
13   ahold of this.  And if the regional designator for
14   the B.O.P. in Grand Prairie, Texas, saying, Ha,
15   further evidence of impeding the administration of
16   justice, then there are classification points that
17   can be assessed against him as well.
18       So, whether they want to argue it, whether the
19   Court wants to consider it, I find absolutely no
20   basis for this even being here.
21       MR. McCOY:  Your Honor, I have no issues with
22   the obstruction of justice.  The only -- and I'm
23   not going to be arguing about it, to be quite
24   honest with you.  The only thing that I find
25   aggravating is the attempts by Rebecca and others

1  to reach out to Josie by phone or by text message.
2  But that doesn't have anything to do with the
3  obstruction of justice that I can see directly, and
4  I will not be arguing that there was any sort of
5  obstruction of justice here.
6      THE COURT:  Well, then, for the record I'm not
7  -- I'm not going to factor this conduct in a
8  sentencing as it might pertain or be arguably
9  impeding or obstructing justice.  I think the
10  continual contact is a basis for argument at
11  sentencing, but I hope I'll be clear enough in my
12  sentence that the contact, in my mind, won't be
13  factored in as impeding or obstructing justice.
14      Now, with that in mind and with the 3553
15  indicating that if factors aren't going to affect
16  the sentencing, number C -- it's not C.  I'm
17  looking for the specific one.  If it's not going to
18  be considered, I can simply sign off on it that
19  way.
20      Mr. Taseff?
21      MR. TASEFF:  I would respectfully ask that it
22  be stricken, Judge.
23      MR. McCOY:  I have no problem with it being
24  stricken as long as I am not stricken from talking
25  about the continued contact or the attempts to

1  contact with Josie.  I'm not arguing -- as I said,

2  I'm not arguing that that's an obstruction of

3  justice issue.  I'm just saying that it's

4  aggravating, if nothing else.

5      THE COURT:  Well, then, it will be -- it will

6  be stricken.  If I hear you right, you're agreeing

7  it be stricken as it references obstruction or

8  impeding an investigation.  Fair enough?

9      MR. TASEFF:  Thank you.

10     THE COURT:  Okay.  All right.  Let's go on to

11  the next one.

12     MR. TASEFF:  Judge, we can make short order of

13  the next one, paragraph -- or objection five, page

14  11.  This is specific offense characteristics

15  relating to Count I, possession of child

16  pornography, paragraphs 30, 31, 33 and 34.  We

17  object to the imposition of upward adjustments for

18  possessing materials involving prepubescent minors,

19  paragraph 30; materials portraying sadistic or

20  masochistic conduct or other depictions of

21  violence, paragraph 31; use of a computer,

22  paragraph 33; and number of images, paragraph 34,

23  as constituting impermissible double-counting.

24     We cite an excerpt from U.S. vs. Dorvee --

25  D-o-r-v-e-e -- of the Second Circuit which is one

1  of the best statements I've seen of late for how

2  the guidelines for child pornography offenses

3  ratchet almost every case involving a defendant

4  with no prior criminal history, as Mr. Seiver, up

5  to or near the statutory maximum by assigning

6  points for factors that are prevalent and present

7  in almost every case of this nature.

8      Indeed, Chief Judge McCuskey in a case in this

9  district, U.S. vs. John Keith, aptly noted that,

10  and I quote, "Mr. Taylor" -- who's my colleague in

11  Urbana -- "knows that I" -- the judge -- "have

12  found in each and every one of these cases

13  double-counting.  They're all computer cases.  We

14  don't go to the dirty bookstore and get DVDs or

15  eight-tracks.  This is all the computer industry.

16  And eventually the sentencing guidelines will be

17  amended, I believe, and catch up to the fact that

18  it's double-counting.  But right now the law says

19  it's okay," unquote.

20      And effectively what Mr. McCoy has done in his

21  very well-written response is cite all the Seventh

22  Circuit cases where they say, yeah, these points

23  are okay even though we all know, as practitioners,

24  these factors are present in every case and take a

25  routine or a general first offender and ratchet him

1    up to a 20-, 30-year guideline range.

2        So, I make these objections knowing that

3    there's adverse authority, but I think Dorvee gives

4    the Court authority under 3553, as does the Seventh

5    Circuit.  The Court has the discretion ultimately

6    to differ on policy grounds from the guidelines and

7    to impose a sentence that is consistent with

8    3553(a).  So, I make these objections solely for

9    the record, and I'm sure the Court will consider

10   Government Counsel's citation of authority from the

11   Seventh Circuit to overrule us.

12       MR. McCOY:  Yes, Your Honor, briefly.  As the

13   defense attorney has pointed out, Dorvee has been

14   repeatedly objected by the Seventh Circuit in case

15   after case.

16       And I'll take each of his objections one by

17   one.  First, dealing with the two-level enhancement

18   for possession of material involving a prepubescent

19   minor, a child under the age of 12, obviously.

20   I'll say this:  The crime of possession of child

21   pornography includes several elements, as the Court

22   is aware.  One of the elements is that the

23   defendant, obviously, possesses images of child

24   pornography.  But what's child pornography?  Child

25   pornography is depictions of children under the age

1    of 18; a minor, basically.  And in this case we had

2    119 images and 34 videos, if I'm correct here, of

3    child pornography that was seized from the

4    defendant's bedroom.  Of those -- of the 119

5    images, 15 involved children under the age of 12;

6    some pretty graphic, terrible pictures to be

7    honest.  So, you have here 12 images out of the

8    119, so basically that leaves, if my math is

9    correct, 107 images that are of children

10   post-pubescent -- or pubescent children, rather,

11   who are engaged in some sort of sexual conduct or

12   of a lascivious display of the genitalia, whatever

13   it might be.  But then you have 15 images of

14   children under the age of 12 that are engaged in

15   sexual activity or the lascivious display of

16   genitalia.  So in that situation, it doesn't

17   matter.  All of them, for all -- whether they're

18   prepubescent or postpubescent, the defendant is

19   guilty of possessing images of child pornography.

20   But it is particularly aggravating when some of

21   those images are of children -- of prepubescent

22   children under the age of 12.  And in this case,

23   there are 15 of those.  And so that's not an

24   element of the offense.  That's its own sort of

25   aggravating, outside factor and the Court takes

1   that into consideration -- the courts have taken
2   that into consideration and that's why they assess
3   a two-level enhancement because of the seriousness
4   and the aggravation of possessing these types of
5   images.
6       In regards to the four-level enhancement for
7   the -- for possessing material that portrays
8   sadistic or masochistic conduct.  Once again, the
9   requirements for or the elements for possessing
10  child pornography is that the defendant possessed
11  images that are sexually explicit in nature.  And
12  that includes the lascivious exhibition of the
13  genitalia, obviously, or the pubic area or any sort
14  of sexual conduct; therefore, images of a minor
15  displaying the genitals in a lascivious manner by
16  itself is enough to warrant a conviction for this
17  offense.
18      However, when you have -- as we did in this
19  case -- several images of girls being brutalized,
20  being raped, in one case one girl being duct-taped
21  down, in another case a girl being held back by the
22  hair forcefully by an adult male while he has
23  sexual intercourse with her, these are particularly
24  aggravating.  And so it's not just -- I hate to say
25  this -- simply the lascivious display of the

1  genitalia of a minor; it is a minor who is being

2  brutalized through sadistic or masochistic

3  behavior.  And because of that, a four-level

4  enhancement is justified and warranted.

5      And finally, in regards to the two-level

6  enhancement for use of a computer.  Well, the

7  defense attorney's right.  Most of the time these

8  days -- most; I've even seen examples in my brief

9  time of being here.  But most of the time these

10  cases arise out of activity that occurs on the

11  computers, and the possession of the pornography

12  occurs on the computers, but that's not an element

13  of the offense.  It's not an element of the

14  offense.  And although using a computer to download

15  and possess child pornography is perhaps the most

16  common way, it is not the only way.

17      And so the fact that the defendant used a

18  laptop and his thumb drive to both acquire and

19  possess these 119 images of pornography and 34

20  videos is a specific offense characteristic that

21  applies to the defendant's conduct and, therefore,

22  an enhancement for that is also warranted.

23      So for those reasons, Your Honor, we believe

24  the two-level enhancement for the prepubescent

25  children -- images of prepubescent children, four

1  levels for sadistic or masochistic conduct, as well
2  as two levels for the use of a computer is
3  warranted in this case.
4      Thank you.
5      THE COURT:  Okay.  Mr. Taseff, anything
6  further?
7      MR. TASEFF:  No, Your Honor.
8      THE COURT:  The Seventh Circuit has made it
9  clear that these enhancements are appropriate, and
10 I find no disagreement with that, at least today.
11     So, with that in mind then, with regard to --
12 that would be with regard to objection five, but it
13 would apply then to the specific objections in six,
14 seven -- six and seven.  Is that correct?
15     MR. TASEFF:  Yes, Your Honor.
16     THE COURT:  Okay.  Are there any other
17 objections to address?
18     MR. TASEFF:  One more, Judge.  Chapter four
19 enhancement, paragraph 32, assigns five levels.
20     THE COURT:  Where is -- hold on a second.
21     MR. TASEFF:  This is objection number seven,
22 and it's to page 15, paragraph 80.
23     THE COURT:  I misspoke a second ago.  All
24 right.  I've taken care of five.  I took care of
25 six.

1          Okay.  Let's move to seven.

2          MR. TASEFF:  Objection number seven is to page

3     15, paragraph 80.

4          THE COURT:  Yes.

5          MR. TASEFF:  And going back to an earlier

6     objection, page 11, paragraph 32 of the presentence

7     report assigns five levels on the basis that, and I

8     quote, "The defendant sexually abused a minor from

9     Rantoul, Illinois."  So according to 2G2.2(b)(5),

10    increase by five levels because the defendant

11    engaged in a pattern or activity involving the

12    sexual abuse or exploitation of a minor.  So, five

13    points comes in under 2G2.2(b)(5) because of a

14    pattern or activity involving the sexual abuse.

15    Now, what does "pattern" mean?  Two or more

16    episodes, two or more victims, two or more, two or

17    more, two or more as the guidelines reference.

18         Now going to paragraph 80, once all of the

19    guideline calculations are conducted, then

20    paragraph 80 says, according to 4B1.5(b), let's

21    take that final offense level, and let's add five

22    more.  Why?  Well, it says that increase five

23    levels because the defendant's instant offense is a

24    covered sex crime and the defendant engaged in a

25    pattern of activity involving prohibited sexual

1 | conduct.  The very same language appears in two
2 | different guidelines.  Very same definitions apply
3 | to the two different guidelines.

4 | It's clear that the section four, chapter four
5 | enhancements is an additional penalty to layer on
6 | and to put on after we've already applied
7 | enhancement points for the pattern or activity
8 | involving sexual abuse and exploitation.

9 | And for the life of me -- we're talking the
10 | same offense conduct, the same predicate body of
11 | evidence justifying two five-level adjustments.
12 | And if that's not double-counting, I don't know
13 | what is.

14 | Now, we can stand here and hypothesize how
15 | there's one, little-bitty difference here so that
16 | satisfies one particular interest, and the other
17 | five points satisfies some other little particular
18 | difference.  In a way it's almost like a
19 | lesser-included offense analysis.  And I find it
20 | just mind-boggling how we can try to engage in the
21 | mental gymnastics necessary to sort out these two
22 | guideline adjustments in their application to this
23 | particular body of evidence the Court has before
24 | it.  It's double-counting all the way.

25 | And for that, Your Honor, I respectfully

1  submit those five points should not be applied.

2      THE COURT:  Mr. McCoy?

3      MR. McCOY:  Yes, Your Honor.  I disagree with

4  the defense attorney, obviously.  It's not one

5  little, itty-bitty difference between the two, and

6  it does take some thinking to see where the

7  distinctions lie here.

8      The five-level assessment that comes in under

9  paragraph 32 relates to Brittany and relates

10  specifically to Count I, the possession of child

11  pornography.  And specifically under that -- under

12  the guidelines for possession of child pornography,

13  there is a provision, 2G2.5 -- or 2G2.2(b)(5) that

14  says if the defendant sexually abused a minor

15  during the course of this, that there's a

16  five-level enhancement that's received for it.  So,

17  the five-level enhancement that's received for 32

18  is based on the fact that he engaged in a pattern

19  of activity with Brittany Miller.  And that pattern

20  of activity, as we heard, is that on at least two

21  occasions he traveled down to Rantoul, got a motel

22  room, met with her and had sex with her and took

23  pictures of it, which he saved to his thumb drive.

24      The enhancement that comes under paragraph 80,

25  I believe -- yes -- is, obviously, an enhancement

143

1    under chapter four, 4B1.5(b)(1) and that's based on

2    something different.  That's based on a pattern of

3    activity related to the other victims in this case.

4         So now in this case you've got not only

5    Brittany, but you've got Josie and Brianna as well,

6    the pattern of activity here being going out,

7    soliciting these girls to take photographs of

8    themselves and send them to him -- photographs

9    displaying the genitalia, of the breasts and, in

10   the case of Brianna, a video of her masturbating

11   that was provided.  So, there's two distinct things

12   here:  An enhancement for where the activity was

13   occurring with Brittany, unique to Brittany related

14   to the possession of the child pornography.  And on

15   the other side you've got the issue of the

16   solicitation from these other girls of child

17   pornography from them as well.  And so two distinct

18   enhancements based on two distinct tracks of

19   conduct that are related to some extent, yes; they

20   stem from the same thing.  But they are two

21   distinct tracks of conduct.

22        And so for that reason, Your Honor, both

23   enhancements are justified and should be in place.

24        MR. TASEFF:  Just a point of clarification for

25   the record.  With Brittany Miller, the

1  Champaign/Rantoul issue, is there evidence in this

2  record that there were two or more sexual

3  encounters with her?

4      That was the point I was trying to make on

5  cross-examination through the report of the agent

6  because the report only referenced one, but the

7  girl said, We went to the motel a couple of times,

8  and didn't elaborate further.  So I guess if we

9  step in and just fill that gaping hole with the

10 supposition that the proof doesn't fulfill, then we

11 can guess that that enhancement applies, according

12 to Government Counsel's theory.

13     MR. McCOY:  I don't believe it's a supposition

14 because I remember standing up after the defense

15 made that and saying, Just to be clear, she said

16 two different events, two different trips to the

17 motel, July of '08 and September of '08, both

18 resulted in sexual conduct because I asked him, At

19 both times did she have sex with him?  Yes.

20     MR. TASEFF:  And I said didn't the report

21 say --

22     THE COURT:  One.

23     MR. TASEFF:  -- one.

24     THE COURT:  Right.

25     MR. TASEFF:  One.  And that's a big -- so this

1  is where it comes to bite, Judge, when we get to

2  these enhancements, is that -- is there indicia of

3  reliability here to find by the preponderance of

4  the evidence two or more sexual encounters that

5  would satisfy that adjustment under 2G, which

6  Mr. McCoy said that's their proof.  Two or more

7  separate hotel rendezvous and romps.

8      And then, okay, with respect to the other two

9  girls, they want an additional five on top of

10 everything else because of this soliciting from the

11 girl the transmittal to Ronald Seiver as opposed to

12 his downloading from other sources.

13     That's where, I respectfully submit, our

14 objections cast great doubt on these adjustments of

15 which the government has the burden of proof to

16 prove by the preponderance of the evidence that

17 these adjustments should apply.  So, can the Court

18 make findings that would support those two

19 predicate tracks of abuse that the government says,

20 according to its theory, is present in this case

21 that awards ten offense level points to be added in

22 this case.

23     THE COURT:  I understand the point you're

24 making, Mr. Taseff.  I did make the finding that

25 the information as it pertained to Brittany was

1  reliable for the purposes of the enhancements.   I
2  referenced the information in the presentence
3  report, referenced the testimony of the detective,
4  and specifically my notes as to that had to do with
5  her statement acknowledging that, as his report
6  indicated, one time, but that her statement was
7  that there were more than -- there were at least
8  two times.  And in the totality of the
9  circumstances, I believe that that information is
10  credible and reliable.
11      So having made that finding then, with regard
12  to the additional five levels for the pattern of
13  activity, I believe as well that that has been
14  established.  The Seventh Circuit has indicated
15  that it's proper if it's been established.  And I
16  will adopt the government and the probation
17  position on that.
18      Okay.  Now, are there any other objections to
19  address?
20      MR. TASEFF:  No.
21      THE COURT:  All right then.  With that in
22  mind, I'm going to take a short break, but let's
23  first establish, given my rulings, the total
24  offense level was 44, the Criminal History Category
25  is I.

1        Parties agree on that, given my rulings?

2        MR. McCOY:  Yes, Your Honor.

3        MR. TASEFF:  Yes.

4        THE COURT:  Okay.  So with that in mind, then,

5   the guideline provisions as to Counts I and II

6   would be -- well, the guideline provision calls for

7   a life sentence.  The maximum, though, by statute

8   is 120 months on Count I and 360 months on Count

9   II, a maximum being 480 months if they're imposed

10  consecutively.  Probation is not authorized.

11  Supervised release period would be for life.  No

12  restitution.  A fine of $25,000 to $500,000.  And a

13  special assessment of $200.

14       Given my rulings, do the parties agree those

15  are the guideline provisions?

16       MR. McCOY:  Yes, Your Honor.

17       MR. TASEFF:  Yes.

18       THE COURT:  All right.  Why don't we take ten

19  minutes?

20       THE CLERK:  Court is in recess.

21       (Recess at 3:10 to 3:22 p.m.)

22       THE COURT:  All right then.  Before we broke,

23  the defense submitted two letters to be attached to

24  the presentence report.  I've received those and

25  read those.

1      Are there any additions from the government to

2  the -- additions or corrections to the presentence

3  investigation report?

4      MR. McCOY:  No, Your Honor.

5      THE COURT:  Are there any additions or

6  corrections to the presentence report from the

7  defense other than the two letters that I received?

8      MR. TASEFF:  No, Your Honor.

9      THE COURT:  Are the parties ready to proceed

10  to sentencing, given my rulings?

11      MR. McCOY:  Yes, Your Honor.

12      MR. TASEFF:  (Counsel nods head.)

13      THE COURT:  Okay.  Any formal evidence in

14  aggravation from the government?

15      MR. McCOY:  None other than what's already

16  been provided, Your Honor, the previous testimony.

17      THE COURT:  Any formal evidence in mitigation

18  from the defense?

19      MR. TASEFF:  No, Your Honor.

20      THE COURT:  Arguments as to sentencing

21  alternatives, then, from the government?

22      MR. McCOY:  Yes, Your Honor.

23      Your Honor, as the Court has outlined, the

24  guideline range for the defendant is 480 months.

25  And as the Court's aware, 18 USC 3553 outlines

1  certain factors that should be considered in
2  imposing a sentence that is just, fair and
3  reasonable.  And that's -- those conditions or
4  those factors are the nature and circumstances of
5  the offense, the history and characteristics of the
6  defendant and the need for the sentence imposed.
7  And under that category, 3553 talks about the need
8  for a sentence that reflects the seriousness of the
9  offense, that promotes respect for the law and that
10 provides just punishment for the offense and also a
11 sentence that deters not just the defendant through
12 specific deterrence but general deterrence as well,
13 keeping others from committing these types of
14 offense -- or deterring others from committing
15 these types of crimes again as well and to protect
16 the public from the defendant.
17     The government believes that taking the
18 factors -- these factors into consideration and the
19 guidelines, a fair, just and reasonable sentence
20 for this defendant is a guideline range sentence of
21 480 months.
22     I'd like to talk about the nature and
23 circumstances of the crimes first.  There are two
24 here.  Obviously, for Count I it's possession of
25 child pornography, and Count II is the sexual

1   exploitation of a child.

2       And I'd like to deal with the possession of

3   child pornography first, Count I, not just because

4   it's Count I but because I think in many ways that

5   crime has been overshadowed, at least here today,

6   by Count II and all the aggravation that surrounds

7   that particular count.  But it is by no means a

8   lesser offense, and the children who are being

9   victimized in those pictures -- including Brittany

10  but the other children as well, many of them

11  anonymous -- are no less real or tragic.  The

12  defendant possessed 119 images of child pornography

13  and 34 video files of child pornography.  And these

14  were images and videos of young girls, young

15  children -- mainly girls, I should say, many

16  prepubescent, being raped, sodomized and

17  brutalized, sexually assaulted at the hands of

18  adults.  Many of these girls are so young that the

19  acts that are being performed on them can be

20  nothing other than physically destructive to their

21  bodies.

22      Many prosecutors at sentencing hearings like

23  this, I know, have made examples of the photographs

24  or the videos.  I can't do that because it's hard

25  to stomach looking at some of this stuff, but I can

just say that the images themselves are tragic, and
what is even more tragic is that by looking for,
downloading and possessing these items, the
defendant continued the victimization of these
children and continues it to this day, the children
who are depicted in these photographs.  It's in
many ways the crime that keeps on giving because
with every download of a picture or a video, the
purpose behind brutalizing these children is
renewed and reinvigorated.  The market for this
filth goes on.  The need for more pictures and more
videos, more children increases.  And it's not an
overstatement, I don't think, or an exaggeration to
say that by downloading and possessing these images
and videos the defendant perpetuated the market for
child pornography.  Thus, he's responsible for the
continuing abuse of these victims and also the new
victims as well.

     The defendant wasn't just a passive consumer
of child pornography.  He was an active participant
in its production as well.  A hunter, if you will,
who trolled the Internet, frequenting teen chat
rooms and other sites like MySpace that are known
to be popular with younger people, looking for his
own girls, young girls who he could manipulate and

1   use to fulfill his sick and depraved sexual needs.

2   And like a good hunter, he camouflaged himself.

3   Just like a hunter, he camouflaged himself and, as

4   you can see in this picture previously admitted as

5   Government Exhibit 1, as a good-looking, 17-,

6   18-year-old boy, basically just enough to get the

7   girls to let their guard down --

8        I don't know if it's on or not.

9        -- just long enough for him to gain access to

10  their chat rooms and their MySpace accounts.  Once

11  he gained access and found his target, he drew them

12  in, sometimes with gifts as in the case of Brittany

13  and Josie, and sometimes with words.  "I love you"

14  means a lot when it's coming from an adult man to a

15  teenage girl.  And when he had them, he preyed on

16  them.  He convinced them to do things which 15-,

17  14-, 13-year-old girls should not be doing.

18       In the case of Brittany, it started off with

19  photos and her partially unclothed and naked body.

20  But the defendant wanted more, and he could get

21  more for no other reason than geography.  He was

22  close to her; she lived only about an hour, hour

23  and a half from where he was living at the time so

24  he drove to her.  And on at least two occasions he

25  got a motel, in July of 2008 and again in September

of 2008, and they met and engaged in sexual
conduct.  Vaginal sex, oral sex.  A 27-year-old man
having sex with a 15-year-old girl in a motel room.
Clearly, not a good scenario.  Clearly, not a good
thing.

But the act itself wasn't enough for him.
Like a hunter, he wanted his trophy.  He wanted
his, his memory of his conquest in this case.  And
so he took pictures and video to memorialize what
he had done, and he saved them to his computer.
And when his computer filled up, he transferred it
to a thumb drive.  Where did he put the thumb
drive?  He slipped it under his mattress, just
where pornography would be expected to be found,
under the mattress.  But on this thumb drive was
not average pornography; it was pornography of
children.  It was pornography of a 15-year-old girl
who he had sexually assaulted.

Included, by the way, with this was a picture
on his thumb drive of her high school I.D. to
further verify the conquest that he acquired.  At
some point, Brittany cut off communication with
him.  She stopped responding to his messages and
calls.  In essence, she took control of the
situation from him.  And perhaps it was the wisdom

154

that comes from turning the ripe old age of 16, but she wanted nothing more to do with the defendant at that point.  And this drove the defendant mad, and he threatened to post some of the nude photographs she previously sent to him online to embarrass her, to convince her to stay with him and to continue to be his pet.

A similar scenario played out with a 14-year-old, Josie from Georgia, except with Josie a personal meeting was obviously not possible, at least not apparently possible, given the fact that she lived in Georgia.  Nevertheless, he convinced her as well to take photographs of her nude body, her breasts, her genitalia and send them to him. Once again he saved them -- another trophy -- on the same thumb drive that he kept Brittany's pictures and on the same thumb drive that he kept his other child pornography.

Then there was Brianna, the 13-year-old girl from Oregon.  13.  He portrayed himself as a good-looking 18-year-old boy, this guy right here on the screen.  Not threatening.  Certainly not a 29-year-old man looking for some cheap thrills and looking to exploit this girl.  He convinced her to take a photograph of her bare chest.  She sent it

to him.  And after he received it, he told her he
wanted more.  He wanted to see more.  She said no.
He threatened to post that image on her MySpace
accounts so her friends and family could see it.
She consented, and then she agreed to go online on
a web cam and masturbate for him, for approximately
20 minutes, inserting her finger into her vagina,
masturbating and doing other things, again, a
13-year-old shouldn't be doing.

       And as the defendant attempted to do with
Brittany, the defendant blackmailed her.  He
blackmailed her to get her to do this by
threatening her to post this.  And that's, that's
particularly evil.  It's particularly sadistic to
do this, to not only get this initial picture from
this girl but then to use that picture to say,
"Give me more."  You heard it from Agent Kaopuiki's
-- Brandon's testimony in regards to the messages
that were sent back and forth.  "I want more.  Give
me more."

       It's a controlling person who seeks out young
women and exploits them for his own sexual thrills,
but these were not just random threats.  Obviously,
the defendant apparently meant what he said.  As I
pointed out previously, this whole case began when

a stepmother in Canada received an e-mail message
with, with attachments -- picture attachments
connected to it via Facebook talking about her
daughter.  These were pictures of her daughter
nude.  And accompanied with this message was -- or
accompanied with these pictures was the message,
"Is JH your daughter?  You need to tell that slut
to stop getting naked on cam on blogTV and on MSN
for ppl.  She also say she had sex over 100 times
since she was nine years old."  This is the message
that accompanied these pictures that were sent out
to this woman.

     Now, the government has no direct evidence of
the connection between this 13-year-old girl and
this defendant other than the fact that the I.P.
address from which this -- these pictures and this
message came from linked right back to the
defendant.  That's why we got the search warrant
and this case actually began.  But I don't think
it's a leap of faith to conclude that he had some
contact with her, that he somehow acquired these
pictures from wherever he'd acquired them from and
that he was using them against her.

     And his excuse that we saw or that was
referenced with the testimony about Vanessa Sotelo

1  and was referenced in the letter that's been
2  admitted as well, that he was doing this to save
3  her, that he somehow was this Robin Hood of the
4  Internet who would go out looking for women on
5  blogTV, young girls who were doing things like this
6  to save them from themselves and report them and
7  get them blocked so that they wouldn't do this
8  anymore.  That excuse is baloney.  Absolutely
9  ridiculous.
10      A concerned citizen.  A concerned citizen who
11  sends a message to the stepmother, and the message
12  starts out with, You need to tell your slut
13  daughter X, Y and Z.  That's the conduct of a
14  concerned citizen?
15      So, these are the nature and circumstances of
16  these offenses.  Serious crimes that require a
17  serious sentence.  But we can't stop there because
18  there is, as in every case but particularly in this
19  case, a concern about deterrence.
20      Congress, the Supreme Court and the Sentencing
21  Commission believe deterrence is a very important
22  factor when dealing with crimes like this,
23  obviously.  Specific deterrence and convincing the
24  defendant never again to engage in this type of
25  behavior, but also general deterrence as well in

1   convincing those individuals like the defendant who

2   share a similarly sick and morbid fascination with

3   young girls not to do this and not to exploit young

4   children.

5       One would expect that the simple act of being

6   arrested, charged with a felony in federal court,

7   admitting guilt and facing at a minimum 15 years in

8   prison would convince or at least deter the average

9   man from engaging in conduct even remotely similar

10  to what led to this whole mess in the first place.

11  But it didn't for this defendant, and that's

12  particularly aggravating here.  It didn't for this

13  defendant.  For even after he was arrested, charged

14  and pled guilty for these crimes, the defendant

15  continued to reach out to 15-, 14-, 16-year-old

16  girls from his jail cell and engaged with them in

17  what can only be described at the very least as

18  inappropriate conduct.  We heard some of it on

19  these recordings.  Talking about sex, talking about

20  the size of breasts, talking about what they --

21  what he wanted to do or whether they could handle

22  him or she could handle -- or he can handle her.

23  Inappropriate conversations.  And where is he

24  making these telephone calls from?  He's making

25  them from jail, from a jail phone.  32 calls to the

girl in Florida over the span of nine, ten months.
15 calls to the girl in Massachusetts.  In the case
of the girl in Florida, 15-, 16-year-old girl.  In
the case of the girl in Massachusetts, a
14-year-old girl.

    And not just that, not just getting involved
in sexual conversations with them but also, in the
case of the girl from Massachusetts, in the case of
Morgan, getting her to break into Josie Little's
online accounts to see what she's up to because he
was -- he was upset that she wasn't responding to
him.  He was upset that she wasn't reaching out to
him in jail.  He loved her; I have no doubt of
that.  It's clear from his conversations with
Rebecca, from these letters that he loved this
girl.  And she shut the door, and he was furious.
So he's having a 14-year-old girl break into her
blogTV account, to break into her MSN account as
well in order to see what she's up to.

    I can only -- I have very limited experience
as an AUSA and as a prosecutor, but I can't believe
this case.  I can't believe the gall of the
defendant to do something like this.  I can't.  It
is galling.  It's aggravating to the government;
I'm assuming it's aggravating to the Court as well.

1  This is how much this defendant apparently is
2  capable of being deterred, what happened the last
3  five, six months.  That's how much he's capable of
4  being deterred.  This is how much the defendant
5  respects this Court, that even after admitting
6  guilt in this court he continues the same activity,
7  the same type of conduct, talking to adolescent
8  girls about sex.  I don't know what he's blinded
9  by, but the defendant is obviously blinded, Your
10  Honor.  And the government believes that the only
11  thing that is going to get him to see the light, if
12  anything, to deter him from doing anything like
13  this again is a lengthy prison term.  But I'm not
14  sure he can be deterred, quite frankly.

15      And I guess that leads to the next sentencing
16  factor and that is the need for the sentence
17  imposed to protect the public from further crimes
18  of the defendant.  Criminal incapacitation, Your
19  Honor, through incarceration is a perfectly
20  legitimate and worthwhile goal of a sentence.  And
21  where a defendant like this defendant shows little
22  sign of being deterred, the best way to protect the
23  public from further crimes is by keeping him away,
24  locked away.  If keeping him behind bars does not
25  curb his behavior, then what does that say about

1 | what will happen when he gets out?  I don't know.

2 | But what I do know is that for the sake of

3 | protecting the public from further crimes from this

4 | defendant, he should be removed from the public for

5 | a significant amount of time, in this case 480

6 | months.

7 | There is a seemingly innocuous statement the

8 | defendant makes to Rebecca in one of his jailhouse

9 | calls to her.  And mind you, at the time Rebecca

10 | had just turned 16 years of age.  This is, I

11 | believe, Government Exhibit 5 or 7.  The defendant

12 | was, at the time, 30 years old.  They were having a

13 | conversation that was sexual in nature.  If I can

14 | relay some of it, Rebecca says to him, You can't

15 | handle me.

16 | The defendant replies back, You can't handle

17 | me.

18 | Rebecca says, Why are we even talking about it

19 | if you're in jail anyways?

20 | And the defendant responds, I'm not going to

21 | be in jail forever.

22 | She says, Whatever.  Whatever.

23 | And he responds, No, I'm not going to be in

24 | jail forever.

25 | He's not going to be in jail forever, and it's

1   not an option here, and the government's not asking

2   for that.  What we are asking for is a sentence,

3   though, that is not only in line with the guideline

4   but is just and reasonable given all of this, the

5   crimes he committed, the girls he victimized, the

6   conduct he continued to participate in even behind

7   bars.  We strongly recommend and request a sentence

8   of 480 months, Your Honor.  Such a sentence is

9   just, it is fair, and it is reasonable, and the

10  government believes it is necessary to deter the

11  defendant and others, to protect the public from

12  further crimes from him, and to punish him

13  adequately for what he has done.

14       Thank you.

15       THE COURT:  Thank you, Mr. McCoy.

16       Mr. Taseff?

17       MR. TASEFF:  3553(a) provides that the Court

18  shall, on consideration of the sentencing factors,

19  impose a sentence that is sufficient but not

20  greater than necessary to comply with the purposes

21  set forth in subsection (a)(2) -- that is, just

22  punishment, deterrence, protection of the public

23  and rehabilitation of the defendant.

24       Mr. McCoy says that he's had limited

25  experience; I know he and I have had a lot of

experience the last year and a half since he's been
assigned to our district and he and I have done
cases.  He's a very passionate advocate who
believes strongly in the righteousness of the
government's cause.  But to ask this Court to
impose -- and correct me if I'm wrong because I'm
mathematically challenged.  To my knowledge, 480
months converts to 40 years of imprisonment.  And
I've been with the Federal Public Defenders now
since 1995, and I've seen the politicization of the
federal justice system from war on drugs, to war on
guns, to war against illegal aliens to now the war
against child pornographers.  Every time we hear
sentencing orations such as this that basically ask
the Court to send forth a message, I respectfully
submit that justice requires fair consideration of
the individual defendant and that emotion or
personal opinions shouldn't have anything
whatsoever to do with this very solemn and serious
proceeding.

    480 months.  I don't know of any sentence ever
handed down by a federal judge in this district.  I
have a client of mine named Albert Jackson who got
480 months, who appeared to be the largest crack
cocaine dealer who ever sold crack over a 12-year

period of a historical conspiracy and had four
prior felony drug convictions on top of it.  Judge
Mills threw the book at him.  But 480 months of
imprisonment for Ronald Seiver who, at age 30, has
never been convicted of any criminal offense --
felony, misdemeanor, petty offense, to my knowledge
not even a traffic ticket.  Ronald Seiver, who's
never been in trouble as a juvenile ever.  A high
school graduate, some college, a work history, a
loving family, the father of two children with a
woman in Canada whom he will never see for the rest
of his life.  What we're talking about is a
two-year -- two- to three-year slice of this man's
life where he engaged in conduct that puts him
before a federal court today facing these kinds of
astronomical sentencing ranges.  I've never seen a
case, of all the child porn cases I've done, with a
sentencing range this high.

     What did he do?  Did he kill people?  Were
these forcible rapes?  I read about cases in Peoria
County Circuit Court involving abductions,
horrific, violent, sexual offenses that result in
lengthy prison sentences.  But 40 years at 85
percent for a case on these facts?

     Mr. McCoy, when you talk about telling

1  statements, at one point in responding to one of my

2  objections, "This isn't a trial," and that's

3  probably the only thing I can agree with Government

4  Counsel on this.  Let's step back and look at the

5  presentence report and see how Mr. Seiver got here.

6      Count I, possession of child pornography.  The

7  thumb drive that was seized from his home is the

8  basis for Count I where there's three images of

9  this girl from Georgia and a bunch of other stuff

10  that is freely available on the Internet to those

11  who would download it for whatever reason.  But

12  even Your Honor knows the number of images here,

13  119, some 30 videos, we've seen cases where there's

14  triple that, quadruple that, ten times that, and

15  sentencing ranges don't come in.

16      But what's Count II about?  It's the Brittany

17  Miller episode, production of child pornography.

18  He engaged in consensual sexual activity.  There's

19  no force here.  There's no knife to the throat.

20  There's no abduction.  The two of them meet at a

21  hotel room in Urbana, and he videotapes it and,

22  therefore, is on the hook for a 15-year minimum

23  sentence.  So months after he's indicted and pled

24  guilty to those two counts, now we've spent an

25  entire day; we might as well call it a trial after

1   all we've heard.  Witnesses flown in from all over
2   the country, heightened standards.  No, we've never
3   been charged with these episodes.  Ronald Seiver
4   has never been charged, has never faced his
5   accuser, has never had the Rules of Evidence
6   available to challenge the evidence in aggravation
7   that we've heard this entire day so that those
8   adjustments fuel the guideline to such an
9   unreasonable basis.
10       I respectfully submit, Judge, that that kind
11   of sentencing range does not offer deterrence.  I
12   think it actually disrespects the law because
13   you've got to think, if this is the kind of
14   sentence that's going to be imposed for this kind
15   of case, then he's got to be the worst of the
16   worst.  And that just isn't the case.  That ain't
17   the case.  I'm not going to pit one client after
18   another, but I've been around long enough, there's
19   a slew of cases you can find in the Federal
20   Reporter about cases that make this pale in
21   comparison in terms of seriousness, in terms of
22   actual harm, in terms of aggravated conduct.
23       And I'm not trying to demean or in any way
24   disparage the significance of this case or the
25   seriousness of this proceeding, but for a man who's

1    never been found guilty or ever committed any other

2    crime besides that which now brings him to court

3    and to suggest that 480 months, 360 months, I mean,

4    how many months will send the message?

5        Congress set a 15-year minimum for Count II,

6    is what the Court has to begin the sentencing

7    process.  But within that the Court should consider

8    the nature and circumstances of the crime as well

9    as Mr. Seiver's history and characteristics.  The

10   guidelines are but one factor amongst many within

11   the statute.  And what we see even post-Booker,

12   Your Honor, is the kind of argument we've heard

13   today that somehow the guidelines are the

14   predominant authority that the Court should wed

15   itself to in fashioning an appropriate sentence.

16   And if Booker stands for anything, it's that

17   federal courts should individualize and tailor the

18   sentence from the totality of factors set forth in

19   3553 with the guidelines as one factor.

20       Although the Seventh Circuit says that the

21   child pornography guidelines may be legal, the

22   Court still has the discretion to impose a sentence

23   to the individual based upon a policy disagreement

24   the Court may have with how those guidelines are

25   promulgated and how they apply it.  Just as Chief

1  Judge McCuskey said in the case that's cited in our
2  sentencing memorandum, that it -- those guidelines
3  will drive the sentencing range to the statutory
4  maximum in almost every single case.  So what
5  deterrence is there towards the most heinous
6  offender if everybody's getting walloped to the
7  statutory maximum?

8      I mean, I would hope that in federal court we
9  still retain some common sense and mercy and
10 compassion to send a message that the law is
11 tempered with a steady hand, not a sledgehammer.
12 And the recommendation made by the government today
13 is nothing but a sledgehammer towards one offender
14 who has already accepted responsibility, stands
15 before this Court and, as will say to the Court, I
16 respectfully hope or submit, all we're asking for
17 is fairness and not being whipped into some kind of
18 emotional frenzy that we've got to pop him so hard
19 to send this message out from this courtroom that
20 all child pornography defendants get blasted by the
21 statutory max.

22     This young man does not stand before this
23 Court with prior sex-related convictions for which
24 he was punished by the system and put on official
25 notice.  This defendant doesn't have a lengthy

1  history of violating the law and harming other

2  people.  This defendant, for almost all of his

3  life, 30 years -- let's take the last three -- for

4  90 percent of his life has been a law-abiding

5  citizen, a son who's loved by his parents who are

6  here in court, a young man who tries to keep in

7  touch with his children in Canada, a young man who

8  will admit that he has made many, many serious

9  mistakes and lapses in judgment.

10      I agree with Mr. McCoy to this extent:

11  There's a lot of these cases -- a lot of things

12  about them that I don't understand either.  And

13  when I think I understand human nature, I realize

14  that I don't understand it much at all.  After 30

15  years of practicing criminal law in the state and

16  federal courts, you think you've seen it all.  You

17  haven't seen the next case.

18      So, I've never seen a case involving the kinds

19  of communications that we've seen in this instance.

20  I've had some crazy ones, as Government Counsel

21  knows from other cases we've had where clients were

22  threatening witnesses and that out of county jails

23  and that, but this is kind of bizarre in that

24  respect.  But is this the kind of aggravation that

25  warrants the kind of enhanced sentence that we see

and what we're hearing from Government Counsel?    I
say no.   No, it's not.

     So, taking these 3553 factors into
consideration, looking at the big picture, looking
at Mr. Seiver's life as a whole and not just for
the last year or two, I respectfully submit that a
sentence on Count II of 15 years mandatory minimum
is sufficient but not greater than necessary to
achieve deterrence, to achieve just punishment, to
allow him to get rehabilitation and to serve the
ends of justice.

     Count I, ten years, to run concurrent with
Count II.   The law requires, as I understand it,
mandatory lifetime supervision.   The law will
require lifetime sexual registration.   Mr. Seiver's
not going to walk out of prison, whenever that may
be, and not have to register with local law
enforcement.   He's not going to be able to move or
go wherever he wants because he will have a
lifetime tether with the probation office and not
be able to move without notifying them and get
permission.   There are collateral consequences to
these convictions that will, indeed, last a
lifetime, that will probably foreclose any area of
gainful employment for him, that will bar him

1  ultimately from having any contact with his

2  children until they reach the age of majority.

3  There are punishments that come with this kind of

4  offense, Your Honor, that are just as severe as

5  periods of incarceration as far as I'm concerned.

6  And, quite frankly, Ronald Seiver is only asking to

7  be treated fairly today, impartially and justly.

8      And in that regard, I respectfully submit a

9  sentence that is at or near that mandatory minimum

10 is sufficient for a 30-year-old man who's never

11 been convicted of any crime in his life.

12     Other recommendations, Judge:  We ask that

13 Mr. Seiver -- the Court recommend to the Bureau of

14 Prisons that he be housed in the least secure

15 facility closest to his family.  We would recommend

16 FCI Pekin so that he can have contact with his

17 mother and father in the years ahead.

18     We also ask that the Court direct the

19 government to return to him all non-contraband

20 items that were seized from their home.  He tells

21 me that there are papers that his mother needs that

22 reference his children in Canada.  Why the

23 government needs that I don't know, but these are

24 things that, I respectfully submit, ought to be

25 returned to the parents so that they can make use

1   of those materials.  Not disks, not computer

2   whatever.  They've had these materials for a long

3   period of time now.  They know what evidence is

4   there and what stuff is of no evidentiary value, so

5   we ask that the Court order the return of that

6   property to Mr. Seiver's parents.

7        THE COURT:  Before I ask Mr. Seiver if he has

8   anything to say, I have two questions.  The first

9   is what about that request about non-contraband

10   materials?

11        MR. McCOY:  Your Honor, I'd have to speak with

12   the case agent.  I wasn't aware that anything

13   existed, but I don't see why we can't return

14   anything at this point that's not related.

15        THE COURT:  Okay.  And second of all, what

16   about the language in 5G1.2(d), "If the sentence

17   imposed" -- because as I'm understanding this, the

18   guidelines, given my rulings, call for a life

19   sentence, 44, Category I.  Right?

20        MR. TASEFF:  Yes.

21        THE COURT:  Okay.  The maximum, by statute,

22   wouldn't be a life sentence.

23        MR. TASEFF:  That's correct.

24        THE COURT:  (d), in 5G1.2 says, "If the

25   sentence imposed on the count carrying the highest

1   statutory maximum" -- that would be Count II -- "is
2   less than the total punishment" -- is the total
3   punishment under the guidelines life -- "then the
4   sentence imposed on one or more of the other counts
5   shall run" -- shall run -- "consecutively, but only
6   to the extent necessary to produce a combined
7   sentence equal to the total punishment."

8        MR. TASEFF:  Post-Booker, the guidelines are
9   unconstitutional for any mandatory purpose so I
10  respectfully disagree on policy grounds for that
11  reason.  There's no sense in imposing that kind of
12  punishment.

13       THE COURT:  I understand.  I'm just saying.  I
14  just want us all to be on the same page here, on
15  the arguments.

16       But -- so if I want to follow this, I have the
17  authority to do so.  If I want to depart or vary --
18  let's use the word "vary," then I would do that
19  pursuant to 3553.  Agreed?

20       MR. TASEFF:  Yes.

21       MR. McCOY:  Yes.

22       THE COURT:  Okay.  Mr. Seiver, at this time
23  you have an opportunity to make a statement if you
24  wish.  You can do so from there, you can stand at
25  the podium, however you wish.

1          THE DEFENDANT:  Your Honor, I really don't
2    know where to start actually.  I mean, after going
3    through all this today, I had, you know, all this
4    written out, you know, beforehand.  I put a lot of
5    thought into it, a lot of time into it.  It's not
6    going to cover everything today.  I'm still going
7    to read the statement.  I hope it covers, you know,
8    and it conveys, you know, how sorry I am and, you
9    know, the regret and remorse I have for all this.

10         So, I'm scared to death so please bear with
11   me.

12         In February 2008 my life completely changed.
13   A nine-year relationship I was in ended.  I lost
14   everything I owned and, most importantly, I lost my
15   two children, not knowing if I would ever see them
16   again.  I was totally devastated.  It left a huge
17   void inside me that I had no idea how to fill that
18   still exists to this day.  Unfortunately, at that
19   time I turned to the Internet and an online video
20   game called World of Warcraft.

21         About a month later, I met a girl on there.
22   And I never took it seriously at first.  And she
23   was just another person playing the game.  As we
24   played together and talked more and more, it
25   started becoming much more than that, and we went

from playing the game together to texting and
talking on the phone.  As we grew closer, it felt
like someone cared about me and that I was starting
to recapture some of what I had lost, and it felt
good.  You know, the relationship lasted until
around the middle of October.  I went to see her
twice, once in July, once in September.  But
anyway, as I look back on all of that and think
about everything that happened, I wish I could
change every single bit of that.  You know, I wish
none of it had ever happened.  I wish I had never
met her.

     And I realize at that point in my life I would
have turned to anyone to try and fill that void.
It just happened to be her, and for that I'm sorry.
It's something I've regretted and will regret for
the rest of my life.  You know, I made a mistake,
and I know that, but I hope you see I'm not really
a bad person, even though it feels like today I'm
being portrayed as some sort of monster.

     You know, I've never been arrested in my life
before this.  I've always tried to be there for my
family and friends whenever they needed me.  I love
my two kids, and I try to be a good father to them
and do everything I can for them, you know, even

though they're so far away and I'm going through
all this.

You know, I did send that message to that
girl's stepmother on Facebook.  I won't deny that.
I will apologize for the crudeness of the message I
sent and subjecting her to the pictures that I --
that went along with the message, but it wasn't my
intention to hurt her in any way.  You know, even
if it hurts me here today, I can't apologize for my
intention.  What that girl was doing was wrong, and
she, she needed to be stopped from what she was
doing.  And that was my intention, nothing more
than that.

But like I said, I made a mistake; I will be
the first to admit it.  It was a mistake I made at
the lowest point in my life, and it has cost me
everything.  I'm going to lose years of my life to
being in prison, and the hopes and dreams I had
will go unfulfilled, like going back to college and
getting a degree, going back out on my own, even
getting married one day.

I've let down everyone who loves me and cares
about me -- my family, my friends and especially my
kids who now have to grow up without me being there
with them because I'll never get to see them again.

I miss them both very much.

I hope one day all of them can forgive me for putting them through all this grief and stress. And I can't apologize to them enough, but I also can't thank them enough for all their support that they've shown me through all of this.

As I stand before you here today, I want you to know the crimes I'm being convicted of weren't an act of perversion, nor were they committed by some predator.  It was a mistake.  It was a misjudgment of the heart -- of my heart.  I was lost mentally and emotionally, and I let my emotions get the best of me.  I wish I could erase it all and have the last three and a half years of my life back.  As much as I want that, I know it won't happen.

Now I'm scared because I don't know what's going to happen.  I'm scared to go to prison.  And I'm scared because I don't know what kind of person prison will turn me into.

You know, I'm scared for my family because I won't be there for them.  I'm scared for my kids because they have to grow up without me being in their lives.  And they need me; they need their father there with them, especially now with what my

1   son is going through.

2       I accept full responsibility for my actions.

3   And as much as it hurts, I must accept the

4   consequences also.  I'm sorry for all of this.  I'm

5   very, very sorry.  I wish none of this had ever

6   happened, but all I want to do now is move on with

7   my life, learn from my mistakes, and make sure I

8   never repeat them.

9       Thank you.

10      THE COURT:  Mr. Seiver, just so I'm clear in

11  what you said, you started off by saying that after

12  your nine-year relationship ended that -- in

13  February of 2008, that a month later you met a

14  girl, didn't take it seriously at first, but then

15  it became more and it lasted until October 2008.

16  And then you made reference to somebody who needed

17  to stop doing what she's doing.  So who is that

18  person that you're referring to in -- from March to

19  October 2008?

20      THE DEFENDANT:  That would be Brittany Miller.

21      THE COURT:  Okay.  So then the other person

22  that you referred to that needed to be stopped from

23  doing what she was doing, that was the incident in

24  Canada?

25      THE DEFENDANT:  Yes, it was.

1          THE COURT:  In January of 2010?

2          THE DEFENDANT:  Around that time, I think.

3          THE COURT:  Okay.

4          MR. TASEFF:  That precipitated the search

5     warrant, Judge.

6          THE COURT:  Right.  I just wanted to make sure

7     that I know who he was talking about.

8          Okay.  Go ahead.  I didn't mean to interrupt

9     you, if there's anything more you want to say.

10          THE DEFENDANT:  No, there's nothing more.

11     Thank you.

12          THE COURT:  All right.  All right then.  I've

13     made a lot of notes as we've gone along here.  I'm

14     prepared to pronounce sentence at this time.

15          Having considered the presentence report,

16     which was prepared by Probation, gone through the

17     objections, resolved those or made rulings on those

18     which then led us to calculate the sentencing

19     guidelines as part of the probation report, I've

20     reviewed the defendant's and the government's

21     commentary on sentencing factors, the letters that

22     were submitted, the arguments of counsel and your

23     statement, Mr. Seiver, all the factors of 3553

24     which have been referenced which I will address

25     shortly, let me say that my observations of this

1  are as follows:

2       Your conduct, I think, can accurately be

3  summed up by stating that you met girls online, you

4  befriended them, you managed to convince them to

5  engage in conversation with you, take photographs

6  or video of themselves naked and I believe, as

7  testified to, threatened to expose them to others

8  if they didn't continue to play along, and

9  convinced at least one of them to have sexual

10 intercourse with you and at least three others to

11 engage in sexual conduct for you.

12      That led me to search a couple of words that

13 came to mind when I read them.  The first one --

14 and both of these as defined in the dictionary --

15 "Predator," An animal that preys on others for

16 one's own gain.  And "Despicable" is defined as so

17 upsetting to arouse moral indignation.  I believe

18 that accurately portrays your actions in this case.

19      Now, having said that and having listened to

20 Mr. Taseff, I want to be very clear here and make

21 no mistake that this sentencing, in my mind, is

22 individual to you and specific to you and the facts

23 of this case and is not solely to send a message.

24 But I will also acknowledge in Mr. Taseff's

25 arguments, to his credit -- and unfortunately for

1  him -- that you didn't give him much to work with
2  here, not because of your actions that led to this
3  charge and the plea, although that would -- were
4  significant in and of themselves, but Mr. Taseff
5  made an argument for the 15-year minimum as to
6  Count II and for that sentence to run concurrent
7  with the sentence imposed in Count I and that way
8  your sentence would be 15 years.  And, frankly,
9  that argument might have had more merit but for
10  your continuing conduct after the plea.  And that's
11  when I -- that's what I mean when I say you didn't
12  give Mr. Taseff much to work with here.
13      After the plea, you continued to make contact
14  with teenage girls from the jail cell.  Before the
15  plea, it might be argued that your computer was
16  your weapon of choice to manipulate young people,
17  but your conduct after the plea indicates
18  otherwise.  It became clear that you're perfectly
19  capable of manipulating and exploiting or
20  attempting to do so by your own means or any other
21  means that you could find ways to do so.
22      Now, it is my practice normally to explain to
23  defendants the specific reasons for my sentence,
24  not so that you will agree with it but so that you
25  understand why I impose a particular sentence in a

1 particular case.  In this case, though, I do

2 believe the record is so clear as to the nature and

3 circumstances of the offense as well as your

4 history and characteristics, which I do consider

5 the 26 years of non-criminal activity but also the

6 last couple of years of criminal activity and the

7 type of criminal activity and the need for the

8 sentence imposed to reflect the seriousness of the

9 offense, promote respect for law, provide just

10 punishment, but more significantly -- and not so

11 much to afford adequate deterrence because I

12 personally don't believe people that are in your

13 position or that are dealing drugs on street

14 corners or whatever the crime may be pick up the

15 newspaper and see what I've done or what somebody

16 else has done and say, "Oh, my gosh, I better not

17 do that," but I do believe that (C) applies in many

18 instances and specifically this one to protect the

19 public from further crimes of the defendant and, in

20 this case, you.

21       Now, are you -- were you going to go out and

22 commit more crime?  You were committing it from

23 your jail cell for criminy sakes or adding to it.

24 So, I don't believe any further explanation is

25 necessary under these circumstances than to say

1    that I don't believe you should see many days in

2    your lifetime outside of the prison system.  The

3    disturbing part of that is that the taxpayers will

4    be on the hook for your care and housing for many

5    years to come, but in my mind that is a small price

6    to pay to protect teenagers from further contact

7    with you.

8        The Seventh Circuit has indicated that -- and

9    more than once -- that child pornography crimes are

10   aimed at eliminating the market demand.  I would

11   simply say that I can't protect all teenagers from

12   others like you, but today at least I can protect

13   all teenagers for quite some time from any further

14   contact with you.

15       With that in mind and pursuant to the

16   Sentencing Reform Act, I hereby commit you on

17   Count I for a period of 120 months to the Bureau of

18   Prisons and on Count II to a period of 300 months,

19   and I believe those should be served consecutively.

20       Pursuant to 5G1.2(d), I find you do not have

21   the ability to pay a fine; no fine is imposed.

22       Following your release from custody you shall

23   serve a lifetime term of supervised release on each

24   count; those will run concurrent.  Within 72 hours

25   of your release from custody from the Bureau of

1    Prisons, you shall report in person to the

2    probation office in the district to which you are

3    released.

4        While on supervised release, not commit

5    another federal, state or local crime.  Not possess

6    a controlled substance.  Submit to drug tests as

7    directed.  Cooperate in the collection of DNA.

8        Furthermore, refrain from any use of alcohol

9    and not purchase, possess, use, distribute or

10   administer any controlled substance or any

11   paraphernalia related to it except as prescribed by

12   a physician.  You shall, at the direction of the

13   probation officer, participate in a program of

14   substance abuse as directed and pay for those

15   services.  You shall not own, purchase or possess a

16   firearm, ammunition or other dangerous weapon.

17       Participate with U.S. probation Internet

18   monitoring during the term of your supervision and

19   that monitoring will begin as soon as possible

20   after your supervision begins.

21       During this time install filtering software on

22   any computer you possess or use which will monitor

23   or block access to sexually-oriented websites and

24   allow Probation unannounced access to any computer

25   software or verification of any filtering software.

1   You can pay for that yourself.

2        Submit to the search of your person,

3   automobile and property as directed by Probation

4   and allow Probation to conduct periodic,

5   unannounced examinations of anything within your

6   household and examinations of computer equipment,

7   Internet-capable devices and all related items.

8        No contact with any person under the age of 18

9   except in the presence of a responsible adult who

10  is aware of the nature of your background and the

11  offense and has been approved by Probation.  Not

12  receive or transmit any sexually-arousing material,

13  including child pornography, via the Internet, nor

14  visit any website that contains any

15  sexually-arousing material, including child

16  pornography.

17       Register with the state sex offender

18  registration agency in any state where you are --

19  reside, employed, work or a student or as directed.

20  Participate in any sex offender treatment as deemed

21  necessary and pay for that.  Neither possess nor

22  have under your control any material, legal or

23  illegal, that contains nudity or that depicts or

24  alludes to the sexual activity or sexually-arousing

25  material.

1        A special assessment of $200 is imposed.

2        It's recommended you serve your sentence in a

3   facility as close to your family in Roseville and

4   that you serve your sentence in a facility that

5   will allow you to participate in the sex offender

6   treatment program and/or other mental health

7   treatment programs and maximize your exposure to

8   educational and vocational opportunities.

9        That sentence is, then, a total of 420 months.

10       Is there anything else that needs to be

11  addressed before appeal rights?

12       MR. McCOY:  Not from the government, Your

13  Honor.

14       MR. TASEFF:  No.

15       THE COURT:  Okay.  You have a right to appeal.

16  This was a blind plea.  You have already

17  established a notice to appeal as it pertains to

18  the motion, but as to any other appealable issues,

19  including the conviction and sentencing and my

20  rulings on the -- at the hearing today, you have 14

21  days to file a notice of appeal or ask Mr. Taseff

22  to do so on your behalf.

23       Anything else?

24       MR. McCOY:  No.  No, Your Honor.

25       MR. TASEFF:  No.

1      THE COURT:  All right.  We'll be in recess.

2      THE CLERK:  Court is adjourned.

3      THE COURT:  Let me go back on the record to

4  make one statement that I believe the sentence is

5  sufficient but not greater than necessary to comply

6  with the purposes of the Act.

7      Thank you.

8      (Proceedings concluded at 4:13 p.m.)

9

10                    CERTIFICATE

11

12

13

14     I, JENNIFER E. JOHNSON, CSR, RMR, CBC, CRR,
   certify that the foregoing transcript constitutes a
15  true and accurate transcript of the original
   shorthand notes of the proceedings had at the time
16  and place aforesaid before the HONORABLE JAMES E.
   SHADID, U.S. District Judge.

17

18                         s/ Jennifer E. Johnson
19                         JENNIFER E. JOHNSON
                           CSR, RMR, CBC, CRR
20                         License #084-003039

21

22

23

24

25